**Jeffrey M. Edelson, OSB #88040**
JeffEdelson@MHGM.com
MARKOWITZ, HERBOLD, GLADE
& MEHLHAF, P.C.
Suite 3000 Pacwest Center
1211 SW Fifth Avenue
Portland, OR  97204
Tel:  (503) 295-3085
Fax:  (503) 323-9105

**Phyllis B. Sumner** (*Admitted Pro Hac Vice*)
**Lewis P. Perling** (*Admitted Pro Hac Vice*)
**Ian E. Smith** (*Admitted Pro Hac Vice*)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel:  (404) 572-4600
Fax: (404) 572-5100

*Attorneys for Defendant Equifax*
*Information Services LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| JULIE MILLER, | Case No.: 3:11-CV-01231-BR |
| Plaintiff, | |
| v. | **Defendant Equifax Information Services LLC's** |
| EQUIFAX INFORMATION SERVICES LLC, | **MEMORANDUM IN SUPPORT OF ITS MOTION TO LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT, EVAN HENDRICKS** |
| Defendant. | |

Defendant Equifax Information Services LLC ("Equifax") submits this Memorandum in Support of its Motion to Limit the Testimony of Plaintiff's Expert, Evan Hendricks ("Hendricks").  For the reasons set forth below, Equifax's Motion should be granted and Hendricks' testimony restricted.

i

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

ARGUMENT ......................................................................................................2

I.    Hendricks Is Unqualified To Provide Many Of His Proposed Opinions.......................3

    A.    Hendricks Is Not Qualified To Testify Regarding Equifax's Procedures Because He Has No Relevant Experience. ................................................3

    B.    Hendricks Is Not Qualified To Testify Regarding Legal Issues. ...........7

    C.    Hendricks Is Not Qualified To Testify Regarding Plaintiff's Damages.................9

II.   HENDRICKS' Opinions Based On INCORRECT or insufficient Facts Should Be Excluded. ......................................................................................10

    A.    Opinions Derived From Demonstrably Incorrect Facts Should Be Excluded...........................................................................11

    B.    Opinions That Make Unwarranted Assumptions And Vague Assertions Should Be Excluded. ........................................................14

III.  Opinions That Do Not Require Specialized Knowledge Should Be Excluded. .............15

    A.    Descriptions Of Uncomplicated Facts And "Common Sense" Inferences Should Be Excluded. .............................................................16

    B.    Hendricks' Subjective Opinions, Invective Characterizations, And Speculation Are Not Helpful To The Jury...................................18

IV.   Irrelevant Opinions And Those More Prejudicial Than Probative Should Not Be Admitted. .....................................................................................20

    A.    Proposed Testimony Regarding Old Agreements And Past Cases Is Irrelevant and Highly Prejudicial. .............................................21

        1.    Hendricks Should Not Be Allowed To Testify Regarding Agreements Entered Into By Equifax In The Early 1990s....................21

        2.    Hendricks' Discussions Of Past Cases Involving Equifax Should Not Be Allowed. ........................................................22

    B.    Opinions That Include Inflammatory Language Are More Prejudicial Than Probative And Should Not Be Admitted................................23

CONCLUSION .....................................................................................24

**CERTIFICATE OF COMPLIANCE** ......................................................................**25**

**ATTORNEY CERTIFICATE OF SERVICE**...........................................................**26**

**Equifax's Memorandum in Support of
Motion to Limit Expert Testimony**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrews v. Metro North Commuter R. Co.*,
   882 F.2d 705 (2d Cir. 1989).................................................................................17

*Andrews v. Trans Union Corp., Inc.*,
   No. 2:96-CV-7369-LGB-VBK (C.D. Cal. July 9, 1998)...........................................6

*Arjangrad v. JPMorgan Chase Bank, N.A.*,
   No. 3:10-cv-01157-PK, 2012 WL 1890372 (D. Or. May 23, 2012) .............6, 7, 16-17, 18-19

*AstraZeneca LP v. Tap Pharm. Prods., Inc.*,
   444 F. Supp. 2d 278 (D. Del. 2006)........................................................................20

*Barabin v. Asten Johnson, Inc.*,
   700 F.3d 428 (9th Cir. 2012) ...................................................................................2

*Baumann v. Am. Family Mut. Ins. Co.*,
   836 F. Supp. 2 1196, 1203 (D. Colo. 2011)...................................................... 23-24

*Berry v. City of Detroit*,
   25 F.3d 1342 (6th Cir. 1994) .................................................................................10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)........................................................................................ 10-11

*City of Grass Valley v. Newmont Mining Corp.*,
   2008 WL 544388 (E.D. Cal. Feb. 26, 2008)..........................................................16

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
   158 F.3d 548 (11th Cir. 1998) ...............................................................................20

*Crow Tribe of Indians v. Racicot*,
   87 F.3d 1039 (9th Cir. 1996) ...................................................................................7

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...........................................................................2, 3, 18, 19

*Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*,
   43 F.3d 1311 (9th Cir. 1995) .................................................................................11

*DePaepe v. General Motors Corp.*,
   141 F.3d 715 (7th Cir. 1998) .................................................................................19

*Equifax v. FTC,*
    678 F.2d 1047 (11th Cir. 1982) ........................................................8

*General Electric v. Joiner,*
    522 U.S. 136 (1997)...................................................................10

*Guidroz-Brault v. Missouri Pacific RR Co.,*
    254 F.3d 825 (9th Cir. 2001) ....................................................17, 18

*Guimond v. Trans Union Credit Info. Co.,*
    45 F.3d 1329 (9th Cir. 1995) ........................................................14

*Harris v. Equifax Credit Info. Servs., Inc.,*
    No. CV-O1-1728-HA (D. Or. June 29, 2005) ...................................6

*Havenfield Corp. v. H&R Block, Inc.,*
    509 F.2d 1263 (8th Cir. 1975) ........................................................4

*In re Air Crash Disaster at New Orleans, LA,*
    795 F.2d 1230 (5th Cir. 1982) ........................................................9

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999) ......................................................22

*In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).........................................19-20

*In re Xerox Corp. Securities Litig.,*
    746 F. Supp. 2d 402 (D. Conn. 2010) ...........................................20

*Jinro Am. Inc. v. Secure Invs., Inc.,*
    266 F.3d 993 (9th Cir. 2001) ..........................................................4

*Kramas v. Security Gas & Oil, Inc.,*
    672 F.2d 766 (9th Cir. 1982) ........................................................21

*Kunz v. Utah Power & Light Co.,*
    913 F.2d 599 (9th Cir. 1990) ....................................................21-22

*Lust v. Merrill Dow Pharm., Inc.,*
    89 F.3d 595 (9th Cir. 1996) ............................................................3

*Memry Corp. v. Kentucky Oil Tech., N.V.,*
    2007 WL 4208317 (N.D. Cal. Nov. 27, 2007) .................................9

*Mukhtar v. Cal. State Univ., Hayward,*
    299 F.3d 1053 (9th Cir. 2002) ...........................................3, 7, 8, 15, 16

*Nationwide Transport Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ...................................................................7

*Neal v. CSC Credit Servs., Inc.*,
    2004 WL 628212 (D. Ne. Mar. 30, 2004) ...............................................5

*Ohio v. Robinette*,
    519 U.S. 33 (1996) ..................................................................................5

*Owen v. Kerr-McGee Corp.*,
    698 F.2d 236 (5th Cir. 1983) ...........................................................7, 8-9

*Robinson v. Hartzell Propeller, Inc.*,
    326 F. Supp. 2d 631 (E.D. Pa. 2004) .....................................................19

*SEC v. Lipson*,
    46 F. Supp. 2 758 (N.D. Ill. 1998) .........................................................16

*Thomas J. Kline v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) ...................................................................6

*Thomas v. Trans Union LLC*,
    No. CV-00-1150-JE (D. Or. July 22, 2002) .............................................6

*U.S. v. 99.66 Acres of Land*,
    970 F.2d 651 (9th Cir. 1992) ...................................................................6

*U.S. v. Christophe*,
    833 F.2d 1296 (9th Cir. 1987) ...............................................................15

*U.S. v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ........................................................................8

*U.S. v. Farrell*,
    563 F.3d 354 (8th Cir. 2009) .................................................................23

*U.S. v. Gwaltney*,
    790 F.2d 1378 (9th Cir. 1986) ...............................................................15

*U.S. v. Hanna*,
    293 F.3d 1080 (9th Cir. 2002) ...............................................................16

*U.S. v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) ...........................................................3, 10

*U.S. v. Ortland*,
    109 F.3d 539 (9th Cir. 1997) .................................................................16

*U.S. v. Seschillie*,
   310 F.3d 1208 (9th Cir. 2002) ..................................................................16

*Wagner v. County of Maricopa*,
   701 F.3d 583 (9th Cir. 2012) ....................................................................3


STATUTES

Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x  ("FCRA")......................................... passim

15 U.S.C. § 1681b..................................................................................1

15 U.S.C. § 1681e(b) ...........................................................................1, 8

15 U.S.C. § 1681i(a) ............................................................................1, 8


OTHER AUTHORITIES

Fed. R. Evid. 401 ..................................................................................20

Fed. R. Evid. 403 ...............................................................................2, 20

Fed. R. Evid. 702 .......................................................................... passim

Fed. R. Evid. 703 ..................................................................................22

Fed. R. Evid. 704 ...............................................................................7, 8

Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair
   and Accurate Consumer Transactions Act of 2003,
   http://www.ftc.gov/reports/facta/041209factarpt.pdf (Dec. 2004). ...................................12, 13

**Equifax's Memorandum in Support of
Motion to Limit Expert Testimony**

## <u>INTRODUCTION</u>

Plaintiff filed this lawsuit under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.  In January 2010, Plaintiff discovered that her Equifax consumer credit file contained information that did not belong to her, including an incorrect Social Security number, date of birth, and collection accounts.  (Doc. 1 ¶ 5.)  Thereafter, Plaintiff claims that she attempted to contact Equifax to obtain copies of her credit file and dispute the misinformation, but she was unsuccessful in obtaining a credit file disclosure or in having the information removed.  (*Id*. ¶¶ 6-10, 12-20.)  Based on those facts, Plaintiff alleges that Equifax willfully and negligently failed to comply with four requirements of the FCRA:  (1) Section 1681e(b), for failing to follow reasonable procedures to assure maximum possible accuracy of the information in consumer reports; (2) Section 1681i, for failing to comply with the reinvestigation requirements of the FCRA; (3) Section 1681b, for providing her credit file to companies without determining that the companies had a permissible purpose to obtain the credit file; and (4) Section 1681g, for failing to provide her with a copy of her credit file.  (*Id*. ¶¶ 22, 28.)  Plaintiff claims that she incurred economic and emotional damages as a result of the alleged violations and seeks punitive damages for alleged willful conduct by Equifax.  (*Id*. ¶¶ 23-24, 29 in part.)

In an attempt to bolster her case, Plaintiff has employed a consumer-privacy advocate and self-published reporter, Evan Hendricks, as an "expert" on more than 100 topics.[1]  The vast

---

[1]    Plaintiff initially submitted an Expert Witness Report on May 18, 2012.  (Exhibit A.)  Equifax deposed Hendricks regarding that report on June 28, 2012.  Discovery in the case closed on July 24, 2012.  More than five months later, on December 27, 2012, Plaintiff served a supplemental expert report.  (Exhibit B.)  Combined, the two reports contain 103 points of proposed expert testimony.  For ease of reference to specific opinions, Equifax included both reports in one document and numbered the proposed opinions.  The compiled and numbered excerpts are contained in Exhibit C.  Highlighted portions of Exhibit C are those portions of Hendricks' reports to which Equifax does not object.

majority of the testimony proffered by Hendricks should be excluded because it does not satisfy the requirements of Federal Rules of Evidence 403 or 702.

In order to assist the Court in its analysis, Equifax has provided a chart (Exhibit D), which sets forth the basis for each topic to be excluded.  Plaintiff's proposed expert should be allowed to testify about only a handful of topics, those in paragraphs 6 in part, 29 in part, 34, and 66 through 84 of his original report, and supplemental opinions S2 in part, S9 in part, and S12 in part.  (*See* highlighted portions in Ex. C.)  The remaining topics should be excluded for a variety of reasons, more specifically set forth below, including that: (1) Hendricks is not qualified to provide testimony regarding Equifax's procedures, the legal requirements imposed on Equifax by the FCRA, or Plaintiff's damages; (2) Hendricks' opinions are based on incorrect or insufficient facts; (3) Hendricks' opinions do not require specialized knowledge, are unnecessary and inappropriately speculate regarding Equifax's intent; and (4) Hendricks' testimony is more prejudicial than probative pursuant to Federal Rule of Evidence 403.  Further, as is evident from Exhibit D, many of Hendricks' opinions warrant exclusion for multiple reasons.

## ARGUMENT

"In federal courts, the admission of expert testimony is governed by Federal Rule of Evidence 702, as elucidated by the Supreme Court in *Daubert [v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]."  *Barabin v. Asten Johnson, Inc*., 700 F.3d 428, 432 (9th Cir. 2012).[2]

---

[2]  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;

"Rule 702 assigns to the district court the role of gatekeeper and charges the court with assuring that expert testimony 'rests on a reliable foundation and is relevant to the task at hand.'" *U.S. v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (quoting *Daubert*, 509 U.S. at 597).  The Court's "'special obligation' to determine the relevance and reliability of an expert's testimony is vital to ensure accurate and unbiased decision-making by the trier of fact," *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (citation omitted), and "[t]o guard against the risk that jurors will accept an expert's testimony simply because he or she is an expert,'" *Wagner v. County of Maricopa*, 701 F.3d 583, 589 (9th Cir. 2012) (quoting *Daubert*, 509 U.S. at 589)).

The party offering expert testimony has the burden of demonstrating that Rule 702's requirements are satisfied.  *See Lust v. Merrill Dow Pharm., Inc.*, 89 F.3d 595, 598 (9th Cir. 1996).  Plaintiff cannot meet that burden here with respect to many of her expert's proffered opinions.

## I.  HENDRICKS IS UNQUALIFIED TO PROVIDE MANY OF HIS PROPOSED OPINIONS.

### A.  Hendricks Is Not Qualified To Testify Regarding Equifax's Procedures Because He Has No Relevant Experience.

A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.  Other than a brief reference to an FCRA certification from the "National Credit Reporting Association," Hendricks does not claim to have any education or training related to the operation of a consumer reporting agency, or in any related fields, such as

---

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

computer programming.  He claims "expertise in credit reporting" based on his "professional activities," which include that he (1) self-publishes his own newsletter, (2) authored a self-published book on credit reporting, (3) has testified in other FCRA cases, (4) has testified before Congress and other bodies, and (5) has worked as a consultant.  (*See* Ex. A at 21.)  Hendricks has never been employed by a consumer reporting agency, or the Federal Trade Commission ("FTC"), has no experience with computer programming, let alone programming required for operation of an extensive and complicated consumer database, and has never been involved with the development of policies or procedures for maintaining consumer-reporting accuracy, or for responding to consumer disputes.  (*See* Ex. E, Deposition of Evan Hendricks ["Hendricks Dep."] at 36:6-18, 37:3-6.)[3]  In short, he has no experience whatsoever related to the operation of a large consumer reporting agency.  His opinions related to Equifax's policies and procedures, therefore, should be excluded.  *Cf. Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1001 (9th Cir. 2001) (district court erred in admitting testimony of expert whose qualifications "amount[ed] to little more than the limited perspective of a professional investigator whose work experience had exposed him to instances of corrupt business behavior.  He did not have the legal, business or financial expertise to evaluate the substance of the . . . transaction.").

"It is important that expert witnesses have experience in transactions that are as similar as possible to the transaction upon which they are being asked to comment."  *Havenfield Corp. v. H&R Block, Inc.*, 509 F.2d 1263, 1273 (8th Cir. 1975) (affirming exclusion of expert witness in broker's action for a finder's fee because expert had represented only a seller – not a buyer – in such transactions).  Hendricks' limited and one-sided familiarity with consumers who have

---

[3] The qualifications of Equifax's expert, Anne P. Fortney, are in marked contrast.  Among other things, Ms. Fortney has worked for the FTC (in the Bureau of Consumer Protection) and in the financial services industry.  (*See* Exhibit I, Rebuttal Report of Anne P. Forney, at 1-2.)

experienced mixed files and other credit problems does not qualify him to testify regarding the reasonableness of Equifax's procedures for maintaining accuracy. He has accumulated, at best, only anecdotal evidence of the effectiveness of Equifax's procedures in a statistically insignificant number of cases. He has no knowledge of: (1) the number of consumers who have disputed information in their credit files and been satisfied with Equifax's response (Hendricks Dep. at 57:12-19); (2) whether Equifax made any changes to its policies or procedures in response to known problems with mixed files (*id.* at 59:17-60:6); (3) how frequently Equifax "does the right thing" (*id.* at 72:8-17); (4) how frequently Equifax remedies combined files to the consumer's satisfaction (*id.* at 76:11-14); (5) how frequently combined files result in linkage of information regarding a single consumer, as opposed to multiple consumers (*id.* at 76:16-77:3); or (6) how frequently incorrectly combined files cause damage to a consumer (*id.* at 80:18-21). These shortcomings are significant given that reasonableness can be determined only when the *totality* of the circumstances is considered. *See*, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (reasonableness "is measured in objective terms by examining the totality of the circumstances").

Hendricks also claims that his prior work as an expert contributes to his qualifications. (*See* Ex. A at 21.) Under similar circumstances, a district court in Nebraska held that a lawyer, who spent 50 percent of his time "bringing lawsuits on behalf of consumers against CSC and other credit reporting agencies," did not qualify as an expert for purposes of expounding on the FCRA. *Neal v. CSC Credit Servs., Inc.*, 2004 WL 628212, *1 (D. Ne. Mar. 30, 2004). "Although he may have gained knowledge of how credit reporting agencies function through his litigation practice, he has no training or expertise that would qualify him as an expert." *Neal*, 2004 WL 628212, *1. "Being a litigator-advocate does qualify one as an expert." *Id.* Because "it would be absurd to conclude that one can become an expert simply by accumulating

experience in testifying," *Thomas J. Kline v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989), Hendricks' past experience as an expert witness should not be considered.

When a witness relies "solely or primarily on experience" to demonstrate expertise, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments; *accord Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1890372, *5 (D. Or. May 23, 2012). Hendricks has not provided such an explanation. "Proffered testimony is properly excluded when foundational facts demonstrating qualification are absent." *U.S. v. 99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992) (affirming exclusion of accountant with no appraisal experience from testifying about appraisals). Because Hendricks clearly lacks the knowledge, experience, or qualifications needed to render an admissible opinion regarding what is required to maintain maximum possible accuracy of a consumer reporting database, his testimony regarding the reasonableness of Equifax's procedures – opinions numbered 9, 11, 15, 16, 21, 29 in part through 31, 33, 35 through 46, 48, 50, 57 through 60, S1, S3, S4, S9 in part, S10, S11, S12 in part, S13, S15, S16, S18, and S19 in Exhibit C – should be excluded. Other courts have likewise stricken Hendricks as an expert or limited the scope of his testimony. (*See* Ex. F: *Harris v. Equifax Credit Info. Servs., Inc., et al.*, No. CV-O1-1728-HA (D. Or. June 29, 2005) (limiting testimony); *Thomas v. Trans Union LLC*, No. CV-00-1150-JE (D. Or. July 22, 2002) (striking testimony entirely); *Andrews v. Trans Union Corp., Inc.*, No. 2:96-CV-7369-LGB-VBK (C.D. Cal. July 9, 1998) (limiting testimony)). The Court should limit Hendricks' testimony here because he lacks the qualifications to testify on Equifax's procedures.

**B.      Hendricks Is Not Qualified To Testify Regarding Legal Issues.**

Opinion evidence that is "otherwise admissible" is not objectionable simply because it "embraces an ultimate issue." Fed. R. Evid. 704(a). This does not, however, "open the door to all opinions." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transport Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *see also see also Mukhtar*, 299 F.3d at 1065 n.10; *Arijangrad*, 2012 WL 1890372, *7 (expert "may not state ultimate legal conclusions, such as whether discrimination occurred"); Fed. R. Evid. 704, 1972 Advisory Committee Note. "Experts interpret and analyze factual evidence. They do not testify about the law." *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996).

Hendricks' proposed testimony includes several statements phrased in broad language containing legal conclusions in which he opines that Equifax did not comply with the FCRA. He states, for example, that "Equifax's procedures were not adequate for assuring maximum possible accuracy" because "Equifax mixed and merged the files of two different women who had different SSNs, different dates of birth, and different addresses." (Ex. C. ¶ S4; *see also id.* ¶¶ 9, 18, 27, S7.) He does not point to any particular deficiencies with Equifax's procedures and, indeed, does not discuss Equifax's procedures at all. Rather, he merely states that, because mixing occurred, Equifax violated the FCRA's requirement that consumer reporting agencies use reasonable procedures for maintaining accuracy. (*See id.*)

This proposed testimony – which equates the presence of errors in Plaintiff's credit file with liability – also demonstrates that Hendricks does not understand the legal requirements imposed on consumer reporting agencies by the FCRA. It is well established that liability under the FCRA is predicated on the reasonableness of the consumer reporting agency's procedures.

*See, e.g, Guimond v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995). Congress recognized when it enacted the FCRA that "total accuracy in consumer reports is not a realistic objective." *Equifax v. FTC*, 678 F.2d 1047, 1048-49 (11th Cir. 1982).  Accordingly, consumer reporting agencies are not strictly liable for errors in consumer reports; "an agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures." *Guimond*, 45 F.3d at 1333.  In other words, Equifax is not liable to Plaintiff just because it combined her file with information regarding another consumer. Instead, Plaintiff has the burden of proving that Equifax violated the FCRA by failing to maintain reasonable procedures for assuring "maximum possible accuracy" of the information in her credit report and/or failing to conduct a reasonable reinvestigation when she disputed the accuracy of reported information. *See* 15 U.S.C. §§ 1681e(b), 1681i(a).  Hendricks apparently does not understand this well established law.  When an expert opinion is based on a misunderstanding of applicable law, it cannot be construed as reliable and should be excluded.

"When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Mukhtar*, 299 F.3d at 1065 n.10 (quoting *U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).  The Advisory Committee for the Federal Rules of Evidence provided the following example to illustrate this point:

> [T]he question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed. R. Evid. 704, Advisory Committee Notes (1972).  "The first question is phrased in such broad terms that it could as readily elicit a legal as well as a fact based response.  A direct

response, whether it be negative or affirmative, would supply the jury with no information other than the expert's view of how its verdict should read." *Owen*, 698 F.2d at 240.

"[T]rial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans, LA*, 795 F.2d 1230, 1233 (5th Cir. 1982). Because many of Hendricks' opinions offer little more than one-sided advocacy – with little or no discussion of the relationship between the facts and the legal standard – and Hendricks is not qualified to offer such legal conclusions, his testimony should be excluded on opinions numbered 9, 12, 15, 18, 27, S1, S4, S6, and S7 in Exhibit C.

### C.    Hendricks Is Not Qualified To Testify Regarding Plaintiff's Damages.

In a section of his initial report labeled "Potential Areas of Testimony," Hendricks proposes to testify regarding the "typical negative impacts of ID theft & Chronic Inaccuracy." (*See* Ex. C ¶ 63.) Key factors to consider, according to Hendricks, include:

> The nature and substance of the category of damage
> Time & energy to solve the immediate problem
> The expectation that the problem was solved
> The number of recurrences
> The period of time over which the problem persisted

(*Id.*) Actual damages may take the form, for example, of "[i]mproperly denied credit," "loss of time and energy," and a "[s]ense of helplessness." (*Id.* at ¶ 62.)

First, Hendricks has not identified any training or experience he has relevant to assessing damages. His self-proclaimed knowledge of consumer credit reporting does not qualify him as an expert on the methodologies of identifying and measuring damages. *See Memry Corp. v. Kentucky Oil Technology*, N.V., 2007 WL 4208317, **1-2 (N.D. Cal. Nov. 27, 2007) (precluding plaintiff's expert from testifying as to damages since his report contained only

cursory treatment of damages, failed to provide bases for his assertions as to damages, and failed to quantify alleged harm). Hendricks has no formal education other than a B.A. in Political Science and no formal training in psychology, banking, lending, or credit reporting that would allow him to propose a methodology for evaluating damages in these subject matters. (*See* Ex. A at 21.)

Second, the jury is just as capable of assessing Plaintiff's damages (if any) as is Hendricks. Indeed, the jury is in a *better* position because – unlike Hendricks, who admitted that he had not spoken with Plaintiff regarding her actual experiences before expounding on her supposed damages (*see* Ex. E, Hendricks Dep. at 13:12-20) – the jury will have the advantage of being privy to actual evidence, as opposed to Hendricks' speculation.

Accordingly, Hendricks' opinions regarding Plaintiff's purported damages in opinions 23 and 61 through 65 in Exhibit C should be excluded.

## II. HENDRICKS' OPINIONS BASED ON INCORRECT OR INSUFFICIENT FACTS SHOULD BE EXCLUDED.

Even if Hendricks' experience could qualify him as an expert on certain matters, "bare qualifications" are insufficient for admissibility. *Hermanek*, 289 F.3d at 1093. An expert's opinion also must be "the product of reliable principles and methods" that have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702 (c)-(d); *see also Hermanek* at 1093 (error to rely on expert's "general qualifications" without explaining method used to arrive at opinions); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (the issue "is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question"). Expert opinions may not be "connected to existing data only by the *ipse dixit* of the expert." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law,

or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242 (1993); *see also Daubert v. Merrell Dow Pharm., Inc.* (*Daubert II*), 43 F.3d 1311, 1319 (9th Cir. 1995) (under *Daubert*, it is "not enough" to be "presented with only the experts' qualifications, their conclusions and their assurances of reliability").

### A.    Opinions Derived From Demonstrably Incorrect Facts Should Be Excluded.

Plaintiff's credit information was combined with that of another consumer as the result of an "online combine." (*See* Ex. G, Deposition of Margaret Leslie ["Leslie Dep."], at 15:25-16:2, 17:24-18:3.)   An online combine is a computer-automated process that occurs when certain criteria are present.   (*See* Leslie Dep. at 25:9-15.)   The criteria used for Plaintiff's online combine are of critical importance for determining the reasonableness of Equifax's procedures for maintaining accuracy.   Hendricks makes assumptions about the criteria used in Plaintiff's case that are demonstrably incorrect.

Equifax's Vice President of Technology, Margaret Leslie, who manages teams responsible for Equifax's consumer database, testified that Plaintiff's online combine was triggered by an electronic communication (an Automated Universal Data "AUD" transmission) sent to Equifax by a creditor seeking to delete a consumer account.   (*Id.* at 7:7-13, 15:5-16:19, 42:2-43:20.)   The AUD listed the consumer as "Julie M. Miller" with a Social Security number differing from Plaintiff's by only two digits – xxx-x2-xx5x versus xxx-x5-xx8x – and birth dates less than 16 months apart.   (*Id.* at 46:8-47:4.)   The AUD also included multiple addresses for "Julie M. Miller," one of which was on Mapleleaf Court in Aurora, California. (*See id.* at 47:17-21.)   The Mapleleaf Court address on the AUD is identical in all respects (street number, street name, town, *and zip code*) to Plaintiff's address with one exception – the name of the state (California versus Oregon).   (*Id.*)

Hendricks incorrectly claims that the combine was based on a different address, one with a different zip code and town (Clackamas), but with the same street number, street name, and state as Plaintiff's address. (*See* Ex. C ¶¶ 11, 29 in part, 30-31, 48, 98-99.) Hendricks' incorrect assumption that the Clackamas address was treated as a match seriously damages the reliability of his opinions regarding Equifax's matching procedures. The opinions based on the incorrect facts, therefore, should be excluded.

Hendricks further demonstrates his failure to grasp the facts of this case in his general statements regarding Equifax's matching procedure. He appears not to understand how the procedure works, or its purpose. He states that Equifax's approach to "partial matching" resulted in: (1) the mixing of Plaintiff's credit information with another consumer's information; *and* (2) Equifax's purported failure to disclose to Plaintiff all of the credit information it had pertaining to her, "[q]uite possibly" because "Plaintiff's file consisted of multiple, or 'fragmented' files." (Ex. C ¶ 11.) Fragmented files occur when two pieces of information cannot be linked because of differences in identifying information even though the data pertains to a single consumer. (*See* Federal Trade Commission, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Consumer Transactions Act of 2003, http://www.ftc.gov/reports/facta/041209factarpt. pdf, pp. *iii*, 13 (Dec. 2004)). Equifax uses "partial matching" to *reduce* the number of fragmented files. (*See id.* at *iv*, 13-14.) This process allows Equifax to identify fragments that likely pertain to a single consumer and to combine those fragments into a single file. (*See id.*) As a result, contrary to what Hendricks apparently believes, Equifax's partial-matching policy does not *increase* the number of fragmented files, but rather reduces that number.[4] This error

---

[4] Equifax's matching procedure is one example of the difficult choices Equifax must make when compiling consumer reports. A stricter matching procedure would result in an excessive number of fragmented files. A liberal matching procedure could result in an excessive number

further damages the reliability of Hendricks' opinions.

In yet another example, Hendricks inaccurately describes testimony provided by one of Equifax's representatives regarding the handling of Plaintiff's disputes and Equifax's reinvestigation procedures. (*See* Ex. C ¶¶ S12-S13). According to Hendricks, Equifax's representative testified that "Equifax at one point ended its inquiry into the possibility of a mix because it was unable to find a so-called 'N File.'" (*Id.* ¶ S12, citing Ex. H, Deposition of LaDeamya Mixon ["Mixon Dep."] at 63.) An N File is "the other credit file that the person lodging the dispute is mixed with." (Ex. I, Fortney Expert Report at 11, quoting Equifax's Mixed Files Policy Manual.) The representative did not realize, according to Hendricks, "that there would not be an 'N File,' only a badly mismerged, singular file." (Ex. C ¶ 12.) Although Ms. Mixon did testify that Equifax's representative had been unable to locate an N-file, she did not testify that this resulted in termination of the reinvestigation. (*See* Ex. H, Mixon Dep. at 63:8-18.) Furthermore, Hendricks is wrong to assume that an N-File cannot exist when an on-line combine has occurred. (*See* Ex. I, Fortney Expert Report at 11.)

Hendricks makes several other incorrect or unsupported statements regarding the facts of this case. These include, for example, unsupported assertions that: (1) Plaintiff's credit file, "[q]uite possibly," "consisted of multiple, or 'fragmented files'" (Ex. C ¶¶ 11, 31); (2) Equifax does not "adjust[] toward more precise matching" when the possibility of a mixed file is present and does not "assign an experienced 'case officer'" to handle mixed-file disputes (*id.* ¶¶ 45-46; *see also* ¶ 33); and (3) Equifax does not use online-combine reports to analyze mixed-file claims

---

of improperly mixed files. (*See* Ex. I, Fortney Rep., at 7-9 [discussing the FTC's 2004 Report to Congress].) Both extremes have potentially adverse consequences for consumers. The purpose of Equifax's partial-matching procedures is to provide a reasonable balance between these two extremes. A perfect balance, as Hendricks appears to expect, is neither possible nor required by the FCRA.

(*id.* ¶ 58).  In addition, Hendricks misstates the nature of the agreements Equifax made with the attorneys general of several states and the FTC in the early 1990s.[5]  (*See id.* ¶¶ 17, 50-57, 65, S4, S18.)  Contrary to Hendricks' characterization of those agreements, they did not require Equifax to use "complete identifying information" when preparing consumer reports.  (*See* Ex. I, Forney Expert Report at 19.)

The list of Hendricks' incorrect and/or unsupported factual assertions is long and cannot be fully described in the limited space of this brief.  The prevalence of these errors further demonstrates Hendricks' bias against Equifax and his lack of expert qualifications.  The Court should exclude statements and opinions related to inaccurate factual assumptions made by Hendricks.  These include paragraphs 11, 29 in part, 30, 31, 45, 48, 51, 53, S4, S8, and S12 in part through S15 of Exhibit C.

### B.    Opinions That Make Unwarranted Assumptions And Vague Assertions Should Be Excluded.

Hendricks also makes unwarranted and unreasonable assumptions about how Equifax's policies and procedures have evolved – or, rather, not evolved – over the past 20 years, a period of time in which computer technology, in general, has dramatically improved.  According to Hendricks, Equifax "failed to adhere to the spirit of consent agreements" it entered into in the early 1990s and "did not make the changes necessary to avoid the predictable recurrence of mixed files and inadequate reinvestigations."  (Ex. C ¶ 17.)  Implicit in this statement is an assumption that Equifax has done little or nothing to improve its handling of mixed files in the past 20 years.  Nothing in the record supports such an assumption.  Hendricks has no evidence regarding error rates in the early 1990s versus those over the last 20 years.  (*See* Hendricks Dep.

---

[5] As is discussed in Section IV(A)(1) below, these agreements are not relevant, and their admission would be highly prejudicial to Equifax.

at 60:3-6, 76:11-20.)   The mere fact that errors sometimes occur does not demonstrate that Equifax made no changes to its procedures designed to reduce the number of errors during this time period, or that the changes it made were ineffective.   Statements and opinions that incorrectly assume that Equifax made no changes to its procedures during this time period should be excluded.  (*See* Ex. C ¶¶ 1, 4, 17, 22, 24, 26, 27, 28, 50, 56, 57, S18.)

Hendricks' proposed testimony also includes several other unwarranted inferences such as: (1) a vague assertion that "Plaintiff's case had several [unidentified] telltale signs of mixed and/or multiple files" (*id.* ¶ 7); (2) speculation regarding what might have happened if Equifax had investigated Plaintiff's disputes and what would have happened if Plaintiff had not filed a lawsuit (*id.* ¶¶ 16, 59-60); (3) assumptions regarding the nature of the harms experienced by Plaintiff even though Hendricks has never spoken with Plaintiff (*id.* ¶¶ 23, 64; Hendricks Dep. at 13:12-14); and (4) assumptions and speculation about the reasons Equifax would give for use of its matching algorithms (Ex. C ¶ 44).  In all, opinions numbered 1, 4, 5, 7, 9 through 12, 14, 16, 17, 19, 20, 22 through 24, 26 through 28, 31, 33, 42, 46, 57 through 60, 64, S6, S8, S9 in part, S10, S12 in part, S17, and S18 in Exhibit C, should be excluded for this reason.

## III.    OPINIONS THAT DO NOT REQUIRE SPECIALIZED KNOWLEDGE SHOULD BE EXCLUDED.

A "central concern" of Rule 702 is whether proffered expert testimony will be helpful to the jury.  *Mukhtar*, 299 F.3d at 1063 n.7; *see also U.S. v. Christophe*, 833 F.2d 1296, 1299 (9th Cir. 1987); *U.S. v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).   Testimony should be permitted only if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a). Regardless of whether Hendricks actually has any specialized "expert" knowledge, the majority

of his proposed testimony concerns matters well within the unaided comprehension of a jury and, therefore, should not be considered expert testimony under Rule 702.

### A.    Descriptions Of Uncomplicated Facts And "Common Sense" Inferences Should Be Excluded.

"A district court does not abuse its discretion when it refuses expert testimony where the subject does not need expert 'illumination' and the proponent is otherwise able to elicit testimony about the subject."  *U.S. v. Ortland*, 109 F.3d 539, 545 (9th Cir. 1997).  "[E]xpert testimony must address an issue beyond the common knowledge of the average layman." *Mukhtar*, 299 F.3d at 1065 n.9 (quotation marks and ellipsis omitted); *accord U.S. v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002).  "Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand."  *City of Grass Valley v. Newmont Mining Corp.*,  2008 WL 544388, *1 (E.D. Cal. Feb. 26, 2008) (quoting *SEC v. Lipson*, 46 F. Supp. 2 758, 763 (N.D. Ill. 1998)).

Thus, a district court should exclude expert testimony on issues that the jury can decide without assistance.  *See, e.g., U.S. v. Seschillie*, 310 F.3d 1208 (9th Cir. 2002).  In *Seschillie*, for example, the Ninth Circuit held that an expert was not needed for a jury to understand the circumstances surrounding discharge of a gun:

> "The jury could determine, as a matter of 'common sense,' whether the shootings as described by the victims were accidental . . . and would not be assisted in that determination by any specialized knowledge. . . . That someone struggling over a gun could experience some of the factors [the expert] identified as causing accidental fire, such as a loss of balance, a surprised reaction, or a need to use his other hand, is a matter which anyone could figure out for herself.

*Seschillie*, 310 F.3d at 1212; *see also Arjangrad*, 2012 WL 1890372, *7.  Accordingly, to the extent Hendricks bases his testimony "on nothing more than his common sense," it should be excluded because "a jury can accomplish the same analysis without an expert."  *Arjangrad*, 2012

16

WL 1890372, *7; *see also Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (testimony that railroad platform was unsafe based on observation that "station was dirty, filthy and kind of icy, that the platform had trash and ice on it and that the lighting was very dim" should not have been admitted).

Much of the testimony proposed by Hendricks falls into this category.  He describes numerous uncomplicated, and often undisputed, facts well within the jury's comprehension.  *See Guidroz-Brault v. Missouri Pacific RR Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (affirming exclusion of expert testimony that "went no further than to establish a fact never really in dispute").[6]  Hendricks provides, for example, a detailed description of Equifax's "matching algorithm," much of which simply quotes testimony of an Equifax witness from another, 10-year-old case (*Kirkpatrick*).  (*See* Ex. C ¶¶ 33-44.)  Moreover, Hendricks himself has no first-hand knowledge of the matching algorithm used by Equifax or its purpose.  Use of the term "algorithm" notwithstanding, the description quoted by Hendricks is not complicated and could easily be entered into evidence in the same manner as in *Kirkpatrick* – through the testimony of an Equifax representative.

Other statements in Hendricks' reports simply describe Equifax's treatment of Plaintiff and her disputes.  He states for example, that Equifax "failed to locate [Plaintiff's] file in a timely manner following several of her disputes, which likely was a significant factor in EQX's failures to investigate her disputes" (Ex. C ¶ 10), and that "Equifax caused Plaintiff to become a victim of a mixed file, and then failed to correct the inaccuracies it caused because none of its responses to Plaintiff's disputes even began to proximate an adequate reinvestigation" (*id.* ¶ S1).

---

[6]  Equifax does not generally dispute, for example, that its computer system combined Plaintiff's credit file with another consumer's file, or that Equifax did not immediately segregate the files in response to Plaintiff's disputes.

Expert testimony is not needed to spin these facts, some of which are undisputed.  To the extent inferences are necessary, the jury can apply common sense rather than be subjected to Hendricks' one-sided perspective.

The majority of Hendricks' proposed testimony involves his own "common sense" inferences concerning the content of Plaintiff's credit file, Equifax's handling of her disputes, and whether Equifax acted reasonably.  No expert illumination is needed for these topics.  The jury should consider the evidence provided by the parties, including testimony from Plaintiff and Equifax, and make its own determination as to whether Equifax's procedures were reasonable and appropriate under the FCRA.  No specialized knowledge possessed by Hendricks is required.[7]  Permitting Hendricks to offer his biased and unsupported opinion that Equifax acted unreasonably will not aid the jury in deciding the issues in this case and would be prejudicial to Equifax.  Opinions numbered 8, 10, 12 through 15, 17 through 21, 25 through 28, 30, 31, 33, 35 through 44, 46, 47, 49, 50, 56, 57, 61 through 65, S1, S4, S5, S7, S8, and S10, S12 in part through S16 in Exhibit C, therefore, should be excluded.

**B.    Hendricks' Subjective Opinions, Invective Characterizations, And Speculation Are Not Helpful To The Jury.**

"[T]he word 'knowledge,'" in the phrase "specialized knowledge," "connotes more than subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Even the opinions of non-scientific experts – such as Hendricks – must be properly based on well-founded, relevant facts and not "unsupported speculation and subjective beliefs."  *Guidrox-Brault*, 254 F.3d at 829.  "[O]pinions that are nothing more than vouchers for or attacks on credibility [also] do not assist the trier of fact."  *Arijangrad*, 2012 WL 1890372, *8 (excluding opinion that employee "failed to

---

[7] In some circumstances, for example, the opinions of experts who have actual experience in the consumer reporting industry might be relevant.

'earnestly' respond to" plaintiff's discrimination charges and "similar innuendo concerning credibility").

Hendricks' expert reports include many speculative statements regarding Equifax's motive, knowledge, and intent, and many descriptors that amount to little more than invective commentary. (*See*, *e.g.*, Ex. C ¶¶ 2, 5, 13, 14, 22, S17.) Hendricks states, for example, that Equifax "had no intention of changing its routine practices and procedures because Equifax was 'very satisfied with the way its system works.'" (*Id.* ¶ 2.) He also states that Equifax's supposed "decision not to make significant changes" in its procedures "reflect[s] [Equifax's] belief that it will make more revenue by sticking with its long-standing practices, in my opinion." (*Id.* ¶ 22.)

"This kind of pure speculation lacks any grounding in science, technical, or other specialized knowledge and should be excluded." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (testimony stating that GM had reduced the amount of padding in its sun visors to save money should have been excluded; expert "lacked any scientific basis for an opinion about the motives of GM's designers"); *see also Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) (excluding testimony that defendant "'knew' the vibratory stresses caused by the engine/propeller combination exceeded permissible limits and 'intentionally misled' the FAA that this combination was safe. . . . [T]he experts' experience in metallurgy, propeller design, propeller maintenance, and FAA reporting requirements does not qualify them to testify as to the subjective intent of Hartzell employees."). "[T]he whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions." *DePaepe*, 141 F.3d at 720.

"State of mind" testimony is also improper because it describes matters that a jury is capable of understanding and deciding without expert assistance. *See*, *e.g. In re Rezulin Prods.*

19

*Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (excluding testimony about drug company's state of mind with respect to reasons for taking drug off the market); *In re Xerox Corp. Securities Litig.*, 746 F. Supp. 2d 402, 415 (D. Conn. 2010) (citing *Rezulin*); *AstraZeneca LP v. Tap Pharm. Prods., Inc.,* 444 F. Supp. 2d 278, 293 (D. Del. 2006) (excluding testimony that "'[AstraZeneca] was, in fact, seeking to utilize...' data on healing of EE and '[AstraZeneca] aimed' to elevate the importance of such data."). The jury can draw inferences from evidence regarding Equifax's policies just as competently and effectively as Hendricks. *See*, *e.g*., *City of Tuscaloosa v. Harcros Chemicals, Inc*., 158 F.3d 548, 565 (11th Cir. 1998) ("His characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as 'signals' [to co-conspirators]," are not helpful "because the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from McClave or other experts.") Opinions numbered 2, 5, 12, 13, 17, 21, 22, 38, 39, 47, 58, S5 through S7, and S17 through S19 in Exhibit C, therefore, should be excluded.

## IV.    IRRELEVANT OPINIONS AND THOSE MORE PREJUDICIAL THAN PROBATIVE SHOULD NOT BE ADMITTED.

To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Irrelevant evidence may not be admitted at trial and, even if relevant, should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Hendricks proposes to testify regarding several past cases and administrative actions against Equifax. The proposed testimony is not relevant, and any minimal probative value it might have is far outweighed by the prejudicial impact it would have on Equifax.

**A.   Proposed Testimony Regarding Old Agreements And Past Cases Is Irrelevant And Highly Prejudicial.**

**1.   Hendricks Should Not Be Allowed To Testify Regarding Agreements Entered Into By Equifax In The Early 1990s.**

Hendricks' expert report repeatedly refers to consent agreements Equifax entered into with the attorneys general of 18 states in 1992 and the FTC in 1994.  (*See* Ex.D. ¶¶ 1, 3, 17, 27, 49-57, 65, S4, S18, and S19.)  These decades-old agreements are not relevant and, in any event, would be highly prejudicial to Equifax if admitted. *See Kramas v. Security Gas & Oil, Inc.,* 672 F.2d 766, 772 (9th Cir. 1982) (excluding evidence of a consent decree entered in a prior SEC enforcement proceeding, explaining that the decree involved no finding of culpability and no judgment of wrongdoing).

The agreements concern procedures used by Equifax in the late 1980s and early 1990s. As discussed above, Hendricks apparently assumes that Equifax's policies and procedures have not changed in 20 years, a period of time in which computer technology grew exponentially. Hendricks' counterintuitive assumptions have no basis in fact and do not supply support for his discussion of the agreements.

The Ninth Circuit reached a similar conclusion in *Kunz v. Utah Power & Light Co.*, 913 F.2d 599 (9th Cir. 1990).  In *Kunz*, a group of landowners, who had been damaged in the mid-1980s by release of water from a lake storage system maintained by the defendant, attempted to enter into evidence the power company's "1971 operating criteria" and "risk analysis curves," which set a target level for water elevation in the lake.  *Kunz*, 913 F.2d at 605.  Much like Plaintiff here, the plaintiffs in *Kunz* wanted to use the documents to demonstrate foreseeability of the damages they had incurred.  *See id.* at 604-05 ("The Landowners allege that the documents represent corporate policy and tend to prove Utah Power's negligence by demonstrating that an unreasonably high target was set and exceeded in flood years, and that the company had notice

Equifax's Memorandum in Support of
Motion to Limit Expert Testimony

and knowledge of the risk that flooding at higher lake elevations would occur.").  The Ninth

Circuit held that the district court had not erred when it excluded the evidence.  *Id.* at 605.  The

documents were not relevant because they did not represent corporate policy in the mid-1980s,

and, in any event, the lower court had permitted the plaintiffs to question power-company

representatives regarding knowledge of prior flooding.  *Id.*; *see also In re Citric Acid Litig.*, 191

F.3d 1090, 1102 (9th Cir. 1999) ("Because there is no evidence in the record establishing that

Cargill's market share was constant between 1993 and 1995, any inference founded upon that

factual assertion – even one drawn by an economic expert – is necessarily unreasonable.").

The same reasoning applies here.  Plaintiff has no evidence that Equifax's policies and

procedures related to mixed files during the relevant time period are the same as those used in

the early 1990s.  Experts may base their opinions on inadmissible evidence provided it is of a

type normally relied upon by experts in the field.  Fed. R. Evid. 703.  When this occurs, the

proponent of the opinion may disclose the otherwise inadmissible evidence "only if [its]

probative value in helping the jury evaluate the opinion *substantially* outweighs [its] prejudicial

effect."  *Id.* (emphasis added).  Any marginal probative value the 1990s agreements might have

in this case is substantially outweighed by the prejudicial effect discussion of the agreements

would have on Equifax.

### 2.    Hendricks' Discussions Of Past Cases Involving Equifax Should Not Be Allowed.

Hendricks also discusses two past cases against Equifax brought by consumers (*Drew*

and *Kirkpatrick*).  (*See* Ex. C ¶¶ 2-5, 8, 25-28, 35-43, S19.)  Discussion of these cases is plainly

more prejudicial than probative.  Both cases involved identity theft, not mixed files, and

*Kirkpatrick* was filed more than 10 years ago.  Equifax's procedures for combining files played

no role in *Drew* and only an insignificant role in *Kirkpatrick*, both of which turned primarily on

Equifax's Memorandum in Support of
Motion to Limit Expert Testimony

the reasonableness of the reinvestigations performed by Equifax.  Furthermore, any anecdotal evidence regarding past FCRA violations by Equifax these cases might provide would not be probative if not accompanied by statistical information regarding Equifax's error rate, which Plaintiff does not have.  Opinions numbered 2 through 4, 8, 17, 24 through 28, 32, 35 through 43, 50 through 57, 65, S4, S18, and S19 in Exhibit C, therefore, should be excluded.

### B.   Opinions That Include Inflammatory Language Are More Prejudicial Than Probative And Should Not Be Admitted.

Hendricks' reports also include wholly inappropriate inflammatory language.   He repeatedly states, for example, that Equifax's conduct was "egregious and inexcusable"  (*See*, *e.g.*, Ex. C ¶¶ 86, 87, S1-S3.)   He also asserts that Equifax "fabricated" a discrepancy in Plaintiff's social security number (*id.* ¶ 89), "disregard[s] . . . the FCRA's goals of accuracy and fairness" (*id.* ¶ 90), and "serious[ly] disregard[s]" its duties (*id.* ¶ 91).   He repeatedly and inappropriately uses words and phrases such as "inexcusable" (*id.* ¶ 8), "unreasonable and reckless" (*id.* ¶ 12), "remarkably" and "astonishingly" (*id.* ¶ 93), "unconscionable" (*id.* ¶ 97), and "stubbornly refused" (*id.* ¶ 102).

These invectives should not be allowed both because they would not be helpful to the jury and because they certainly fall within the sphere of Federal Rule of Evidence 403.   The inflammatory descriptors have little, if any, probative value and present a strong danger of prejudice to Equifax.  Courts have excluded similar expert testimony.  *See*, *e.g.*, *U.S. v. Farrell*, 563 F.3d 354, 377 (8th Cir. 2009) (finding improper expert's testimony that evidence of peonage was "incredible" and "strong"); *Baumann v. Am. Family Mut. Ins. Co*., 836 F. Supp. 2 1196, 1203 (D. Colo. 2011) (excluding testimony describing insurance company's computer program, used to test the reasonableness of medical services, as a "systematic hurdle" and "incredibly

confused and convoluted").  As such, opinions numbered 8, 22, 25, 27, 33, 45, 60, S1, S2 in part

through S7, S9 in part, S13, S18 and S19 in Exhibit C should be excluded.

## <u>CONCLUSION</u>

For the reasons discussed above, Equifax's Motion to Limit the Testimony of Plaintiff's

Expert, Evan Hendricks should be granted.

Respectfully submitted, this 14th day of May, 2013.


/s/Lewis P. Perling
Lewis P. Perling (*Admitted Pro Hac Vice*)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel:  (404) 572-4600
Fax: (404) 572-5100
Email: lperling@kslaw.com

Jeffrey M. Edelson, OSB #88040
MARKOWITZ, HERBOLD, GLADE
&MEHLHAF
Suite 3000 PacwestCenter
1211 S.W. Fifth Avenue
Portland, Oregon  97204
Tel:  (503) 295-3085
Fax:  (503) 323-9105

**Attorneys for Defendant Equifax**
**Information Services LLC**

## **<u>CERTIFICATE OF COMPLIANCE</u>**

This brief complies with the applicable word-count limitation under Local Rule 7-2(b) because it contains 7,481 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

/s/ Lewis P. Perling
<u>                                         </u>
Counsel for Equifax Information
Services LLC

**Equifax's Memorandum in Support of**
**Motion to Limit Expert Testimony**

## ATTORNEY CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2013, I have made service of the foregoing in the manner

indicated:

**Michael C. Baxter**
**Justin Baxter**
**Kachelle Baxter**
Baxter & Baxter
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon  97225
*Attorneys for Plaintiff*

☐ U.S. Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email
☒ Electronically via USDC CM/ECF system


/s/Lewis P. Perling
Counsel for Equifax
Information Services LLC

**Equifax's Memorandum in Support of**
**Motion to Limit Expert Testimony**