1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF OREGON

3    JULIE MILLER,                     )
                                       )   Case No. 3:11-CV-1231-BR
4              Plaintiff,              )
                                       )
5    v.                                )   July 24, 2013
                                       )
6    EQUIFAX INFORMATION SERVICES,     )
     LLC, a foreign limited liability  )
7    company,                          )
                                       )
8              Defendant.              )
     _____)   Portland, Oregon

9

10                     TRANSCRIPT OF PROCEEDINGS

11            (Excerpt of the Testimony of Anne Fortney)

12

13         BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23   COURT REPORTER:             AMANDA M. LeGORE, RDR, CRR, FCRR, CE
                                 U.S. COURTHOUSE
24                               1000 SW Third Avenue, Suite 301
                                 Portland, OR  97204
25                               (503)326-8184

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:        MICHAEL BAXTER
                               JUSTIN BAXTER
3                              Baxter & Baxter, LLP
                               8835 SW Canyon Lane, Suite 130
4                              Portland, OR  97225
                               (503)297-9031
5                              michael@baxterlaw.com
                               justin@baxterlaw.com
6

7    FOR THE DEFENDANT:        JEFFREY EDELSON
                               Markowitz, Herbold, et al.,
8                              1211 SW Fifth Avenue
                               Suite 3000
9                              Portland, OR  97204
                               (503)295-3085
10                             jeffedelson@mhgm.com

11
                               PHYLLIS SUMNER
12                             LEWIS PERLING
                               King & Spalding, LLP
13                             1180 Peachtree Street, N.E.
                               Suite 1700
14                             Atlanta, GA  30309
                               (404)572-4799
15                             psumner@kslaw.com
                               lperling@kslaw.com
16

17

18

19

20

21

22

23

24

25
```

INDEX

| FOR THE DEFENDANT: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Anne Fortney | 5 | 41 | | |

-oOo-

1          (The following excerpted proceedings were held on

2          Wednesday, July 24th, 2013; 1:33 p.m.)

3          THE COURT:  Would you all please rise for the jury.

4          (Jurors enter.)

5          THE COURT:  Thank you, everyone.  Please be seated.

6          So, jurors, good afternoon.

7          Just before I sent you out for the noon recess, you

8   may recall Mr. Baxter announced that plaintiff rests.  That

9   means, Ms. Miller's counsel have now presented all the evidence

10  that there is going to be presented in her case-in-chief.

11         So now we're turning to Equifax, to see if it has any

12  evidence to offer.  And, indeed, it does have three witnesses

13  to offer to you.  One of them is before you now.

14         Would you stand, please.  Face the jury.  Raise your

15  right hand to be sworn.

16         (Witness sworn.)

17         THE WITNESS:  I do.

18         THE CLERK:  Please take a seat.

19         THE COURT:  And when you're situated there, bring

20  yourself as close as you can to the microphone.

21         Please tell us your full name, and spell all of it.

22         THE WITNESS:  My full name is Anne Price Fortney.

23  Anne is spelled with an E, A N N E.  Price, P R I C E.

24  Fortney, F O R T N E Y.

25         THE COURT:  Thank you.

Fortney - D

1          Counsel.

2                    DIRECT EXAMINATION

3    BY MS. SUMNER:

4    Q.   Good afternoon, Ms. Fortney.

5    A.   Good afternoon.

6    Q.   If you could just start off, please, and tell the jurors

7    what your current position is and responsibilities.

8    A.   Yes.  I'm a lawyer, and I'm a partner with a law firm

9    called Hudson Cook.

10           My law firm and I specialize in compliance in the

11   field of consumer financial services.  We help companies comply

12   with the Fair Credit Reporting Act and similar laws.

13   Q.   And how many years have you been involved in practicing in

14   federal and state consumer protection laws?

15   A.   Well, I got my start with J.C. Penney back in 1976.  Oh,

16   what?  That's about 37 years.  And at that time, I was in the

17   Washington office with the Penney Company.  And Penney was one

18   of the largest credit card issuers in America.  It was

19   difficult for consumers to get bank cards at that point.

20   Q.   All right.  Let's back up just a little bit.  And if you

21   wouldn't mind, walk the jury through your educational

22   background.

23   A.   Sure.

24           I went to Mary Washington College, which was then a

25   women's college, University of Virginia.  I went to Georgetown

6

Fortney - D

1   University Law Center.  And -- and I've been practicing law

2   since 1969.

3   Q.   And have you also participated in other programs, in terms

4   of training at other universities?

5   A.   I was -- went one year to college at -- in

6   Aix-en-Provence, and I also did some post-graduate work at

7   Harvard University, when I was with the Federal Trade

8   Commission.

9   Q.   Okay.  Let's actually move to some of your other

10  experiences.  Because in your 37 years, I am sure you have not

11  spent the entire time at the -- this law firm.

12          Could you just walk us through some of your -- and

13  you don't need to spend a lot of time on this.  But I think it

14  would be helpful for you to walk through the various

15  positions -- professional positions that you've held.

16  A.   Yeah.  As I said, I began -- oh, I'd been practicing law

17  for a few years before I joined the Penney Company.  But I had

18  been more involved with just general consumer protection

19  issues.  But I really began to get into this industry at the

20  Penney Company.  And I was with them until 1982.

21          And then I went to work for the Federal Trade

22  Commission.  And at the Federal Trade Commission, I was the

23  director of a division that enforces the Fair Credit Reporting

24  Act and the other privacy laws on behalf of consumers.  So I

25  was basically representing -- I was a federal representative of

7

Fortney – D

1  consumers at the Federal Trade Commission.

2       I left the Federal Trade Commission in the late '80s

3  because I got married and my husband was in the Navy, and we

4  had to move to Hawaii.  Tough duty.  Somebody had to do it.

5  And I have been in private practice ever since.  I've been with

6  a couple of law firms.  But about ten years ago I joined Hudson

7  Cook, because I wanted to be able to concentrate my practice in

8  the area of compliance in this field.

9       THE COURT:  Could you slow down a bit, Ms. Fortney,

10  when you are responding.

11       Go ahead, Counsel.

12       THE WITNESS:  Sure.

13  BY MS. SUMNER:

14  Q.   So as part of the compliance work that your firm does, has

15  it done work for any of the three credit reporting agencies?

16  A.   Yes.  Our firm has about 2,000 clients, because we

17  represent just about everyone in the consumer financial

18  services industry.  And the way we get to 2,000 clients is we

19  also represent a lot of auto dealers who are creditors, under

20  the law.

21       And -- and I -- because I specialize primarily in the

22  area of the Fair Credit Reporting Act and privacy, I do work

23  for the major consumer reporting agencies:  Experian,

24  TransUnion, and Equifax, to a certain extent.  I have not done

25  much work for Equifax ever, and I have done no work for Equifax

8

Fortney - D

 1    in the last year or so.

 2            But I do respond to questions from primarily banks

 3    and finance companies as they try to comply with the Fair

 4    Credit Reporting Act.  But I also do represent some reporting

 5    agencies.

 6            THE COURT:  Can you slow down a bit.

 7            THE WITNESS:  I'm sorry.  I do talk too fast.  I

 8    apologize.

 9            THE COURT:  It's really important that the jurors --

10            THE WITNESS:  I know.  I know.

11            THE COURT:  -- are able to understand, and that we

12    have a good record, without interruption.

13            Go ahead, Counsel.

14    BY MS. SUMNER:

15    Q.   Thank you.

16            Ms. Fortney, if you can talk a little bit about some

17    of the publications that you have in this area, and whether you

18    have published any materials specifically on the Fair Credit

19    Reporting Act?

20    A.   Yes, I have.  I have written articles for professional

21    journals on the Fair Credit Reporting Act.  I've also written a

22    how-to-comply manual for the consumer reporting industry.  How

23    to comply with the Fair Credit Reporting Act.

24            I haven't written much recently, because I devote

25    most of my time, other than the practice of law, to giving

1  presentations, at various professional associations, American

2  Bar Association, the -- and others.  And -- because it's

3  difficult for even lawyers to keep up with all of the changes

4  in the law in this area.

5  Q.    And the materials that you -- or that were published, were

6  those self-published or published by some other publication?

7  A.    They were all published by some other publication.

8  Q.    And could you name some of the publications that have

9  published your work?

10  A.    *The Quarterly Report of the Conference on Consumer Finance*

11  *Law.*  The -- I think that's the one that I published in most

12  often, most recently.

13        *Credit World* was another one.  And I'm sure there's

14  some others.  I just don't recall offhand.

15  Q.    Okay.  And have you also acted as an expert on FCRA

16  issues?

17  A.    I do, from time to time; it's not a major part of my work.

18  Again, I spend most of my time dealing with these compliance

19  issues.

20        I would say probably about -- maybe 10 percent, maybe

21  15 percent of my time, on average, is involved in writing

22  expert reports or otherwise serving as an expert witness.

23  Q.    Could you tell the jury a little bit about the purposes of

24  the Fair Credit Reporting Act.

25  A.    The Fair Credit Reporting Act is designed to balance the

1  need of the credit reporting industry for complete and accurate

2  information on consumers.  Balance those needs with the rights

3  of consumers to the privacy and confidentiality and fair

4  treatment of that highly sensitive information.

5  Q.   And does the FCRA require perfect consumer reports?

6  A.   No.  And, in fact, Congress has repeatedly said, and the

7  federal regulatory agencies have said, perfection is impossible

8  given the volume of -- of consumer reports, given the number of

9  files that are out there, given the speed at which this

10  information is disseminated, and also because it's an automated

11  system.  It's also a system that runs pretty much on a

12  voluntary basis.

13         No law requires a bank or other furnisher to give

14  information to a consumer reporting agency, and no law requires

15  a consumer reporting agency to provide a consumer report to a

16  bank.

17         And so it's basically a voluntary system.  It is a

18  system that has evolved; evolved over the last hundred years or

19  so.  And most significantly in the last 20 or 30 years.

20  Q.   So how would you characterize the basic standard that

21  relates to the Fair Credit Reporting Act?

22  A.   Well, as I said, it's a balancing of -- of competing

23  interests, competing needs.

24         And the standard generally is one of reasonableness.

25  What is reasonable under the circumstances?  And that term

Fortney - D

"reasonable" appears repeatedly throughout the Fair Credit

Reporting Act.

  Consumer reporting agencies are required to have

reasonable procedures to ensure the accuracy of information in

consumer reports.  They have reasonable procedures to address

disputes.  Everything in the act is based on a standard of

reasonableness.

Q.   Now, if you can address a little bit the role of credit

reports in our U.S. economy and the -- how that information is

shared between different groups.

A.   Okay.  Again, I'm relying here primarily on -- not just my

expertise but also the findings of Congress in this area and

also the Federal Trade Commission; and a new agency, the

Consumer Financial Protection Bureau, which was created a

couple of years ago to assure the -- the protective rights of

consumers in the field of consumer financial services.

  And what they all have said, including fairly recent

testimony by the director of the Consumer Financial Protection

Bureau, is -- is that our economy really rests on -- in large

part, on the consumer reporting industry.

  This is the industry that enables creditors to make

informed decisions about consumers, gives consumers access to

mortgage loans, credit cards, and even auto loans.  Now, the

fact that someone can go into an auto dealership and drive away

with a car within minutes or hours, after you finish

Fortney - D

1   negotiating with the dealer, that does not exist in most

2   countries.

3           The fact that you can get an instant credit card

4   in -- in a retail department store, that is because of the

5   consumer reporting system.

6           And there have also been studies showing that on

7   average, Americas pay two percent less for our mortgage -- our

8   mortgages than in any other country because of our consumer

9   reporting industry.  It is a -- it is the foundation, as I

10  said, of the U.S. consumer economy.

11  Q.   And is there a certain expectation of the speed of

12  processing the information at this point in our economy?

13  A.   Yes, there is.  That's why I mentioned the fact that you

14  can go into -- actually, you've all been in a department store,

15  they're offering you 10 percent off, or some other incentive,

16  if you get their credit card.  And you can get it right then

17  and there.  The reason you can get it right then and there is

18  because there is an instantaneous report from a -- a CRA, a

19  consumer reporting agency, to the store.  So this -- this all

20  happens with great speed and with remarkable accuracy.

21  Q.   Now, you mentioned a few moments ago Congressional

22  findings.  You mentioned the FTC and the CFPB.  A mouthful.

23          Are those -- first, if you can explain the role of

24  the regulators, and then also -- well, I won't pose two

25  questions.  Just start off with explaining the role of the FTC

Fortney - D

1   and CFPB.

2   A.   For many years the Federal Trade Commission was the

3   primary agency regulating the consumer reporting industry.

4            And then when Congress created the Consumer Financial

5   Protection Bureau, it consolidated a number of the functions of

6   other regulatory agencies into this new agency.  So although

7   the Federal Trade Commission still has some responsibilities in

8   this area -- and we'll talk about studies and things like that

9   the FTC has done -- the principal agency now is the Consumer

10  Financial Protection Bureau, and they exercise oversight in

11  this industry.  And they also, along with the Federal Trade

12  Commission, enforce the laws when any of these companies may

13  violate the law.

14  Q.   Through your years in this area of expertise, have you

15  followed Congressional findings, FTC enforcements, and the more

16  recent CFPB actions with respect to credit reporting agencies?

17  A.   Yes, I have.  I've been following them ever since 1976,

18  and when I was with the Federal Trade Commission, and then even

19  more recently in private practice -- practice, I've testified

20  before Congress on issues involving credit reporting.

21  Q.   Now, and as part of your following the guidance from these

22  regulators and from Congress, has there been discussion about

23  whether or not errors are inevitable in this process?

24  A.   Yes.  As I think -- I think I mentioned that -- there's

25  actually direct Congressional language saying that -- that

14

Fortney - D

1   errors are inevitable.

2   Q.   Now, you did mention a little bit about the furnishers

3   of -- of information to the credit reporting agencies.

4            Is there any requirement that they use any specific

5   form of identification of a consumer when they are reporting

6   that information?

7   A.   No, there is not.  And, in fact, that's one of the reason

8   why furnishers will provide different information and sometimes

9   incomplete information with respect to the consumers on whom

10  they are furnishing the information.

11  Q.   Does this -- well, what issues does that create for a

12  credit reporting agency that is receiving information from

13  furnishers that may not include the same identification items?

14  A.   Yeah.  I think, first of all, you have to understand the

15  volume.  We have -- I think it's 1.3 billion updates of

16  information from the furnishers to the consumer reporting

17  agencies each month.  Each month.  Billions of items of

18  information are going into the consumer reporting agencies.

19  And all of this information has been identified by the

20  furnisher with a consumer in some way.

21           Well, the first issue is consumers often have similar

22  names, last names.  Also, furnishers don't have any standard

23  way of reporting a first name.  Names can be abbreviated, they

24  can be misspelled.  Addresses, consumers move around a lot.

25  And -- and the agencies, the consumer reporting agencies

1    actually rely on updates from the furnishers, quite often,

2    because consumers don't notify -- and they are really required

3    to notify these consumer reporting agencies of changes in their

4    address.  So they rely on information from the furnishers about

5    changes in address.  The other issue that comes in is people

6    don't always give or provide accurate information about their

7    date of birth.

8         The final issue involves a Social Security number.

9    There's a move on -- I think, on the part of some governments

10   and some creditors, to truncate Social Security numbers.

11        There's also the error -- in other words, you just

12   provide the last four -- or last six digits a Social Security

13   number.  There are also errors in the input of Social Security

14   numbers.

15        So that creates an issue for the -- the CRAs, the

16   credit reporting agencies, in trying to match the data that's

17   coming in, these billions of items of information that are

18   coming in, trying to match it to the correct consumer.

19   Q.   So in addition to the variety of information that credit

20   reporting agencies receive from furnishers, do the furnishers

21   also rely on receiving information from consumers?

22   A.   Yes, because it's the consumers, of course, who provide

23   the information to the furnishers.  It's consumers who complete

24   the -- the applications for credit and who will often notify

25   their creditors when they are changing their address.

Fortney - D

1  Q.   And in your opinion, do consumers sometimes provide

2  information that is inaccurate to the furnishers?

3  A.   Consumers could provide inaccurate information or, as

4  indicated, the furnisher could take it down wrong.  You have

5  telephone applications.  That information might be incorrectly

6  recorded.

7  Q.   So have you been involved in reviewing some of the mixed

8  file procedures that Equifax has employed to address issues

9  where information comes in that potentially relates to more

10 than one consumer?

11 A.   Yes, I have.

12 Q.   And has this been an issue that has been -- that Equifax

13 has -- has reviewed over time?

14 A.   Yes.  In fact, when you look at the procedures -- and

15 you'll get to them in a minute -- what you see is the -- these

16 procedures are constantly being reviewed, updated.  Every time

17 there's a modification to procedure, there's a notation of when

18 it was made and who made it.  So I think Equifax is, like the

19 other CRAs that I know, updating these procedures, trying to

20 improve the process.

21 Q.   Okay.  Let me back up for just a minute and ask you a

22 little bit about the credit reporting industry.  Is it your

23 understanding that these regulators from the FTC, and now from

24 the CFPB, do they work directly with the credit reporting

25 agencies?

17

Fortney - D

1  A.   Well, they certainly -- I think that they work with the

2  credit reporting agencies with a lot of interaction.  There's

3  always, in my experience, been interaction with the Federal

4  Trade Commission.  And now there's a lot of interaction with

5  the representatives of the consumer reporting agency and the

6  Consumer Financial Protection Bureau.  Yes.

7  Q.   Let me ask you if you are familiar with some agreement of

8  assurances and consent de -- decrees involving the FTC in the

9  early 1990s.  Are you familiar with that?

10  A.   I am very familiar.

11  Q.   Okay.

12  A.   And here's why.

13       When I was at the Federal Trade Commission, we had

14  complaints about accuracy of information at consumer reporting

15  agencies.

16       We investigated the consumer reporting agencies.  We

17  actually sued TransUnion; entered into an agreement with them.

18  And we thought that we had addressed the problem.

19       What happened, though, was that problems were not

20  really addressed, because we were focusing on the information,

21  once it was in -- within the consumer reporting agency.

22       So these investigations by the Federal Trade

23  Commission and the states' Attorney General really focused on

24  the procedures that the agencies had -- or, I'm sorry, with

25  these companies, these consumer reporting agencies had to

Fortney - D

18

1    comply with the Fair Credit Reporting Act, including the input

2    of the data and also resolving consumer disputes.

3           And what the -- the Government found is that there

4    were in fact deficiencies.  And that's why they entered into

5    settlements with all of the consumer reporting agencies.  This

6    was an industry-wide problem.  But this was a problem in the

7    1990s.

8           And in the early 1990s, credit reporting was the

9    number one source of complaints at the Federal Trade

10   Commission.  Today, it isn't even on the top ten list.

11          By the way, identity theft is on the top -- is the

12   number one complaint, not credit reporting.

13          So what happened?  Well, two things happened.  First

14   of all, the industry got a wake-up call.  They realized there's

15   a problem here.  They -- they developed some automated systems,

16   automated systems for the input of information from -- from

17   furnishers.  This is the Metro 2 (phonetic) format, trying to

18   create a standardized format in which information could be

19   automatically provided; these billions of updates each month to

20   the bureaus.

21          Also they developed the EOSCAR system --

22          THE COURT REPORTER:  I'm sorry.  I need you to speak

23   slower, please.

24          THE WITNESS:  They also developed the EOSCAR system.

25   BY MS. SUMNER:

1   Q.   If you could spell that out for the court reporter.

2   A.   EOSCAR is an acronym.  It's E-O-S-C-A-R.  And it stands

3   for the electronic online -- I forget.  I forget the acronym.

4           But, anyway, it's designed to -- it's -- what it is,

5   it is the web-based computer software that enables the CRAs to

6   communicate with furnishers about consumers' disputes, and also

7   enables the furnishers to relay the results of their

8   investigations of these disputes back to CRAs.

9           This is a system that was developed because there was

10  revision in an amendment to the Fair Credit Reporting Act that

11  essentially required the consumer reporting agencies to have an

12  automated system.  They developed this system.  And, again,

13  when the Federal Trade Commission and the Consumer Financial

14  Protection Bureau have -- have looked at this system, they

15  recognized that it does in fact provide for the resolution

16  of -- of consumer complaints.

17          So we had a change in the industry in the early '90s.

18  We also had some major improvements to the federal -- to the

19  Fair -- Fair Credit Reporting Act.  And those improvements

20  really put more of an obligation on the furnishers to provide

21  accurate information to the bureau -- to the consumer reporting

22  agencies, and also to investigate the disputes.

23          So we had a major change in the law.  We had changes

24  in technology.  And so I think that's the reason, today, that

25  we don't have the percentage of complaints involving --

Fortney - D

1    involving credit reporting involving consumer reporting

2    agencies.

3    Q.    And if I could just pause you there for a moment.  And I

4    would like for you to actually address this issue of consumer

5    satisfaction and the changes that have occurred over time,

6    since the '90s.

7    A.    Um-hmm.

8    Q.    You mentioned a number of system changes.  But if you can

9    focus on the changes in the consumer satisfaction as well.

10   A.    Right.  Yes.  And because this is an area where the

11   industry is constantly trying to improve, there are studies

12   now -- studied by the Federal Trade Commission and a -- a study

13   by a report by the Consumer Financial Protection Bureau.

14          The Federal Trade Commission reported in, I think it

15   was, 2008 that 90 percent of consumers resolved their

16   complaints regarding, you know, primarily accuracy and

17   disputes.  But involved -- resolved their complaints with the

18   consumer reporting agencies before these were referred by the

19   Federal Trade Commission to -- to the consumer reporting

20   agencies for their resolution.

21          So -- in other words, the FTC found a 90 percent

22   resolution basis before anybody else had to get involved.

23          What the Consumer Financial Protection Bureau

24   reported in December of last year was that 95 percent of

25   consumers were satisfied with the results of the

Fortney – D

1    reinvestigations.

2    Q.    Okay.   Let's focus for a minute on issues with respect to

3    mixed files.

4              Has the FTC provided guidance with respect to that

5    and the -- sort of the evolution of that issue?

6    A.    Yes.   Congress directed the Federal Trade Commission to

7    study this issue.   And, in 2004, the FTC published a report of

8    its investigation of the study.

9              And the first thing that the FTC did was discuss some

10   of the issues that I've just mentioned before about the

11   difficulty that consumer reporting agencies have in matching

12   the data that comes in to them with the correct consumer.

13             And the FTC noted that one of the procedures, which

14   was engaged in by all three of the CRAs -- they focused on the

15   three nationwide CRAs.   But they said that the procedure

16   engaged in by all three of the CRAs with respect to the Social

17   Security number was that if seven or eight of the nine digits

18   matched, that was -- even though it was considered a partial

19   match, that was considered a sufficient match to identify the

20   consumer to the -- to the correct file.   They recognized that

21   was the procedure that was being used.

22             They also, of course, recognized that the -- the CRAs

23   were -- were attempting to match name, address -- you know --

24   date of birth, as well as Social Security number.

25             So the issue was -- that -- that -- that the FTC

1    thought about the issue, was should we require an exact match?

2    Should we require a nine-for-nine match with -- with the Social

3    Security number?  Should we require more identification with

4    respect to matching?  And the FTC concluded no, we should not

5    require this.

6            Well, why?  The reason is that if you require a more

7    exact match, you're going to have a lot of file fragments

8    sitting out there that don't belong to anybody, because you

9    can't exactly match them to somebody.  What that means -- what

10   the FTC actually said is that would harm consumers.

11           You might have an increase in accuracy, but you have

12   a decrease in completeness, which would mean you would have

13   more incomplete files.  And the more incomplete files would

14   mean that fewer consumers would get credit, because creditors

15   would not be able to evaluate all of their information, or they

16   would get credit on high returns -- higher rates.

17           What the FTC also observed was that 85 percent of the

18   credit accounts contained positive information.

19           So they -- they -- they looked at this.  They did a

20   thorough study.  And they concluded it's not perfect, but we

21   think, at this point, we are not going to recommend any changes

22   to this procedure, the procedure that all three of the

23   nationwide consumer reporting agencies follow.

24   Q.   Let me ask you a question about error rates.

25           Did the FTC consider error rates when it was

1  reviewing the process and particularly with respect to mixed

2  files?

3  A.    They recognized that mixed times are a source of errors.

4  The FTC also did a study at the direction of Congress.  It was

5  a study that took them about ten years to complete because they

6  had to develop the methodology.  They published the results in

7  February of this year.  The study dealt with the accuracy of

8  information in consumer reports.

9        And what they found was that 98 percent of consumer

10 reports contain no errors that would result in a material

11 change in the consumer's ability to get credit or the rate that

12 they would pay.  So you have a two percent error rate.

13       Now, that's not great, but it's a whole lot better

14 than it was in the early '90s, and it's getting better all the

15 time.

16       There was also a study done by the Political and

17 Economic Research Council that was published about a year

18 before, and it found a 1 percent error rate.  And these are --

19 these are not the types of errors that somebody has an old

20 address, or something like that.  These are the errors that

21 could result in somebody either not getting credit or getting

22 credit on higher terms.  We are talking about a 1 to 2 percent

23 error rate.

24       So that means that 98 to 99 percent of consumers are

25 able to get -- or -- 98 to 99 percent of consumer reports

24

Fortney - D

1  are -- can be relied on and are relied on because they

2  completely accurate with respect to the consumers.

3  Q.   Ms. Fortney, Mr. Hendricks testified earlier today and

4  referenced a -- a PIRG study, which I understand that to mean

5  the Public Interest Research Group.  And I believe that the

6  study that he referenced was in the 1990s.

7         Are you familiar with that study?

8  A.   I'm familiar with that study.  I'm familiar with even a

9  later study done in 2004.  I'm also aware that the Consumer

10  Financial Protection Bureau looked at that study and said that

11  the results were not reliable.

12         Why?  Because, first of all, the sample size was 154.

13  That's much too small to -- to form any conclusions.  And,

14  secondly, the people who participated in -- in the study were

15  employees of PIRG; their family and their friends.  So the --

16  even the Consumer Financial Protection Bureau said there is

17  likely bias here.

18         And there's -- there's an agency called the GAO,

19  which is the Government Accounting Office.  And what they --

20  what they do is investigate -- or sort of -- investigate

21  information, provide information to Congress about various laws

22  that Congress is interested in.

23         And the GAO looked at these same PIRG studies and

24  came to the same conclusion as the Consumer Financial

25  Protection Bureau, which is that these -- that this study -- or

1   these studies by PIRG -- are not reliable.

2   Q.   Mr. Hendricks also referenced generally to media coverage

3   concerning credit reporting issues and mixed files.

4        Do you also follow media coverage with respect to

5   this industry?

6   A.   I do follow media coverage, and I find a lot of it to be

7   very inaccurate, to be sensationalist.  And here's my own take

8   on it, which is the idea that, you know, 99, 98 percent of the

9   time reports are being provided in a way that enables consumers

10  to get credit.  That's not a headline.  The headline is this

11  one person or that one person had difficulty getting inaccurate

12  information removed from their file.

13       So I think the problem is -- is media stories.  And,

14  again, I don't know exactly which ones to which Mr. Hendricks

15  has referred.  But the ones that I have seen, that I question,

16  are the ones that attempt to sensationalize the -- the problems

17  that individuals may have, without necessarily having all of

18  the background, having all of the facts, and also, of course,

19  not looking at this in terms of how the system works for the

20  vast, vast majority of consumers.

21  Q.   Now, based on your experience as having been in a position

22  of the Bureau of Consumer Protection at the FTC, is it your

23  understanding that the FTC would seek enforcement of prior

24  agreements of assurance or consent decrees if they believed

25  that the credit reporting agencies were in violation of those?

26

Fortney – D

1    A.    Yes.   The Federal Trade Commission regularly enforces its

2    consent decrees, the orders it has against companies.   It also

3    reviews compliance by companies with those orders.

4          And if it had found any problems with these or other

5    orders, it would have brought enforcement actions.

6    Q.    Let me switch gears for a moment.   And if I can ask you to

7    tell us -- or tell the jury what you reviewed in preparation

8    for your testimony with respect to Ms. Miller's particular

9    situation.

10   A.    Well, I reviewed her complaint.   I reviewed her deposition

11   testimony.   I reviewed the deposition testimony of -- of two of

12   the witnesses for -- for Equifax who were involved in the

13   process.   And I also reviewed the deposition testimony of

14   Mr. Hendricks.   I've reviewed the initial reports that he

15   prepared in this case.   And I reviewed the policies and

16   procedures and training manuals of Equifax.

17   Q.    Let's talk a little bit about those policies and procedure

18   manuals.

19         And if I can ask you to just direct your attention

20   to -- do you have a notebook of exhibits?

21   A.    Yes, I do.

22   Q.    Okay.   And if I can just ask you to take a moment, and

23   look at the exhibits that are marked 116 through 134.

24         And just flip the -- through those for a moment,

25   please.   And that way the jurors can do so as well.

Fortney - D

1          And after you've had a chance to look at those, let

2    me know if those policies and procedures were some of those

3    that you reviewed in preparation for this case.

4    A.    (Pause, referring.)

5    Q.    Done?

6    A.    Done.  I looked at them before, so I had an advantage over

7    the jury.

8    Q.    Does this represent all of the policies and procedures and

9    manuals that Equifax has concerning consumer disputes and mixed

10   files?

11   A.    I don't believe these are all of the manuals.

12          These are some of the ones that I reviewed.  I did

13   review others.  And these are included in ones that I reviewed.

14   Q.    Are those excerpts from some of the -- and when I say

15   "excerpts," just -- are partial pieces of the manuals, as

16   opposed to complete manuals, in some circumstances?

17   A.    Yes.

18   Q.    And are the manuals themselves much more voluminous?

19   A.    Yes, they are.

20   Q.    And then, as part of your review, did you go through the

21   policies and procedures manuals and the training manuals?

22   A.    Yes, I did.

23   Q.    And did you review those manuals with respect to consumer

24   disputes?

25   A.    Yes, I did.

Fortney - D

1 Q.   Is there a -- a requirement concerning the verification of

2 a consumer identity?

3 A.   Yes.  They're very specific provisions of what is

4 necessary to identify a consumer who is making a dispute.

5 Q.   Why is that important?

6 A.   Because, as I mentioned before, identity theft is a

7 problem.  And consumer -- the consumer reporting agencies are

8 concerned about the wrong person inserting information into a

9 consumer's file.  A -- a common tactic of someone who wants to

10 commit identity theft is to change the address, because now all

11 of the mail is going to them.  They've set up new accounts.

12 That's all going to them.

13         So it's really important for the CRA that it properly

14 identify the consumer before beginning a dispute or making any

15 changes to the information in the file.

16 Q.   And do some of those policies and procedures also

17 specifically address mixed file procedures?

18 A.   Yes, they do.

19 Q.   And do they address the training of agents to prepare them

20 for various mixed file scenarios?

21 A.   Yes, they do.

22 Q.   And have you reviewed the specific scenario, with respect

23 to Ms. Miller?

24 A.   Yes, I have.

25 Q.   And how would you characterize that, based on your

29

Fortney – D

1  experience, in terms of what you've seen in the way of mixed

2  files?

3  A.    Well -- I'm sorry.  Could you --

4  Q.    Sure.  That was not a very clear question.  I apologize.

5         When you -- how would you describe Ms. Miller's

6  situation, in terms of what happened in that particular

7  instance in the mixing of files?

8  A.    Well, I think it's undisputed that her file was merged

9  with that of another consumer, and the evidence also indicates

10 that Equifax provided her file disclosure, even though she did

11 not give Equifax the necessary verification of her Social

12 Security number.

13         And that was in contravention of the -- the policy

14 that -- policies that Equifax had and that I believe every

15 consumer reporting agency has.  That they must identify the --

16 verify the identity of the consumer before they provide the --

17 the report to the consumer.

18 Q.    And as a result of that, did that trigger next steps with

19 respect to her file that was unusual under the circumstances?

20 A.    Well, I think the first thing is, this was a very, very

21 unusual situation, to have this close a match.  I had never

22 seen it before.

23         You know, we have such a close -- we have the same

24 name, including the same middle initial.  And then, of course,

25 a Social Security number, that was so close.

Fortney - D

1          So after she had received her file and saw the

2    information she identified as not being hers, she then disputed

3    this to -- to Equifax.

4          The problem was that they didn't know that she had

5    been able to receive her file with incomplete verification of

6    her Social Security number.

7          So I think that was one of the problems in the

8    process as Equifax was attempting to resolve her dispute.

9    Q.   And does that circumstance create a confusing scenario for

10   purposes of -- of communication from the consumer to the

11   agents?

12   A.   Again I'm not quite sure I understand that.

13   Q.   I'll withdraw it.  Let me try a different approach here.

14         Based on your review and analysis of Equifax's

15   policies and procedures and the circumstances of this case,

16   could you give us your expert opinion as to whether, those

17   procedures were reasonable?

18   A.   Well, I think the jury, when they have a chance to review

19   these policies and procedures, will -- will see how -- how

20   thorough they are.

21         The thing that struck me also about these policies

22   and procedures was how they are periodically updated.  That is

23   one of the elements, in my experience, of reasonable

24   procedures.

25         That the company is not just satisfied with the way

Fortney - D

1   things were, you know, 20 years ago, but they are continuing to

2   look at these policies and procedures as -- as new developments

3   occur.

4        So in my experience, and based on my expertise, I

5   would say these policies and procedures that Equifax has for

6   dealing with consumer disputes, including those that involve

7   mixed files, are reasonable, are consistent with the industry

8   standards.

9   Q.   And do you have an opinion as to whether Equifax, over the

10  years -- since the early 1990s, when those agreement of

11  assurances and any consent orders were entered -- as to whether

12  Equifax has changed and updated its policies and procedures

13  over that time?

14  A.   Yes.  And, again, I think the -- the dates on the policies

15  and procedures reflect that.

16  Q.   And with respect to the Social Security number match of

17  seven to nine, do you think by applying that, Equifax

18  disregarded Mrs. Miller's Social Security number?

19  A.   No.  I think Equifax followed the procedure that is the

20  standard in the consumer reporting agency and the procedure

21  that the Federal Trade Commission studied and concluded does

22  not have to be changed.

23  Q.   You talked a little bit about some of the statistics

24  involved in this industry, which range in the millions and

25  millions.

1      Could you also help the jury understand how many

2 times a name can arise in -- like a last name, like a common

3 name.  You know, such as Johnson, or a name like that.  How

4 many times that --

5 A.   The Consumer Financial Protection Bureau, in the study I

6 mentioned before, dating from December of last year, noted that

7 in -- in America, there are 1.8 million consumers with the last

8 name Johnson.  And another million consumers with the last name

9 Davis.  And there are many other common last names.  And,

10 again, that is one of the problems that consumer reporting

11 agencies have to face when they are trying to match the data to

12 the correct consumer.

13 Q.   Earlier, Mr. Hendricks also testified about how closed

14 this industry is, and that consumers don't have access to this

15 type of information.

16      Could you explain to jury what your understanding is,

17 in terms of -- of the status of this industry today?

18 A.   I think this is a very transparent industry, and that's

19 not just my conclusion.

20      The Consumer Financial Protection Bureau, in their

21 study, found that 44 million consumers get their free credit

22 report each year.  44 million.

23      And I also know that each time a consumer gets their

24 free credit report, or any consumer report from a credit

25 bureau, they get a statement of their rights under the Fair

Fortney – D

1   Credit Reporting Act.  So they are informed as to how they can

2   protect themselves, protect their rights, exercise their rights

3   with respect to their own credit information.

4           In addition, each time a consumer applies for credit

5   these days, many creditors, in order to comply with what's

6   called the Dodd-Frank credit score structure, and was to comply

7   with a new law -- each time a consumer applies for credit, the

8   creditor gives them a -- a copy of their credit score and an

9   explanation of how credit score -- scoring works and what goes

10  into their particular credit score.  What are the four major

11  factors that influence their credit score.

12          So as a result, as consumers today apply for credit

13  cards or auto loans or mortgage loans, they are getting their

14  free credit score disclosure.  So, as a result, I believe

15  millions of consumers are getting their credit scores on a

16  regular basis.

17          And I think what's also significant is the Consumer

18  Federation of America.  Now, that's an organization that

19  represents consumers.  It does not represent anybody in the

20  industry.

21          The Consumer Federation of America published a study

22  last year, and found that the vast majority of Americans today

23  have a very good understanding of their credit reports and

24  their credit scores, and particularly their credit scores.

25          They found that depending on the question they asked,

Fortney - D

1  80 to 90 percent of consumers understood how credit scores are

2  used, who provides them, what goes into a credit score, how

3  consumers behave in paying their bills affects your credit

4  scores.  And they also -- a very high percentage -- understood

5  the importance of seeing their credit report each yeah and

6  checking for the accuracy of that information.  This is a very

7  transparent industry.

8         And I have to say 20 years ago, or in the early '90s,

9  it was not.  Consumers could not get their credit score at all.

10 They couldn't buy it.  They couldn't get it.  And they were not

11 entitled to a free credit report unless they were declined for

12 credit.  So the world has changed dramatically in the last 20

13 years, and for the better.

14 Q.  And as the world has changed dramatically in the last 20

15 years, has Equifax changed its policies and procedures to

16 address that?

17 A.  Absolutely.  Absolutely.

18 Q.  Let's go back to the specific situation that occurred

19 here, from your review.  Is it your -- your review of the

20 materials relating to Ms. Miller.

21        Is it your understanding that a -- a single Equifax

22 agent handled her disputes, or whether there were multiple

23 agents involved?

24 A.  It appeared to me that there were multiple agents

25 involved.

35

Fortney - D

1   Q.   And based upon your review of the information that they

2   were receiving at the time of her disputes, what -- what --

3   what information did the Equifax employees have concerning

4   that -- that credit report that would have indicated to them

5   whether or not they were dealing with the right consumer?

6   A.   Well, again, from the -- when -- when you are looking at

7   the reasonableness of a CRA's procedures and the following of

8   those procedures, you have to put yourself in the place of what

9   did these people know at this time.  Not what did they know

10  today or what do we know today.  This is actually the standard.

11  The test is, what did they know?  What did they reasonably know

12  at the time?

13       And it appears to me that they reasonably knew or

14  believed that they did not have the proper identification from

15  Ms. Miller when she continued to dispute the information.  And

16  that was because she had gotten the report initially from --

17  her free credit report without identifying her Social Security

18  number.

19       But see, the agents looking at that -- you know,

20  after she got that report, they didn't know that.  What they

21  knew was they had one file on Ms. Julie Miller, with certain

22  identifying information.  And what she was providing wasn't

23  matching.

24  Q.   So could you distinguish for a moment the difference

25  between a mixed file and a merged file.

Fortney – D

1   A.   Well, a merged file is a type of mixed file.

2        In this -- a mixed file can occur when just some

3   information that, for instance, should go to -- let's assume

4   that a father and son have the same name, senior and junior.

5   But creditors don't always put in, you know, senior and junior.

6   So you could have a mixed file.  Then you have a file for the

7   senior and a file for the junior.  Some goes to the senior

8   file, some to the junior file.

9        That is probably the most common type of mixed file.

10  And mixed files, by the way, are not that common.  They're

11  about 1 to 2 percent of the number of files at consumer

12  reporting agencies.  And that goes back to the FTC study that I

13  mentioned before about mixed files.  So you have a very small

14  percentage of files that are mixed files.

15       In this case, you didn't have a mixed file.  We had

16  some information for one Julie Miller and one information for

17  another Julle Miller.  You had this information merged

18  together.  That makes it extremely difficult to determine what

19  information really should pertain to this Julie Miller.

20  Q.   Now, in this case, if -- would it have been more work for

21  the agents to have reinvestigated and sent out requests for

22  information to the furnisher, as opposed to what they were

23  doing in response to her communication?

24  A.   Well, the procedures are that no investigation should

25  begin until Equifax has the proper identification from the

1    consumer.  So until they receive that identification, they

2    should not have begun any -- any investigation.  This goes back

3    to the concern about fraud, identity theft, corruption of data

4    in -- in the files.

5          So what they did was keep asking her for verification

6    of her identifying information.  That required the agent to go

7    and determine which letter to send.  And that's a hard decision

8    sometimes when you have a situation like this, which is very

9    unusual.

10          So they had to go out and figure out which letter to

11    send.  They had to generate that letter.  That letter then had

12    to be mailed out.  The agents are sitting there were their

13    computer terminals, they have access to the EOSCAR system.  All

14    they have to do is enter into the EOSCAR system, the consumer's

15    dispute, and it goes automatically to the furnisher.  That

16    would have been a much more simple procedure.

17    Q.    Let's talk a minute about information that's coming in

18    from a consumer.

19          Do you agree that Equifax should always just believe

20    the consumer when they contact Equifax and dispute information?

21    A.    I think that would be a disaster to the consumer reporting

22    industry, and let me explain why.

23          Not just the fact that we have the problem of

24    identity theft -- and, again, that is a big problem -- but also

25    we have the problem of credit repair organizations.

1    Now, I don't know if you're familiar with credit

2    repair companies.  These are the ones who promise, falsely and

3    illegally, that they can remove accurate but negative

4    information from consumers' reports and their files.

5    The way they do this is they abuse the process, which

6    is very important for consumers when used properly.  They abuse

7    the process to dispute the information.  They -- they -- they

8    file the same disputes over and over and over again, hoping

9    that at some point either the CRA will get tired of hearing

10    from them.  Or, alternatively, that the furnisher will get

11    tired of verifying the information, or will not verify the

12    information within the appropriate time.

13    Well, the system works in favor of the industry.  It

14    doesn't work in favor of the consumer.  These consumers pay a

15    lot of money to these companies that make these illegal

16    promises.  They violate the law.  But here's the problem.  They

17    are -- these companies, these credit repair organizations are

18    preying on consumers who are desperate.  They want to get this

19    bad information out of their file.  So they are successful in

20    getting consumers to sign up.

21    As a result, 30 percent of all disputes received by

22    Equifax and the other CRAs come from customers of credit repair

23    clinics.  That's a very large percent.  It ties up a lot of

24    resources.  They have to investigate every single dispute.

25    So if you -- if they just took the word of a

Fortney - D

1    consumer, Not mine, or This isn't my information, or I want you

2    to change this information, you would have -- it would be an

3    invitation to identity theft and other fraud, and also would

4    enable credit repair organizations to basically corrupt the

5    information on which everyone relies in providing credit to

6    consumers.

7    Q.    Now, earlier, in Mr. Hendricks' testimony, he proffered an

8    alternative procedure to address the mixed file situation.  And

9    I believe -- if I'm quoting this correctly -- he referred to an

10   automated program that he would suggest to review and detect

11   mixed files.

12          Are you familiar with what he is talking about?

13   A.    I've never heard of such a thing, and I am involved in a

14   lot of issues in this area.  And I've never heard of such a

15   thing.  I don't know what he has in mind.

16          What I do know is that the Federal Trade Commission

17   and Consumer Financial Protection Bureau would not require such

18   a thing unless it were fully developed, vetted, and determined

19   to meet the cost-benefit analysis that would be required before

20   a CRA should implement such a program.

21          So without any more information, I really can't

22   comment on it, other than to say I've never heard of it.  And I

23   can't imagine why the FTC or the CFPB would think it's a good

24   idea.

25   Q.    You mentioned a cost-benefit analysis.  Is that a term

Fortney - D

1  that the regulators use in analyzing potential programs or --

2  or procedures for the credit reporting agencies?

3  A.   Yes, it is.

4       And that is the analysis that the Federal Trade

5  Commission applied when studying the problem of mixed files,

6  and determining whether it was appropriate to require more

7  precise matching.

8       They said that they -- based on their study, they did

9  not believe that they could conclude that the cost -- in other

10 words, the harm to consumers of having incomplete files --

11 would offset the -- or be offset by the benefits to consumers

12 of having completely accurate information.

13      They did a cost-benefit analysis and said, Based on

14 that analysis, we do not believe that we should recommend

15 changes to the current system.

16 Q.   Based on your experience and expertise in this industry

17 and your review of this case, do you believe what happened to

18 Ms. Miller was foreseeable to Equifax?

19 A.   Well, even though mixed files occur only about one to two

20 percent of the time, it was foreseeable that there would be a

21 mixed file.  That's why Equifax has these procedures.  This is

22 a foreseeable event.

23      What was not foreseeable was that -- an Equifax agent

24 would provide a consumer report to a consumer who had a

25 different Social Security number than what was on file, without

Fortney - X

1    requiring a -- a verification of that Social Security number.

2    That's what was not foreseeable.  And I think that was the --

3    the thing that Equifax, despite all of these good procedures,

4    could not have foreseen.

5    Q.    And in your expert opinion, with respect to the

6    information that you've reviewed in this case, were Equifax's

7    actions that of a reasonably prudent credit reporting agency?

8    A.    Yes, they were.

9    Q.    And in your expert opinion and in your review of this

10   case, did Equifax act with reckless disregard as to Ms. Miller?

11   A.    Not at all.

12            MS. SUMNER:  May I have a moment, your Honor?

13            THE COURT:  Yes, of course.

14            MS. SUMNER:  Thank you, your Honor.

15            THE COURT:  No further questions?

16            MS. SUMNER:  No further questions.

17            THE COURT:  Cross.

18            MR. JUSTIN BAXTER:  Thank you, Judge.

19                          CROSS-EXAMINATION

20   BY MR. JUSTIN BAXTER:

21   Q.    Good afternoon, Ms. Fortney?

22   A.    Good afternoon.

23   Q.    My name is Justin Baxter.  We've never been introduced.

24   I'm one of the attorneys who represents Ms. Miller.

25   A.    Um-hmm.

Fortney - X

1  Q.   Earlier in your testimony, you said that consumer

2  reporting agencies are required to have reasonable procedures

3  to ensure maximum possible accuracy.  Is that correct?

4  A.   That's correct.

5  Q.   But that's not the legal standard under the Fair Credit

6  Reporting Act.  Correct?

7  A.   Yes, it is.

8  Q.   Well, let me read to you Section e of the statute.

9  A.   Yeah.

10 Q.   Whenever a consumer reporting agency prepares a

11 consumer --

12       MS. SUMNER:  Your Honor, I would ask counsel to

13 provide Ms. Fortney with a copy of the --

14       THE COURT:  Well, if she needs it, she'll ask for it.

15 But given what she's described, she can probably read it to

16 counsel.

17       So let's everybody get on the same page.  And if you

18 need the help, go ahead and ask for it.

19       Go ahead.

20 BY MR. JUSTIN BAXTER:

21 Q.   Whenever a consumer reporting agency prepares a

22       consumer report, it shall follow reasonable

23       procedures to assure maximum possible accuracy of

24       the information concerning the individual about

25       whom the report relates.

43

Fortney - X

1   A.   Yeah.  That's a -- I shortened that.  That is the

2   standard.  The standard is to have reasonable procedures to

3   assure maximum possible accuracy.  Where the Fair Credit

4   Reporting Act actually imposes that obligation is when that

5   report is actually provided by the CRA.  That's why you have

6   that language.

7   Q.   And you would agree that the Fair Credit Reporting Act

8   requires consumer reporting agency not just to have procedures

9   but to follow procedures?

10  A.   Yes.

11  Q.   Okay.  And so that's the correct standard?

12  A.   Yes.

13  Q.   All right.  You mentioned that there's an approximate 1 to

14  2 percent error rate for mixed files.  Is that correct?

15  A.   That's correct.

16  Q.   So --

17  A.   That's what the Federal Trade Commission reported.

18  Q.   And so for 200 million adults in America with credit

19  files, approximately 2 to 4 million Americans with mixed files?

20  A.   That's correct.

21  Q.   All right.  As we discussed a moment ago, the standard

22  under the Fair Credit Reporting Act is that the agency must

23  follow reasonable procedures to assure maximum possible

24  accuracy.  Correct?

25  A.   Correct.

Fortney - X

1   Q.    Now, in this case, Equifax merged Ms. Miller's credit file

2   with a different person, with a different Social Security

3   number, with a different date of birth, and a different

4   address.  Correct?

5   A.    Correct.

6   Q.    And that's not reasonable, is it?

7   A.    That's not the standard.

8         The standard is they follow reasonable procedures to

9   assure the accuracy, not that the report be accurate.  That

10  would be strict liability.  They follow the reasonable

11  procedures to assure the accuracy of the information.  The

12  focus is on the reasonableness of the procedures.

13  Q.    Okay.  But my question is, was it reasonable to mix

14  Ms. Miller's credit file with a different person, with a

15  different social, a different date of birth, and a different

16  address?

17  A.    What I'm saying is given the report that the Federal Trade

18  Commission did on this -- on this issue of mixed files, that

19  Equifax followed the industry standards, which the FTC declined

20  to change.

21  Q.    All right.  I guess we're talking past each other.

22        I'm just asking --

23  A.    No, I'm trying to answer your question.  I'm just --

24  Q.    All right.  I'm just looking for a yes-or-no answer.

25        Was it reasonable to mix Ms. Miller's file with a

1    different person, with a different social, a different date of

2    birth, and a different address?

3    A.    Under the circumstances, yes.

4    Q.    All right.  Now, each and every time a consumer disputes

5    information in their credit report, the agency is required to

6    conduct a reasonable reinvestigation within 30 days.  Correct?

7    A.    Once the agency -- consumer reporting agency identifies

8    the consumer, yes.

9    Q.    Okay.  And it's not just that they have to do a

10   reinvestigation.  The -- the statute actually defines what they

11   have to do.  Correct?

12   A.    It's set forth -- sets forth the parameters, yes.

13   Q.    Okay.  And that includes the agency has to review and

14   consider all of the relevant information provided by the

15   consumer?

16   A.    That's once the agency -- once the consumer reporting

17   agency begins the investigation, yes.

18   Q.    Okay.  The agency must also notify the furnisher of the

19   disputed information?

20   A.    Once it begins the investigation, yes.

21   Q.    Okay.  The agency also has to provide all relevant

22   information that it receives from the consumer to the

23   furnisher?

24   A.    Yes.  Yes.

25   Q.    The agency also has to delete any information that it

1  finds to be inaccurate or incomplete or cannot verify?

2  A.   That's correct.

3  Q.   Okay.  And the agency also has to provide written notice

4  to the consumer of the results of their reinvestigation?

5  A.   Yes.  Once they complete the reinvestigation, yes.

6  Q.   Okay.  And all of that has to take place within 30 days?

7  A.   That is correct.

8  Q.   And if the agency doesn't take each of those steps, that's

9  a failure to comply with the Fair Credit Reporting Act?

10  A.   No, it is not.  Because the first step, which I mentioned,

11  is that the agency must obtain the proper identification of the

12  consumer before beginning the investigation.

13  Q.   Okay.  So in this case, Ms. Miller disputed the

14  completeness and accuracy of information in her credit file.

15  Correct?

16  A.   That's correct.

17  Q.   And Equifax received that dispute.  Correct?

18  A.   They received a dispute.  They did not know from whom that

19  dispute came, because they did not have the information they

20  needed to verify the identity of Ms. Miller.

21  Q.   Okay.  Would you take a look at your book.  Okay?

22  A.   Um-hmm.

23  Q.   If you'll turn to Exhibit (pause) 25.

24  A.   Okay.

25  Q.   I'm sorry.  Exhibit 26, please.

Fortney - X

1   A.   Okay.

2   Q.   This has been identified as a dispute package that

3   Ms. Miller sent to Equifax.

4        Okay.  If you'll take a look at the first page.  It's

5   marked Exhibit 26, page 1 of 8.

6   A.   (Pause, referring.)  Yes.

7   Q.   Okay.  Do you see the final sentence in the first

8   full-body paragraph is:

9             I've exposed my identity by mailing requested

10            information several times.

11            And she writes:  And twice now, I've received

12            someone else's credit report, with the wrong

13            Social Security number and birth date.

14  A.   That's what it says.

15  Q.   Okay.  That would adequately advise Equifax of -- of an

16  issue with the credit file.  Correct?

17  A.   It -- well, the letter speaks for itself.  It basically

18  tells what her concern is here.

19  Q.   Okay.  If you'll turn to the second page.

20  A.   Um-hmm.

21  Q.   This is Equifax's research request form.  Correct?

22  A.   Right.

23  Q.   And this is a document that comes with a credit file.

24  Correct?

25  A.   Correct.

Fortney - X

1    Q.   And Ms. Miller could only obtain this if she had provided

2    enough information and documentation to obtain a credit file.

3    Is that correct?

4    A.   I don't know what Equifax agents look at when they

5    provided the information of the credit file to her.

6         What I do know, because it's in the record, is that

7    she did not provide the verification of the Social Security

8    number when she initially received her report.

9    Q.   Okay.  Well, let's keep looking at this letter, because I

10   think we'll get there.

11   A.   Okay.

12   Q.   So also on page 2, you see, she circles the Social

13   Security number and date of birth.

14   A.   Correct.

15   Q.   And she writes "incorrect."

16   A.   Correct.

17   Q.   So --

18   A.   She writes "incorrect."

19   Q.   Right.  That would put Equifax on notice that there's an

20   issue with this credit file with the Social Security number and

21   the date of birth?

22   A.   Yes.

23   Q.   Okay.  Now, if you will flip with me a couple of pages --

24   A.   Um-hmm.

25   Q.   -- to page 6.

1   A.   Okay.

2   Q.   Exhibit 26, page 6.

3   A.   Um-hmm.

4   Q.   This is a copy of Ms. Miller's complete W-2 form.

5   Correct?

6   A.   Um-hmm.  Correct.

7   Q.   And it has her full, unredacted Social Security number?

8   A.   Um-hmm.

9   Q.   And it has her address?

10   A.   Yes.

11   Q.   Okay.  Would you turn to the next page.

12   A.   Um-hmm.

13   Q.   It's Exhibit 26, page 7?

14   A.   Um-hmm.

15   Q.   This is an insurance bill.

16   A.   Um-hmm.

17   Q.   And it shows Ms. Miller's complete, correct address?

18   A.   Right.

19   Q.   Okay.  This is enough information for Equifax to verify

20   Ms. Miller's identity?  Do you agree?

21   A.   I really don't know, because, again, I would have to know

22   everything else that was there at the time.  I really don't

23   know.

24   Q.   Okay.  During your testimony, you said that the standard

25   is what's reasonable based on what they knew at the time.

Fortney - X

1  A.    Right.  Um-hmm.

2  Q.    Correct?

3        Here we have a complete document the -- the --

4  Ms. Miller sent to Equifax and they received.

5  A.    Right.

6  Q.    And she says, I'm receiving the credit file for another

7  person.

8  A.    Um-hmm.

9  Q.    And then she provides the confirmation number that

10 corresponds to that person.  And then she provides her W-2 and

11 her insurance bill.

12       What more could she provide?

13 A.    Well, again, I don't -- I would have to look at everything

14 that was available.  That's outside the scope of what I've

15 testified to.

16       What I'm saying is we're looking at this from her

17 perspective, and that's a very important perspective.  This is

18 what she provided.

19       The other thing -- and I think there are some

20 unknowns here -- is what did the agents have in front of them?

21 What did they know?  What did they look at?  We have some

22 information.  But, again, this is not something I spent a lot

23 of time on because I'm only talking about the -- the issues as

24 an expert here.

25       I bet the jury could certainly look at the evidence.

1    But what I think we have to do is say that this was an unusual

2    situation from the perspective of the agents.  That's not

3    Ms. Miller's' perspective.  And I appreciate her perspective.

4    But there are two perspectives here, and I don't know what

5    other information the agents had, and why they did not respond

6    in the way Ms. Miller wanted.

7    Q.    Okay.  But this is the document.  We actually have a real

8    document --

9    A.    Yes.

10   Q.    -- that she sent.

11   A.    But -- but we also need to know that, you know, what they

12   had on file, was -- was other information.  We know that.

13   Q.    Okay.  What I'm asking is based upon this documentation

14   that we have before us --

15   A.    Right.

16   Q.    -- was this enough to initiate a reinvestigation?

17   A.    I -- I think that what we have here is her identifying

18   information, the nature of her dispute.

19          So I think if we're just looking at this and not

20   anything else, I would say yes.  But I don't know what else was

21   going on.

22   Q.    Okay.  So your answer to my question is yes?

23   A.    That's correct.

24   Q.    They should have started a reinvestigation?

25   A.    Yes.

52
Fortney - X

1  Q.   And if they didn't, that would be a failure to comply with

2  the Fair Credit Reporting Act?

3  A.   I wouldn't go that far.  Again, it could be, and -- it

4  could be a failure.  It could also be that they misunderstood

5  what was there.  We don't know that.

6         What we do know is Ms. Miller submitted this dispute,

7  and it was not resolved to her satisfaction.  That's what we

8  know.

9  Q.   Okay.  Earlier in your testimony you said that the agency

10  must follow reasonable procedures.  Correct?

11  A.   Um-hmm.  Correct.

12  Q.   In your review of this case file, did you see evidence

13  that Equifax failed to follow its own procedures?

14  A.   What I saw, yes, was that Equifax did not always follow

15  its own procedures; including when it initially provided that

16  first consumer report to Ms. Miller.

17  Q.   In fact Equifax sent four different credit reports to

18  Ms. Miller.  Correct?

19  A.   Correct.

20  Q.   And each of those credit reports had the full Social

21  Security number of the other person.  Correct?

22  A.   That's what -- because that's what Equifax had on file.

23  Q.   And the date of birth?

24  A.   That's what they had on file.

25  Q.   And that other person's accounts?

1    A.    That's what -- that's what they had on file.  They thought

2    they were providing the complete file to Ms. Miller.

3    Q.    Okay.  But it was also your testimony that under their

4    procedures they weren't supposed to send any of those credit

5    files to Ms. Miller.  Correct?

6    A.    That's correct.

7    Q.    Okay.  So those four times, Equifax ignored its own

8    procedures?

9    A.    I didn't say they ignored their own procedures.  I don't

10   know why they provided a report to Ms. Miller when she did not

11   provide, from the perspective of the agent, the necessary

12   identifying information and verification of that identifying

13   information.

14   Q.    Okay.  Okay.

15   A.    Are we saying the same thing?

16   Q.    Did you happen to review -- you said you read some

17   deposition testimony in this case.  Correct?

18   A.    Correct.

19   Q.    You read the deposition of Ms. Mixon.

20   A.    I think so, yes.

21   Q.    And she talked about some of the reinvestigations, or --

22   or some of the disputes.  Correct?

23   A.    Correct.

24   Q.    And in fact she said that on some occasions, Equifax was

25   supposed to process reinvestigations, but the agents didn't do

Fortney - X

1   that?

2   A.   That's what I think her testimony is, yes.

3   Q.   And she said that when they didn't do that, that was also

4   outside of procedure.  Correct?

5   A.   I don't recall exactly what she said.  What I do recall is

6   that she said -- and I don't think there's an issue here --

7   that Equifax agents did not always follow the procedures.

8   Q.   Okay.  So -- so there were instances with regard to

9   investigations where Equifax didn't follow its procedures.

10  Correct?

11  A.   The -- the -- the record reflects the fact that Equifax

12  did not respond to Ms. Miller's disputes and did not always

13  follow its procedures.

14           This -- you know, you really don't need an expert to

15  tell you that.

16           MR. JUSTIN BAXTER:  Judge, those are the questions I

17  have of this witness.

18           THE COURT:  Thank you.

19           Redirect.

20           MS. SUMNER:  Your Honor, we have no redirect.

21           Thank you.

22           THE COURT:  All right.  Thank you.  You are free to

23  go Ms. Fortney.

24           THE WITNESS:  Thank you.

25           (Conclusion of excerpt.)

1

2                              --oOo--

3

4    I certify, by signing below, that the foregoing is a correct

5    transcript of the oral proceedings had in the above-entitled

6    matter this 24th day of July, 2013.  A transcript without an

7    original signature or conformed signature is not certified.  I

8    further certify that the transcript fees and format comply with

9    those prescribed by the Court and the Judicial Conference of

10   the United States.

11

12              /S/ Amanda M. LeGore
                 _____

13                  AMANDA M. LeGORE, RDR, CRR, FCRR, CE

14

15

16

17

18

19

20

21

22

23

24

25