1           IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3    JULIE MILLER,                    )
                                      )  Case No. 3:11-CV-1231-BR
4              Plaintiff,             )
                                      )
5    v.                               )  July 23, 2013
                                      )
6    EQUIFAX INFORMATION SERVICES,    )
     LLC, a foreign limited liability )
7    company,                         )
                                      )  Volume 1
8              Defendant.             )
     _____)  Portland, Oregon

9

10                  TRANSCRIPT OF PROCEEDINGS

11                  (Jury Trial – Day 1)

12

13       BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23   COURT REPORTER:          AMANDA M. LeGORE, RDR, CRR, FCRR, CE
                              U.S. COURTHOUSE
24                            1000 SW Third Avenue, Suite 301
                              Portland, OR  97204
25                            (503)326-8184

2

1    APPEARANCES:

2    FOR THE PLAINTIFF:        MICHAEL BAXTER
                               JUSTIN BAXTER
3                              Baxter & Baxter, LLP
                               8835 SW Canyon Lane, Suite 130
4                              Portland, OR  97225
                               (503)297-9031
5                              michael@baxterlaw.com
                               justin@baxterlaw.com
6

7    FOR THE DEFENDANT:        JEFFREY EDELSON
                               Markowitz, Herbold, et al.,
8                              1211 SW Fifth Avenue
                               Suite 3000
9                              Portland, OR  97204
                               (503)295-3085
10                             jeffedelson@mhgm.com

11
                               PHYLLIS SUMNER
12                             LEWIS PERLING
                               King & Spalding, LLP
13                             1180 Peachtree Street, NE
                               Suite 1700
14                             Atlanta, GA  30309
                               (404)572-4799
15                             psumner@kslaw.com
                               lperling@kslaw.com
16

17

18

19

20

21

22

23

24

25

INDEX

Page

Opening Statements
     By Mr. Michael Baxter........... 59
     By Ms. Sumner................... 80

Witness Index

FOR THE PLAINTIFF:          <u>Direct</u>  <u>Cross</u>   <u>ReDirect</u>  <u>ReCross</u>
Julie Miller                  104     158       178

-oOo-

4

1          (Tuesday, July 23, 2013; 8:30 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Okay.  So, officially, good morning,

6    everyone.

7          MS. SUMNER:  Good morning, your Honor.

8          MR. JUSTIN BAXTER:  Good morning, Judge.

9          THE COURT:  We are here for trial in the case of

10   Julie Miller versus Equifax Information Services, LLC.

11         Is Ms. Miller here?

12         MR. JUSTIN BAXTER:  She is, your Honor.

13         THE COURT:  Good morning.  Why don't you come

14   forward, and take a seat at the table.

15         Isn't she going to be with you?

16         MR. JUSTIN BAXTER:  She will be, Judge.

17         THE COURT:  We'll need a name tag for her, Ms. Boyer.

18         Good morning, Ms. Miller.

19         MS. MILLER:  Good morning.

20         THE COURT:  Go ahead and take a seat.

21         Mr. Baxter, is the plaintiff ready to proceed?

22         MR. JUSTIN BAXTER:  We're ready to go, Judge.

23         THE COURT:  And, Ms. Sumner, is the defendant ready

24   to proceed?

25         MS. SUMNER:  We are, your Honor.  I will say our

1    corporate representative will be here prior to when we select a

2    jury.

3                THE COURT:  And his name?

4                MS. SUMNER:  Her name is Margaret Leslie.

5                THE COURT:  Her name.  Okay.  Thank you.

6                MS. SUMNER:  And she will be here shortly.

7                Thank you.

8                THE COURT:  So I just want the record to show that

9    since we were last in session yesterday, I assembled a version

10   of -- at least my first version, my first draft of proposed

11   jury instructions.

12               And that I from those, this morning, prepared a

13   proposed form of verdict.  It is clear to me we're still not on

14   the same page, despite the work we have done Friday and

15   yesterday, and we need to be on the first page before we

16   start -- on the same page before we start with jury selection.

17               That means we need to start with the verdict form,

18   which is really where we should have been at the beginning of

19   the pretrial conference on Friday.  It's very difficult to make

20   rulings and to be consistent, going forward, if we don't have

21   an agreed path as to what the jury is supposed to be deciding.

22               One of the points that I want to clarify, which I

23   think is fundamental, is something I thought we agreed to

24   yesterday, Mr. Baxter, and that was that a -- a negligence

25   finding is necessarily subsumed within any willfulness finding.

```
 1              I thought we agreed that it would necessarily be the

 2     case that in order for the jury to find defendant acted

 3     willfully in any particular respect, the jury would have to

 4     have found that the defendant acted negligently in violating

 5     the act.

 6              Am I wrong on that point?

 7              MR. JUSTIN BAXTER:  No, your Honor.  I think what I

 8     had said yesterday is I don't think the two are mutually

 9     exclusive.  I think the jury could return a verdict for both.

10     But if the jury found willful, they could award damages --

11     compensatory damages and punitive damages.  They wouldn't have

12     to --

13              THE COURT:  Well, let me look at it.  Let me have you

14     look at it this way, the way I charted it out on the verdict

15     form, and tell me if you think that is an erroneous approach.

16              I began with the premise that the plaintiff has to

17     prove the negligence claims.  We start with question 1, as I

18     framed it:  Did plaintiff prove defendant negligently violated

19     FCRA in one or more of the four ways that are specified.

20              Do you agree that that's the starting point?

21              MR. JUSTIN BAXTER:  That's fine.

22              THE COURT:  We may fuss with the language a bit.  As

23     I say, I've roughed this out.  But I'm trying, again, to get --

24     confirmed that we're all on the same analytical page.

25              So we start with a finding whether plaintiff proved
```

1    any negligent violation.

2            Now, my thinking was that if the answer to that

3    question was no, the case is over.  That in the absence of a

4    finding of negligence on one or more of the four claims, there

5    could not be a finding of willfulness.

6            Am I right there?

7            MR. JUSTIN BAXTER:  No, I don't think that's correct,

8    Judge.

9            THE COURT:  All right.

10           MR. JUSTIN BAXTER:  I think that the first question

11   is did they violate the act.  Then the second question is then

12   the mental state.

13           So then --

14           THE COURT:  No, it's not, sir.

15           I am not going to approach the jury with a vague

16   assertion of violation and then ask them which mental state or

17   states applied.

18           You have two -- two simultaneous claims that you're

19   prosecuting.  One is for a negligent violation and one is for

20   willful violation.  And it will be hopelessly confusing to the

21   jury if you are not specific and if I'm not requiring adherence

22   to elements as to particular claims.

23           This is what I've been trying to direct you all

24   through since Friday, and we're evidently still not

25   communicating.

1            So in the instructions I sent you yesterday, I set

2   out four claims for relief somewhat consistently with what you

3   all gave me yesterday.  Those four claims for relief were for

4   negligent violations.  Right?

5            MR. JUSTIN BAXTER:  Correct.

6            THE COURT:  My point is, plaintiff alleges Equifax

7   violated the Fair Credit Reporting Act negligently in four

8   different ways.

9            Correct?

10            MR. JUSTIN BAXTER:  Correct.

11            THE COURT:  Plaintiff also alleges that Equifax

12   violated the Fair Credit Reporting Act willfully in four

13   separate ways.

14            MR. JUSTIN BAXTER:  Correct.

15            THE COURT:  Your contention is that a no finding on a

16   negligence -- negligent violation does not preclude a yes

17   finding on a willful violation.

18            MR. JUSTIN BAXTER:  That's our contention, yes.

19            THE COURT:  Okay.  Let me see if the defendant agrees

20   with you, in which case -- as I say I've been on a different

21   analytical course.

22            What's the defendant's position on this issue?

23            MS. SUMNER:  Your Honor, we understood all along that

24   negligence is required first, and that as a part of that, they

25   would have to prove damages.  And in the verdict forms that we

1   have submitted to you previously, the parties agreed to that

2   concept.

3           So I'm -- it's not clear to me why they are objecting

4   at this point, because I understood that would be the case.

5           THE COURT:  Well, that's not what we're talking about

6   now.  What we're talking about now is what is the law.

7           I'm done trying to meld you all together.  Because

8   after two full days of proceedings and a lot of paper, you're

9   still not on the same page.

10          My question to you simply is this:  Is a finding of a

11  negligent violation necessary before a finding of a willful

12  violation when the two claims -- when the two mental states are

13  tried simultaneously for the same violation, yes or no?

14          MS. SUMNER:  Yes.

15          THE COURT:  Do you have authority for that

16  proposition?

17          MS. SUMNER:  I don't at my fingertips, but I can

18  certainly look at that and then get back to you --

19          THE COURT:  No.  My question is do you know of

20  authority on that, even though you can't cite it?

21          MS. SUMNER:  I do not, at my fingertips, your Honor.

22          THE COURT:  What is theoretically wrong with

23  Mr. Baxter's assertion that you could have a finding of

24  willfulness for a particular claim -- say Claim 1 -- without a

25  finding of negligence on that claim?

1          MS. SUMNER:  Your Honor, it's our understanding that

2     as part of the elements required to find negligence, that they

3     would have to find actual damages.  In this case, it would be

4     the noneconomic damages --

5          THE COURT:  You're not listening to me, or at least

6     I'm not making myself clear.

7          My question is whether a negligence claim is

8     necessarily a negligence -- a negligent mental state is

9     necessarily subsumed within the willful violation, the elements

10    of a willful violation.  Or if you assume, say, only one claim,

11    Claim 1, and I instruct the jury as to the elements of a

12    negligent violation and the jury answered no, Equifax was not

13    negligent in the manner alleged, could the jury necessarily

14    find that -- or nevertheless find that Equifax was responsible

15    for a willful violation of that same claim?

16         MS. SUMNER:  (Nods head.)

17         THE COURT:  That's what I'm trying to understand.

18         MS. SUMNER:  I apologize, your Honor.  I think I

19    understand your point now.

20         My answer is that they would have to find negligent

21    first.  Particularly in this circumstance, where plaintiff is

22    arguing reckless disregard, which is a greater standard than

23    the mere negligence standard.

24         THE COURT:  That's really still not responsive.

25         The question is, in theory, could Equifax be

1    proceeding with a willful mental state if plaintiff proves the

2    willful violation?  Is there something inconsistent with a no

3    finding that Equifax acted negligently in the same way?

4            In other words, is a failure to use reasonable care

5    or the failure to act as a reasonably careful credit reporting

6    agency a precursor to a finding that not only was it negligent,

7    it was willful?  Are they subsumed or are they -- can they

8    exist independently and inconsistently?  Because that's a total

9    different analysis that would have to be explained to the jury.

10           MS. SUMNER:  Our position is that they are subsumed,

11   and that the definition of willfulness supports that.  That

12   they would have to find the negligence first.  And if they do

13   not, that they would not move on to willfulness.

14           THE COURT:  Mr. Baxter, are you aware of any case, in

15   any kind of tort setting, where a jury was permitted to

16   consider willful misconduct when they've found there wasn't

17   even negligent misconduct?

18           MR. JUSTIN BAXTER:  No, Judge.  Your Honor, I have

19   authority for -- for our position.

20           It's the statute.  Section O says if a consumer

21   proves a negligent violation, they get damages.  Section N says

22   if they prove -- the consumer shows a willful violation, they

23   get damages and punitive damages -- or that's submitted to the

24   jury.

25           THE COURT:  But that seems, to me, to be consistent

1    with the premise I've been pursuing, and that is that you have

2    to have at least established a negligent violation before you

3    can have a willful violation.  Which is why on the verdict

4    form, as I've been thinking this through -- and as I handed it

5    to you just now -- the jury would be instructed that if they

6    answer no to question 1, the case is over because if you fail

7    to prove Equifax acted at least negligently, how can a jury

8    rationally find on the same record that Equifax acted

9    willfully?

10            Do you see what I'm saying?

11            MR. JUSTIN BAXTER:  I understand.  And I --

12            THE COURT:  My point is am I logically -- am I not on

13   the right track here or --

14            MR. JUSTIN BAXTER:  Well, I probably should have

15   started with the premise that the format of this -- where we

16   are today, I think the format of this verdict is acceptable to

17   me.

18            THE COURT:  The one I'm handing to you?

19            MR. JUSTIN BAXTER:  Yes.

20            THE COURT:  Well, that says to tell the jury the case

21   is over if you don't get a yes answer on question 1.  And I

22   need you to tell me if you contend that's wrong legally or it's

23   correct legally.  Or whether you're just satisfied with it.

24            MR. JUSTIN BAXTER:  I'm satisfied with it.

25            THE COURT:  Okay.  Then we won't have an issue on

1    appeal about it.

2              MR. JUSTIN BAXTER:  Correct.

3              THE COURT:  All right.  Then the first question the

4    jury will be asked is a form of the question 1 I gave you,

5    which is, in part, a form of the way you gave it to me, but

6    we'll fuss with the actual words later.

7              I just want to be sure I have the basic logical legal

8    framework worked out before I ask a juror to come into the

9    room.

10             So, now, I have departed again in -- in the order of

11   questions, from what you suggested.  Because I believe that if

12   the jury answers yes to question 1, they should then focus on

13   answering what are the plaintiff's noneconomic damages arising

14   from the negligent violation or violations that they find by

15   answering yes to question 1.

16             Is there any problem with that approach?

17             MR. JUSTIN BAXTER:  That approach is fine, Judge.  I

18   would ask the Court to strike the word "noneconomic," and use

19   the word of the statute, which is --

20             THE COURT:  You want "actual damages"?

21             MR. JUSTIN BAXTER:  Right.

22             THE COURT:  Well, I'll -- I get that.  I will work

23   through that with you, the wording of it.

24             But let's just call it compensatory for the moment,

25   because actual damages can be noneconomic or they can be

1    economic.  Here, actual damages are only noneconomic.

2              Do we want to just call them actual damages, knowing

3    in our heads that it really is just noneconomic damages, and

4    defining it in the words of noneconomic damages, without

5    getting into all of the other labels?

6              I don't much care because we're not going to be

7    introducing the notion of economic damages, and we're going to

8    be defining noneconomic -- I should say, actual damages as

9    those subjective nonmonetary losses incurred by the plaintiff

10   as a result of the defendant's alleged wrongful conduct that

11   they find was proved.

12             Do you care?

13             MS. SUMNER:  It would be our preference that we

14   reference noneconomic because they have conceded that there are

15   no economic damages --

16             THE COURT:  Well, why does the jury need to know the

17   noneconomic label when the statute speaks of actual damages?  I

18   think we're in agreement as to what categories can be

19   considered by the jury for actual damages.  Basically, the

20   definition of noneconomic.

21             I'm trying to avoid introducing terms that could be

22   confusing.  And if we all mean the same thing by actual damages

23   and I define that to the jury in a way that's legally correct,

24   that we'll work through -- I haven't included one of your

25   categories.  The privacy thing.  I'm not -- no, I can't

1    remember which one.  But we'll get to that.

2              But if -- if we're all focusing on actual damages,

3    knowing that they equal a legal definition of noneconomic

4    damages, then I can avoid using different terms that could

5    confuse the jury.

6              Is there anything legally wrong with that?

7              MS. SUMNER:  No, your Honor.  I just think because we

8    are only focused on noneconomic, that it helps the jury focus

9    on what is at issue.  That would be the basis for our request.

10             THE COURT:  All right.  We're not going to use the

11   word "compensatory."

12             MS. SUMNER:  Okay.

13             THE COURT:  We'll try to figure out a way not to

14   confuse them, by using the statutory language "actual damages,"

15   and the conceptual definition "noneconomic damages," but I'll

16   work with that.

17             Okay.  So Question 1 and Question 2, in theory, are

18   in the proper order.  Right?

19             MS. SUMNER:  We agree, your Honor.

20             THE COURT:  Both sides?

21             MR. JUSTIN BAXTER:  Yes.

22             THE COURT:  Okay.  So then -- then we -- then my next

23   conceptual question is this.

24             As to 3, I'm directing the jury back to being sure

25   that when they consider willful violations, they consider that

1   willful issue only as to any negligent violation they found by

2   answering yes to question 1.

3          So I wanted to be sure, Mr. Baxter, you saw that

4   that's what I thought was required, and that you continue to

5   agree that that's, in principle, consistent and correct, given

6   how we're proceeding with question 1.

7          MR. JUSTIN BAXTER:  Yes.  That's fine, Judge.

8          THE COURT:  And so we would -- we would just then

9   have a total of five questions, not six.

10         There was a lot of parsing on the six-question

11  verdict form:  Was liability proved, were actual damages

12  proved, was willfulness proved, was -- you know.  So I combined

13  one of them.  I think this is still conceptually legally

14  correct.

15         MS. SUMNER:  I think this does streamline it, your

16  Honor, and --

17         THE COURT:  I will work a little more with the

18  language before I try to sit you all down.  And I don't quite

19  know when we can do that.

20         Perhaps, depending on how long jury selection takes,

21  perhaps each side can designate one person to work with me for

22  about 20 minutes over the noon hour to work through some of the

23  wordsmithing before we use a lot of time on the record to

24  actually challenge concepts.

25         Now, briefly, were there legal correctness issues

 1    that are of initial concern in the draft of jury instructions

 2    that I sent you late last night?

 3              Mr. Baxter?

 4              MR. JUSTIN BAXTER:  Judge, there were a few minor

 5    edits, but no major omissions.

 6              THE COURT:  Edits we'll take care of later.  But I

 7    just want to make sure if I've missed -- here's one concern I

 8    had about the punitive damage language, and I -- I'm not sure I

 9    have a complete statement here.

10              But you know the law has those three categories.

11    And, really, we shouldn't be instructing the jury with respect

12    to any category of reprehensibility or punitive conduct that

13    doesn't exist.  So -- for example, I think it's the definition

14    of oppression that talks about basically harm to the public

15    welfare; physical harm, those sorts of things.  And we need to

16    pay attention to exactly what category and definitional

17    construct ought to be in the final jury instruction around

18    punitive damages.

19              The model instruction assumes it all.  And, you know,

20    an economic case that involves the integrity of a person's

21    financial health may not qualify for that public well -- health

22    and welfare sort of language that is in the standard

23    instruction.  So that's one thing I'll want to wordsmith with

24    you to be sure we get that right.

25              And if there are typos in it, those are all of my

1    problem since I'm the author.  We'll take those up in due

2    course.

3           Substantively, were there concerns you needed to

4    alert me to, so that I don't start off with the jury on -- on a

5    tack you object to legally?

6           MS. SUMNER:  Your Honor, I think that we would

7    request the attorneys fees instruction.  It's not in your

8    version.  We thought that was pretty important, so that the

9    jurors --

10           THE COURT:  It is.  It is.

11           MS. SUMNER:  It is?  I'm sorry.  Maybe I missed that.

12           THE COURT:  It's in the definition of -- in fact, I

13    put it in over my own objection.  I normally don't do that.

14           MS. SUMNER:  Well, I should sit down then, your

15    Honor.

16           THE COURT:  It's there.  I know you're trying to rule

17    out the jury thinking that they need to compensate Ms. Miller

18    for her attorneys and --

19           MS. SUMNER:  Yes.

20           THE COURT:  And I've said that I will do that in the

21    event the verdict warrants that.  But it is there.

22           MS. SUMNER:  And the only other issue, your Honor, is

23    that we just want to take -- have a chance to think about the

24    substantial factor instruction.  That that is --

25           THE COURT:  Here was the problem I had around your

1    instructions.  You all melded the law -- the common law of

2    proximate cause and proximate causation language and the

3    substantial factor causation language.  It really would be very

4    confusing to a juror to have both.

5             We have one formulation of causation.  Substantial

6    factor seems to be the correct definition.  It's a cause if

7    it's a substantial factor, which is an important one and not

8    one that is insignificant.

9             All of that proximate cause, **Palsgraf** legalese has

10   always been, I think, inherently confusing to jurors, and I

11   have steered away from using it unless I'm required to as a

12   matter of substantive law.

13            So if in the context of the Fair Credit Reporting Act

14   substantial factor is not the right causation standard, then

15   show me the authority that says that.  But the problem I have

16   with the way you all phrased it is that you threw multiple

17   concepts of causation into your proposed language.  And that

18   was, in my mind, not helpful to the jury.

19            MS. SUMNER:  Then, your Honor, we would simply ask --

20   and forgive me, if this is in here.  But the -- we have a very

21   brief instruction on harm caused by others, which I think does

22   apply --

23            THE COURT:  I think that is also in there, but we'll

24   look for it when we do our editorializing through the language.

25            MS. SUMNER:  Okay.  Thank you.  Generally, your

1    Honor --

2              THE COURT:  But in sum, we're on the right track,

3    anyway?

4              MS. SUMNER:  Yes.  Thank you.

5              THE COURT:  Okay.  Very good.

6              Now, before we call for the jury, are there issues

7    you want to deal with this morning, or are we ready to actually

8    bring the jury in?

9              Yes, Mr. Edelson.

10             MR. EDELSON:  Would you just -- would you like us to

11   stand for the jury?  I know different judges have different

12   views on that, as they come and go.

13             THE COURT:  We'll pick a plan.

14             There isn't a formal rule in this district.  I think,

15   anecdotally, different judges have implemented different plans.

16   What I don't want is a situation where some people are doing

17   one thing and some are doing others.  It's confusing and

18   potentially embarrassing.

19             The last trial I just finished a couple of weeks ago

20   in a criminal case, we had the jury standing -- I'm sorry.  We

21   had everybody standing every time the jury came in and out.

22   But that's because most of the lawyers were going to stand up

23   impulsively anyway, and we wanted everyone to do it the same

24   way.

25             I really don't care.  I think jurors may see it as a

```
 1   sign of respect.  You know, like you -- you're required to
 2   stand initially when a judge enters.
 3            I don't take it personally.  But, you know, they
 4   might see it as an additional sort of sign of the importance of
 5   this proceeding.
 6            I will do whatever you like to do, so long as you
 7   agree.
 8            Do you have a preference, Mr. Baxter?
 9            MR. JUSTIN BAXTER:  We prefer to stand, Judge.
10            MS. SUMNER:  Agreed.
11            THE COURT:  And that's the Georgia plan, yes?
12            MS. SUMNER:  Yes, it is.
13            THE COURT:  So I will announce every time the jury is
14   coming in, "All rise for the jury," and then you'll have your
15   cue.
16            All right.  This must be Ms. Leslie.
17            MS. SUMNER:  Correct, your Honor.  Margaret Leslie,
18   vice president of technology.
19            MR. PERLING:  Would it be okay, your Honor, if I sat
20   at this table with Ms. Leslie for now?
21            THE COURT:  Sure.  Sure.  Right.
22            Here -- here is -- I mean, if it turns out
23   Mr. Edelson is not going to be here for the main
24   presentation -- and I haven't heard what your choice was --
25   then it probably -- the three of you can sit there.
```

1          If it's going to be four of you most of the time, you

2     ought to figure out a way that you're not crowding each other.

3     Yes, you can bleed over to that space.

4          The jurors like to see these name tags.  We've had

5     feedback from them repeatedly that despite introductions, they

6     don't remember who is who.  And in this last trial, the jurors

7     actually complained that the lawyers didn't introduce themself

8     often enough.

9          I'm just saying.  There were eight lawyers there, so

10    maybe that might have been the problem.  But I think they'll

11    pretty much figure out who you all are.

12         It's not that hard, within an hour or two.

13         Okay.  We're -- let's get a seat for Ms. Leslie, and

14    work this out.

15         MR. JUSTIN BAXTER:  Your Honor, I had one item.

16         THE COURT:  Yes.

17         MR. JUSTIN BAXTER:  We -- the parties have completed

18    the trial -- the exhibit notebooks that we discussed yesterday.

19         THE COURT:  Yes.

20         MR. JUSTIN BAXTER:  So we have those prepared for the

21    Court and for counsel and for the jurors.

22         Our preference, for plaintiff, is to hand them out

23    after opening statements.  We're going to show the jury the

24    specific demonstratives that we want to show them.  And we

25    prefer them not to be leafing through the books during opening

1    statement.

2            THE COURT:  All right.  So what you're telling me is

3    that you have come to an agreement that the jury may have in

4    the possession of each of the trial jurors a notebook that has

5    some -- or all?

6            MR. JUSTIN BAXTER:  All.

7            THE COURT:  All of the presently agreed-to exhibits?

8            MR. JUSTIN BAXTER:  Correct.

9            MS. SUMNER:  And that is one -- there is one item we

10   should address, your Honor, because you had requested -- and we

11   did pull out the inserts to the manuals.  So our plan is, to

12   the extent appropriate, we may show them the volume of the

13   manuals.  But we now have only in the jury books the excerpts

14   that we would direct them to during examination.

15           THE COURT:  Are you anticipating additional exhibits

16   will be received in evidence during the trial?  And in that

17   case, are you anticipating supplementing or adding to what the

18   jury has as their personal record?  Or not?

19           MR. JUSTIN BAXTER:  (Shakes head.)

20           MS. SUMNER:  Your Honor, it is possible.  But I will

21   have to say it's been a while since I've used notebooks.  But

22   in the past, when doing so, we've always required the jurors to

23   leave the notebooks under their chairs at the end of the trial,

24   and then we have worked with the courtroom deputy if additional

25   exhibits need --

1          THE COURT:  No, I mean, at the end of the evidence

2   and before deliberation.  Are you intending the jurors -- we'll

3   just deal with it.  It won't be that many.  We'll figure out

4   what to do.  And then you're going to have an official set,

5   despite -- in addition to the one the jurors have?

6          I would like to be able to tell them that they're

7   free to mark on what they have.  It's their personal copy and

8   not the official -- official exhibit.

9          MS. SUMNER:  That's fine.

10          THE COURT:  Okay.  Okay.  Good.

11          Solved that.

12          Yes?

13          (Pause, Court and clerk conferring.)

14          THE COURT:  Ms. Boyer is inquiring how to describe

15   Ms. Leslie on her name chart.

16          She is what?

17          MS. SUMNER:  She is the Equifax vice president of

18   technology.

19          THE COURT:  That's a lot to put on a little name

20   chart.  So what do you want?  Defendant -- Equifax's

21   representative?  How's that?

22          MS. SUMNER:  That's fine.  We will obviously

23   introduce who she is.

24          THE COURT:  Right.  But I meant on a label, so that

25   she's not seen as the unidentified person here.

 1          Okay.  All right.  Are we ready for bringing up the

 2   jury then, folks?

 3          Plaintiff is?

 4          MR. JUSTIN BAXTER:  Plaintiff is ready.

 5          THE COURT:  And are you all ready?

 6          MS. SUMNER:  We are ready, your Honor.  Thank you.

 7          THE CLERK:  And the jurors are ready.

 8          THE COURT:  Okay.  Bring them up, please.  Let's get

 9   started.

10          At the appropriate time in voir dire, then, I'll just

11   have one person from each side of the case introduce everybody

12   you want introduced on the team.

13          So, Mr. Baxter, you seem to be the one on your feet

14   most of the time.  Do you want to be the introducer?

15          Or, Mr. Baxter, do you?

16          MR. JUSTIN BAXTER:  It will be my father.

17          THE COURT:  All right.  He'll introduce you.  And

18   then, Ms. Summer, you'll be the introducer?

19          MS. SUMNER:  Actually, I was going to ask Mr. Edelson

20   to do that.

21          THE COURT:  Finally, meaningful participation.  A

22   little joke.

23          Okay.  So how many jurors are we expecting, Bonnie?

24          THE CLERK:  She called 25.

25          THE COURT:  Okay.  So we'll see.  All right.

```
 1           MR. PERLING:  Your Honor, since we do have this
 2    unique situation, where I'm going to be sitting away from my
 3    co-counsel, could we have -- when it comes time to start our
 4    deliberations on the jurors, could we have a few minutes to
 5    confer, so I can come back around?
 6           THE COURT:  The jury's going to be out of the room.
 7    Nobody's going to really care where you're positioned at that
 8    point.
 9           (Pause.)
10           MS. SUMNER:  At some point, we want to make sure
11    we're properly connected.  Should we do that now or should we
12    wait?
13           THE COURT:  You're definitely going to have a recess
14    before opening statement.  At least the jury will be out of the
15    room, while you're -- we're picking them, so we'll be okay.
16           MS. SUMNER:  Okay.
17           (Pause.)
18           MR. EDELSON:  Your Honor, one other item.  I just
19    wanted to confirm that witnesses are excluded until they've
20    completed their testimony.
21           THE COURT:  No one has addressed that.
22           Is there a Motion to Exclude Witnesses?
23           MR. EDELSON:  We so move.
24           THE COURT:  Any objection to that?
25           MR. JUSTIN BAXTER:  No objection, Judge.
```

1          I'll ask Mr. Miller to take a seat outside the

2    courtroom.

3          THE COURT:  Is Mr. Miller Ms. Miller's husband?  Yes?

4          MR. JUSTIN BAXTER:  Yes.

5          THE COURT:  And he is going to testify?

6          MR. JUSTIN BAXTER:  He is.

7          THE COURT:  All right.  So, Mr. Miller, sir, you'll

8    need to wait outside.

9          If there's any other witness in the room, that person

10   should wait outside, too.

11         No witness should talk to another witness about

12   what's going on in the courtroom.  You're free to talk to the

13   lawyers.  After your testimony, you're free to come back, if

14   you're not going to be called again.

15         So, sorry, Mr. Miller.

16         Go ahead and step on out.

17         (Pause.)

18         (Whereupon jury selection was held but not requested

19         to be transcribed herein.)

20         (Presiding jurors sworn.)

21         THE COURT:  Yes, or I do.

22         THE JURORS:  Yes.

23         THE COURT:  Very good.  Each of you said yes?  Yes.

24         Okay.  That's a very important step, because what

25   you're undertaking now is the official responsibility to be the

1    judges here in this case.

2              Now, let me tell you a little bit about scheduling,

3    so I can help plan the day as we go forward.

4              I have about 15 minutes or so of some basic

5    introductory instructions.  The next step in the trial is

6    opening statements.

7              That will be a statement by one of the lawyers for

8    each of the parties, ahead of the evidence, to give you a

9    preview from each side's perspective about what they think you

10   should be listening for as the evidence comes in.

11             Now, one of the choices I need to make is managing

12   the time around our lunch break.  You'll definitely get lunch.

13   We're not going to be working you all day without a lunch

14   break.

15             The really open question at the moment is whether I

16   instruct and then we take a lunch break, or whether I instruct

17   and we take one opening statement and then a lunch break.

18             Do any of you have any particular strong preference?

19   Would you rather have your lunch break in about 15 minutes or

20   in about -- oh, I see a nod.  So we'll do that.

21             See, jurors get to make a decision.  If no one acts,

22   then we'll do that first.

23             So I'm going to give you an instruction.  I need you

24   to listen patiently through that.  Then we'll take the lunch

25   recess, which will be about an hour.  And then when you're

1    back, we'll start with opening statements from each of the

2    lawyers.  And then we'll begin with the evidence.

3            So let me first make the point that everything we've

4    talked about, up till now, was intended to help you help us get

5    you picked, but none of it proves anything.  You haven't yet

6    heard any evidence.  Evidence will come from the witness stand,

7    from witnesses under oath, who will be answering questions in

8    front of you.  And it will come to you in the form of exhibits,

9    documents, things, records that are already received as

10   evidence or will be offered as evidence during the trial and

11   then received in your presence.

12           So there's one other kind of evidence in the case,

13   and that's in the form of any agreed facts that the parties

14   point out to you or I point out to you.

15           So once it's determined that a point of fact is

16   actually agreed to, then nobody needs to prove it with a

17   witness.  All right?

18           So evidence comes in three sources; witness stand,

19   exhibits that are received, or admitted facts.

20           You and you alone will review that evidence, that

21   body of material at the end of the case.  And you and you alone

22   will decide who to believe and what is proved or not proved.

23           Once you decide what the facts are, you'll apply to

24   those facts the law that I give to you, whether you agree with

25   the law or not, and that's basically how you reach a verdict.

1            Just to recap, in federal court, it is required that

2    all verdicts returned are unanimous; meaning all eight jurors

3    have to agree on whatever verdict is returned.

4            And in this case there will be a verdict form that

5    asks a number of questions.  In a particular logical order,

6    usually phrased like, Did plaintiff -- in this case,

7    Ms. Miller -- prove a certain point, yes or no.

8            And then there will be directions.  I call them red

9    light/green light directions.  If it's one answer, you go one

10   direction.  If it's another answer, you go another.  So we'll

11   lay it out logically for you.  All right?

12           Now, I want to review some basic areas of law.

13           Please don't be concerned that you're not writing any

14   of this down.  All of the instructions that will be the final

15   instructions that you use during your deliberation each of you

16   will have a copy of, fully written out.  So you don't need to

17   worry about remembering any of this.

18           I'm simply wanting to give you some basic orientation

19   about the legal rules that control your -- your view of the

20   evidence and how you conduct yourself and the substantive law,

21   so that you know what to expect of you and it isn't just given

22   to you at the end, after you've already heard the evidence.

23           I want you to understand that you're going to be

24   asked questions about whether the plaintiff proved her claim,

25   and I'll summarize what those claims are now.  They'll be

1    summarized again in opening statement.  They'll be laid out for

2    you in the final instructions.  And they'll be on the verdict

3    form.  So there will be, as I say, a written record, and a

4    summary of what you need to do.

5           Now, the function of a jury, as I said earlier, is to

6    be the final judge of the evidence, to decide what the facts

7    are.

8           After we go through the trial as I've described it --

9    the opening statements of the attorneys, the testimony of the

10   witnesses -- we'll then have a situation where the lawyers will

11   be able to speak to you again in what's called closing

12   arguments.  Because Ms. Miller has the burden of proof, she

13   goes first in every phase of the trial.

14          So her lawyers, one of them, will make an opening

15   statement first.  Her side will call the witnesses first.

16   Equifax's counsel will be able to cross-examine her witnesses.

17   And then once the next witness comes up, we'll just do this in

18   order until Ms. Miller has offered all of the evidence she

19   wants to offer.

20          Then the tables turn.  Equifax gets an opportunity to

21   offer evidence it wants to offer that isn't already in the

22   case, and they'll be asking questions first.  All right?

23          When we get to closing arguments, Ms. Miller's

24   lawyer, again, will address you first.  But because she has the

25   burden of proof, they'll also get a rebuttal argument, meaning,

1    after Equifax's counsel argues, they'll get to stand up one

2    more time.  I'm give the final instructions about your

3    deliberations, and then the case will be yours.

4            So when that happens, it will be your duty to weigh

5    and to evaluate all of the evidence calmly and dispassionately;

6    to decide how believable the evidence is; and in that process,

7    to decide what the facts are.

8            You are free to draw reasonable inferences from the

9    evidence, as long as those inferences and conclusions are based

10   on common sense and experience.  But you're never allowed to

11   guess or to base a finding of fact on speculation or

12   conjecture.

13           You must not allow bias, sympathy, or prejudice any

14   place in your deliberations, because all parties -- these two

15   included -- are equal before the law.

16           Ms. Miller, and a corporation like Equifax, are

17   entitled to the same fair and conscientious treatment as you

18   consider the evidence and ultimately as you return a verdict.

19           Once you decide what the facts are, then you'll apply

20   to those facts the law that I give to you, whether you agree

21   with the law or not.  This is just as you promised to do in the

22   oath you just took.

23           You'll have to follow all of the instructions I give

24   and not seize upon a single word or a single sentence, single

25   out some and ignore others.  It's intended to be a

1    comprehensive set.

2            Now, because your verdict must be based only on the

3    evidence and on the law that I give you, you must not be

4    exposed to any other information about the case or to its

5    issues.

6            So except for discussing it among yourselves when the

7    case is in your hands for deliberation, do not communicate with

8    anyone in any way.  And do not let anyone else communicate with

9    you in any way about the merits of the case, or anything to do

10   with it.  This includes discussing the case in person, in

11   writing, by phone, or electronic means; via e-mail, text

12   messaging, or in any Internet chat room, blog, website, or

13   other feature such as Facebook.  I have a friend judge who

14   says, Or anything else that's invented before the end of the

15   trial.  (Laughter.)

16           The point is, we communicate a lot of things a lot of

17   ways.  While you're a juror, you're not permitted to give out

18   information or to receive information about the case.

19           You may have noticed nationally coverage around

20   jurors who are blogging about the case they're sitting on,

21   during the case.  That can't happen.

22           Some judges, in desperation, around the country, have

23   taken to taking devices away from jurors just to ensure that

24   nothing like that happens.  That's not going to happen here.  I

25   trust you not to do what I've explained you shouldn't do.  You

1    need to just insulate yourself from information around the

2    case.

3         Around the building, you need to avoid the parties.

4    You'll be given a juror button to wear.  That designates you as

5    the special people you are in the building.

6         And the lawyers who use the building know they should

7    stand away from you in the elevator and not be talking about

8    cases around you.  These parties know who you are, and they'll

9    stay a distance from you.  It's not that they're being rude.

10   They're just not supposed to engage with you.  All right?

11        So, despite my instruction, if anything comes your

12   way about the case, if someone says, Oh, you're a juror on that

13   case involving Equifax.  What do you think?  Or did you know --

14   you stop them right then.  You tell them, Stop.  I'm a juror.

15   Don't talk to me about it.  And then you report it to me,

16   through Ms. Boyer or any other means.

17        If someone persists with that, even after you've

18   warned them, that that's especially serious, and I will need to

19   know so I can take action.

20        Now, when you have a break, you're going to want to

21   call home, or your office, or whomever, to let them know you've

22   been seated on -- on this jury, and that's fine.

23        Tell them you've been seated on a jury in a civil

24   case, and the judge has ordered you not to discuss it.  Nine

25   times out of ten you'll be then asked, Oh, what kind of civil

case have you been seated on?  And your response is, The judge
has ordered me not to talk about it, and to report to her if
people keep asking.  (Laughter.)  That usually puts it to rest.

It's a little humorous way to deal with it, but it's
very serious business here.

Why?  Because these parties are entitled to have a
fair trial, based on the same evidence that they know you have.
If you had outside information that they didn't know about and
didn't have an opportunity to challenge, it would be
fundamentally unfair.  You would have information that clearly
could affect how you view the evidence, and that's not right.
If something like that happened, we would have to start over,
declare a mistrial, bring in another panel.  And, you know, all
of the expense and effort that the parties have gone through to
get ready for today would be all for naught.

So it's very important that you observe this
instruction.  It only exists for the length of the trial.  It
will only be a few days.  When it's over, you're free to say to
whomever you want whatever you want about the case.

I only ask that you always respect the privacy of
your fellow jurors.  Because what goes on during deliberations
is your business.  And the private impressions and views of one
juror really should not be communicated by other jurors to the
outside world.  You're free to express your own opinions about
things, but let people speak for themselves if and when you

1    choose to talk.  Okay?

2              So enough about that.  Don't do any research.  Don't

3    go to the Internet.  Don't be looking up Equifax or try to find

4    information about the Fair Credit Reporting Act.  The case

5    rises or falls on whatever's presented to you.  It's either

6    enough or it isn't, and that's the way it goes.

7              So I've told you what evidence is.  Now, let me tell

8    you what is not evidence.

9              Everything we've done up to the part where you were

10   sworn as a juror is not evidence.

11             You can't count on anything that was said during jury

12   selection in deciding who and what to believe or in how you

13   return your verdict.  The arguments, the statements and the

14   questions the lawyers ask of the witnesses are not evidence.

15   The lawyers are not witnesses.  What they do say in their

16   opening statements, in this closing arguments, and at other

17   times -- even when they question a witness -- is intended to

18   help you interpret the evidence; but it isn't the evidence.

19   The evidence is the answer to the question, not what the lawyer

20   said that is the question.

21             If you at any point remember differently the

22   testimony of a witness, as opposed to how the lawyers describe

23   it to you, you rely on your memory.  They're advocates.

24   They're doing the best they can to present the case from their

25   client's perspective.  But any differences are resolved by you

1    and not them.

2            Now, from time to time in any trial, a lawyer may

3    make an objection, which is a cue to me that I need to make a

4    legal ruling about whether a question can be answered or

5    whether certain evidence can be received.

6            Don't worry about why a lawyer is objecting.  If I

7    had to stop to explain the legal history of that kind of

8    objection or why it's important, you would be here a lot longer

9    than three days, and you don't want -- want that.  Just trust

10   me that I will rule on the objection.

11           If I overrule the objection, then forget that it

12   happened, the question will get answered, and the evidence will

13   come in just like all of the other evidence.  And you'll

14   consider it with everything else, at the end of the case.

15           But if I sustain an objection, that's the equivalent

16   of my saying, jurors, forget that you ever heard the question

17   or the answer.  Disregard what has just happened.  A sustained

18   objection means disregard it, don't consider it in your

19   deliberations.

20           And please don't guess about what the witness would

21   have said, had the witness not been stopped before answering

22   the question.  Okay?

23           Now, it may not just be an objection.  From time to

24   time things happen that I have to direct your attention away

25   from.  If something happens that you're not entitled to

1    consider, I'll alert you to it, and I'll tell you to disregard

2    it.

3           Finally, anything you might see out of the courtroom,

4    when court is not in session -- even if it involves the

5    parties, the lawyers, or the people in this case -- that's not

6    evidence.  So don't let it affect how you view the evidence at

7    the end of the case.

8           This evidence -- the testimony, the exhibits, the

9    agreed facts -- fall into two categories in the law.  We call

10   them direct evidence or circumstantial evidence.

11          Direct evidence is the direct proof of a fact, such

12   as the testimony of an eyewitness about what that witness

13   personally saw or heard or did.

14          Circumstantial evidence is indirect evidence.  That

15   is, the proof of one or more facts from which you could find by

16   inference that another fact exists, even though that other fact

17   hasn't been proved directly.

18          It's the reason and commonsense approach that I was

19   speaking to Mr. Peck about during jury selection.

20          So you have direct evidence, you have circumstantial

21   evidence.  The law doesn't prefer one over the other.  You're

22   entitled to determine what weight that you will give to any

23   particular piece of evidence, whether it's direct or

24   circumstantial.

25          Now, when the witnesses testify, you'll have to

1    decide what testimony to believe and what testimony you may

2    choose not to believe.  You are free to believe everything a

3    witness says, or part of it, or none of it.  In fact, the

4    testimony of any one witness whom you believe is enough to

5    prove any fact in dispute.

6              So don't simply count up the number of witnesses for

7    or against a proposition, but weigh and evaluate the testimony

8    of each witnesses, so you can decide for yourself who and what

9    to believe.

10             In doing that, you should consider the opportunity

11   and the ability of the witness to see or to hear or to know the

12   things testified to, the witness's memory, the witness's manner

13   while testifying, whether the witness has any interest in the

14   outcome of the case and therefore might have a bias or a

15   prejudice that affects the reliability of the witness's

16   testimony.  You should consider whether there is other more

17   persuasive evidence that contradicts a particular witness's

18   testimony.  And you should consider the reasonableness of the

19   witness's testimony, in light of all of the evidence.

20             You'll be hearing from one witness at least, and

21   maybe more, but at least one witness who's not -- who's not an

22   eyewitness to the event.  But he's a person who's going to be

23   permitted to offer opinions about certain of the issues in the

24   case.

25             That's permitted because the witness may, because of

1    his education or experience, have the foundation from which to

2    offer you information that you might not otherwise have about

3    the subject of credit reporting, and so forth.

4        You're to evaluate an opinion witness like that, just

5    like you would the testimony of any other witness.  You may

6    accept it or reject it.  You may give it however much weight

7    you think it deserves, after you consider the reasons the

8    witness gives for the opinion, his education, and his

9    experience.

10        Most of the witnesses will testify live from the

11    witness stand.  There is, in one case, testimony that's going

12    to be presented to you by so-called deposition.

13        A deposition is simply a question-and-answer process

14    under oath that's like courtroom testimony.  It's just happened

15    before today.  And in this case the witness won't be here live.

16    But parts of that witness's prior testimony -- questions and

17    answers -- will be written -- read to you.  You're to consider

18    that and evaluate it just like you would the testimony of any

19    live witness.

20        Now, Ms. Miller, as indicated, is a consumer and an

21    individual and clearly she can speak for herself.

22        Equifax is a corporation, however.  And it can only

23    act through employees, agents, directors, or officers.  As a

24    corporation, it's responsible for the acts and -- of its

25    employees, agents, directors, and officers that are performed

1    within the scope of that person's authority.

2            So you should consider the acts and statements of any

3    of the defendant's officers, agents, or employees as the

4    statements of the defendant if those statements were made

5    within the scope of that person's duties for the defendant.

6            I've already covered for you in introduction the

7    notion of burden of proof.  In this case, Ms. Miller has the

8    burden to prove her claims and every element of them by a

9    preponderance of the evidence, and in the absence of that

10   proof, she cannot prevail.

11           Defendant has the opportunity to challenge the

12   evidence Ms. Miller is bringing and to bring its own evidence,

13   but it doesn't have any kind of burden to prove anything.  So

14   just keep that orientation in mind.

15           Preponderance of the evidence then.  The standard

16   that applies here means the greater weight of the evidence.

17   It's that evidence, when compared with what opposes it has more

18   convincing force, is more probably true than not.

19           So Ms. Miller has the burden to prove each of the

20   elements of her claims by this preponderance of the evidence.

21   She has to show it's more probably true than not that Equifax

22   violated the Fair Credit Reporting Act in one or more of the

23   ways she's alleged.

24           And that as a result of that violation, she sustained

25   damage.  A substantial factor in the cause of that damage being

1    the violation.  So it has to be a breach of the statute, more

2    probably true than not.  That that more probably true than not

3    caused her damage in this case in the form of what's called

4    actual damages or noneconomic damages.  There isn't any receipt

5    or out-of-pocket invoice because she hasn't made a claim for

6    lost money or lost -- or costs incurred.  What she's asserting

7    is that she sustained emotional distress, humiliation, an

8    invasion of her privacy, and these sorts of subjective

9    concerns.  But don't take it from me.  Wait until you hear from

10   her and from her counsel about the nature of the damages she

11   alleges.  She has to prove those by a preponderance of the

12   evidence.

13          I've talked with you about the notion of negligence

14   and of willful conduct.  Let me first just summarize again what

15   it is specifically Ms. Miller alleges Equifax did that violated

16   the Fair Credit Reporting Act.

17          Now, each one of these alleged violations has certain

18   subparts.  I'm not going to lay them all out now, but think of

19   it this way.

20          There are four claims, and I'm going to lay out the

21   four theories here.  But within each theory there's proof of

22   several elements:  Two, or three, or four, and I'll lay those

23   all out for you.  All of them have to be proved in order for

24   the plaintiff to prevail.  Okay?

25          And that means all eight of you have to agree on the

1   same claim that is violated.  She doesn't have to prove all

2   four were violated.  She has to prove at least one.  She could

3   prove all four.

4          But the minimum is that she convinces all eight of

5   you that the elements of at least one single claim, the same

6   single claim, was proved.

7          So as to those four claims, she alleges Equifax,

8   which is a consumer reporting agency with certain duties and

9   responsibilities under the Fair Credit Reporting Act, she

10   alleges it negligently violated the act in one or more of the

11   following four ways.

12          First, by furnishing her consumer credit report to

13   persons or businesses who did not have a permissible purpose to

14   receive the report.

15          Second, by failing to follow reasonable procedures to

16   assure the maximum possible accuracy of the information

17   contained in her credit report.

18          Third, by failing to disclose to her the entire

19   contents of her credit file, upon her request.

20          And, fourth, by failing to conduct a reasonable

21   reinvestigation of disputed information in her credit file,

22   after she notified the defendant of the disputed information.

23          Now, I'll give you more particulars about what the

24   statute requires, but this is sort of the headline, so you

25   can -- you can kind of organize what the lawyers tell you in

1   their opening statement in advance.

2           Four claims, each has its own elements.  In order to

3   recover, the plaintiff has to prove all of the elements of at

4   least the same one claim to all eight of you by a preponderance

5   of the evidence.

6           As indicated, she alleges she was damaged by way of

7   emotional distress, humiliation, mental anguish, and loss of

8   reputation that she asserts she suffered as a result of the

9   defendant's alleged violations.

10          She also contends that Equifax acted willfully in

11  violating her rights under the Fair Credit Reporting Act.  She

12  seeks, as I mentioned earlier, an award of punitive damages to

13  punish the defendant for these allegedly willful violations of

14  the act and to deter the defendant and others from similar

15  misconduct in the future.  Now, that's a summary of her claims.

16          For Equifax's part, it denies it violated the Fair

17  Credit Reporting Act, either negligently or willfully.  It

18  denies it caused Ms. Miller any damage.  And to the extent she

19  proves there has been any emotional distress or humiliation or

20  anguish or loss of reputation associated with her credit

21  information, they assert that that was not caused by the

22  defendant but by other entities.  So that's -- that's a general

23  framework of what it is that's being claimed.

24          Let me tell you that negligence -- let me just define

25  a couple of terms up front, and then you'll have them before

1    you again and again.

2          The term "consumer report" is a key term in the

3    statute.  It's also known as a consumer credit report.  It's

4    any communication by a consumer credit reporting agency like

5    Equifax to a third party that bears on the consumer's

6    creditworthiness and which is used in establishing a consumer's

7    eligibility for credit, or for other purposes defined by the

8    Fair Credit Reporting Act.

9          A consumer report is different, however, from a file

10   disclosure under the act.  Under that act, all consumers have a

11   right to request a copy of the information appearing about them

12   in a consumer reporting agency's database.

13         The act requires consumer reporting agencies, such as

14   the defendant, to disclose to the consumer, upon request, all

15   of the information in the consumer's file.  The report

16   generated by the agency in response to such a request is called

17   a file disclosure.

18         A file disclosure must contain certain additional

19   information and must disclose all instances where a particular

20   consumer reporting agency furnished the consumer's report to a

21   third party.  These are called inquiries.  And to make the --

22   that is in order to make the consumer aware of the information

23   contained in the consumer reporting agency's files.  So those

24   are just a couple of key terms.

25         Now, as to the concept of negligence.  Remember

1    Ms. Miller alleges Equifax was negligent in the way it violated

2    the Fair Credit Reporting Act.

3            In the context of this case, negligence means doing

4    something which a reasonably prudent consumer reporting agency

5    would not do, or failing to do something which a reasonably

6    prudent consumer reporting agency would do under the same or

7    similar circumstances which you find existed in this case.

8            In deciding what a reasonably prudent consumer

9    reporting agency would or would not do in the circumstances of

10   each of plaintiff's claims, you'll need to balance the risk of

11   potential harm to the plaintiff from the particular violation

12   alleged against the burden on the defendant of safeguarding

13   against such improper conduct.

14           But if a consumer reporting agency accurately

15   transcribes, stores, and communicates consumer information

16   received from a source that it reasonably believes to be

17   reputable and which is credible on its face, the credit

18   reporting agency is not negligent simply by reporting an item

19   of information that turns out to inaccurate.

20           Moreover, the law does not require a consumer

21   reporting agency to be error-free in performing its obligations

22   under the act.  And the law recognizes that perfect accuracy in

23   consumer credit reports is not a realistic objective.

24           I told you that the plaintiff has the burden to prove

25   that the alleged violations by the defendant caused her harm.

```
 1    So that term "cause" has a legal definition.  It means
 2    substantial other factor.  The defendant's conduct, in
 3    violating the statute, was a substantial factor in causing the
 4    harm she alleges.  A substantial factor is one that is material
 5    and not insignificant.
 6            So I think that's enough of the general overall.
 7            You'll get more of the details filled in at the
 8    appropriate time at the end of the case.
 9            So remember, plaintiff goes first.  We're going to
10    hear evidence, as we already projected for you, perhaps a
11    little bit out of order.  It's important that you keep an open
12    mind.  Wait until you've heard all of the witnesses, you've
13    heard about all of the exhibits, and then you finally have a
14    chance to talk with each other about the case.
15            To assist you, the parties have agreed that you
16    should each have a binder of the key exhibits.  Probably most
17    of the exhibits.  So those will be waiting for you when you get
18    back.
19            They're for your use, if you want, while you -- while
20    you're listening to the evidence, to take notes.  If that's
21    distracting to you, to look through the papers, then don't --
22    don't concern yourself with it.  It's just there as a resource,
23    if you find it helpful.
24            Some people don't like to have physical papers in
25    front of them.  They really want to focus on what a person is
```

1    saying.  Others would like to see and touch and mark on what's

2    being talked about when it's being talked about.  It will be

3    your preference.

4         We also have an electronic display evidence here in

5    the courtroom.  Probably the very documents that are being

6    talked about, that will be in your book, will also be on the

7    screen.  So things will be pointed to.

8         You know, if all of this is too distracting and you

9    need something clarified while we're going forward, please let

10   me know.

11        This is not a case where you're going to be asking

12   questions of the witnesses, but I do need you to be aware that

13   you can let us know if you miss something, if you didn't hear a

14   witness's answer, if something got in your way when they were

15   demonstrating it.  If -- or if, like every other human being,

16   you had a passing thought and you just missed what was going

17   on, it -- it's important that you get all of the evidence when

18   it comes in.  So let me know, if you need something repeated.

19   Okay?

20        Now, Ms. Boyer is going to take you to the jury room

21   you'll be using for this case.  It's literally behind this

22   wall, to my right.

23        And that's the room where you will be reporting to

24   and the room you'll be using while you serve on the jury in

25   this case.  You don't need to go back to the main jury room.

1          This is secure space back here, meaning the door to

2     the hallway that leads to it is locked and only people

3     associated with my chambers or the judge next door and you will

4     be behind here.  So you don't need to worry that you'll be

5     bumping into witnesses, or whatever.  It's the best place for

6     you to be waiting when you come in the building, as opposed to

7     being out in the common areas, where you might encounter a

8     witness.

9          All right.  I think I've talked enough.

10          Do any of you have any particular questions or

11     concerns logistically?

12          Yes, Mr. Peterson.

13          JUROR NO. 8:  Just wondering if we could take notes.

14          THE COURT:  Oh, I forgot to cover that.  Yes,

15     absolutely.  We'll have notepads and pens waiting for you here.

16          We'll have you keep your notes in the courtroom,

17     during all of the breaks, so that they're here when you get

18     back, and you're not like me and leave them somewhere else; and

19     then that's frustrating.  But, yes, you'll be free to take

20     notes.

21          Notes, though, are an aid to help you remember, but

22     none of us should look at notes as if they're the absolute

23     transcript of whatever anybody said.  So if the notes conflict

24     with a juror's memory of what was said, you should rely on your

25     memory and not the notes.  They're intended to help refresh

1    your memory, but not a substitute for them.

2              Okay.  So it's straight-up noon.  We'll take a lunch

3    break.

4              We'll resume, for your purposes, at 1:15.  Okay?

5    We'll take a break, midafternoon.  We'll adjourn at a logical

6    time.  Somewhere in the 4:30, 4:45 range.

7              My hope is to get you out of the building a little

8    before 5:00, so that if you're taking public transit, and so

9    forth, you're not immediately caught in the downtown crush.

10             Will we have coffee this afternoon?

11             THE CLERK:  (Nods head.)

12             THE COURT:  All right.  So we'll have coffee in the

13   jury room.

14             For those of you who are connoisseurs of fine coffee,

15   just know that it's good coffee, but it's institutional.  If

16   you want to bring something else, you're free to do that.

17   You're free to bring any beverage of your choice -- that is

18   nonalcoholic -- into the jury box.  You know, if you bring a

19   soft drink or a -- whatever.  If you would like that and if it

20   will help you keep attentive, please -- please feel free to do

21   that.  Okay?

22             Anything else?

23             All right.  Jurors, please follow Ms. Boyer.  Take a

24   little more direction from her.  And be ready in the jury room,

25   here at 1:15, and we'll have you in the courtroom just then.

1    Okay?  Take all of your possessions with you now.

2              Thank you, everyone, for standing for the jury.

3              (Jurors exit.)

4              THE COURT:  So as will be my habit at every break, is

5    there anything for the record at this point, that we need to

6    address?  For plaintiff?  For the defendant?

7              MR. MICHAEL BAXTER:  No, your Honor.

8              MS. SUMNER:  No, your Honor.

9              THE COURT:  Okay.  Will you all be back at one

10   o'clock, please.

11             MS. SUMNER:  Yes.

12             THE COURT:  I'm going to see what I can do to redraft

13   these instruction and verdict forms, and maybe we can talk

14   about some things, maybe not.  But if you're here at 1:00, we

15   can cover what's anticipated for the afternoon, if you have any

16   issues.  Okay?

17             MR. MICHAEL BAXTER:  Thank you.

18             THE COURT:  See you at 1:00.

19             Thank you, everybody.

20             MS. SUMNER:  Your Honor, it's fine for us to leave in

21   the courtroom --

22             THE COURT:  The courtroom -- do you want the

23   courtroom left unlocked?  If you do, we have to tell the

24   marshal; otherwise they'll lock them up just for security.

25             MS. SUMNER:  I would prefer the court to be locked.

1          THE COURT:  Yes.  We'll have the courtroom locked.

2          Has Ms. Boyer told you about the locking cabinets

3   over here?

4          I'll get her to explain, but there are locking

5   cabinets.  You can get keys.  You can store things overnight.

6          MS. SUMNER:  Great.

7          THE COURT:  But no one else is going to be using the

8   room over the break.  There isn't another criminal or short

9   matter ahead of your next time, so you can just leave your

10  papers where you are, and we will lock the room then.

11         MS. SUMNER:  Thank you.

12         THE COURT:  Thank you.

13         (Recess taken.)

14         THE COURT:  Counsel, do you have any issues you need

15  to raise or review in anticipation of the afternoon session,

16  opening statements?  Any of those matters?

17         MR. JUSTIN BAXTER:  Not for plaintiff, Judge.

18         MS. SUMNER:  None for defendant, your Honor.

19         THE COURT:  Okay.  Could I ask a couple of things

20  that might help me simplify this first draft of jury

21  instructions.

22         Are you anticipating any evidence will be received

23  for a limited purpose in this case?  In other words, do I

24  that instruction in the final packet?  Or do you know yet?

25         MR. JUSTIN BAXTER:  I don't expect it, Judge.

1          MS. SUMNER:  Only perhaps a couple of demonstratives,

2     which we would not be --

3          THE COURT:  Well, that's not even evidence received.

4          MS. SUMNER:  Right.  Exactly.  So then, no.

5          THE COURT:  I'll take that out for now.

6          Are we anticipating any witness is going to have

7     evidence of a felony crime --

8          MR. JUSTIN BAXTER:  No, Judge.

9          THE COURT:  -- conviction?

10          MS. SUMNER:  Not that I'm aware of.

11          THE COURT:  I'll take that out.

12          Are you going to be using hypothetical questions with

13     your expert witnesses, or even with other witnesses?

14          MR. JUSTIN BAXTER:  I don't have any hypothetical

15     questions planned, but sometimes it comes up in testimony.

16          THE COURT:  All right.  I'll leave that in for now.

17          Somehow the charts and summaries standard instruction

18     got into the pack.

19          Are you presenting charts and summaries of evidence?

20          MR. JUSTIN BAXTER:  Not ones that would be offered

21     into evidence.  There is a demonstrative, but it's not that

22     instruction.

23          MS. SUMNER:  No, your Honor.

24          THE COURT:  We don't need that then.

25          Okay.  In the form of the first draft I gave you, the

1    order of the four claims was set out in one direction.  And

2    then from the elements set of instructions, they came up

3    another -- in another order.

4            So when I read the order to the jury this morning, it

5    was in an effort to being consistent with the way you had laid

6    it out in your elements handout to me yesterday.  I don't much

7    care what order they're in, but I do want to be consistent.

8            So I wanted to check with you, Mr. Baxter, to see

9    what order you want, if you have any particular preference.

10   The way it's set out in the elements packet you give me

11   yesterday, and the way I've modified the summary of the

12   plaintiff's claims in the instruction is that No. 1 is the

13   furnishing claim.  No. 2 is the failing to follow reasonable

14   procedures claim.  No. 3 is the failing to disclose to

15   plaintiff the contents of her credit file claim.  And then

16   fourth is the failure to conduct a reasonable reinvestigation.

17           MR. JUSTIN BAXTER:  Okay.

18           THE COURT:  Do you care?  And if you do, what order

19   do you want them at?

20           MR. JUSTIN BAXTER:  We would suggest reasonable

21   procedure is "e(b)" first.  "i", the reinvestigation, second.

22   "g", the failure to disclose.  And then "b," the -- the -- the

23   permissible purpose.

24           THE COURT:  I'm sorry?

25           MR. JUSTIN BAXTER:  The fourth one would be the "b"

1   claim.

2            THE COURT:  So do you have the draft set of

3   instructions here?

4            MR. JUSTIN BAXTER:  I do.  I don't have a hard copy,

5   but I have it on my laptop.

6            THE COURT:  Okay.  Well, if you could pull it up.

7            I may have it in that order on the summary of the

8   plaintiff's writings, but I don't have it in that order in the

9   way the elements were set out because I used the order from the

10  pack you gave me yesterday.

11           So one way or the other we need them straight.  I

12  just want -- since it's plaintiff's case, you get to pick what

13  order you want them in.  It's page 10, about, of the hard set

14  of the first draft.

15           MR. JUSTIN BAXTER:  Right.  So from page 10, I think

16  it's listed in the order I just stated.

17           THE COURT:  That's the order you want them in?

18           MR. JUSTIN BAXTER:  Yes, please.

19           THE COURT:  Then I'm going to recast the elements,

20  because that's not the order they're laid out in.

21           MR. JUSTIN BAXTER:  Okay.

22           THE COURT:  What's -- for example, on page 12, what's

23  called the first claim is the 1681b claim, which is really your

24  fourth claim.

25           So I'm going to move those around.  Okay?

1          MR. JUSTIN BAXTER:  Okay.

2          THE COURT:  Are there -- do you want to take a few

3    minutes, since we're here?  Are there other constructive

4    comments you want to give me?

5          I'll be trying to edit this, while I'm listening to

6    your opening statements because I think I should be able to do

7    both.

8          Any -- any -- I know there are typos and other edits,

9    but we don't necessarily need to take time to do that now.  I

10   will give you a better set that you can do that now.

11         MS. SUMNER:  Not that we haven't already raised, your

12   Honor.

13         THE COURT:  Okay.

14         MR. JUSTIN BAXTER:  Just one on the -- there's a

15   blank or --

16         THE COURT:  Yes.

17         MR. JUSTIN BAXTER:  The report is listed.  You know,

18   produced credit reports, namely.  And the one issue there is --

19   is it -- it -- there's about 17 different businesses that --

20         THE COURT:  You know what, I'm not going to require

21   the specification, then.

22         MR. JUSTIN BAXTER:  Okay.

23         THE COURT:  They're just going to have to show who

24   they are, and point to them.

25         Okay.  All right.  I'll work on this.

 1          But you're not giving the opening.  You are, right?

 2          MR. MICHAEL BAXTER:  Yes.

 3          THE COURT:  Do you have issues?

 4          MS. SUMNER:  I don't.

 5          THE COURT:  Excellent.

 6          All right.  Then we can all work until the jury's

 7   here, ready to go.  And --

 8          MS. SUMNER:  Very good.

 9          THE COURT:  Is your setup to your satisfaction here?

10          MR. MICHAEL BAXTER:  Yes, your Honor.

11          THE COURT:  And, Ms. Sumner, have you seen what's on

12   the board?  You've got several boards, it looks like.

13          MR. MICHAEL BAXTER:  Here's the exhibits, if you want

14   to look at them.

15          THE COURT:  You've seen all of the blowups they're

16   going to show?

17          MS. SUMNER:  You know, I don't have a problem if

18   they're all exhibits.  And we shared our demonstratives

19   previously, so we should be in good shape.

20          THE COURT:  Okay.  Do you think you're going to need

21   to move to see them?

22          MS. SUMNER:  The only issue is that it does sort of

23   block -- those boards block my view of the jurors.

24          THE COURT:  If you want -- see those chairs there at

25   the end of the jury box, if you, during opening statement, want

```
 1    to sit there, you may.

 2            MS. SUMNER:  Okay.  Thank you.

 3            THE COURT:  You could stake Mr. Perling out over

 4    here, where he could keep an eye to follow the jury, in the

 5    meantime.

 6            MR. PERLING:  We could have three different angles.

 7            MR. EDELSON:  I want an aerial view.

 8            (Pause.)

 9            THE COURT:  The jurors are all here?

10            THE CLERK:  Yes.

11            THE COURT:  Well, when Ms. Sumner is back, we're

12    ready to proceed, Mr. Perling.

13            MR. PERLING:  Thank you.

14            THE COURT:  Just so you know.

15            Do the jurors have room in the front of them to store

16    these in the little spaces?  (Indicating notebook.)  This is

17    awfully heavy.  No?  They can put it on the floor, I guess.

18            The weight of authority.

19            (Pause.)

20            MR. JUSTIN BAXTER:  And, your Honor, just to confirm,

21    our plan is to pass out the exhibit books after the opening

22    statements.

23            THE COURT:  (Nods head.)

24            I'll make a point to do that first, and then we'll

25    have your first witness testify.
```

Opening Statement - By Mr. Michael Baxter

1    Who will that be?  Will it be Ms. Miller first?

2    MR. MICHAEL BAXTER:  It will be Ms. Miller.

3    THE COURT:  Okay.

4    All rise for the jury, please.

5    (Jurors enter.)

6    THE COURT:  All right.  Thank you, everyone.  Ladies

7  and gentlemen, please be seated.

8    Welcome back, jurors.

9    As I explained this morning, the next step in this

10  trial process will be opening statements by counsel.

11    Remember, this is not evidence, but it's intended for

12  you to be a helpful preview of what each side contends the

13  evidence may show, or at least an outline so that you know

14  where thematically each of the witnesses might fit.

15    So as I told you, Ms. Miller has the burden of proof.

16  She goes first.  In this instance, Mr. Michael Baxter will give

17  the opening statement on her behalf.  So please give him your

18  attention.

19    Counsel, you may proceed.

20    MR. MICHAEL BAXTER:  Thank you, your Honor.

21    Your Honor, thank you.  Counsel, thank you.  Ladies

22  and gentlemen.

23    Who is Julie Miller?  Ms. Miller is a mother, a wife,

24  a nurse, a volunteer.  She has great credit.  She pays all of

25  her bills in full when they come due.  She has no collections.

60

Opening Statement - By Mr. Michael Baxter

1          Equifax merged her credit file with someone who does

2    not have great credit.  The person she merged -- or Equifax

3    merged the two files, and with someone who has a totally

4    different Social Security number.  A different birthday --

5    month, day, and year.  A different address.  One of them is in

6    Oregon, one of them is in California.  And Mrs. Miller pleaded

7    over and over and over again to correct it, and they never

8    would.

9          You're going to find that -- the person she was mixed

10   with had dozens of collections, and that Equifax refused to

11   investigate Mrs. Miller's disputes.

12         They never contacted a single creditor.  They never

13   deleted a single account.  They never corrected a single piece

14   of false identifying information, after mixing her with another

15   person.  She had seven disputes over two years.  Zero

16   deletions.

17         In addition, Equifax repeatedly and habitually lied

18   to Ms. Miller.

19         She would dispute, and they would say -- they would

20   tell her that they had contacted all of the sources of

21   information.  That was a lie.  They never contacted a single

22   source of information.

23         They would tell her that they addressed all of her

24   concerns, when they hadn't addressed any of her concerns.

25         They told her that they had conducted investigations,

61

Opening Statement – By Mr. Michael Baxter

1  but they would only provide the results of those investigations

2  if she would produce acceptable pieces of identification.  She

3  repeatedly sent in identification.  Equifax knew it never

4  conducted any investigation after this merge.  It knew it had

5  no results to send her.  And yet they kept telling her, over

6  and over again, No, we've conducted an investigation.  Well,

7  you have to produce more identifying information before we can

8  show you what the results are.

9         How did this happen?  The evidence is going to show

10  that in 2009 a collection company, Bay Area Credit, sent in an

11  electronic form to -- to Equifax.  The form showed a different

12  person, for a different address, for -- with a -- a different

13  Social Security number, a different date of birth.  For

14  example, the form shows the person lives in California.

15  Ms. Miller lives in Oregon.  And Bay Area is from California,

16  this particular collection company.

17         And based on that one form from this one collection

18  agency, with information that didn't match, Equifax took this

19  other -- this other person and mixed both files together, so

20  that Mrs. Miller would receive a file not only with her

21  information but with this other person's information.

22         Equifax placed 37 additional collections on her

23  credit report in addition to Bay Area Credit.  Bay Area says it

24  is one form.  They put it on a total of 38 collections on

25  Ms. Miller, who had perfect credit.

Opening Statement – By Mr. Michael Baxter          62

1          Then Equifax would send this credit report to

2   Ms. Miller's businesses that she deals with day-to-day in her

3   community.

4          They would send it to the businesses she didn't deal

5   with for the other creditor, telling her -- telling these

6   creditors that Mrs. Miller does not pay her bills.

7          And repeatedly, over and over again, she would

8   contact Equifax, and they would not -- dispute it again and

9   again.  Seven times, after the merge, she disputed.  Seven

10  disputes.  She called.  She wrote.

11         There was not a single investigation, not a single

12  creditor contacted, not a single account deleted, not a single

13  piece of identifying information corrected.

14         So how did she learn about all of this?

15         Well, it began, she applied for a joint credit line

16  with her son at the bank she normally deals with in Hubbard,

17  Oregon.  And she received, first at the bank and then in the

18  mail, the following denial.  (Exhibit displaying.)

19         And, incidentally, you'll all be getting exhibit

20  books.  Don't expect -- you don't need to read through the

21  whole document.  This is just for demonstrative purposes.  You

22  will be getting the exhibit books shortly, just to point out.

23         But on this, this is for a credit line at KeyBank

24  with her son.  It shows she was denied the credit line.  Why?

25  Because of an Equifax credit report.  It shows that she has

63

Opening Statement – By Mr. Michael Baxter

1   recent delinquencies, excessive delinquencies.  And what does

2   she do when she got this?  She immediately wrote to Equifax to

3   get her credit report.

4         And Equifax responded.  They sent her a January 5,

5   2010, letter.  What does it say?  It says, we can't send your

6   credit report until you send acceptable identification.

7         So what does she do?  She immediately puts together

8   and sends identification showing her Social Security number and

9   her telephone bill.

10        And the Social Security number she truncates.  It

11  only shows the last four digits, because she's concerned about

12  her privacy.

13        This was sufficient for Equifax to send her a January

14  18th, 2010 credit report.  And keep in mind, this is with a

15  truncated Social Security number that they send this

16  information.  This was the credit report that she gets now.

17  (Document displaying.)  This is the credit report of Julie

18  Miller.  None of these collections belong to Julie Miller.

19  She's been mixed with another Julle Miller.  This credit report

20  includes all of her accounts and all of the other person's

21  accounts on it.  It includes both people's identifying

22  information.  It includes 38 false collection and derogatory

23  accounts, combined with her own accounts.

24        And, obviously, this is a person who takes pride in

25  her credit.  And she, you know, is extremely upset when she

Opening Statement - By Mr. Michael Baxter   64

1   gets this.

2          What does she do?  She immediately disputes to

3   Equifax.  She sends a dispute, January 25, 2010.  Excuse me.

4   Can you put those other collections up, just so they can see --

5   here's page 2 of that credit report.  None of these belong to

6   her.

7          Would you put page 3 up.

8          None of these collections belong to her.

9          Okay.  Now, in her first dispute, on January 25,

10  2010, what she sends, certified mail, so she knows that they

11  receive -- received it, what does she say in her dispute?

12         And, again, you don't have to read this.  But, in

13  essence, she says, I've been mixed with someone else.  My

14  identity might be stolen.  I have pages of collections and

15  derogatory accounts on my credit report.

16         Then she took the credit report, took a yellow

17  highlighter, and highlighted all of the false information on

18  it, and included that with her dispute that she sent to

19  Equifax, certified mail.

20         What was Equifax's response?  First, there was no --

21  no accounts deleted.  There is no identifying information

22  corrected.  But she received a February 5th, 2010, response

23  from Equifax.

24         This is the response she received.  First, right

25  here, it says, We -- we've received your request concerning

65

Opening Statement - By Mr. Michael Baxter

1    your Equifax credit report -- credit file, and have addressed

2    your concerns.

3         They -- she just got this credit report.  It didn't

4    address any of her concerns.

5         It also says, In order to receive the results of your

6    investigation -- they knew they hadn't done an investigation.

7    But they told her, if you want to see the results, we'll give

8    them to you if you can provide us with acceptable pieces of

9    identifying information.  And what do they say?

10        It has to be -- we had two categories here.

11        It has to be -- the identifying information has to be

12   acceptable from Category 1, and acceptable from Category 2

13   before they'll send you the results; which there had been no

14   results in this investigation.

15        Equifax will testify -- testify that the credit

16   report -- her submitting the credit report highlighted, alone,

17   was sufficient identification for them to conduct an

18   investigation.  That will be Equifax's testimony.

19        Then she made her second dispute, on February 11th,

20   2010.  What does she say, in this dispute letter?  I'm

21   concerned my identity's been stolen.  I'm concerned of identity

22   theft.  I've been mixed with another person.  Would you

23   please -- she pleads with them, get this other person's

24   private -- get this information and also their private

25   identifying information off of my credit report.

Opening Statement - By Mr. Michael Baxter

1       She tells Equifax how to fix the report.  She tells

2  them, Remove all of the collections.  They don't belong to me.

3  She includes their February 6 response, that you just saw, that

4  says, Just send in identifying information, and we'll send you

5  the results of the investigation.  She includes a copy of her

6  Oregon driver's license.  She includes a copy of her pay stub,

7  with a current address, with her Social Security number, with

8  her dispute; that she sends to Equifax.

9       On -- she receives Equifax's response, dated February

10  23, 2010.  And this is the results of an investigation.  So

11  immediately she's happy.  Oh, there's been an investigation.

12  Here are the results of the investigation.

13       What are -- what does this say?  Right at the top

14  here:  Equifax contacted each source directly and our

15  investigation is now completed.  Well, that was a complete lie.

16  They didn't contact any source, period.

17       Next, they say, Be specific about the nature of your

18  dispute.

19       Well, she just sent in a complete credit report,

20  highlighted with all of the false information.  How could she

21  be more specific than that?

22       Instead of fixing Ms. Miller's credit report, which

23  Equifax had merged, they also told her she needs to contact

24  credit grantors herself.  We're not going to do it, but you can

25  contact the credit grantors and get this straightened out.

67

Opening Statement - By Mr. Michael Baxter

1           There's no investigation of Mrs. Miller's dispute.

2    There's not a single deletion as a result of the investigation.

3    There was no false identifying information corrected.

4           Then she received Equifax's February -- or let me

5    show you Equifax's February 23, 2010, credit report she

6    received with these results.  No changes.  She gets the -- the

7    response to their investigation.  It's -- the -- exactly the

8    same as what she said in her dispute.

9           This is -- they -- they sent this to her with a

10   redacted Social Security number and an Oregon driver's license.

11   Again, it shows dozens of false collections that don't belong

12   to her.

13          The report also shows that these false collections

14   have been provided to the businesses that Mrs. Miller does

15   business with on a daily basis in her small community that she

16   lives in.  Equifax did not investigate a single disputed

17   account.  Equifax did not contact a single creditor.  And yet

18   they tell her the investigation has been completed, and

19   here's -- and we have contacted all of the sources of the

20   investigation.

21          Then, in March of 2010, she requests an increase in

22   her checking account credit line at her local bank.  And here's

23   what she receives from KeyBank, her local bank.

24          Again, she's denied credit based on an Equifax credit

25   information because of collection actions.  She has no

68

Opening Statement - By Mr. Michael Baxter

1   collection actions.  The only collection actions that are there

2   are ones that Equifax put on her credit report.

3           On February 8, 2011, she requests her credit report.

4   What does Equifax do?  Equifax ignores it.  They don't do

5   anything.  They won't send her her credit report.  Then on

6   March 21, 2011, she requests her credit report again.  She

7   sends the ID.  She sends it via certified mail.

8           And on -- she receives Equifax's March 30, 2011,

9   response to this second request.  What does that response say?

10  We'll send you a credit report if you send acceptable

11  identifying information to us.  Then we'll give you a copy of

12  your credit report.  But we're not going to send it to you.

13          She then makes an April 5th, 2011, third request for

14  a credit report.  She provides her insurance bill, with a

15  complete address.  Her W-2 form, with a full, unredacted Social

16  Security number.  She sends it certified mail.

17          And on April 21, she receives Equifax's April 13th,

18  2011, response:  We're not going to send you a credit report

19  until you provide us with acceptable information from column 1

20  and column 2.

21          They will admit the information she sent was

22  acceptable.  But they told her it was unacceptable, and refused

23  to send her a credit report.

24          She then writes them again, on April 27th, 2011.

25  This is her fourth request to try and get a credit report from

69

Opening Statement – By Mr. Michael Baxter

1   Equifax.  She submits her identifying information.  She submits

2   an insurance bill with her current address, a W-2 form with a

3   full, unredacted Social Security number.  She sends it

4   certified mail.

5          Equifax ignores that request.

6          Now, she's requested her credit report on February

7   8th, March 21st, April 5th, April 27th, never received a credit

8   report.

9          THE COURT:  She calls Equifax, to plead with them to

10  give her a credit report on June 28th.  And she tells them,

11  Could I please get a copy of my credit report?  And the

12  operator on Equifax's phone line makes her provide her full

13  Social Security number, her date of birth, her current address,

14  her mortgage information, all of her credit card information

15  account.  Over the phone, she gives all of this information.

16         Then the operator says, Uh, I need to talk to my

17  supervisor.  I'll get right back to you.

18         They put her on hold for seven minutes.  They come

19  back on the line.  And the operator asks the same questions

20  again.  Will you please give me your Social Security number,

21  your date of birth, your current address, the mortgage, the

22  credit card information.  And then tells her, Well, we think

23  you've been mixed with someone else.  You need to contact the

24  credit grantors and update your Social Security number.

25         And how do we know that for sure?  Let me show you

70

Opening Statement – By Mr. Michael Baxter

1  Equifax's record.  This is Equifax's record of that telephone

2  conversation.  And right up here it reads:  Advise the consumer

3  needs to contact the credit grantors to update Social Security

4  number.  So they told her, You fix it.  You have the problem.

5  You fix it.  There's no offer to assist, to try to get this

6  information off of her credit report.  She's told to contact

7  the creditors.

8         And think about that.  She has a different Social

9  Security number than what these creditors have on file.  And

10  she -- Equifax is telling her she has to go back to the credit

11  grantors and make them somehow correct Equifax's mix -- mix of

12  this information on her credit report, when she's not even

13  their -- their debtor, not even the person on file.

14        She's frustrated.  She asks for a credit report, to

15  see what to dispute.  Equifax initially refuses to provide her

16  a credit report, even though they know she's been mixed with

17  somebody else.

18        Finally, without providing any documents, they do

19  send her another credit report.  Equifax caused her to be

20  mixed.  They knew she was mixed, but they refused to fix that

21  she was mixed.

22        There was no investigation of her January -- June 28

23  telephone call.  Not a single deletion.  No false information

24  was corrected.  Equifax continued to send false and deveining

25  [sic] credit reports to the businesses she deals with every day

71

Opening Statement - By Mr. Michael Baxter

1    in her life, in her community.

2            The information now, she learns, is also going to the

3    other person's creditors.  So all of her private, confidential

4    information is also going to the other person's creditors as

5    well.

6            She doesn't know if this other person has her

7    information and -- and potentially could steal her identity.

8    She is in fear of that.  So she makes a fourth dispute.

9            On July 18th, 2011, she disputes again to Equifax.

10           Again, in this dispute, she explains how frustrated

11   she is.  How the credit report still includes both hers and

12   this other person's accounts.

13           She questions, why am I getting this other person's

14   personal financial information?  She's concerned for the safety

15   of her own private information.  She, again, sends a copy of a

16   highlighted credit report, with all of the false information

17   highlighted.

18           But, in addition, she used a form that Equifax

19   provides on the back of the credit report.  It's called a

20   research request form.  And she fills that out, and includes

21   her Social Security number, her date of birth.  She crosses out

22   all of the false information that they have on there.  She

23   puts -- points out what addresses are not hers.  They ask her

24   for her personal cell phone number.

25           She thinks -- she doesn't want to give it because she

72

Opening Statement – By Mr. Michael Baxter

1   doesn't like giving our her cell phone number.  But she says if

2   this will help, I'll even give them my personal cell phone

3   number.  So she does.

4            They never contact her.

5            Here's their response.  She receives a July 28, 2011,

6   response from Equifax:

7            We've addressed your concerns.

8            They haven't addressed any of her concerns.

9            Second, if you want to get the results of our

10           investigation, you have to provide acceptable

11           identifying information, from both of these

12           columns.

13           And they don't conduct any investigation, not a

14   single account is deleted.  No false identifying information is

15   corrected.

16           What does she do?  Do you believe -- she disputes

17   again, a fifth time.  She disputes again to Equifax, on

18   August -- her August 1, 2011, dispute.  First, following

19   Equifax's instructions, she submits the research request form

20   with her dispute to receive the results of the investigation

21   that they say they've already done.

22           She tells Equifax in this -- that this is her

23   dispute.  That here's a copy of her insurance bill, with her

24   current address.  Here's a copy of her W-2 form, with her full

25   Social Security number.

73

Opening Statement - By Mr. Michael Baxter

1          She had already provided a completely highlighted

2   credit report, with all of the false information on it.  They

3   know it's her current address.  The return address on her

4   envelope is the same as the bills that she's sending in.  So

5   Equifax responds.

6          And there's no investigation.  But what they do is

7   they send her her August 8th, 2011, credit report.

8          Here's her credit report.

9          Now, since she's been mixed, they send her four

10  credit reports.  They haven't deleted any account that she's

11  disputed.  The collections and false information remain.

12  There's been no investigations.  There's been no creditors

13  contacted.  There's been no deletions as a result of a single

14  investigation.  There's been zero false identifying information

15  corrected.  There are pages and pages of collections still on

16  her credit report, going to all of the businesses she deals

17  with on a daily basis, in her community.  And it's still going

18  to the other person's businesses and -- as well as to her, her

19  own businesses.

20         So she disputes again.  She disputes on August 25th,

21  2011.

22         What does she say in this dispute?  First, she

23  disputes the identifying information.  She tells them how upset

24  she is about the identify -- the ID theft -- the potential of

25  ID theft to her.  She uses Equifax's research request form.

74

Opening Statement - By Mr. Michael Baxter

1   She hand -- she literally goes through and hand-writes each of

2   these accounts on a research request form.  And you can see

3   here, this is a research request form.

4           She -- this is -- she used multiple pages.  And she

5   goes through and hand-writes all of these collections, with the

6   accounts.  She circles the Social Security numbers, telling

7   them "incorrect."  She crosses out the false addresses.  She --

8   and in her dispute, she tells them she's upset about identity

9   theft.

10          She sends it with this research request form, which

11  Equifax says, you -- they would like, if they're going to do a

12  dispute.  They again request she send a cell phone number.  So

13  she sends her cell phone number again.  Of course, she's never

14  contacted.

15          She preemptively submits identifying information, a

16  W-2 form with her full Social Security number, insurance bill,

17  with her current home address.  What's Equifax's response to

18  this sixth dispute?

19          On September 1, 2011, they respond again.

20          Once again:  We've addressed your concerns.

21          This is her sixth dispute, and they haven't addressed

22  any of her concerns.

23          To receive the results of the investigation, we

24          need acceptable identifying information.

25          Well, she sent in copies of the credit report.  She

Opening Statement - By Mr. Michael Baxter

1    sent in all of her identifying information.  And there --

2    there's never -- they'll testify that there never was an

3    investigation in any of these instances.

4          They warn her, down here, that the F.B.I. has named

5    identity theft as the fastest-growing crime in America.  This

6    just heightens her fear of what it's like having this

7    information out in the public sphere, being provided to people

8    that she has not given the authorization to receive it.

9    There's no investigation.  There's not a single account that's

10   deleted.  No corrections of the false identifying information

11   that they knew -- they knew it belonged -- that she -- had

12   mixed her with another person.  But it didn't make any

13   difference.  There are no corrections.

14         What did she do again?  You won't believe.  She

15   disputes again.  She sends in a seventh dispute to Equifax, and

16   she sends a copy of Equifax, September 1, 2011, response.  And

17   she sends, again, her identification, with her full Social

18   Security number.  And she receives Equifax's response, the

19   September 21, 2011, response letter.

20         Once again:  We've addressed -- no results.  No

21   investigation.  Not a single account deleted.  Not a single

22   piece of false identifying information corrected, despite

23   knowing that she's mixed.  But she gets this response, which

24   again says, We've addressed your concerns.

25         Another lie.

Opening Statement - By Mr. Michael Baxter

1          Again, to receive the results of -- of the

2    investigation -- when they knew there had never been any

3    investigation -- but we're not going to send you these results

4    unless you send in some kind of identification that's going to

5    be acceptable to us.  And after seven disputes, two years, zero

6    investigations, after being mixed with this other person, she

7    gave up.

8          Now, you're also going to hear evidence that in --

9    now, this began in, I think, September of 2009 that she was

10   mixed with these other people.

11         You're going to hear in 2008 she learned that she had

12   been -- had accounts from another person on her TransUnion and

13   Experian credit report in 2008.  She -- and she disputed the

14   TransUnion and Experian.

15         And what did they do?  They conducted investigations.

16   They went to the -- the creditors.  They deleted all of the

17   false information.

18         Now, you'll learn that a credit grantor incorrectly

19   had -- made a public record lien that was not deleted.  And so

20   in September of 2009, after -- or September of 2010, after the

21   point that Equifax became involved in this case, she was denied

22   credit based upon an Experian credit report, based on that

23   public record lien.

24         Now, you're also going to hear in this case that they

25   did correct it.  Well, they did correct her credit report.

77

Opening Statement – By Mr. Michael Baxter

1  Four months after filing the case, they gave her a corrected

2  credit report.  They took off all of the collections.  And they

3  corrected the credit report, just as she asked them to do, and

4  told them how to do it in her first dispute.  After we sued,

5  four months into this case.

6       And the evidence is going to show that Equifax

7  committed serial violations of the Fair Credit Reporting Act.

8  They blew away the four requirements to the Fair Credit

9  Reporting Act.  They complied with none.  Their requirements

10 that they must always follow, they never followed with

11 Ms. Miller.

12      What are those four elements?  You've heard them from

13 the judge.  But, basically, the first one, 1681i, is that each

14 time a consumer disputes the accuracy of their credit report,

15 Equifax shall investigate.  Shall investigate.

16      They never conducted a single investigation.  Seven

17 disputes.  No investigations.

18      If an investigation finds information which is

19 inaccurate or cannot be verified, Equifax is required to modify

20 or delete it.  Required to modify or delete it.

21      Equifax never modified or deleted any information as

22 a result of any investigation.

23      They also violated 1681e(b).  Equifax is required to

24 follow reasonable procedures to ensure the maximum possible

25 accuracy of Mrs. Miller's personal credit report.  Not

78

Opening Statement - By Mr. Michael Baxter

1    everybody's credit report.  They have to follow the procedures

2    for the maximum possible accuracy for Julie Miller, the

3    plaintiff's credit report.

4         Equifax put 38 derogatory false accounts on her

5    credit report.  And for almost two and a half years, refused to

6    delete them.

7         They also violated 1681g.  Equifax shall, upon

8    request, disclose to the consumer their complete credit file.

9    Equifax refused to provide Mr. -- Mrs. Miller her credit report

10   four times in 2011, and only provided reluctantly, in June,

11   when -- when she insisted on it -- receiving it, after a

12   telephone call.

13        Finally, they failed -- we allege they failed to

14   comply with Section 1681b.  And that says, The consumer

15   reporting agency may only furnish the consumer report to a

16   company who intends to use the report for a credit transaction

17   involving the consumer.

18        Equifax furnished Ms. Miller's credit report to

19   companies it knew had no right to receive it.  Equifax knew

20   both consumers had been mixed on their credit file.  Creditors

21   all over the country received plaintiff's credit reports,

22   saying Mrs. Miller does not pay her bills.

23        Who are the witnesses we're going to call in this

24   case?  We're going to call Julie Miller, and she's going to

25   tell you her story, on the stand.

Opening Statement – By Mr. Michael Baxter

1        We're going to call Rick Miller, her husband.  And

2   he's going to tell you about what -- what -- what it was like

3   going through this ordeal with Mrs. Miller, and what was the

4   impact on her, and the frustration, fear, and distress that he

5   observed in her.

6        We're going to call Sheryl Bauer.  Ms. Miller grew up

7   with Ms. Bauer.  She spoke regularly with Ms. Bauer.  And she's

8   going to testify to the changes she observed in her during this

9   period of time.

10       We're going to call Karen Fox.  Ms. Fox is also a

11  nurse.  She's a long-time friend.  And she's going to testify

12  to the changes she observed in her going through this ordeal.

13       And, finally, we're going to call Monica Evanson, her

14  hairdresser.  And Ms. Evanson is going to testify the changes

15  she observed from the stress in dealing with the credit

16  reporting agencies.

17       We're also going to call Evan Hendricks.  Evan

18  Hendricks, a national expert in credit reporting issues.  He

19  was involved in the formation of the Fair Credit Reporting Act.

20  He knows the importance of the law, and how the law works.

21       He's going to testify that Equifax has known, since a

22  19 -- 1994 consent decree, about the problems that Equifax was

23  having with mixed -- mixing consumers' credit files.  He's

24  going to talk about the refusal to fix those problems, and

25  their inadequate investigation procedures.

80

Opening Statement – By Ms. Sumner

1        Basically, Equifax mixed Mrs. Miller with a different
2   person, with a different Social Security number, with a
3   different date of birth, with a different address.
4        Mrs. Miller asked Equifax to correct her credit
5   report again and again and again.
6        Equifax wouldn't investigate a single one of her
7   disputes a single time.  And, finally, Equifax lied when it
8   said it had contacted the sources directly and said it had
9   provided -- if she only provided acceptable ID, it would give
10  her the results of the investigation, when it knew there had
11  never been an investigation.
12       That's the case that plaintiff is going to be
13  presenting to you today.
14       Thank you.
15       THE COURT:  Thank you, Mr. Baxter.  Thank you.
16       So would you clear your poster boards, please.
17       And now, jurors, let's turn our attention, please, to
18  Ms. Sumner, on behalf of the defendant.
19       You may proceed, Counsel.
20       MS. SUMNER:  Thank you, your Honor, Counsel, members
21  of the jury.
22       I know we were already introduced to you earlier, but
23  I would like to do it again.  If you're like me, sometimes it's
24  hard to keep track of who is who.
25       I think the labels probably help a little bit.  But

Opening Statement – By Ms. Sumner

1    I'm Phyllis Sumner, counsel for Equifax.  My colleagues who are

2    here today, on behalf of Equifax, are Mr. Edelson and Perling,

3    who are seated at counsel table.  And then we already

4    introduced to you earlier to Margaret Leslie, who is our

5    corporate representative.  She is VP of technology for Equifax.

6          Now, you may be surprised to hear me say that there

7    are a few things that Mr. Baxter said that we agree with.  Of

8    course, we don't agree with them all.  That's why we're here.

9    And there are always two sides to a story.

10         You got to hear Ms. Miller's side of the story, and

11   now this is our opportunity to preview for you our side of the

12   story.

13         As the Court said, what we're saying is not the

14   evidence.  The evidence will need to be proven by Ms. Miller

15   and her counsel, but I hope to forecast to you what Equifax

16   will show, when our witnesses are on the stand.

17         But before we do that, let me just go ahead and tell

18   you a few things with which we agree.

19         First, Equifax agrees that it does have grave

20   responsibilities concerning the FCRA and concerning the

21   millions -- and it is millions -- of credit histories that it

22   maintains in order to assist the credit system.

23         Equifax also acknowledges it's not infallible.  And

24   as the evidence will show, Equifax has gone to great lengths to

25   put into place numerous policies and procedures to protect the

Opening Statement – By Ms. Sumner

82

1    rights of the consumers such as Mrs. Miller.  In fact Equifax

2    has hundreds of pages of policies that -- and procedures, which

3    it must, in order to manage the vast amount of information that

4    it handles on behalf of consumers and businesses.

5          And during the trial, Equifax will show you many of

6    those procedures, and show you how it continuously updates and

7    evaluates its procedures in order to deal with unusual

8    circumstances and the ever-increasing sophistication of this

9    industry.

10         And Equifax representatives will also testify how

11   Equifax learns when mistakes happen, and how it trains its

12   agents to avoid repeating those mistakes.

13         Now, second, Equifax acknowledges that its

14   sophisticated matching algorithm did merge Mrs. Miller's file

15   with another, Julle M. Miller, who resides in the Portland area

16   and has a seven-for-nine social security match, and is almost

17   the same age.

18         And, third, we agree that Ms. Miller contacted

19   Equifax on numerous occasions to discuss what she discovered on

20   her credit disclosure.

21         Finally, we agree, and you'll hear Equifax witness

22   DeeDe Mixon acknowledge -- and she has already acknowledged in

23   a prior deposition -- that the Equifax agents made errors in

24   responding to Ms. Miller's disputes.

25         And, in fact, that the agents didn't always follow

Opening Statement - By Ms. Sumner

83

1   the procedures that were outlined for them.

2           So if we agree on those points, then why are we here?

3   And it really boils down to the mistakes that the Equifax

4   agents made in handling Ms. Miller's credit file rise to the

5   level of violations of the Fair Credit Reporting Act.  And that

6   is what you'll be asked to consider.  And Mr. Baxter has talked

7   with you a little bit about what those requirements are, but he

8   has not spoken with you about each elements of those offenses

9   and what is required to be proven.

10          And, of course, that's the Court's job, and you will

11  hear from the Court with respect to that.  But keep in mind

12  that there are very specific elements that must be shown in

13  order to prove a violation.

14          Equifax believes that it did not negligently violate

15  the FCRA and that it certainly did not willfully violate

16  Ms. Miller's rights.

17          This case is not about fixing Ms. Miller's file.  You

18  will hear evidence -- and you already heard Mr. Baxter

19  acknowledge -- that Equifax has fixed her file.

20          We are here because Ms. Miller is asking you to award

21  her with monetary damages.  And she doesn't have what would be

22  considered economic damages; in other words, financial losses.

23  She's asking you to award her with emotional distress damages.

24          And in addition, she is asking you to find that

25  Equifax' conduct was so reprehensible in this circumstance that

Opening Statement – By Ms. Sumner

1    you should punish Equifax and award her punitive damages.

2          That, ladies and gentlemen, is the crux of our

3    disagreement and why we're here today.

4          So I would like to talk with you a little bit -- now

5    that we've put those important issues on the table, I would

6    like to back up a little bit and try to put this in context.

7          You've already heard Mr. Baxter refer to Equifax over

8    and over again in his opening argument.  And I'll have to say,

9    he didn't -- he didn't provide a very pretty picture of Equifax

10   in these circumstances.

11         And it's difficult for us to sit and listen to this

12   commentary.  And what I would like to do now is to put it in

13   context, so you can understand who Equifax is and what it is

14   about and what it tries to do in order to respect the rights of

15   the consumers.

16         And, of course, Equifax is made up of people, and

17   people sometimes make mistakes, as the agents did in this

18   circumstance.

19         We're not making an excuse by saying that.  That's

20   reality.  When we have people that make up companies, sometimes

21   that happens.

22         And during this trial, you'll have the opportunity to

23   hear from some people who have had many years with Equifax.

24   And, again, to help put this in context, so you'll understand

25   what Equifax has done and continues to do.

Opening Statement – By Ms. Sumner

1    Let me give you a little bit of background on

2   Equifax.  It is one of the country's three major credit

3   reporting agencies.  You've already heard that the other two

4   are TransUnion and Experian.  Equifax is headquartered in

5   Atlanta, Georgia, which you may guess, from my accent, that's

6   where I'm from.  And it's been in business for over a hundred

7   years.  So it's actually withstood a lot of growth and many,

8   many changes over this year as our economy has grown, as our

9   credit reporting industry has expanded, and continued to become

10  more and more sophisticated.

11    It has over 7,000 employees, and it compiles data

12  from over 65,000 sources and completes nearly 1.5 billion

13  updates on a monthly basis.  1.5 billion on a monthly basis.

14  That's a lot of data that comes into Equifax.  And it handles

15  more than 200 billion data updates on an annual basis.

16    And Equifax manages that colossal amount of data and

17  does focus on how it handles consumer information.  In fact

18  Equifax, you will hear, was the first consumer reporting agency

19  to establish a national consumer service center with a

20  toll-free access to allow consumers to be able to contact

21  Equifax.

22    And we have folks who stay at Equifax for many years

23  because of what the company stand -- stands for, including the

24  two employees who will testify live for you at trial.  And I

25  want to talk with you a little bit about those individuals.

86

Opening Statement – By Ms. Sumner

1        Now, to help you understand Equifax's role as a

2   credit reporting agency, you'll hear from Margaret Leslie, who

3   you've already met.  And she has worked for the company for

4   over 23 years.  And she's managed five key Equifax core systems

5   in technology:  Consumer data acquisition and credit reporting,

6   consumer disclosure and dispute, skip trace technology,

7   mortgage technology, and commercial technology groups.

8        And she will explain the intricate process of credit

9   reporting, and how Equifax's system works to manage that -- the

10   billions of data points that come in, and who manage data of

11   over 250 million consumers.

12        So I know it's a lot of numbers that I'm throwing at

13   you, but it's important to understand in context the volume of

14   information that Equifax manages on a daily basis.  250 million

15   consumers is, of course, a lot of folks.

16        Now, Ms. Leslie will explain that as a credit

17   reporting agency, Equifax maintains that information, and that

18   it's reported to Equifax by furnishers of information.  And

19   that when it receives that 1.5 billion amount of information on

20   a monthly basis, that that information has to be processed.

21   And she'll testify and explain to you a very sophisticated

22   system and computer programming that Equifax has used, an

23   algorithm to manage the massive data.  And that it has to match

24   information to over 250 million consumers.

25        So when a lender sends in an update, for example, on

1  a Rebecca Jones, that Rebecca Jones might be Rebecca Jones in

2  the application.  She might be Becca Jones in the application.

3  She might use a middle initial in one application.  She might

4  get married and use a new name.

5          And Ms. Leslie will explain how creditors, when they

6  send in information -- sometimes they transpose numbers.

7  Social Security numbers may not match exactly, but it may

8  relate to the exact same consumer.  And she will explain that

9  applications are often handwritten and difficult for the

10  creditors to understand.  So when the updates come in, there

11  might be a slight variation on an address number.  And

12  sometimes creditors and consumers make their own mistakes.

13  Sometimes consumers transpose numbers when they send in

14  information.  They're all people, too.

15          So Ms. Leslie will explain how the computer system

16  works in a very sophisticated way in order to match these

17  consumers, because it will not always be that a consumer's

18  information will come in the same way.

19          And yet Equifax's job is to match all of that

20  information on one consumer into one file.

21          And Ms. Leslie will talk with you about how critical

22  that matching process is for our system to work, so that

23  individuals don't have multiple files.  So that when a creditor

24  requests information on an individual, then they don't get a

25  piece of a file because that individual's information has not

Opening Statement – By Ms. Sumner

1    been merged into one file.

2           The matching of the information and the merging of

3    files is critical for this process to work appropriately.  They

4    must be able to match those files.

5           So if Rebecca Jones marries Bobby Smith and becomes

6    Becky Smith, the system needs to identify her now as being the

7    same person that she used to be, when her name was Rebecca

8    Smith [sic]; not that she would have changed as a person, but

9    her name would have changed.

10          Now, to accomplish this challenging task, this is not

11   something that's managed by individuals.  And you can imagine

12   with the millions of amounts of data coming in and the -- the

13   task of trying to get the right data to the right individuals,

14   that has to be something that is computerized.  And so Equifax

15   has developed a sophisticated matching algorithm, and it's a

16   logic system that figures out what to do when a piece of

17   information comes in.

18          And you can see from the slide in front of you, this

19   gives you a little bit of a forecast.  And I'm not going to

20   spend a long time on this.  This is not my forte.  I'm not

21   someone who can go through the details of this.

22          But, fortunately, Ms. Leslie can, because she's been

23   in this technology business for a very long time.  And she will

24   talk with you about the 13 matching elements, which compares to

25   match information to consumers.  And she'll explain that the 13

Opening Statement – By Ms. Sumner

1   elements are those listed on the chart, which is last name,

2   middle name, first name, suffix, gender, street number, street

3   name, city, state, zip, Social Security number equal, Social

4   Security number maybe -- because as I mentioned, sometimes they

5   may be slightly off, but it still relates to the same person --

6   age, date of birth, and account numbers.

7           So she will explain to you, then, that if data about

8   a Bobby Smith comes into the system, then that matching logic

9   goes through the process to figure out, out of the whatever

10  number -- thousands and thousands of Bobby Smiths, which one it

11  is.

12          And she will walk you through that whole process and

13  how that works, and she'll explain that there's something like

14  8,000 possible combinations of those 13 elements.

15          And she'll explain how that works when the data comes

16  into the system, how it matches up.  And when someone requests

17  a report, how the system works to identify the report that they

18  are requesting.

19          And she'll address how it brings in candidate files

20  and then returns a file in response to the request.  And she'll

21  talk with you about the combining of multiple files and

22  specifically what happened in this case, because Mr. Baxter

23  didn't really go into detail about how that happened in this

24  particular case.

25          And she'll talk with you about that because of the

Opening Statement – By Ms. Sumner

90

1    very close identification information of these two Julie M.

2    Miller's, who reside very close together.

3            Now, you'll also hear from DeeDe Mixon, and she will

4    explain the consumer dispute process and how agents respond

5    when they receive a consumer contact.

6            And she's been with Equifax for 22 years and has held

7    a lot of different positions in consumer services.  She's

8    currently a consumer service manager.  But she's held positions

9    such as disclosure processing agent, verification agent,

10   dispute agent, maintenance reviewer, quality analyst, trainer

11   and supervisor in the dispute department, and vendor manager.

12           Now, Ms. Mixon did not personally make the mistakes

13   in this case, but she feels the most responsible for them,

14   because she's in charge of the training department.  She works

15   with the agents.  She tries to identify potential issues that

16   may arise.  And she trains agents to address them.

17           And she'll explain to you about the different

18   functions in that department, and walk you through the dispute

19   process.

20           And she'll discuss the policies and procedures that

21   Equifax has in place so that when a consumer makes a dispute,

22   they can handle it efficiently, which is important, and

23   appropriately.  And how those agents are trained.  And she'll

24   discuss what happened in this case, in terms of the contacts

25   for Ms. Miller and what the records reflect, because she's very

Opening Statement – By Ms. Sumner

91

1   familiar with the Equifax records and the form letters, that

2   you have seen some of those today.

3           Now, we're not going to ask her to walk you through

4   every single document in this case, but we are going to ask her

5   to summarize for you the evidence.  And she will point out to

6   you what things the agents did wrong and what things the agents

7   did right when they were handling this dispute.

8           They didn't do everything wrong.  They did follow

9   some policies and procedures.  But they did not follow all of

10  them.  And we have acknowledged that in prior depositions, and

11  we will continue to acknowledge that to you here today.

12          She's also going to talk with you about how they've

13  addressed this, to try to keep this unusual circumstance from

14  happening again.

15          Now, another witness that you will hear from is Anne

16  Fortney, and she is a credit reporting industry expert.

17          She is a partner at the law firm of Hudson Cook, in

18  Washington, D.C.  And she has 35 years of experience

19  interpreting federal and state consumer protection laws and of

20  the consumer financial services industry.  She's also a former

21  associate director for the credit practices bureau for consumer

22  protection of the Federal Trade Commission, which we often

23  refer to as the FTC.  And she'll talk about the Fair Credit

24  Reporting Act, because it's not an easy statute.  There are

25  many components of it.  Yes, there are many requirements.  But

Opening Statement - By Ms. Sumner

1   it is not quite as simple as summarized by Mr. Baxter.  And

2   she's going to provide you some expertise with respect to that.

3          She's going to explain the purpose of the Fair Credit

4   Reporting Act, which was enacted to provoke -- promote the

5   efficiency of the banking system while ensuring fairness,

6   impartiality, and respect for a consumer's right of privacy.

7          But she will also explain that it requires balancing

8   of interests and obligations of several different groups, not

9   just the credit reporting agencies.

10          She'll also explain that there is -- there is no

11   perfect information requirement.  It would be impossible, with

12   the amount of data that is managed, for there to be perfection.

13   And the FCRA does not require that.  It requires the CRAs to

14   follow reasonable procedures.  And those reasonable procedures,

15   she will explain, must be determined in context.

16          And Equifax agrees that it has obligations under the

17   FCRA.  But you will see evidence presented to you that it

18   maintains and follows reasonable procedures.  They're not

19   perfect procedures and they're not infallible procedures, but

20   they are reasonable.  And Equifax has gone to great lengths in

21   order to develop and implement those procedures.

22          Ms. Fortney will also talk to you about the role of

23   credit reports in our economy, because there is an important

24   role.  And our country depends on the balancing of interests

25   and the sharing of information and the quick sharing of

93

Opening Statement – By Ms. Sumner

1    information.  I think all of us are familiar with how credit

2    seems to be so instantaneous at this point.  People can stand

3    in line to check out at Macy's and be offered a credit card,

4    and the expectation is that you will get a response on the

5    spot.

6            To be that efficient and that quick, then steps have

7    to be taken to process information at a very, very high speed.

8    So lenders, such as banks and credit card companies, they rely

9    on credit reporting agencies to receive information about

10   consumers so they can decide whether to extend credit.

11   Consumers rely on credit reporting agencies to report their

12   information quickly and accurately.  We recognize that.

13           And the credit reporting agencies and consumers rely

14   on the creditors to report information about the consumers

15   accurately to the credit reporting agencies.  Because,

16   remember, the credit reporting agencies are the ones that are

17   receiving information from furnishers of information.

18           They're not the ones developing the information.

19   They are taking the billions of updates that are coming in on a

20   regular basis and matching it, but they're not creating that

21   information.  The creditors provide the information, the

22   consumers provide the information.  So the credit reporting

23   agencies also have to rely on the creditors and the consumers

24   to provide accurate and complete information.  So it is a

25   sharing of information that occurs all the way around.

94

Opening Statement – By Ms. Sumner

1          Now, let's talk a little bit about accuracy, because

2     that's another word that you're going to hear over and over

3     again during this trial.  There will be several terms you will

4     hear over and over again; you'll be tired about hearing, before

5     the end of this trial.  But Ms. Fortney will talk about, in the

6     meaning of the statute, what is the maximum accuracy in credit

7     reports and how is that evaluated under a reasonableness

8     standard.

9          And credit reporting agencies are to follow

10    reasonable procedures to assure maximum possible accuracy of

11    the information concerning the individual about whom the report

12    relates.  And they are to conduct reasonable investigations to

13    determine whether disputed information is inaccurate.

14         So, again, these are reasonableness standards that

15    have to be considered in the context of the situation, and

16    Equifax places great emphasis on accuracy.  And in addition to

17    Ms. Fortney, you're going to hear from our own Equifax

18    witnesses why it's important to focus on accuracy.  Because

19    Equifax, obviously, is a company, and it does sell credit

20    reports.  If it has a record of selling inaccurate credit

21    reports, it would not stay in business.

22         It has not been in business for over a hundred years

23    because it reports inaccurate information.  Its customers want

24    information, both the customers that are the creditors and the

25    customers that are the consumers.  And Equifax strives to

Opening Statement – By Ms. Sumner

1    achieve that because that is the lifeblood of this company, to

2    achieve a very accurate high standard.

3          And they have systems, codes, policies, procedures in

4    order to be efficient.  But the primary thing is they're also

5    in place so that Equifax information can be accurate.  They

6    don't get paid more for bad information.  They just simply

7    would lose customers.

8          And Equifax continues to try to improve its system,

9    to improve its sufficiency, to improve its accuracy.  But we

10   can't ever expect that kind of a system to be perfect.  It is

11   not possible.

12         And in handling this amount of data with this many

13   bits and bytes of information that comes in from all over the

14   United States every hour on the hour, it will never be perfect.

15   And the Fair Credit Reporting Act doesn't expect it to be

16   perfect.

17         Now, we do acknowledge that Equifax should have done

18   a lot better than it did with Ms. Miller.  And you will hear

19   how some of the agents made mistakes in evaluating her

20   circumstance, which was unusual and which provided information

21   that set up a confusing circumstance.

22         And you will hear our Equifax representative talk

23   about the steps that Equifax has taken in order to train agents

24   on this particular type of circumstance, but they can't

25   forecast every possible scenario that would come out of

Opening Statement – By Ms. Sumner

96

1   managing 250 million consumer reports.

2          So let's talk, just briefly, about the circumstances

3   here.  You'll hear Ms. Fortney talk about why Julie M. Miller's

4   file combined with another Julie M. Miller's credit file.  And

5   you'll hear Ms. Dixon discuss what happened when Ms. Miller

6   disputed the inaccurate information from the other Julie M.

7   Miller, and when the files combined.

8          Before we talk about that combination of events,

9   though, let's talk about some important facts concerning

10  Ms. Miller's experience with the other two CRAs.

11         Mr. Baxter didn't talk much about her experience with

12  TransUnion and Experian.  And she sued them both because of a

13  mixture of her file with another file.

14         And when the other two CRAs mixed her file, at that

15  point Equifax hadn't done so.  And you will hear that

16  Ms. Miller is claiming that the damages against Equifax from

17  mixing her file -- but she can't really distinguish, herself,

18  from the damages that was caused by the mixing of her file by

19  other CRAs because it all happened relatively close in time.

20         That's a problem for Ms. Miller, because she's not

21  entitled to recover damages from Equifax unless she can prove

22  that Equifax caused those damages and that the damages weren't

23  caused by someone else or another entity.

24         We recognize that Ms. Miller had to deal with some

25  problems with her credit reports.  That's never fun.  She had

1   to deal with it with the other two CRAs, which had some similar

2   problems in this circumstance, and with Equifax as well.

3          So you will hear Ms. Leslie explain, when that

4   information came in, she'll walk you through the process that

5   we talked about earlier with the matching.  And she'll explain

6   that this was a very close and unusual matching circumstance.

7          Now, Mr. Baxter didn't really go into how the

8   matching worked.  He focused on why you might think that

9   they're very distinguishable.  But you will see from

10  Ms. Leslie's testimony that these two individuals are very,

11  very close in their identification.  And you will hear

12  testimony that it was highly unusual that all of these factors

13  aligned so that when you looked at their identification

14  information, it appeared as if it was one person.

15         And Ms. Mixon will talk with you about the impact of

16  that unusual online combine which created the confusing

17  situation involving a file with an ID that matched Ms. Miller's

18  file very closely, and it created some unique challenges to

19  understand what happened.

20         And Ms. Mixon will discuss in detail what procedures

21  were in place to address it, and why there may -- why agents --

22  or the steps that agents took in order to -- to sort out the

23  issue.

24         So one of the things that she's going to talk about

25  is in the policies and procedures.  Before a reinvestigation is

Opening Statement – By Ms. Sumner                    98

1    triggered, there are some steps that an agent has to go

2    through.  One is seeking appropriate identification

3    information.  And there are some very specific requirements.

4    For example, a truncated Social Security number may not be

5    sufficient.  Because, as I've already told you, we have such

6    close matches sometimes with Social Security numbers, you need

7    to have the full Social Security number.

8            So that you'll see -- and I'm not going to spend a

9    lot more time going over the details here, because it's all

10   going to come out in the evidence.

11           But you'll see, it wasn't as if every time that

12   Ms. Miller provided identification information it was

13   sufficient to support that she was the right match.  There --

14   sometimes what she provided was not sufficient, according to

15   the procedures.  But I've already told you the agents made some

16   mistakes, and we've acknowledged that.

17           They should not have sent a file disclosure to her

18   one time when she didn't provide sufficient ID information, and

19   they did.  And they sent the wrong form letter at a time when

20   they should have sent her a letter -- and this is on your --

21   your -- it should be on your screen, where it sort of shows

22   which way you go.

23           Once you get the consumer information, then you have

24   sort of two choices, and it depends on what you choose as to

25   what form letter the agent sends out.

Opening Statement – By Ms. Sumner

1          Here, if -- Ms. Mixon will explain that if the ID

2     doesn't match, then the reinvestigation should occur only if

3     certain information differs.  So if the address differs or the

4     date of birth differs or if the name differs.

5          But the agents should not start a reinvestigation if

6     the Social Security number differs or the name differs.

7          So here we had a slight variation of a Social

8     Security number, which meant that a reinvestigation should not

9     have been triggered at that point but that there should have

10    been further investigation to determine whether or not they had

11    the right consumer.

12         So there was a lot of back and forth in terms of

13    requests for identification as the agents were requesting

14    information from her.

15         And at one point they sent the wrong form letter,

16    which triggered -- which was the -- the language that

17    Mr. Baxter pointed out to you, which said we're addressing your

18    concerns.  That's -- if she had provided appropriate

19    identification information and the social security numbers had

20    matched, then they could have started an investigation and

21    addressed her concerns.  She should have sent the letter that

22    says, We haven't found your file.  They sent the wrong form

23    letter.

24         Now, the agents also could have escalated this issue

25    to the Office of Consumer Affairs.  That's sort of a special

Opening Statement – By Ms. Sumner

1   group that is trained to -- to try to address unusual

2   circumstances.  Unfortunately, here, they didn't escalate it.

3   And Ms. Mixon will acknowledge that if the agents had escalated

4   it to that group of people who have specialization, then that

5   may have provided a different story.

6          So, unfortunately, it didn't come to that office's

7   attention until she filed a lawsuit.  And, at that point, they

8   went through the proper steps in order to separate those files.

9   So the fact that our witness -- our representatives acknowledge

10  errors, that's not a gotcha moment.  It is something that we

11  have already agreed occurred.  The distinction here is whether

12  those errors rise to the level that Ms. Miller is claiming.

13  Did we negligently violate the FC -- FCRA, or did Equifax

14  willfully try to violate her rights?  That's what we submit to

15  you you will not see evidence to support.

16         Now, Mr. Baxter also repeatedly said that Equifax

17  lied to her.  I think that's an unfair characterization of what

18  occurred.  Equifax agents submitted the wrong form letter.

19         Did the form letter accurately say what was

20  occurring?  No, it didn't.  Was it an intentional lie?  Did

21  they try to mislead Ms. Miller?  I don't think the evidence

22  will reflect that.

23         As I mentioned, we don't believe that the evidence

24  will reflect that -- that Equifax negligently violated the

25  FCRA, or that Ms. Miller has proved that she suffered actual

Opening Statement - By Ms. Sumner

101

1   damages as a result of any specific negligent violation of the

2   Fair Credit Reporting Act.

3           Importantly, she's not alleged any economic damages

4   here.  There's no evidence of actual financial losses.  What

5   she will present to you and allege to you is that she suffered

6   emotionally as a result of this.

7           But as I previewed for you earlier, there are two

8   other CRAs involved in this process, and she cannot segregate

9   the frustration that she experienced in dealing with the other

10  two CRAs from what she later experienced from Equifax.

11          And as is clear from Mr. Baxter's opening remarks,

12  this case is really about Ms. Miller's allegations that

13  Equifax's conduct was willful.

14          In other words, she argues that Equifax acted with

15  knowledge that it was violating the law, that it knew it was

16  violating the law, or that it recklessly disregarded the law.

17  And although it's her burden to prove that willfulness, I

18  expect the evidence to show that Equifax didn't act willfully.

19  That Equifax didn't blow away the FCRA requirements, as

20  Mr. Baxter asserts.  Rather, that Equifax had in place

21  reasonable policies and procedures.  That this was an unusual

22  circumstance that tripped up some agents who admittedly made

23  some mistakes, and that Equifax fixed the problem and corrected

24  the credit report once it understood what the problem was.

25          Now, at the end of the evidence, the Court will

Opening Statement – By Ms. Sumner

1   instruct you on the law.  And Mr. Baxter's version of what the

2   FCRA requires is not what controls.  It's the elements that

3   your Honor will provide.

4          And it is very important, though, for you to think

5   about each of those elements, and that is where your unanimous

6   agreement comes into play.  And we respectfully submit that

7   when you apply those jury instructions to the fact of this

8   case, that you will find that Ms. Miller has not met her burden

9   of proving either that Equifax negligently violated the law

10  and, particularly, that Equifax did not willfully violate the

11  law.

12         And so I will be back before you at the end of the

13  trial, asking you to return a verdict for Equifax.  And I

14  sincerely thank you for your time and attention.

15         THE COURT:  Thank you, Ms. Sumner.

16         So, Ms. Boyer, would you move the podium, please.

17         Jurors, as I mentioned earlier, the parties have

18  assembled exhibits in a notebook.  There will be one for each

19  of you.

20         I find it a little hefty, you know, to have on

21  your –– my lap, if I was in your shoes.  So you're free to put

22  it down to the side or to pick it up as you choose.

23         You don't have to use it at all.  It's there, again,

24  to be of use to you.  So we'll pass those out in just a moment.

25         And as soon as that's all accomplished, we'll start

1   with the first witness.  All right?

2        We'll go until about 3:00, 3:15.  At that point we'll

3   take an afternoon recess.  So let us just get these logistics

4   set up.

5        Mr. Baxter, you can give those to Ms. Boyer to pass

6   out, please.

7        Danny, would you help her, if you would like, to pass

8   out notebooks.

9        (Pause, notebooks being passed to jurors.)

10       THE COURT:  So, again, jurors, you can consider this

11  just another part of your personal notes.  You can mark on

12  them.  Use them as you choose.  And at the end of the

13  deliberations, your notes will be destroyed.  It's just there

14  for you to use as you choose.

15       Mr. Baxter, your first witness, please.

16       MR. MICHAEL BAXTER:  Yes.  I call Julie -- I call

17  Ms. Julie Miller, your Honor.

18       THE COURT:  Ms. Miller, would you come here, please,

19  to the witness chair.  Would you please come all the way up.

20  And when you get to the chair, remain standing.

21       Thank you.

22       Face the jury and the deputy there.  Raise your right

23  hand to be sworn.

24       (Witness sworn.)

25       THE WITNESS:  Yes.

Miller – D                              104

 1              THE CLERK:  Please take a seat.

 2              THE COURT:  I need you to pull yourself in, as close

 3    as you can get to the microphone there.  I know the chair is a

 4    little hard to move.

 5              All right.  Pull the microphone down, and close to

 6    you.  There you go.

 7              Tell us your full name, and spell all of it, please.

 8              THE WITNESS:  Julie Marie Alt Miller.  J U L I E.

 9    Marie, M A R I E.  Alt, A L T.  Miller, M I L L E R.

10              THE COURT:  Thank you.

11              And try to keep your voice up, so that all of the

12    jurors can hear you.

13              Counsel.

14              MR. MICHAEL BAXTER:  Sure.  Thank you, your Honor.

15                         DIRECT EXAMINATION

16    BY MR. MICHAEL BAXTER:

17    Q.   Ms. Miller, are you married?

18    A.   Yes.

19    Q.   And what is your husband's name?

20    A.   Rick.

21    Q.   And do you have any children?

22    A.   Yes.

23    Q.   And how many?

24    A.   Two sons.

25    Q.   And where do you reside?

Miller – D                              105

1    A.    13037 Maple Leaf Court, Northeast, Aurora, Oregon.

2    Q.    Okay.  And do you own your home?

3    A.    Yes.

4    Q.    Are you involved in the community at all?

5    A.    Yes.  I'm -- I was on the Pryview (phonetic) Sports Board

6    for 15 years.  I volunteer in the classroom.  I was involved in

7    parent group, boosters club -- or still am.  And I am on my

8    13th year on the school board.

9    Q.    Okay.  Would you tell the jury what you do for a living.

10   A.    I'm a registered nurse.

11   Q.    And are you employed by a particular physician?

12   A.    Yes, I work for Carolyn Hale.

13   Q.    And what is your approximate income?

14   A.    About 50,000 a year.

15   Q.    Okay.  Would you tell the jury your educational

16   background.

17   A.    I went to Silverton High School, and I went to Oregon

18   State for a year for pre-nursing.  And then I went to Oregon

19   Health Science University and graduated with a Bachelor's of

20   Science in nursing.

21   Q.    And where did you grow up?

22   A.    Silverton.  Out of Silverton, Oregon.

23   Q.    Okay.  When did you first learn that your credit reports

24   were mixed with another person?

25   A.    In -- around 2008.

Miller - D

1    Q.    Can you tell the jury about that?

2    A.    I had a denial of credit.  So I ordered my three credit

3    reports, and found that there was a lot of incorrect

4    information on two of them.

5    Q.    And which two were those credit reports?

6    A.    TransUnion -- TransUnion and Experian.

7    Q.    And what did you do?

8    A.    I filed disputes with both of them.

9    Q.    And after you filed those disputes with TransUnion and

10   Experian, what happened?

11   A.    They were corrected.

12   Q.    Were you still denied credit in the fall of 2010?

13   A.    Yes.

14   Q.    And what credit reporting company was that denial based

15   on?

16   A.    Equifax.

17   Q.    Were you denied in 2010 for -- from another -- from --

18   also from Experian?

19   A.    Yes.  I think that's when there was still one lien that

20   hadn't been removed.

21   Q.    Okay.  Now, at some point did you discover massive amounts

22   of false information being reported by Equifax in your Equifax

23   credit report?

24            MS. SUMNER:  Leading, your Honor.  Objection.

25            THE COURT:  Sustained.

Miller - D

```
 1           The witness needs to testify on her own, and she
 2    clearly is not an adverse witness to you, so please ask her
 3    open-ended questions.
 4           MR. MICHAEL BAXTER:  At some -- I'm sorry, your
 5    Honor.
 6    BY MR. MICHAEL BAXTER:
 7    Q.   At some point did you order your Equifax credit report?
 8    A.   Yes.
 9    Q.   And what did you discover when you found -- when you saw
10    it?
11    A.   When it came, it had a different Social, a different birth
12    date, numerous incorrect addresses, around 40 debt collection
13    information that was not mine, wrong employers.
14    Q.   And when did you learn this?
15    A.   That was -- I think it was like the first part of 2010 or
16    the end of 2009.
17    Q.   And how did you learn that there were problems with your
18    Equifax credit report?
19    A.   I think what started that round was denial from KeyBank on
20    a cash reserve type --
21    Q.   Do you have an exhibit book in front of you?
22    A.   Yes.
23    Q.   Okay.  Would you look at Exhibit 1.
24           Is that the denial from KeyBank you're speaking in
25    terms of?
```

Miller - D

1   A.   Yes.

2            THE COURT:  Excuse me.  Excuse me just a second,

3   Counsel.

4            I just want to make sure the jurors know, all of the

5   exhibits that you have are in evidence.  So they're part of the

6   evidentiary record.  They're not things that will be admitted

7   or not.  So this is all already before you, as of now.

8            Excuse me, Mr. Baxter.

9            MR. MICHAEL BAXTER:  Okay.  Thank you.

10  BY MR. MICHAEL BAXTER:

11  Q.   Why did you apply for a loan with KeyBank in December of

12  2009?

13  A.   This was a cash reserve option on a joint account with my

14  son.

15  Q.   Did you physically go to KeyBank with your son?

16  A.   Yes.

17  Q.   And at a particular branch of KeyBank that you went to?

18  A.   Our local branch in Hubbard.

19  Q.   Is that the bank branch that you bank with?

20  A.   Yes.

21  Q.   Would you tell the jury what happened.

22  A.   I went in and co-signed with him, and then later received

23  the letter of denial.  This letter of denial.

24  Q.   Did the denial letter indicate what was the basis for

25  their denial?

Miller - D

1   A.   Yes.   It says here, in the mid-section, that it was based

2   on an Equifax credit report.

3   Q.   And did that surprise you?

4   A.   I was very surprised, because I thought we had, you know,

5   cleared up all of the credit issues.   And we always pay our

6   bills on time.   We've never been delinquent.   So I -- I was

7   shocked.

8   Q.   Does Exhibit 1 list the reasons in the Equifax credit

9   report that caused the denial?

10  A.   Yes.

11  Q.   What are those reasons?

12  A.   Recency of derogatory credit bureau rating and

13  excessive -- excessive number of 30-day delinquencies reported.

14  Q.   Now, at the time that you applied for this loan at KeyBank

15  did you have any accounts that were delinquent?

16  A.   No.   We have never had any delinquent accounts.

17  Q.   What about your son Zack?   Does he have any delinquent

18  accounts?

19  A.   No.

20  Q.   What happened next?

21  A.   I think right after -- after this, I had ordered the

22  credit report from Equifax.

23  Q.   And did Equifax respond to your request?

24  A.   Yes.

25  Q.   Would you turn to Exhibit 2.   What is Exhibit 2?

Miller - D

1    A.    A response from Equifax, requesting more information.

2    Q.    And did you provide the additional information that

3    Equifax was requesting?

4    A.    Yes.

5    Q.    What did you provide?

6    A.    Pay stub from one of my employers and a Century tel -- a

7    telephone bill.

8    Q.    And did that identifying information include your current

9    mailing address?

10    A.    Yes.

11    Q.    And did it include documents with your Social Security

12    number?

13    A.    The pay stub had my Social, but I think I only -- I only

14    exposed part of the Social.

15    Q.    And why -- were you concerned about your identification?

16    A.    Yes.  I don't like sending this kind of information

17    through the mail because of all of the issues with identity

18    theft.  We live in a really rural area and use a mailbox, and

19    people get their things stolen all the time.  So it was -- it

20    was scary.

21          And I think on their form, somewhere, I recall seeing

22    a place where you -- you didn't always have to put your whole

23    Social.  But, anyway, at this particular time, I did not put

24    the whole Social on.

25    Q.    Did Equifax send you a copy of your credit report?

Miller - D

1    A.    After this letter, I believe so.

2    Q.    Okay.  Would you turn to Exhibit 5.  What is Exhibit 5?

3    A.    It's a copy of the -- my credit report.

4    Q.    Is that a copy of your January 18th, 2010, Equifax credit

5    report?

6    A.    Yes.

7    Q.    When you received it, did you -- did you review the credit

8    report?

9    A.    Yes.

10   Q.    And -- hang on.

11         Did -- would you read, in the first paragraph of

12   Exhibit 5, this section beginning -- which says, "Great care."

13   A.    Great care has been taken to report this information

14              correctly.  Please help us, in -- in achieving

15              even greater accuracy by reviewing all of the

16              enclosed material carefully.

17   Q.    Okay.  And when you reviewed your credit report, did you

18   believe that statement was accurate?

19   A.    No, because I had already sent my Social a couple of

20   times, and I had received someone else's Social.  And so I was

21   totally freaked out and dismayed because I didn't know where my

22   Social was.  And here I'm receiving someone else's.  I felt I

23   was violating another person.  And then I was scared for

24   myself, not knowing where -- where my information was.

25   Q.    Okay.  Would you turn to page 3 of your January 18th,

Miller – D                    112

1    2010, credit report, Exhibit 5.

2    A.    Page 3?

3    Q.    Um-hmm.  Tell me when you're there.

4    A.    Oh, I'm there.

5    Q.    Can you tell the jury what information didn't belong to

6    you that was in that credit report?

7    A.    The Social Security number, the date of birth, our -- our

8    address was there.  An old address of ours was there.  But

9    there was a couple other addresses that weren't ours.  The

10   employment information was in -- incorrect.  And then there's

11   approximately 40 collection service information here that's not

12   ours.

13   Q.    Were there also other derogatory accounts, besides the

14   collections, on your credit report?

15   A.    Yes.

16   Q.    Well, now, what was your reaction when you got this

17   report?

18   A.    I was very frustrated and alarmed and scared, and just

19   kind of my heart sank.  I was overwhelmed by all of this

20   incorrect information.

21   Q.    Now, on the front page, this is page 3 of your credit

22   report.

23         Do you see all of these collections there?

24   A.    Which page?

25   Q.    Page 3 of your credit report.

Miller – D                                    113

1    A.    Oh, yeah.

2    Q.    Are any of those collections yours?

3    A.    No.

4    Q.    What about page 2?  Are any of the collections on page 2

5    yours?

6    A.    Page 2 is a different -- it's --

7    Q.    Oh, I'm sorry.  Page 4, at the bottom.  Page 4 of 14.

8    A.    No.

9    Q.    What about page 5 of 14.  Are any of those collections

10   yours?

11   A.    No.

12   Q.    Are there any other accounts on your credit report that

13   didn't belong to you besides the collections?

14   A.    Yes.  There are some accounts listed.  I think page 5 is

15   us, but on page 7 --

16   Q.    For example, on page 8 --

17   A.    Or, yeah.  I can't read this very well.

18   Q.    Do you have an account with Portfolio Recovery?

19   A.    No.

20   Q.    Would you turn to page 11 of this credit report.

21         This is -- this is the page that says, "A summary of

22   your rights."

23   A.    Um-hmm.

24   Q.    Would you read the section beginning with "you have the

25   right to dispute."

Miller - D

114

1   A.   You have the right to dispute incomplete or inaccurate

2        information.  If you identify information in your

3        file that is incomplete or inaccurate, and report

4        it to the consumer reporting agency, the agency

5        must investigate unless your dispute is frivolous.

6   Q.   Did you attempt to resolve these false accounts with

7   Equifax the same way you did with Experian and TransUnion?

8   A.   Yes.

9   Q.   What did you do?

10  A.   I filled out their -- well, I copied, highlighted, wrote a

11  letter, and sent it all in to them.

12  Q.   Would you turn to page 8 -- or, I'm sorry, Exhibit 8.

13       Tell me when you're there.

14  A.   Under No. 8?

15  Q.   Yes, Exhibit No. 8.

16  A.   Okay.

17  Q.   Would you tell the jury what this letter is.

18  A.   This is the letter I sent with the dispute information.

19  Q.   And how did you mail this letter?

20  A.   Certified.

21  Q.   And why did you do that?

22  A.   I wanted to make sure that the information was being

23  received.

24  Q.   Now, would you read the first sentence to yourself and --

25  of your dispute, and then explain what you are saying in that

```
 1   sentence, when -- what you're trying to tell Equifax.

 2   A.    I was just trying to convey how frustrated I -- and upset

 3   I was, and amazed to get this much incorrect information.

 4   Q.    Now, I notice there's handwriting on this document.  Can

 5   you explain that?

 6   A.    That's the information that I enclosed with this letter,

 7   when I mailed the packet to them.

 8   Q.    Now, would you -- read to yourself paragraph 2.  And then

 9   explain to the jury, in summary form, what you're trying to

10   tell there, Equifax in summary, in paragraph 2.

11   A.    It was just -- so to summarize what I was saying, was,

12   again, my concern for my identity, with all of the identity

13   theft, et cetera, and how frustrated and upset.  I had no

14   information on where my own personal information had gone.  And

15   here I have someone else's information and a lot of incorrect

16   information.

17          And, again, because of the identity theft, I was

18   really concerned about that.

19   Q.    And will you summarize paragraph 3 for the jury.

20   A.    I summarized what was incorrect about the report.

21   Q.    Did you attempt to keep track of everything that happened

22   with your communications with Equifax?

23   A.    Yes.

24   Q.    And why did you keep track -- keep these notes?

25   A.    The main reason is because my background is in medicine.
```

Miller - D

116

1  And in the medical world, everything is documented.  So I --

2  if -- you know, you just need to write it down so you know that

3  you did it, and when I did it.  And then also this had been

4  going on for a while and was getting pretty repetitive.  And

5  just to try to keep track, I kept notes for myself, as well.

6  Q.   Now, when you mailed this January 25th letter to Equifax,

7  did you include anything in the letter?

8  A.   Yes.  What I wrote at the bottom, the copies of the report

9  I had received, that had been highlighted with incorrect

10  information.  And my letter and their letter.

11  Q.   Now, would you look at Exhibit 6.  Tell me when you're

12  there.

13  A.   I'm there.

14  Q.   Okay.  I will tell you, this is Equifax's copy of the

15  credit report.

16       Is the highlighting you're talking about noted on

17  their copy of your credit report you submitted?

18  A.   Yes.  It's kind of darkened from the highlighter.

19  Q.   Okay.  Let's turn to page 9 of Exhibit 5.

20       Tell me when you're there.

21  A.   I'm there.

22  Q.   Does this -- does this page show -- what does this page

23  show to you?

24  A.   I think this is in -- inquiries that other companies made.

25  Q.   Are any of the companies that are listed on this credit

Miller - D

1  report companies which you do business with?

2  A.   There are some, yes.

3  Q.   What -- can you tell the jury what those are?

4  A.   KeyBank Penney's.  I think those are the two.

5  Q.   Are any of the inquiries showing companies that you do not

6  do business with?

7  A.   Yes.

8  Q.   And what are some of those?

9  A.   Oh, Cox Communication is one.

10 Q.   Okay.  Now, does this credit report -- in addition to the

11 information that does not belong to you, does it also include

12 your personal accounts and information?

13 A.   Yes.

14 Q.   Did Equifax respond to Exhibit 8, your January 25th, 2010,

15 dispute letter?

16 A.   Yes.

17 Q.   And how did they respond?

18          I tell you what.  Why don't you look at Exhibit 9.

19 A.   I sent information to them, like 13 different times.  So I

20 get confused as to which letter came, in what order.  So --

21 sorry about that.  So -- this is No. 9.

22 Q.   Is Exhibit 9 Equifax's response to your January 25

23 dispute?

24 A.   Yes.

25 Q.   And would you read the first line of Equifax's response to

Miller - D                                      118

1   the jury.

2   A.   We received your request concerning your Equifax credit

3        file and have addressed your concerns.

4   Q.   Had Equifax addressed your concerns?

5   A.   Not to my knowledge.

6   Q.   What were your concerns?

7   A.   That my file had been mixed, and a lot of incorrect

8   information, and I had no idea where my information was.

9   Q.   And would you read the first -- up to the -- the comma of

10  the first sentence of the second paragraph to the jury.

11  A.   In order to receive the results of the investigation, a

12       copy of one item in each of the categories below

13       is needed in order to verify your identification

14       and address.

15  Q.   Did you want to know what Equifax had concluded in their

16  investigation?

17  A.   Yes.  Yes, I was hoping to -- that it was going to come

18  back corrected.

19  Q.   And what did you do next?

20  A.   I sent information from their two categories that they

21  were requesting back to them.

22  Q.   And does Equifax have a section on here, on the bottom, in

23  a box -- would you read that -- the -- the bold print to the

24  jury.

25  A.   The F.B.I. has named identity theft as the

Miller – D

1          fastest-growing crime in America.

2    Q.   What did you think when you read that?

3    A.   Well, I -- unfortunately, I was very concerned about that.

4    That was my whole concern.  And it was really concerning that I

5    wasn't making any progress.  Because I take my Social Security

6    number very securely and safely, and I remember when I got it.

7    And it's just something that -- that information should be

8    secure.  And I was shocked that I was having such a hard time

9    finding out about it.

10   Q.   How did you respond to Equifax's February 5th, 2010,

11   response?

12   A.   I sent the information -- the identifying information that

13   they requested again.

14   Q.   Would you turn to Exhibit 10.

15        What is Exhibit 10?

16   A.   It's a letter I -- I wrote when I sent in the other

17   identifying information.

18   Q.   And what other identifying information did you provide

19   with your dispute?

20   A.   My driver's license and a pay stub with my address and

21   Social Security number.

22   Q.   Now, at the bottom of Exhibit 10 it says, Enclosures,

23   quote, for, colon, your letter.  What do you mean by "your

24   letter"?

25   A.   I also included the request letter that they had mailed to

Miller – D

120

1   me.

2   Q.   So were you –– what were you trying to get acrossed to

3   them by sending them their own letter?

4   A.   Well, I –– just wanted to try to make sure I did

5   everything right and that they had all of the cross-linked ID

6   numbers, and everything, since our Socials weren't matching up.

7            So I just copied the whole letter, thinking there

8   might be some numbers on there that would help identify my

9   information.

10  Q.   Okay.  And would you explain to the jury what you told

11  Equifax in the first paragraph of your February 11, 2010,

12  letter.

13  A.   Well, I paraphrased their last paragraph on their letter

14  about identity theft, because I was really feeling concerned

15  about my Social and where it was.  And so I just was telling

16  them that they needed to look at my Social and birth date, and

17  try to –– and I was –– I wanted to get some information about

18  where my information was.

19  Q.   So was there a fear of –– that Equifax might improperly

20  release your identifying information?

21  A.   Yes.  I wasn't sure where that was.

22  Q.   Now, I see in your letter you indicate that you're mixed

23  with another person.  How were you able to come to that

24  conclusion?

25  A.   There was some of our correct accounts on the credit

Miller - D

1   report.  So that -- I mean -- so that's how I knew.  And our

2   address was on there.

3   Q.   Did you recommend to Equifax how they could correct it?

4   A.   Yes.

5   Q.   What did you tell them?

6   A.   Well, they just -- they needed to look at the Socials and

7   the birth date more closely, and that they weren't exact

8   matches.  And that -- to clear the report.

9   Q.   Now, later in this case, were you provided a corrected

10  credit report from Equifax?

11  A.   Much later.  After we filed the suit.

12  Q.   And did they follow your recommendations when they finally

13  cleaned up your credit report?

14  A.   Yes.

15         MS. SUMNER:  Objection, your Honor.  It's speculation

16  as to what Equifax did.

17         THE COURT:  I don't know if it is or isn't.  I can't

18  really tell what the question is calling for.

19         Can you rephrase it and perhaps address the issue.

20  BY MR. MICHAEL BAXTER:

21  Q.   Sure.  What was corrected in your credit report two and a

22  half years later, after Equifax cleaned it up?

23  A.   All of the information that I had disputed.  The Social,

24  the birth date, the addresses, the employment, all of the false

25  creditors.  All of the things that I had highlighted and

Miller - D                    122

1    disputed had been removed.

2    Q.    Did Equifax respond to this second dispute, this

3    February 11 dispute?

4    A.    Let's see.  I think I got -- after this one, I got another

5    credit report.

6    Q.    Would you turn to Exhibit 12.  What is Exhibit 12?

7    A.    A copy of my -- the mixed credit report.

8    Q.    And the first bold box, you see where it -- does it label

9    what the -- you are receiving from Equifax there?

10   A.    Results of your investigation.

11   Q.    And would you read to the jury the first two lines of

12   Exhibit 12.

13   A.    Below are the results of your request for Equifax to

14             reinvestigate certain elements of your Equifax

15             credit file.  Equifax contacted each source

16             directly, and our investigation is now completed.

17             If you have any additional questions or concerns,

18             please contact the source of that information

19             directly.

20   Q.    Did you review the actual credit report behind the results

21   of the investigation?

22   A.    Yes.

23   Q.    And tell me what you found.

24   A.    It was still the same mixed incorrect information that

25   they had sent me the first time.  Nothing had changed.

Miller – D

123

1   Q.   Did -- did -- from reviewing the report, did you believe

2   Equifax had contacted the creditors, who provided the disputed

3   information?

4   A.   No, because nothing had changed.  So it was very

5   frustrate -- frustrating because, you know, again, I -- my --

6   my Social is very important to me.  And to have it -- not even

7   know where it is, it was very alarming.

8   Q.   And in your similar disputes to Experian and TransUnion,

9   what happened after you made disputes to those companies?

10  A.   They corrected my accounts, or credit report.

11  Q.   Now, on the first page there, Equifax also recommends that

12  you contact the sources directly if you want additional

13  corrections.  Did you do that?

14  A.   No.  And I don't really see how I could have, because this

15  wasn't my information.  This, in my opinion, wasn't really

16  my -- my credit report.  It was not really my job to -- or,

17  again, I don't even know if I could have, because I don't have

18  that Social.  And they're the ones that sell my information,

19  and I feel like they should be responsible for making sure that

20  the information is correct.

21  Q.   Now, if -- would you read to the jury the second paragraph

22  of page 1 of Exhibit 12, beginning with "if you."

23  A.   If you have any additional questions regarding the

24          information provided to Equifax by the source of

25          any information, please contact the source of that

Miller - D

124

1           information directly.

2    Q.   So you did not contact any of the sources?

3    A.   No.

4    Q.   And the -- the paragraph above that, would you read that

5    to the jury.

6    A.   The "please be specific"?  That one?

7    Q.   Yes.

8    A.   Please be specific with your concerns by listing the

9           account names, numbers, and nature of the dispute.

10   Q.   How did you feel when you read that?

11   A.   Like I just said, I didn't feel like it was my

12   responsibility.  I didn't feel like this was even my credit

13   report.  It had some of my information, but the majority of it

14   was not my information, I thought.  And it's their job to clean

15   it up.

16   Q.   And had you already sent them a detailed credit report

17   with the highlighted false information?

18   A.   Yes.

19   Q.   Would you read the first line of the notice to the

20   consumers, in the bottom part of page 1 of Exhibit 12.

21   A.   Upon receipt of your dispute, we first review and

22           consider the relevant information you have

23           submitted regarding the nature of your dispute.

24   Q.   Do you believe there was any attempt to review the

25   relevant information that you had submitted with your dispute?

Miller - D

1    A.    Not at this time.

2    Q.    Why not?

3    A.    Nothing had changed.  There was, you know, starting to be

4    a little pattern of responses, but I wasn't getting any action.

5    Q.    Now, would you -- would you read the paragraph, "If you

6    still disagree," to the jury.

7    A.    If you still disagree with an item after it has been

8              verified, you may send to us a brief statement,

9              not to exceed 100 words, explaining the nature of

10             your dispute.  Your statement will become part of

11             your credit file, and will be disclosed each time

12             that your credit file is accessed.

13   Q.    Did you send in any statements to Equifax to include on

14   your credit file?

15   A.    No.

16   Q.    Why not?

17   A.    Well, for one, all of the items I would have been

18   disputing were not my items to -- they were not my credit

19   information, and I didn't believe that it would be helpful.

20   Q.    Now, you have made two disputes to Equifax.  Was a single

21   piece or a single item of the information that you disputed in

22   those first two disputes corrected in this February 23, 2010,

23   credit report?

24   A.    No.

25             MS. SUMNER:  Your Honor, I'm going to object again to

Miller – D                                  126

 1    continue to leading the witness.

 2              THE COURT:  I don't think that's leading, it's a

 3    summary of the prior testimony.  The objection is overruled.

 4    The answer stands.

 5              Go ahead.

 6              THE WITNESS:  No, nothing had changed on the credit

 7    report.

 8    BY MR. MICHAEL BAXTER:

 9    Q.   Did it appear that Equifax had taken any steps to protect

10    your identity?

11              MS. SUMNER:  Your Honor, same objection.

12              THE COURT:  Overruled.  Go ahead and answer the

13    question.

14              THE WITNESS:  No.  I was very concerned because they

15    hadn't responded to my questions as to where my Social and my

16    private information was, as well as the fact that I had someone

17    else's.

18    BY MR. MICHAEL BAXTER:

19    Q.   How are you feeling at this point?

20    A.   I was feeling very frustrated and overwhelmed because I

21    had repeated the process and I hadn't made any headway.  And I

22    had, you know, done this with other companies, and they did

23    work with me.  And I was not getting any cooperation, so I was

24    just angry and frustrated.

25    Q.   Were you later denied for credit again?

Miller - D

1    A.    Yes.

2    Q.    Would you turn to Exhibit 13.  And tell the jury what this

3    is.

4    A.    I co-signed for a cash reserve credit that we had on --

5    had the option for on one of our bank accounts.

6    Q.    And were you accepted for that cash reserve?

7    A.    No.  We were denied.

8    Q.    Why were you requesting an increase of the cash reserve?

9    A.    Because we had the option.  We had some other projects

10   that we were planning for, so it seemed like a good option.

11   Q.    What kind of projects were you planning for?

12   A.    We wanted to build a shop, a big garage on our property.

13   We had some things that were coming up with my disabled

14   brother.

15   Q.    Now, does this March 4th letter from KeyBank accept -- an

16   acceptance or a denial of -- of application for credit?

17   A.    Denial.

18   Q.    And does it indicate the basis for that denial?

19   A.    An Equifax credit report.

20   Q.    And does it state the reasons in the denial on that

21   Equifax credit report that caused the denial?

22   A.    It says, "Collection Action."

23   Q.    Now, again, is this KeyBank the bank you regularly do

24   business with?

25   A.    Yes.

Miller - D

1  Q.   Did it concern you that KeyBank was being sent the Equifax

2  credit report with all of these collections on it?

3  A.   Yes.  I live in this community, and -- and see these

4  people regularly.  And it was very disheartening to have my

5  reputation tarnished when we worked so hard to pay our bills on

6  time, live within our means.  And, again, it's a small

7  community, where people talk.  So it was -- it was frustrating.

8  Q.   Now, at some point did you attempt to obtain another

9  Equifax credit report?

10 A.   Yes.

11 Q.   Would you turn to exhibit -- just a moment.

12        Do you remember when that occurred?

13 A.   I think it was in February of -- was it February of 2010

14 or 2011?  2011.  I get confused which year we're in.  2011, I

15 think.

16 Q.   Okay.  Would you turn to Exhibit 3.  What is Exhibit 3?

17 A.   It's a request for a credit report.

18 Q.   Is this the request for a credit report that you sent on

19 February 8th, 2011, to Equifax?

20 A.   Yes.

21 Q.   Did Equifax respond to your request for a credit report?

22 A.   Yes.

23 Q.   Initially, when you sent that letter, did they respond?

24 A.   Not the first time.  I had to send it again in March.

25 Q.   And when you sent it again in March, how did you send it?

Miller - D                    129

1    A.    Certified mail.

2    Q.    Did you receive a response?

3    A.    That time I did receive a response, requesting more

4    identification, again.

5    Q.    Would you turn to Exhibit 14.  Is this Equifax March 30

6    response to your March 21 request for a credit report?

7    A.    Yes.

8    Q.    What was Equifax requesting in this letter?

9    A.    They were requesting identifying information again.

10   Q.    And what did you do?

11   A.    I sent information from each category, as they were

12   requesting.

13   Q.    And how did you send that?

14   A.    Certified mail.

15   Q.    And what happened next?

16   A.    I received an -- I -- another letter, requesting more

17   information.

18   Q.    Okay.  Would you turn to Exhibit 15.

19             First, would you look at pages 2 and 3 of Exhibit 15.

20             Is this the information that you sent to Equifax when

21   you received your credit report?

22   A.    Yes.

23   Q.    And Exhibit 15, page 3, does it include your Social

24   Security number?

25   A.    Yes.

Miller - D

1   Q.   And it -- it's a full Social Security number.  Correct?

2   A.   Yes.  The whole Social.

3   Q.   And page 4, includes Equifax's copy of the envelope.

4   Correct?

5   A.   Yes.

6   Q.   And it shows your return address on that envelope?

7   A.   Yes.

8   Q.   Does -- does your return address match the address on your

9   insurance bill?

10  A.   Yes.

11  Q.   Do you have any idea why your identifying information is

12  not acceptable to Equifax?

13  A.   No.  But that's why -- at this time I sent the whole --

14  you know, I was getting very frustrated.  I had sent this in

15  several times before, hadn't made any progress.  I was trying

16  to make sure I did everything correctly and clearly, and so I

17  exposed myself again, by sending all of my information through

18  the mail.  But I don't know why they didn't accept it.

19  Q.   And you sent this also by certified mail.  Correct?

20  A.   Yes.

21  Q.   Now, after sending this -- oh, wait.

22       How did Equifax respond to this request?

23  A.   I think, next, they requested more information again.

24  Q.   Okay.  Did you send requests for a credit report on

25  February 8th, 2011; March 21, 2011; April 5th, 2011; and April

Miller – D

1    27, 2011?

2    A.    Yes.

3    Q.    Did Equifax provide you a credit report to any of those

4    requests?

5    A.    No.

6    Q.    So what did you do next?

7    A.    At this point I felt like a lost soul because I figured,

8    for some reason, they could not -- that my Social was out in

9    the cyber world and they couldn't identify me anymore.  So I

10   was just really frustrated.

11           And normally they had responded fairly quickly,

12   within a reasonable amount of time.  But then after the last

13   one, I never received anything.  So I did not really know what

14   to think.

15           So, finally, I dug around and found a telephone

16   number, and I tried calling.

17   Q.    And do you remember when you made that telephone call?

18   A.    June 28th.

19   Q.    And why did you initially contact Equifax?

20   A.    Because I had never received the credit report that I

21   would -- had requested four times.

22   Q.    And did you speak with someone from Equifax?

23   A.    Yes.  I spoke with their customer -- one of their customer

24   service representatives named Allie.

25   Q.    Now, would you tell the jury about that call.

Miller - D

132

1    A.    First, she asked me all of the identifying information:

2    Social, birth date, address, asked credit card information,

3    mortgage, a lot of questions along that line.

4    Q.    Did she ask you to mail in your Social Security number?

5    A.    Yes.  And I had told -- I told her that I had already

6    mailed my identifying information many times to them.  That she

7    already had that.

8    Q.    And what happened next in that conversation?

9    A.    She put me on hold.  And went and talked to someone.  Then

10   she came back and asked me the same questions again, all of the

11   identifying information.

12        And then I think she -- that's when she put me on

13   hold again.  She said she was going to talk to her supervisor.

14   And I was on hold for quite a long while.  And she came back,

15   and she said that for my safety, they weren't going to send me

16   my current report and that I needed to contact all of my

17   creditors myself to clear it up, and give them the correct

18   Social Security number.

19        So I was, like, fuming and boiling and didn't know

20   what to think.  Because, again, I have someone else's

21   information.  I don't really think I can be correcting that

22   information.  And I told her that -- how can I dispute the

23   credit report if I don't have the credit report?

24        I need it, to send it.  And she said, Well, again, it

25   was for my protection.  They didn't want to send it.  And

Miller - D

1  that -- then she finally said, You've been mixed with someone

2  else.

3           And just kept pushing and said, Well, I need a copy

4  of my credit report.  And finally, at the end of our

5  conversation, she said that I would receive it in five to seven

6  business days.

7  Q.   In that conversation, did Equifax agree to assist you in

8  unmixing your file?

9  A.   No.

10  Q.   Did Allie or her supervisor ask you which accounts

11  belonged to you and which ones did not?

12  A.   No.

13  Q.   What did they tell you you should do to get this mix

14  corrected?

15  A.   They said that I needed to call all of the creditors and

16  vendors, and everyone, and give them the correct Social.

17  Q.   How did you feel after this call?

18  A.   I was infuriated.  And I -- really overwhelmed.  I was

19  frustrated.  I had no control over the situation.  And I guess

20  that -- that's like the biggest frustration is because I gave

21  them all of the right information.  I was hopeful, since they

22  had actually said that they recognized that I was mixed, that

23  maybe I would make some progress.  But -- but nothing came of

24  it.

25  Q.   Now, other than the collections, are there any accounts

Miller – D

134

1   that do belong to you that are derogatory on your credit

2   report?

3   A.   No.

4   Q.   How did you pay, for example, with credit cards, when you

5   would get credit card bills?

6   A.   We pay off our full account every month.

7   Q.   Did Equifax indicate they're willing to submit your

8   dispute of the false information to the creditors on your

9   behalf?

10   A.   No.

11   Q.   I want you to turn to Exhibit 17.

12          Does -- on Exhibit 17, does that line summarize

13   Equifax's conversation with you on that date?

14   A.   From their side, yes.  It says, Advised that customer

15   needs to contact credit grantors to update her Social.

16   Q.   Now, during the entire 2011, was there any other credit

17   reporting agency besides Equifax reporting false information

18   about you?

19   A.   No.

20   Q.   So by this time, your TransUnion and Experian credit

21   reports were not mixed.  Correct?

22   A.   Correct.

23   Q.   Did you eventually receive a credit report from this call?

24   A.   Yes.

25   Q.   Did the credit report you received, still contain errors?

Miller - D                         135

1  A.   Yes.  It hadn't really changed much.  Still had the wrong

2  Social, the wrong birth date, numerous collections.

3  Q.   And how did that make you feel?

4  A.   Depressed, because I was hoping that, like I said, when I

5  talked to them, that they admitted that I was mixed, and that

6  maybe that they would get it fixed.

7  Q.   What did you do next?

8  A.   I disputed the -- the report they sent.

9  Q.   Would you turn to Exhibit 20.  What is Exhibit 20?

10  A.   It's a letter that I sent with the dispute.

11  Q.   And what's the date of this dispute?

12  A.   July 18th, 2011.

13  Q.   Okay.  And if you would turn to page 4.

14       Wait a minute.  Excuse me.  Page 5.  What is page 5?

15  A.   That's the credit report, with the incorrect information.

16  Q.   So did you highlight for Equifax all of the false

17  information on the credit report?

18  A.   Yes.

19  Q.   Getting back to page 1 in your dispute, would you

20  summarize paragraph 1 for the jury.

21  A.   I just told them that I had requested five times, and had

22  called to get my credit report, and that I was disputing the

23  report that was sent again.

24  Q.   And what about paragraph 2?  Would you summarize that for

25  the jury.

Miller – D

136

A.    Basically, that, again, it was not my information, my

Social, my birth date.  And I had sent them all of this

information five times and gave it on the telephone, and I

still received somebody else's information.

Q.    And would you summarize the third paragraph.

A.    So, I was just explaining that I had highlighted the

incorrect information on the form.  And –– and I also had

commented in another paragraph about –– that I was still

concerned about the security of my own information.

        THE COURT:  Mr. Baxter, I just was curious if you can

give me an estimate of how long the direct will be, as I'm

trying to time the afternoon recess.

        If it's a few more minutes, we'll keep at it.

Otherwise, we'll take a break.

        MR. MICHAEL BAXTER:  I'm guessing 20 minutes, maybe.

        THE COURT:  I think we'll take a break then, just so

that we let the jurors stretch their legs.  So, ladies and

gentlemen, on the recess you're free, as I said earlier, to

talk about anything you would like except the case.  It's very

important you not talk about the case with each other or let

anything about the case cross your path; others talking about

it with you, investigating, and so forth.

        We'll take 15 minutes.

        Leave your notes in that notebook at your chair, so

it will be there when you get back.  And then in 15 minutes

Miller - D                137

1    we'll continue this direct examination.

2              Please follow Ms. Boyer.

3              Please stand for the jury.

4              (Jurors exit.)

5              THE COURT:  Ms. Miller, you can step down for the

6    recess.

7              Thank you, everyone.  Please be seated.

8              Counsel, it appears to me, as I'm looking through the

9    exhibits, that obviously Ms. Miller's Social Security number is

10   written all over the exhibits.  I think the jury would

11   understand, but I -- I believe I probably should instruct them

12   that this is private information that's before them only for

13   purposes of the case.  And, obviously, we expect that they

14   cannot copy it or reproduce it or use it in any way.  That it's

15   in a protected form here.  It's not a public record, and so

16   forth.

17             Do you agree with that approach?

18             MR. MICHAEL BAXTER:  I think that would be fantastic.

19             MS. SUMNER:  Your Honor, I think a limiting

20   instruction is appropriate, but I don't think that we need to

21   draw too much attention to that; to make it clear that they're

22   to leave that information in the courtroom and certainly not to

23   take her private information out.

24             THE COURT:  I -- I think I will convey the issue.

25             All right.

Miller - D

1          MS. SUMNER:  Thank you.

2          THE COURT:  So you say about 20 minutes more on

3    direct, once we resume.

4          MR. MICHAEL BAXTER:  Okay.  Thank you.

5          THE COURT:  Do you have any issues for the record at

6    this point?

7          MR. MICHAEL BAXTER:  No, your Honor.

8          THE COURT:  Any for the defense at this point?

9          MS. SUMNER:  I don't think so, your Honor.

10          THE COURT:  Okay.  15 minutes.

11          (Recess taken.)

12          THE COURT:  Thank you.  Please be seated.

13          Are there any issues before we bring back the jury?

14          MR. MICHAEL BAXTER:  Not for plaintiff.

15          THE COURT:  All right.  Ms. Miller, would you please

16    resume the witness chair.  Retake it, please.  Ms. Boyer, would

17    you bring the jury in.

18          Would you thank IT for getting me back, connected.

19          THE CLERK:  Yes.

20          THE COURT:  Thank you.

21          (Pause.)

22          THE COURT:  Please rise for the jury.

23          (Jurors enter.)

24          THE COURT:  Thank you, everyone.  Please be seated.

25          All set, jurors?

Miller - D

139

1          Okay.  Mr. Baxter.

2          MR. MICHAEL BAXTER:  Thank you.

3    BY MR. MICHAEL BAXTER:

4    Q.   Returning to Exhibit 20, Ms. Miller.

5    A.   Um-hmm.

6    Q.   I was going to ask, the -- the handwritten notes, when

7    were those put on the document?

8    A.   Usually the day I wrote the letter, or mailed it, or

9    whatever I was doing with it.

10   Q.   And would you turn to the second page of Exhibit 20.  And

11   tell me what you were doing when you put this information in

12   your dispute.

13   A.   I was extremely frustrated, and I was trying to figure out

14   a way to make this information more clear, as to what needed to

15   be removed.  And so this was an attempt to make things as clear

16   as possible.

17   Q.   So what you're -- you're listing more disputed information

18   on that second page?

19   A.   Yes.  Yes.

20   Q.   Okay.  Turning to the next page.  What is the next page,

21   Exhibit 3 -- or page 3 of Exhibit 20?

22   A.   The research request form.

23   Q.   And where did you get this form?

24   A.   This is the form that comes with their packet, that I can

25   fill out and put the -- the disputed information here.

Miller - D

1    Q.    And I notice there is information that's crossed out and

2    information that's written in.

3              Can you explain what you're doing here?

4    A.    Right.  Again, I'm just hoping that this is more clear of

5    what the incorrect and correct information is.

6    Q.    And I see that you have provided your e-mail address to

7    Equifax.  Did Equifax ever contact you at your e-mail address?

8    A.    No.

9    Q.    Turning to the next page, page 4.  And I see here under

10   daytime phone number, would you tell the jury what those phone

11   numbers are that you provided?

12   A.    Those are my cell phone and home phone number again and

13   the e-mail, all hoping that they would contact me if they had

14   questions so hopefully we could get this matter resolved.  I

15   don't usually like to give out my cell number.  I just have it

16   for my own security.  But in this case, I was hoping it would

17   be more helpful.

18              I put this kind of information on for the Experian

19   and TransUnion.  It seemed to -- to work, to get the matter

20   cleared up.

21   Q.    Above that, I see you've crossed out a Social Security

22   number, date of birth, and there's another Social Security

23   number and date of birth.  Can you explain what those are?

24   A.    So I was crossing out the incorrect, and putting in my

25   own.

Miller - D

141

1    Q.    Okay.  And then why don't you go through what you did, for

2    example, in this first collection information for all Columbia

3    Collections.

4    A.    Well, there were so many of them.  I didn't --

5    Q.    Well, just that first one.  I -- what that writing means.

6    A.    Oh, I just wrote in that I have never defaulted on any of

7    my bills, never.

8              And, again, that's what I said when I filled out

9    these forms before, for TransUnion and Experian, and that was

10   accepted.

11   Q.    And if you would turn to page 5 of Exhibit -- Exhibit 5 of

12   page 20.  Are you there?

13   A.    Yes.

14   Q.    And is all of the information that is highlighted false

15   on -- on this credit report?

16   A.    Yes.

17   Q.    And the next page, page 6, is this all highlighted with

18   false information?

19   A.    Yes.

20   Q.    Okay.  Was there other information besides collection

21   accounts that you were highlighting in here?

22   A.    I don't think so.

23   Q.    Can you turn to the next couple of pages.  See if you see

24   any other accounts that did not belong to you.

25   A.    Hard to tell on this copy what's highlighted and what's --

Miller – D                    142

1   Q.    It is difficult to see in this.

2   A.    Yeah.

3   Q.    For example, turn to page 7.  That's page 7 of 14.  Are

4   you there?

5   A.    Yeah.

6   Q.    Does the portfolio recovery account, is that highlighted?

7   A.    I can't read it on this copy, but it looks like there's a

8   couple of highlights on this page.

9   Q.    Okay.  And the next page, page 8.

10          Does that Visa account belong to you, at the top?

11  A.    Yes.

12  Q.    Okay.  And then you have highlighted here numerous of

13  these inquiries.

14          What does the highlighting mean on these inquiries?

15  A.    On the same page 8 we're looking at?

16  Q.    I'm looking at page 8.  There's -- the inquiry page.

17  A.    I don't think this is up here.

18  Q.    It's page -- oh, I'm sorry.  I'm confused.  I'm looking at

19  the wrong number here.  It's page 10 of 12.  I'm looking on the

20  exhibit -- I was looking at the credit report.  I apologize.

21          So it's page 10 of Exhibit 20.

22  A.    Okay.  What was the question?  I'm sorry.

23  Q.    Yeah, the highlighted inquiries there, what do they

24  represent?

25  A.    Oh, these are companies that I've never done any business

Miller – D                              143

1    with.

2    Q.    Okay.  Can you read any of those companies?

3    A.    I think there's one that says Clearwire, DISH Network,

4    Swiss Colony.  I can't read -- oh, Fingerhut.

5    Q.    Okay.  Turning to page 11 of 12, the next page.

6          Now, I notice some of the inquiries have been

7    highlighted and some have not.

8          First, the ones that have not been highlighted, are

9    those inquiries that belong to accounts that you have?

10   A.    Yes, I believe so.

11   Q.    And the inquiries that have been highlighted are accounts

12   that do not belong to you.  Correct?

13   A.    Correct.

14   Q.    And the same thing on page 12 of 12.

15   A.    Correct.

16   Q.    Okay.  Were -- were you ever contacted by Equifax prior to

17   sending -- prior to them sending out your credit file?

18   A.    No.

19   Q.    Now, after you sent in this dispute, did Equifax respond?

20   A.    Yes.

21   Q.    And would you turn to Exhibit 21.

22         Is this Equifax's response to your dispute?

23   A.    Yes.  They sent another form letter, requesting more

24   identifying information.

25   Q.    And, again, they're saying they've addressed your

1   concerns.  Correct?

2   A.   Right.  And, again, it was really frustrating, not making

3   any progress, trying to be as clear as possible.  I felt

4   trapped because I had no control of trying to get this

5   information corrected.  And I just kept getting these same form

6   letters, and I -- it was just really worrisome.

7   Q.   And at the bottom of the form, where it says, "F.B.I. has

8   deemed identity theft," do you see that?

9   A.   Um-hmm.

10  Q.   Did you purchase their Equifax Credit Watch?

11  A.   No.  I -- I really would have no trust in this company.

12  It would not be a place I would go for business, if I had a

13  choice.

14  Q.   Now, does this letter also -- could you read the first

15  line in paragraph 2.  Or the first -- to -- to the comma.

16  A.   First line in paragraph 2?

17  Q.   Yes.

18  A.   In order to receive the results of the investigation, a

19  copy of one item in each of the categories below is needed in

20  order to verify your identification and address.

21  Q.   Did you have any idea what identification would be

22  acceptable to Equifax?

23  A.   Well, it's pretty clear what they were requesting, and I

24  thought I had met their request many times.  And, like I said,

25  this -- this -- this last dispute, I had tried to be super

Miller – D

1    clear with the information.

2    Q.    Up till this point, has Equifax addressed any of your

3    concerns?

4    A.    No.

5    Q.    Have they deleted any of the false information on your

6    report?

7    A.    No.  It's just the same bad information over and over.

8    Q.    Was there a concern by you of any misuse of your private

9    information?

10   A.    Very much so.  That was one of my main concerns because I

11   am getting someone else's private information, and I have no

12   idea of where mine is.  I'm assuming, at this point, that they

13   don't either.  And it could be being sent out everywhere.

14   Q.    Did you respond to Equifax' July 28th, 2011, letter?

15   A.    Yes.  I mailed them again, what they were requesting.

16   Q.    Would you turn to Exhibit 22.  What is Exhibit 22?

17   A.    It's a letter I added with the requested information.

18   Q.    And what was your dispute in this letter?

19   A.    Just the repetitive of the -- you know, the misinformation

20   and the problem that I wasn't, you know, getting any action.

21   And -- and I was still requesting and waiting for a corrected

22   report.

23   Q.    And turning to page 2 of Exhibit 22.

24          Is this an insurance bill that you submitted?

25   A.    Yes.

Miller - D

1   Q.   And page 3, the W-2 form that you submitted to Equifax?

2   A.   Yes.

3   Q.   Would you turn to Exhibit 22 -- I'm sorry.  Exhibit 23.

4   No, 24.  I'm sorry.  Exhibit 24, your Equifax credit report.

5        When did you receive this credit report?

6   A.   August 15, 2011.

7   Q.   And had Equifax corrected any of the concerns addressed in

8   your disputes?

9   A.   No.  It's just the same information, wrong information.

10  Nothing had really changed.  It was really unacceptable at this

11  point.  Very frustrating.

12  Q.   Turning to page 3 of Exhibit 14.  Is this a copy of your

13  credit report?

14  A.   Yes.

15  Q.   Did you note that there were any changes by Equifax on it?

16  A.   Not -- no.  Not that I could see.

17  Q.   Okay.  Would you turn to page 8 of exhibit -- or I'm

18  sorry.  Page 8 and 9 of 14.

19        Tell me when you're there.

20  A.   Page 8.

21  Q.   Yes.

22  A.   Okay.

23  Q.   This one looks like you can read it a little bit better.

24        Would you read the bold print in the top box.

25  A.   Inquiries that -- that display to companies may impact

Miller - D

1           your credit score.

2    Q.    Are any of the companies listed as inquiries here

3    companies you've never done business with?

4    A.    All of them except for KeyBank are companies that I had

5    not done business with.

6    Q.    And on the bottom is KeyBank.  And I think if you turn to

7    page 9, do you see KeyBank listed as the fourth account down?

8    A.    Yes.

9    Q.    Do you know what that "AR" represents?

10   A.    Account review.

11   Q.    Does it concern you they're sending this credit report to

12   your bank to do an account review?

13   A.    Yes.  It concerns me that they send my information to all

14   of these companies around the country, that must think I'm --

15   have bad credit.  But especially the local people that I do

16   business with.

17   Q.    Now, returning to page 8, at the top, where it says, These

18   inquiries impact your credit score.

19           What is your understanding of what that means?

20   A.    Well, we've always been told that we had really good

21   credit, the times that we have financed.  It's usually -- our

22   credit score had been in the 800s at one time.  And so my

23   understanding is every time there's an inquiry, that can affect

24   your credit score, and it keeps going down.  So I would

25   assume -- I don't know what our credit score is right now,

Miller - D

1    but --

2    Q.    How did you feel when you learned that Equifax was sending

3    your personal financial information to companies that you had

4    never done business with?

5    A.    I was very frustrated because, you know, I feel like my

6    information had been going all over the country.  And -- but,

7    basically, this was never going to be over.  That it's always

8    going to be hanging out there now, I think, over my head.  So

9    regardless of how this all pans out, if I ever want to do

10   business with any of these companies, I'm not sure, you know,

11   what might come of it.

12   Q.    Okay.  Would you turn to page 14 of Exhibit 24.

13        And would you read for the jury the top question --

14   the answer to the top question, How can I correct a mistake on

15   my credit file.

16   A.    Complete the research request form and give details of

17            the information you believe is incorrect.  We will

18            then check with the credit grantor, collection

19            agency, or public records source to see if any

20            error has been reported.  Information that cannot

21            be verified will be removed from your file.  If

22            you and a credit grantor disagree on any

23            information, you will need to resolve the dispute

24            directly with the credit grantor, who is the

25            source of the information in question.

Miller - D

149

1   Q.   To your knowledge, was Equifax sending any of your

2   disputes to the credit grantors?

3   A.   Not that I was aware of, because nothing had been changing

4   on the credit report.

5   Q.   To your knowledge, was any information which could not be

6   verified removed from your file?

7   A.   No, because I think it would have been an easy fix if they

8   would have checked.

9   Q.   Were you hopeful on all of these disputes that Equifax

10   would finally get it right and correct your credit report?

11   A.   Yes.  That was why I was so persistent.  I -- I wanted

12   to -- to get my Social Security number -- I really felt like

13   they had totally lost it and were being totally irresponsible

14   with it.  And that really is upsetting and frustrating and

15   worrisome.  And I felt it was their place to fix it.

16   Q.   Would you turn to page -- page 11 of Exhibit 24.

17         Is this a summary of your rights that Equifax is

18   providing you?

19   A.   Yes.

20   Q.   Would you read the paragraph, second from the bottom.

21   A.   You have the right to dispute incomplete or inaccurate

22         information.  If you identify information in your

23         file that is incomplete or inaccurate and report

24         it to the consumer reporting agency, the agency

25         must investigate, unless your dispute is

Miller – D                                    150

1              frivolous.

2  Q.    And, I'm sorry.  Would you turn, again, to page 14 of

3  Exhibit 24.

4              And under the section "Facts you should know."

5              How long is Equifax telling you that collection

6  accounts will remain on your file?

7  A.    For seven years.

8  Q.    Would you turn, now, to Exhibit 26.

9              What is Exhibit 26?

10 A.    My dispute of that credit report.

11 Q.    And would you outline for the jury what you're telling

12 Equifax in paragraph 1.

13 A.    Basically that I had been working on this since February,

14 and that there was an identity problem.  And I had exposed my

15 information via the mail many times.  And just told them,

16 again, that it was the wrong Social and birth date.

17 Q.    And would you outline paragraph 2.

18 A.    Just how frustrated and humiliating and out of control I

19 felt in trying to get this corrected, and not knowing where my

20 Social was.  And, again, just that there was the wrong Social

21 that they kept sending me.

22 Q.    And would you outline what's in paragraph 3.

23 A.    I asked for a deadline on getting a report back, just

24 because I had had some problems earlier in time.  So I put a

25 timeline on there.  I enclosed the disputed information, and I

Miller – D                    151

1   also enclosed the ID that they kept asking for, hoping that I

2   could skip that -- that one step this time.

3   Q.   Can you think of any way that you might have disputed to

4   let Equifax know that your information was mixed with someone

5   else, that you haven't tried?

6   A.   No.  Not that I was aware.  Each time I -- I did this -- I

7   don't know if you can tell -- but I was trying to be a little

8   more clear and a little bit more clear, in case I was doing

9   something wrong.

10  Q.   Okay.  Turn to page 2 of Exhibit 26.

11          And what is this?

12  A.   This is the research request form.

13  Q.   And I notice in this research request form you literally

14  are handwriting out all of the Columbia's Collection Service

15  accounts one by one.  Is that what you did?

16  A.   Yes.

17  Q.   Did you think that might help?

18  A.   I was hoping.  It took a lot of time, but I was trying to

19  be as clear as possible.

20  Q.   Did Equifax send you results of an investigation within

21  the 30 days you asked them to?

22  A.   What's the date on this one?  No.

23          Or did -- is that one they sent just requesting ID?

24  I forget what comes next.

25  Q.   If we could go further, and look at page 6 and 7 of

Miller - D

152

1   Exhibit 26.

2           Is this the identification that you submitted?

3   A.    Yes.

4   Q.    Did Equifax investigate the disputes, as outlined in your

5   August 25th, 2011, letter?

6   A.    Not that I was aware of.

7   Q.    I want you to turn to Exhibit No. 27.

8           Tell me what this is.

9   A.    This is the response I received from the dispute,

10  requesting more identifying information.

11  Q.    So this is Equifax's response to your August 25 dispute?

12  A.    Yes.

13  Q.    And, again, they say they addressed your concerns.

14          Did they address any of your concerns?

15  A.    Not that I was aware of.

16  Q.    And in order to receive the results of the investigation,

17  you would need to send more identifying information.

18          How were you feeling when you read that this time?

19  A.    I was speechless.  I was out of words.  I mean, I -- I was

20  up to my limit.  Concerned for my identity.  Frustrated with

21  the process.  I was just overwhelmed.

22  Q.    Did Equifax attempt to telephone you?

23  A.    No.

24  Q.    At this point, after two years, had Equifax addressed a

25  single one of your concerns?

Miller - D

153

1   A.   No.

2   Q.   Were you still of the belief that if you send in

3   identifying information that they would send you the results of

4   their investigation?

5   A.   I was hopeful, but I'm not sure I really believed it at

6   this point.

7   Q.   Were you -- what were your feelings about Equifax at this

8   time?

9   A.   I mean, normally I would not do business with a company

10  like this, and I felt like they just kept send -- sending me

11  form letter after form letter and not addressing my concerns.

12  I felt trapped.  I didn't know really what I could do.  I had

13  no control over the situation, which is a really frustrating,

14  you know, feeling.  I just was kind of running out of patience.

15  I didn't really know what to do.

16  Q.   Did you respond to Equifax's September 1, 2011, request

17  for more identifying information?

18  A.   Yes, I mailed in, again.

19  Q.   And how did you respond?

20  A.   I think they -- they requested more information again.

21  Q.   Did you send in the identifying information that they

22  requested?

23  A.   Yes.

24  Q.   And is page 3 and 4 the identifying information you sent

25  again?

Miller – D

154

1    A.    Yes.

2    Q.    Did they send you the results of their investigation?

3    A.    No.

4    Q.    Would you turn to page 2 of Exhibit 28.

5          Is this what you received from Equifax in response to

6    your dispute?

7    A.    Yes.  It was another -- the same form letter requesting

8    the same information.  And I was starting to -- the pattern was

9    becoming the same as back in February, where at this point they

10   weren't even sending the credit report anymore.  They were just

11   sending out the form letters.

12   Q.    At this point in time, did you believe there was anything

13   you could do, short of filing a lawsuit, to get Equifax to

14   correct the false information in your credit file?

15   A.    I felt I had been really clear what the request was.  We

16   had, you know, gone through this process before with TransUnion

17   and Experian.

18         They had verbally said on the phone that they knew I

19   was mixed.

20         I sent them all of the information they ever

21   requested.  I -- I -- I was pretty much -- had given up.  Given

22   up hope.

23   Q.    And were there times that you did not apply for credit

24   during this period?

25   A.    Yes.

Miller - D

155

```
 1   Q.   And why would you not apply for credit?
 2   A.   Because I was -- assumed, pretty sure that I would be
 3   denied.
 4   Q.   Have there been changes in your life because of Equifax
 5   mixing you with this other person and refusing to correct the
 6   collections on your credit report?
 7   A.   We've delayed some of the things that we had, you know,
 8   planned to do, wanted to.
 9   Q.   For example, what have you delayed?
10   A.   We were planning to build a shop on our property, and we
11   were hoping to refinance the house while the interest rates
12   were low.
13   Q.   What was the interest rate on your house?
14   A.   It was five and a quarter.
15   Q.   After you got a clean credit report from Equifax, did you
16   seek that refinancing?
17   A.   Yes.
18   Q.   Did you get a better interest rate?
19   A.   Yes.
20   Q.   Was there anything else that you were seeking to -- or
21   seeking to finance?
22   A.   We were trying to help my disabled brother.  And we were
23   going to get a loan to help purchase some things for him.
24   Q.   And why didn't you seek that loan?
25   A.   Because I thought we would be denied.
```

Miller - D

1   Q.    Were you and your husband interested in any form of

2   remodel?

3   A.    No.  Not at that time.

4   Q.    Were you -- did -- did you wish to build a workshop?

5   A.    Yeah.

6   Q.    Tell us about that.

7   A.    Well, his hobby is working on cars, muscle cars.  And it's

8   just always been a goal to -- to build a shop.  And so we were

9   close to being able to do that, but we needed to get some

10  financing.

11  Q.    Now, did you believe from Equifax mixing you with this

12  other person that your reputation has been damaged?

13  A.    Yes, because the local businesses that -- you know, that I

14  work with -- it's a small community, and, you know, people

15  talk.  And, you know, I'm just concerned.  I -- like I said,

16  I'm on the school board, and I'm a person of integrity.  And,

17  you know, I don't want people thinking that I'm a deadbeat and

18  I don't pay my bills.

19  Q.    (Pause, referring.)  Has your husband been working with

20  you on these credit reportings -- issues as well?

21  A.    We always, you know, went over them and talked about it,

22  and shared the frustrations.  And I did most of the -- the

23  work, you know, filling out the paperwork and --

24  Q.    Has working with him impacted you personally, in having to

25  deal with this?

Miller - D

1   A.   I'm not sure I know what you mean.

2   Q.   Okay.  How about -- do you believe that Equifax mixing you

3   has impacted your privacy?

4   A.   Oh, definitely.  I have no idea of where my Social and

5   birth date has traveled to, and it has been -- you know, it's

6   been sold to all of these inquiry companies.

7   Q.   Do you still have a concern about identity theft?

8   A.   Yes, because --

9   Q.   Explain.

10  A.   Well, I exposed my information like 13 times.  So it's

11  gone out in the mail.  They had misplaced it for two and a half

12  years.  So during that time it was going out to all kinds of

13  different businesses and companies, and I have no idea, really,

14  where all it probably ended up.  So I feel like now that it's

15  out in cyber world, that I'll never really -- it will never

16  really be over, because things will keep popping up.

17  Q.   Did the problems you had with TransUnion and Experian in

18  2008 impact the -- how you were feeling when the same types of

19  problems occurred with Equifax?

20  A.   Yes and no.  I mean, it was frustrating -- or it was

21  just -- it was shocking, even with those reports, to see the

22  mixed reports.  But this one was petrifying and scary to me,

23  because, like I said, I really treasure my Social Security

24  number.  And I didn't know where mine was, and I thought it was

25  so irresponsible of a company.  If they're giving me someone

Miller – X

158

1   else's Social, I have no idea where mine might have ended up.

2   Q.    Now, you brought a claim for punitive damages.  Why have

3   you brought that claim?

4   A.    Because I feel violated.  My most private and personal

5   information has been mishandled.  I feel like they were

6   reckless and irresponsible.  You know, it's -- like I just

7   said, it's been sent all over the country, maybe all over the

8   world.  I don't feel like I'll -- this will ever be totally

9   behind me.

10          And I feel they -- they should be accountable for the

11  blatant neglect that they -- on how they handled my

12  information, and the fact that they would never address the

13  disputes.  And for all of the stress and frustration that I had

14  to put up with and the time that was committed.

15          And I would hope that they would improve their

16  practices, so that other people hopefully won't have to put up

17  with this in the future.

18          MR. MICHAEL BAXTER:  I have no other questions, your

19  Honor.

20          THE COURT:  All right.  Thank you.

21          Cross.

22          MS. SUMNER:  Your Honor, may I have permission to

23  stand at the desk?

24          THE COURT:  Yes.  Yes.  You may do so freely.

25                      CROSS-EXAMINATION

1   BY MS. SUMNER:

2   Q.   Good afternoon, Ms. Miller.

3            Now, you talked a little bit about the experiences

4   you had with Experian and TransUnion.  And you said the other

5   companies worked with you.  But you filed suits against both

6   Experian and TransUnion.  Correct?

7   A.   Yes.

8   Q.   And you understood at the time that you filed suit against

9   those two CRAs that there was a third credit reporting agency

10  that was called Equifax.  Correct?

11  A.   Yes.

12  Q.   So during 2009, you were having difficulties correcting

13  information on your credit files at both Experian and

14  TransUnion.  Correct?

15  A.   Yes.

16  Q.   And you hired a lawyer -- in fact, the Baxters -- to

17  assist you with those problems.  Is that right?

18  A.   I handled all of the disputes and all of that.  If you go

19  to his website, he tells you exactly, you know, how to order

20  your report and how to fill out the paperwork.  So I did all of

21  that.

22  Q.   Did the Baxters represent you in your lawsuits against

23  Experian and TransUnion, Ms. Miller?

24  A.   Yes.

25  Q.   And did some of the problems that you had with your credit

Miller - X                    160

1  files of those CRAs involve information that was mixed and

2  belong to another consumer?

3  A.   Yes.

4  Q.   And so they -- those files also had some inaccurate

5  collection accounts that you believe belonged to someone else.

6  Correct?

7  A.   They did, but they never mixed my Social or my birth date,

8  the real personal information.

9  Q.   Didn't they in fact have some of the exact same collection

10 accounts on your file that appeared in the Equifax credit file?

11 A.   Possible.  I don't know.

12          MS. SUMNER:  Well, your Honor, if I can approach the

13 witness with an exhibit that we marked previously and provided

14 to you as Defense Exhibit 138.

15          THE COURT:  Has defense counsel seen -- I'm sorry,

16 plaintiff's counsel?

17          Show it to them further.  And, yes, you may approach.

18          MS. SUMNER:  Thank you.  Actually, if Mr. Lewis can

19 hand it up -- Mr. Lewis -- Mr. Perling.

20          MR. PERLING:  Thank you.

21          (Witness handed document.)

22          MR. PERLING:  I have another copy for the Court.

23          THE COURT:  I don't need one yet.

24          Go ahead.

25 BY MS. SUMNER:

Miller - X

1  Q.   What has been marked as Defense Exhibit 138, do you

2  recognize this?

3  A.   Yes.

4  Q.   Is this an Experian credit report?

5  A.   Yes.

6  Q.   And is it dated January 26, 2009?

7  A.   Yes.

8  Q.   And if you flip through that credit report, do you see

9  that there are Columbia Collections accounts?

10 A.   Um-hmm.

11 Q.   Are these some of the same accounts that you were seeing

12 on the Equifax credit file?

13 A.   The Columbia ones are.

14 Q.   That's correct.  So those are the same problem accounts.

15 Correct?

16 A.   Well, I assume so.  They're both -- they're Columbia.  I'm

17 not looking at both things side by side.  But --

18 Q.   Ms. Miller, do you agree with me that the Experian,

19 Equifax files both had Columbia Collection accounts that you

20 disputed?

21 A.   I assume so.

22 Q.   Well, can you see that in front of you?  That this has

23 Columbia Collection accounts?

24 A.   Well, it does have Columbia.  But I don't know if that's

25 exactly the same as the other ones.  I mean, there was like 20

1   of them.

2   Q.   My question to you, Ms. Miller, is do you agree with me

3   that both credit files had disputed Columbia Collection

4   accounts on the file?

5   A.   I get your question.  Sorry.  Yes.

6   Q.   That's all right.

7          And if you flip through, are there a number of other

8   inaccurate accounts included on this credit file?

9   A.   Yes.

10  Q.   And in fact if you flip to the back page of this file --

11  actually, it's the last couple of pages, did you prepare a list

12  of multiple incorrect information on this Experian credit file?

13  A.   Yes.

14  Q.   And so that would include, from the last couple of pages,

15  starting with the Miller No. 290, a Clackamas Circuit Court

16  account number.  That's incorrect?  Were you disputing that?

17  A.   Yes.  Sorry.

18  Q.   And following that, there were other -- there were a

19  couple of other county accounts that you were also disputing?

20  A.   Right.

21  Q.   And on the following page, that continues with another

22  Clackamas City recorder, as well as a couple of Columbia

23  Collection accounts.  Correct?

24  A.   Yes.

25  Q.   And if you go to the next page, there are two more

Miller – X

1   Columbia Collection accounts?  Is that correct?  As well as a

2   Credit Protection Association account?

3   A.   Yes.

4   Q.   And then following the next page, you also dispute an ER

5   solutions account.

6   A.   Yes.

7   Q.   And you dispute a Geo Recovery Group account?

8   A.   Yes.

9   Q.   And a Professional Credit Services account?

10  A.   Yes.

11  Q.   So in January of 2009, is it fair to say that you were

12  having significant problems with inaccurate information on your

13  Experian credit file?

14  A.   I disputed them, yes.

15  Q.   And you were frustrated and stressed by Experian at this

16  point?

17  A.   Yes.

18  Q.   And how many times did you contact Experian, to try to get

19  this worked out?  Do you recall?

20  A.   As I recall, just the once.

21       MS. SUMNER:  Okay.  If -- your Honor, if we can pass

22  up another exhibit.  It's Exhibit 139.

23       THE COURT:  Yes.

24       MS. SUMNER:  Marked for identification.  If you can

25  hand that to co-counsel, Mr. Perling.  And if you would hand

Miller - X

1  that up to the witness, Mr. Perling.

2            If he may, your Honor?

3            THE COURT:  Yes.

4            MS. SUMNER:  Thank you.

5            (Witness handed document.)

6  BY MS. SUMNER:

7  Q.   Ms. Miller, I'll ask you to take a look at that letter.

8            Do you recognize it?

9  A.   (Pause, referring.)  Yes.

10 Q.   Is that a letter that's dated February 2nd, 2009, to -- to

11 Experian from you?

12 A.   Right.

13 Q.   And does it state, at that point, that you were writing

14 for the third time to dispute inaccurate information?

15 A.   Yes.

16 Q.   And does it also state that this has been very frustrating

17 and stressful for you?

18 A.   Yes.

19 Q.   And do you recall how many times you contacted TransUnion

20 about problems that you were having on their credit file?

21 A.   No, but I have notes on all of this.  So I -- which I

22 didn't look at because I didn't know I was supposed to.

23            So I did keep track of -- like I had told you, I had

24 documented this whole process.  So -- but I don't recall,

25 because I haven't reviewed that information.

Miller - X

165

1    Q.    Is it fair to say that you also contacted TransUnion on

2    multiple occasions to also dispute inaccurate information on

3    your TransUnion credit file?

4    A.    I couldn't tell you, without looking at my notes.

5    Q.    But you sued TransUnion because of the problems you were

6    having with them.  Correct?

7    A.    Yes.

8    Q.    And you alleged that TransUnion caused you damages.

9    Correct?

10   A.    Yes.

11   Q.    And you alleged that Experian caused you damages.

12   Correct?

13   A.    Yes.

14   Q.    And didn't you testify in your deposition in this matter

15   that they caused essentially the same types of damages that you

16   are claiming Equifax has caused you?

17   A.    They did not cause me the same stress.  Because my -- I

18   felt more secure that my social and birth date and private

19   information was more secure than with Equifax.

20   Q.    Ms. Miller, did you seek emotional distress damages from

21   TransUnion and Experian when you sued them?

22   A.    I don't really remember what was in --

23   Q.    Do you know what damages you asserted again them in the

24   lawsuits?

25   A.    I -- I have not -- I haven't read that in a couple of

Miller – X

1   years, so I don't remember exactly what was written.

2   Q.   It's difficult for you to distinguish between the

3   lawsuits, isn't it?

4   A.   Not really.

5   Q.   But you can't recall the specifics of the lawsuits that

6   you filed against TransUnion and Experian?

7   A.   Well, it's been four years, so I don't remember the

8   specifics.

9   Q.   And you've acknowledged, though, that you can't

10  distinguish between the stress that that -- those CRAs caused

11  you and what Equifax has caused you.   Correct?

12  A.   No, I can distinguish the difference.   I was much more

13  concerned and worried and stressed and out of control and in a

14  box and trapped by the experience I went through with Equifax.

15  Q.   Okay.   And you recall being deposed in this action.

16  Right?

17  A.   Yes.

18  Q.   And that was on June 25th, 2012?

19  A.   Right.

20  Q.   And do you recall testifying that Experian caused you

21  stress and frustration, when you testified at that time?

22  A.   I don't -- yes.   I mean, I -- they did.

23  Q.   Okay.   And you also recall testifying that TransUnion

24  caused you stress and frustration?

25  A.   Yes.

Miller – X

1   Q.   Now, you settled with TransUnion and Experian, towards the

2   end of 2009.  Correct?

3   A.   Correct.

4   Q.   And even when you learned that Equifax had included

5   information on your credit file that did not belong to you,

6   your attorney didn't contact Equifax at that time, although

7   they were dealing with TransUnion and Experian.  Correct?

8   A.   I'm sorry.  I missed that question.

9   Q.   Okay.  You learned that Equifax had included some

10  incorrect or inaccurate information on your credit file at the

11  time that you were negotiating settlement with TransUnion and

12  Experian.  Right?

13  A.   Right.

14  Q.   Okay.  And your attorney didn't contact Equifax at that

15  time to let Equifax know of the problems that you were having

16  with your credit files.  Correct?

17  A.   Not that I'm aware of.

18  Q.   And you didn't inform Equifax, in your communications with

19  Equifax, that you had experienced mixing of your information

20  with other individuals by both TransUnion and Experian.  Right?

21  A.   I didn't inform who?

22  Q.   Equifax.

23  A.   Right.  I'm not sure why I would.

24  Q.   And then you were still experiencing some problems with

25  Experian in 2010.  Correct?  Even after you had resolved that

Miller - X                    168

1   lawsuit?

2   A.   Right.   There was one -- one of those liens that somehow

3   didn't get removed.

4   Q.   And a lien, with -- would you consider that to be

5   derogatory information on your credit file?

6   A.   Yes.

7   Q.   Now, you mentioned that you were unable to co-sign for --

8   was it overdraft protection on that KeyBank account?

9   A.   Yeah, I think on one of them.

10  Q.   Okay.   Ultimately, was -- was this an account that

11  belonged to somebody else?   Your son, perhaps?

12  A.   It was a joint account.

13  Q.   Okay.

14  A.   But his --

15  Q.   Were you able to obtain overdraft protection?

16  A.   My husband ended up co-signing.

17  Q.   Now, you never actually saw the credit report that was

18  issued to KeyBank.   Correct?

19  A.   I just saw the letter that was in the notebook.

20  Q.   I understand you've got a letter, but my question goes to

21  the credit report.

22       The credit report was not attached to that letter.

23  Correct?

24  A.   Correct.

25  Q.   So you've never seen the actual credit report --

Miller – X                          169

1    A.    No.

2    Q.    -- that may have been issued?

3          And you don't know what credit score may have been

4    provided to KeyBank.  Correct?

5    A.    Right.

6    Q.    And at this point, in all of the documents that you have

7    been walking through today, you don't have any copies of any

8    credit reports that were provided to other companies.  Correct?

9    A.    Right.

10   Q.    Okay.  And you don't have any documents which reflect

11   credit scores that may have been provided to other companies.

12   Correct?

13   A.    Correct.

14   Q.    Now, during 2011, before you sued Equifax, you were able

15   to obtain credit.  Correct?

16   A.    Say that again.

17   Q.    During 2011, before you sued Equifax, during the time

18   frame that you said you were experiencing all of these problems

19   with Equifax, you were able to obtain credit.  Correct?

20   A.    No.

21   Q.    Do you recall testifying in your deposition that you

22   opened an American Express account that year?

23   A.    Oh, right.  Sorry.

24   Q.    And that was through a Costco.  Correct?

25   A.    Yes.

Miller - X                        170

1    Q.    Okay.  So you didn't have any problems opening that

2    account in 2011, did you?

3    A.    I -- not that I recall.

4    Q.    All right.  And during that time -- that was the time when

5    you are -- believe that Equifax still has your information

6    merged with another consumer.  Correct?

7    A.    Right.

8    Q.    And with the American Express account that you opened at

9    Costco, you don't know if American Express used a credit

10   report, do you?

11   A.    Right.  I don't know what they based that on.

12   Q.    Okay.  You never saw any copies of any credit reports or

13   any credit scores.  You just know you were able to obtain

14   credit in 2011.  Correct?

15   A.    Correct.

16   Q.    Now, do you recall stating in your deposition that the

17   reason you sued Equifax was to get your credit report clear?

18   A.    Yes.

19   Q.    Okay.  And that was what you wanted out of this lawsuit,

20   was to get that information corrected?

21   A.    Right.  And -- and to get my Social Security number where

22   it's supposed to be.

23   Q.    All right.  And Equifax did in fact remove the incorrect

24   information after the lawsuit was filed.  Correct?

25   A.    Four months after, yes.

Miller - X                                    171

 1   Q.   Okay.  So if I can ask you to look at Exhibit No. 112 in

 2   your notebook.

 3            Let me know when you're with me.

 4   A.   Okay.

 5   Q.   Okay.  Do you recognize what this is?

 6   A.   Yes.

 7   Q.   Is this a credit disclosure to you on January 5th, 2012,

 8   from Equifax?

 9   A.   Yes.

10   Q.   And does it include a copy of your credit report at that

11   time?

12   A.   Yes.

13   Q.   All right.  And is this a copy of your clean credit

14   disclosure report, so that it no longer includes the

15   information that you had disputed?

16   A.   It looks like it is, yes.

17   Q.   And have you in fact reviewed this credit report at the

18   time that you received it, to -- to make sure that it was clear

19   and you were satisfied that it was accurate?

20   A.   I believe so.

21   Q.   Now, you have mentioned a couple of lost opportunities, I

22   think, is the way that Mr. Baxter put it.  That you didn't --

23   concerning, I believe, a garage/shop.  Is that right?

24   A.   Yes.

25   Q.   All right.  But you didn't apply for any credit to build a

Miller - X

172

1  garage/shop during the 2009 to 2011 time frame.  Correct?

2  A.   Correct.

3  Q.   And no creditor ever turned you down concerning an attempt

4  to take out a loan for that purpose during that time?

5  A.   The times that we had -- that I had co-signed on, just a

6  few basic little things, had been denied.  So we just weren't

7  going -- just didn't try.

8  Q.   I'm sorry.  I don't mean to interrupt you.  Are you

9  finished?

10  A.   Yeah.

11  Q.   Okay.  So you didn't attempt to try to obtain credit at

12  that time?

13  A.   Right.

14  Q.   But you had attempted to get an American Express card in

15  2011, and you were able to get credit in that regard.  Correct?

16  A.   (No response.)

17  Q.   So you don't know if you had gone out and applied for

18  credit, like you did the American Express card, whether you

19  might have received credit during that time.  Correct?

20  A.   I just assumed that I wouldn't be able to get credit.

21  Q.   And you don't know if you had applied for a refinancing

22  during that time whether or not you would have obtained credit.

23  Right?

24  A.   Right.  I never tried.

25  Q.   And you don't know whether you would have been denied if

Miller - X

1  you had applied for credit to purchase -- I think you had

2  mentioned purchases for your brother.  Correct?

3  A.   Right.  We didn't attempt.  I was afraid we would be

4  denied.

5  Q.   But that attempt was also -- or, I guess, when you were

6  considering that, that was in 2011, when you had obtained

7  credit for an American Express card.  Correct?

8  A.   I don't really remember the exact dates.  I couldn't say

9  for sure if it was before or after.

10  Q.   But you recall it was in the same basic time frame.

11  Correct?

12  A.   I just assumed, with the Costco thing, that I had been a

13  customer of Costco for a long time, and it was more of an

14  upgrade on their membership.  So I -- I don't really know how

15  that worked.

16  Q.   And you also assumed that others wouldn't give you credit,

17  but you didn't actually take steps to try.  Right?

18  A.   Right.

19  Q.   Now, you've asked some friends and family members to

20  testify at trial this week.  Correct?

21  A.   Yes.

22  Q.   Okay.  And these are people that you have identified could

23  help explain some of the emotional distress that you were

24  feeling during this time?

25  A.   Right.

Miller - X

1  Q.    Now, these people are aware -- and I say friends and

2  family, and maybe a co-worker, too.  Is that correct?

3  A.    I think they're all --

4  Q.    Friends and family?

5  A.    Yeah.

6  Q.    Okay.  Now, these individuals know about your experience

7  because you told them.  Right?

8  A.    Right.

9  Q.    So they -- they -- are they people that you're concerned

10 about will talk to others in the community about this problem

11 that you had?

12 A.    No.

13 Q.    Okay.  So -- but you chose to share the information with

14 them about your experiences not only with Equifax but also

15 problems with Experian and TransUnion.  Right?

16 A.    Right.  I told quite a few friends they needed to check

17 their credit report.  I didn't give everybody details.  But

18 I -- as is advertised in information you read, that you should

19 check your -- with the credit companies, annually.  And I --

20 Q.    You weren't concerned, by telling that, that you were

21 harming your reputation with respect to them, were you?

22 A.    These were my friends, and I was concerned for them.  So I

23 wanted to share my experience.

24 Q.    And you didn't -- other than perhaps your husband, you --

25 with your friends, you did not share with them your actual

Miller - X

1   credit report?

2   A.   Correct.

3   Q.   So they were aware that you were having credit report

4   issues, but you didn't share the details of exactly what was

5   going on with each credit report and each credit reporting

6   agency.  Correct?

7   A.   Depends on what you would define as "details."

8   Q.   Did you show them your credit reports?

9   A.   I did not show -- physically show them my credit reports.

10  Q.   Now, you've alleged that Equifax caused you some stress

11  and frustration, but you acknowledge that you also were

12  experiencing stress and frustration due to TransUnion and

13  Experian as well.  Correct?

14  A.   Right.  This has been going on since 2008.  So it was a

15  long -- long time of frustrations and stress, from all the

16  different sources.

17  Q.   And other possible sources of stress as well, right?

18  In -- in terms of your daily life, stress caused by work,

19  perhaps?

20  A.   I'm sure everybody here has a busy life, a busy schedule,

21  and stress.

22  Q.   So it wasn't -- didn't you have like an issue with a

23  department or a division of your work that was eliminated at

24  some point during this time?

25  A.   I think that was after, when I changed jobs.

Miller – X

1              Is that what you're referring to?

2    Q.   There was a time that your department or division was

3    eliminated, yes, and you had to change your position.

4              Did that cause you stress?

5    A.   Of course.

6    Q.   Now, have you been prescribed any medication for stress

7    that you might have been experiencing during this time frame?

8    A.   No.

9    Q.   And have you taken over-the-counter medications to deal

10   with the stress that you were experiencing?

11   A.   No.

12   Q.   And you've never had any physical problems because of

13   anything associated with Equifax.  Correct?

14   A.   Correct.

15   Q.   And you're not claiming that Equifax caused you any

16   financial harm.  Correct?  You were focused on emotional

17   distress, or what's also known as noneconomic damages?

18   A.   Right.  And the other fair credit issues that were

19   ignored.

20   Q.   And have you calculated an amount of money that you think

21   you are due as a result of the stress?

22   A.   No.

23              MS. SUMNER:  Your Honor, may I have one moment?

24              Thank you.

25   BY MS. SUMNER:

Miller - X

1    Q.   Ms. Miller, do you still have Exhibit 136 in front of you?

2             Oh, it's not.  I'm sorry.

3             MS. SUMNER:  Your Honor, I guess I thought this was

4    the same one as -- may we pass that up?

5             THE COURT:  Yes.  Yes, you may.  And show it to

6    counsel, please.

7             MS. SUMNER:  Show it to opposing counsel and

8    Ms. Miller.

9             Thank you.

10            (Witness handed document.)

11   BY MS. SUMNER:

12   Q.   Ms. Miller, if I can ask you to take a look at this

13   exhibit that's marked at Defendant's Exhibit 136, dated

14   February 16, 2008.

15            Do you recognize this?

16   A.   Yes.

17   Q.   And is this an Experian credit disclosure to you?

18   A.   Yes.

19   Q.   And if I can ask you to turn to the third page of this

20   exhibit, there are a number of addresses on this credit file

21   that you are disputing?

22   A.   Yes.

23   Q.   And if I can also ask you to -- to refer to the social

24   security number that is listed on this credit file, that is

25   circled.  Is that your handwriting that says "incorrect"?

Miller - ReD

1   A.   Yes.

2   Q.   Is that an incorrect Social Security number that is

3   included on this credit file?

4   A.   Yes.

5   Q.   So, in fact, Experian was having some difficulty with the

6   credit -- with the Social Security numbers on your file.

7   Correct?

8   A.   Yes.

9   Q.   Thank you.

10          MS. SUMNER:  Your Honor, nothing further.  Thank you.

11          THE COURT:  All right.  Redirect?

12          MR. MICHAEL BAXTER:  Thank you.

13                     REDIRECT EXAMINATION

14  BY MR. MICHAEL BAXTER:

15  Q.   (Pause.)  Are you satisfied with the way that Experian and

16  TransUnion handled your disputes?

17  A.   Well, I -- I -- I haven't really reviewed that part of all

18  of this, because that's been so many years ago.  But -- and,

19  obviously, I've forgotten some of it.  But I was able to get it

20  resolved, whereas I -- I wasn't even able to get any response

21  or correction from Equifax.  So it looks like it did take me

22  some work, but --

23  Q.   Okay.  Would you turn to Exhibit 24, page 8.  Tell me when

24  you're there.

25  A.   Okay.

Miller – ReD

1    Q.    Do you see any inquiry that -- that Costco or American

2    Express sought credit information from Equifax during -- from

3    February 2010 to July 2011?

4    A.    It doesn't appear to be any on here.

5    Q.    After you -- after Equifax resolved your credit reporting

6    problem, did you -- are you and your husband in the process of

7    building the shop for your husband?

8    A.    Yeah.  We've started just the preliminary -- we got a

9    quote and had -- PGE's been out.  Just some of the, you know,

10   beginnings.

11   Q.    Was it humiliating to not be able to assist your son in

12   getting a credit line in 2010, when you applied from KeyBank?

13   A.    Yeah.  It was pretty embarrassing to be at your local bank

14   and have everyone find out that supposedly you have bad credit.

15   Q.    Was -- your TransUnion credit report clean by 2010?

16   A.    Which one did you just --

17   Q.    TransUnion.

18   A.    Yes, as I recall.

19   Q.    And was Experian clean, other than the one lien that

20   occurred September -- I believe September of 2010?  But was

21   it -- was it your -- your Experian credit report clean

22   throughout 2011?

23   A.    Yes.

24         MR. MICHAEL BAXTER:  That's all the questions I have.

25         THE COURT:  All right.  Thank you, Ms. Miller.  You

Colloquy

1    can step down.

2                THE WITNESS:  Thank you.

3                THE COURT:  Ladies and gentlemen, I think we'll call

4    it a day because it's been a day.  We don't need to start a new

5    witness at this hour.

6                I want to thank you for your attention to this

7    matter.  Let me remind you that this evening, before you come

8    back to court tomorrow, it's important that you stay away from

9    these issues.  Don't do any research.  Don't let anyone talk

10   with you about these matters.

11               I wanted to point out to you something that's

12   probably already obvious to you.  The exhibits in the case

13   contain private information about Ms. Miller, her Social

14   Security number, and other things.  They're before you because

15   they're actually relevant in this case and you would need to

16   see them in order to decide the case.  But, obviously, those

17   are not matters of public record, and they won't be part of the

18   public record at the end of the case.  So you'll be able to --

19   we'll take those exhibits from you.  They'll be safeguarded.  I

20   just wanted you to know that we're not being care-free about

21   that matter.  It's important, but you have to have it in order

22   to determine the case.  All right?

23               Now, tomorrow morning, we're going to start with you

24   at nine o'clock.  I'll be working with the lawyers ahead of

25   time.  I need you in the jury room, ready to go at nine

Colloquy                                      181

1   o'clock.  You can come after -- or any time up to nine

2   o'clock -- I should say, starting at around eight o'clock,

3   staff will be here to let you in.  So you're welcome to do

4   that.  And, again, in the morning, if you would like to bring

5   your own beverage, that's fine.  But we'll have coffee from the

6   cafe downstairs, in the morning.

7          Now, any issues or concerns?  Is everybody good?

8          Leave your notebooks at your chair, leave your notes

9   at your chair.

10         Okay, folks, thank you.  You're free to go for today.

11  See you all tomorrow, rusted [sic] and attentive, ready to go.

12  Right?  Right.  Okay.

13         Okay.  Follow Ms. Boyer, please.

14         Not rusty.  Rested.

15         (Jurors exit.)

16         THE COURT:  Okay.  You can go ahead and step down,

17  Ms. Miller.

18         Okay.  And everyone can be seated.

19         Counsel, I have a second draft of the jury

20  instructions, which I just think it's best if you toss the

21  first draft.

22         There were lots of issues with it.  This is a better

23  working draft.  I have one for all of you.  Ms. Gamboa, my law

24  clerk, will send it to you.  I have a second draft of a verdict

25  form.  So you can disregard what I wrote up on my own, this

Colloquy

1    morning.  These are the forms from which I would like you to

2    work now.

3            In fact, I would like you to take about ten minutes

4    on your own.  I'll come back out about five o'clock.  We'll be

5    off the record.  I would just like to do some preliminary

6    review, to get a sense of whether we have issues.  And then to

7    the extent we can resolve some, we will be able to do that.

8            I have a 5:15 conference call, so I can't work later

9    than that with you on instructions, but I'm hoping we might be

10   able to get right to the heart of some things and we can make

11   some progress there.  The sooner we get these settled, the

12   better.  So I'm going to excuse Ms. -- what's your name --

13   LeGore, for the night, assuming that the plaintiff has nothing

14   for the record at this point.

15           MR. JUSTIN BAXTER:  Not right now, Judge.

16           THE COURT:  And may she leave?  Do you have anything

17   for the record?

18           MS. SUMNER:  We do not.  Thank you.

19           THE COURT:  We'll need you at 8:30 in the morning.

20   Thank you.

21           So we're off the record.

22           (Court adjourned.)

23                           -0-

24

25

Certificate

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the oral proceedings had in the above-entitled matter this 1st day of August, 2013.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

                    /S/ Amanda M. LeGore

                    _____

                    AMANDA M. LeGORE, RDR, CRR, FCRR, CE