1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3   JULIE MILLER,                    )
                                     )  Case No. 3:11-CV-1231-BR
4              Plaintiff,            )
                                     )
5   v.                               )  July 24, 2013
                                     )
6   EQUIFAX INFORMATION SERVICES,    )
    LLC, a foreign limited liability )
7   company,                         )
                                     )  Volume 2
8              Defendant.            )
    _____)  Portland, Oregon

9

10                  TRANSCRIPT OF PROCEEDINGS

11                  (Jury Trial – Day 2 )

12

13        BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23   COURT REPORTER:            AMANDA M. LeGORE, RDR, CRR, FCRR, CE
                                U.S. COURTHOUSE
24                              1000 SW Third Avenue, Suite 301
                                Portland, OR  97204
25                              (503)326-8184

185

1    APPEARANCES:

2    FOR THE PLAINTIFF:        MICHAEL BAXTER
                              JUSTIN BAXTER
3                             Baxter & Baxter, LLP
                              8835 SW Canyon Lane, Suite 130
4                             Portland, OR  97225
                              (503)297-9031
5                             michael@baxterlaw.com
                              justin@baxterlaw.com
6

7    FOR THE DEFENDANT:       JEFFREY EDELSON
                              Markowitz, Herbold, et al.,
8                             1211 SW Fifth Avenue
                              Suite 3000
9                             Portland, OR  97204
                              (503)295-3085
10                            jeffedelson@mhgm.com

11
                              PHYLLIS SUMNER
12                            LEWIS PERLING
                              King & Spalding, LLP
13                            1180 Peachtree Street, NE
                              Suite 1700
14                            Atlanta, GA  30309
                              (404)572-4799
15                            psumner@kslaw.com
                              lperling@kslaw.com
16

17

18

19

20

21

22

23

24

25

INDEX


Witness Index

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Rick Miller | 219 | 228 | 229 | |
| Sheryl Bauer | 230 | 236 | 240 | |
| Karen Fox | 241 | 243 | | |
| Monica Evanson | 248 | 251 | | |
| Margaret Leslie | 255 | | | |
| LaDeamya Mixon | 270 | | | |
| Evan Hendricks | 289 | 309 | | |

| FOR THE DEFENDANT: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Anne Fortney | 345 | 382 | | |
| LaDeamya Mixon | 398 | | | |

-oOo-

Colloquy

1        (Wednesday, July 24, 2013; 8:30 a.m.)

2

3                    P R O C E E D I N G S

4

5        THE COURT:  All right.  So let's begin with the

6    verdict form.  Comments?

7        MR. JUSTIN BAXTER:  It's my understanding the most

8    recent draft is acceptable to both sides.

9        THE COURT:  That which is called the second draft?

10        MR. JUSTIN BAXTER:  Correct.

11        THE COURT:  Is that right?

12        MR. EDELSON:  That is correct.

13        THE COURT:  Good.  We can move on, then.

14        Let's move to the jury instructions and the form

15    called "second draft."  And what I would like to do is go

16    through them page-by-page; both with respect to editorial

17    suggestions, typographical errors, formating, substance.

18        Let's go through it all once, and then you can

19    address concerns.

20        So on the first page, of course, when the jury gets

21    the document, it won't have the caption, "second draft."  It

22    will be final.  So I'll obviously take care of that.

23        I don't see any issues on the first page, and assume

24    you don't either.

25        Maybe you can tell me where the first issue may

188

Colloquy

 1    arise, of any kind, in the pages that you have.

 2            MR. EDELSON:  Page 10.

 3            THE COURT:  I'm just noting on page 7, we still have

 4    pending the hypothetical question issue.  As you've been

 5    thinking, do you -- do you think you will be asking a

 6    hypothetical question or not?

 7            MR. JUSTIN BAXTER:  I do know.

 8            THE COURT:  All right.  Then I'm going to take out

 9    the brackets, the unnecessary language, and put that into

10    regular text and not bold text.

11            Page 10.  All right.  Page 10 is in the midst of the

12    summary of the claims, and where -- what should I focus on, and

13    what's the issue?

14            MR. EDELSON:  Your Honor, this is a matter of how

15    we're going to describe the damages.

16            THE COURT:  Okay.

17            MR. EDELSON:  The damages that are being sought here

18    are a specific type, and they're emotional distress damages.

19            And as we understand emotional distress damages, they

20    can include things like humiliation, loss of reputation.  That

21    those aren't different from emotional distress damages.

22    They're rather a subset --

23            THE COURT:  So you would rather I not itemize the

24    types of emotional distress damages in the summary of the

25    plaintiff's claim?  Because that's really where we are, is a

189

Colloquy

 1    summary of what the plaintiff's claiming.

 2            MR. EDELSON:  It's not that I rather you not.  The

 3    proposal that I have --

 4            THE COURT:  Okay.

 5            MR. EDELSON:  -- is that on that second paragraph,

 6    the one that begins, "plaintiff also alleges."

 7            THE COURT:  Yes.

 8            MR. EDELSON:  And we move down, Damages for the

 9    emotional distress, comma -- I would add the word "including

10    humiliation, mental anguish, and loss of reputation," et

11    cetera.

12            That's the proposal that I had in mind.  And --

13            THE COURT:  That shouldn't bother the plaintiff, does

14    it?

15            MR. JUSTIN BAXTER:  No.  That's fine, Judge.

16            I have an additional clause to add.

17            THE COURT:  Okay.  But right now "including" is being

18    added to the fourth line of that paragraph.

19            What would you propose, Mr. Baxter?

20            MR. JUSTIN BAXTER:  "Including" is fine, but we would

21    add to the list the invasion of privacy and lost credit

22    opportunity.

23            MR. EDELSON:  Your Honor, I don't think those -- on

24    the other hand --

25            THE COURT:  I'm sorry.  I didn't catch the last part

Colloquy

1    of what you said.  Invasion of privacy and?

2              MR. JUSTIN BAXTER:  Lost credit opportunity.

3              THE COURT:  I think the lost credit opportunity is

4    actually a form of economic damage and not noneconomic damage.

5              MR. JUSTIN BAXTER:  Right.  The fear of the loss of

6    opportunity to seek credit.  I was using shorthand.

7              THE COURT:  So what you would like to add is invasion

8    of privacy and fear of lost credit opportunities?

9              MR. JUSTIN BAXTER:  Yes.

10             THE COURT:  And to that you say?

11             MR. EDELSON:  I say that those are -- become subsets

12   of some of the other ones, yet.  And I think it gets too much

13   of a fine point and becomes argument.

14             So, for example, an invasion of privacy is not in and

15   of itself known as an emotional distress type of description.

16   It is a reason why she's experiencing mental anguish, for

17   example.

18             So I believe counsel would be free to argue this

19   invasion of privacy resulted in mental anguish.  But invasion

20   of privacy is not in and of itself emotional distress.

21             THE COURT:  Mr. Baxter, listening to Mrs. Miller's

22   testimony yesterday around the issue of reputation, it struck

23   me that she was also talking about a fear of loss of

24   reputation, as opposed to any evidence that her reputation was

25   actually reported back to her as being damaged.

Colloquy

1          What's coming in the case, and is it really loss --

2     actual loss of reputation?  Is there some evidence that her

3     reputation was actually diminished, as opposed to her fearing

4     that?

5          MR. JUSTIN BAXTER:  Yes, there were both.  There was

6     the fear, because she kept saying, I live in a small town.  But

7     also the actual loss of reputation because she was denied

8     credit.

9          THE COURT:  On the KeyBank event?

10         MR. JUSTIN BAXTER:  Right.

11         THE COURT:  Well, let me just make an observation.

12    All of this falls under the category of actual damage in the

13    specific form of noneconomic damages, as we know that term in

14    Oregon; meaning not economic damages.

15         These are all examples of how one can experience

16    emotional distress.  You're distressed because you're

17    humiliated.  You're distressed because you're in anguish.

18    You're distressed because you're fearful of what's going to

19    happen because of the defendant's conduct.  You're fearful

20    about your privacy being invaded.  And, in fact, you have had

21    signs to you that your reputation has been harmed.

22         One way for me to resolve this here is not to give

23    any examples here.  But the problem with that is that it tends

24    to deprive the jury of a better understanding of the summary of

25    the plaintiff's claims, and that's really where we are.

192

Colloquy

1          This is not a statement of law as much as it is, at

2   this part of the instruction, a statement of what plaintiff

3   claims.

4          So the real question is can plaintiff recover actual

5   damages in this lawsuit for the invasion of her privacy, as she

6   has called that, and for the fear of lost credit opportunities?

7          I ruled on summary judgment that the latter is

8   recoverable.  I don't see any point in not including that in

9   the list here, if I'm including the others.  Invasion of

10  privacy is also such a form of noneconomic or actual damage.

11         So I -- I don't think the line should be drawn to

12  exclude those things.  It's either -- I'm either giving the

13  examples or I'm not.  They're -- none of them are erroneous, as

14  a matter of law, that I can tell.  There's evidence to support

15  them all.

16         So tell me why that it would be erroneous, then,

17  Counsel, for me to include these examples in the summary part

18  of the instruction.

19         MR. EDELSON:  Well, I just think as a matter of

20  language it's not accurate.

21         It's not so much that if we are -- without regard to

22  the -- if we assume that the -- the summary judgment decision

23  is otherwise -- is correct, then you're right.  That should --

24  it could be in here.  But I think, then, maybe it should say

25  not -- noneconomic damages, including --

Colloquy

1    THE COURT:  All right.  Let me propose a brief

2    formulation of this.  Rather than having one long sentence in

3    the paragraph, let me suggest the following.

4        (Pause, referring.)

5    THE COURT:  All right.  I'm going to propose two

6    sentences for this paragraph.

7        The first would be plaintiff also alleges that she

8    was damaged as a result of defendant's alleged FCRA violations,

9    and she seeks reasonable compensation for actual damages she

10   suffered as a result of the defendant's allegedly wrongful

11   conduct.

12       This includes her claim to be compensated for

13   emotional distress, including humiliation, mental anguish, and

14   loss of reputation, invasion of privacy, and fear of future

15   denials of credit.

16       I think that's a fair statement of plaintiff's claim.

17   And using the word "actual damage" is faithful to the statute.

18   And then as we go forward, I'll try to be mindful of the

19   references to damage to, again, track it to actual damages.

20   We've talked about this a few times.

21       If -- and so it may just be better, all along, to

22   just refer to this as actual damages in the form of emotional

23   distress.

24       That includes all of these other things, versus

25   introducing a label or substituting the label of noneconomic

Colloquy

194

1   damages or compensatory damages because they don't necessarily

2   track.

3            So right now I'm proposing that formulation.

4            Does that work for the plaintiff?

5            MR. JUSTIN BAXTER:  It does, Judge.

6            THE COURT:  Mr. Edelson, subject to the defendant's

7   objection about the fear issue, to which you have a continuing

8   objection because you don't agree with the summary judgment

9   ruling, other than that, is there anything else I would need to

10  be aware of from your --

11           MR. EDELSON:  Well, just one other -- one other

12  suggested change that Mr. Baxter and I just agreed upon, which

13  is to remove the word "reasonable" from the first sentence.

14           THE COURT:  Why?

15           MR. EDELSON:  Because we don't know what they're

16  asking for.  And the risk is that it would sound as if you are

17  characterizing their request as reasonable, as opposed to

18  they're only entitled to reasonable.

19           THE COURT:  It's in the context of a phrase that

20  says, "She seeks reasonable compensation."

21           MR. EDELSON:  I hear you.  I've explained what I see

22  as a nuance.

23           THE COURT:  All right.  The word "reasonable" will

24  come in the later damages instruction.

25           MR. EDELSON:  It should be in there somewhere, but it

1    just doesn't seem like it belongs here.

2          THE COURT:  If nobody cares about it being omitted,

3    I'll take it out.

4          Most defense lawyers want the word "reasonable"

5    everywhere compensation is referenced.

6          But okay.  So this would read then, this paragraph:

7          Plaintiff also alleges that she was damaged as a

8          result of defendant's alleged FCRA violations, and

9          she seeks compensation in the form of actual

10          damages for the -- actual damages, I'm sorry, she

11          suffered as a result of defendant's allegedly

12          wrongful conduct.  This includes her claim to be

13          compensated for emotional distress, including --

14          And then the list that we've talked about.

15          Okay?

16          What else on page 10, anything?

17          MR. EDELSON:  Yeah, we have an agreed change in the

18    second-to-last paragraph, last -- and --

19          THE COURT:  This is the "defendant denies" paragraph?

20          MR. EDELSON:  Yes.

21          THE COURT:  Um-hmm.

22          MR. EDELSON:  I'm trying to figure out a good way to

23    pick up there.  So if we pick up with "moreover," the second

24    sentence there.

25          THE COURT:  Yes.

Colloquy

1          MR. EDELSON:  Defendant contends plaintiff has not

2    sustained any damages as a result of its conduct, and to the

3    extent it's determined plaintiff has sustained damages, comma,

4    we've eliminated any emotional distress or other like damages.

5    Such damages were not caused by defendant.

6          THE COURT:  Okay.  I get your point.  Let me see if I

7    can --

8          MR. EDELSON:  Just strike "any," up through "like."

9    That's what we've agreed upon.

10         THE COURT:  Don't you want the word "damages," to be

11   the word "damage," in the singular?

12         To the extent it is determined plaintiff has

13   sustained any damage --

14         MR. EDELSON:  Correct.

15         THE COURT:  -- such --

16         MR. EDELSON:  Damage.

17         THE COURT:  -- damage --

18         MR. EDELSON:  Was.

19         THE COURT:  -- was.

20         All right.  So that's your theory, and I assume

21   plaintiff doesn't care much about how you characterize your

22   theory?

23         Does that work for you, Mr. Edelson, as just

24   modified?

25         MR. EDELSON:  It does.  There's one other

Colloquy

1    modification to that sentence.

2            THE COURT:  Go ahead.

3            MR. EDELSON:  Just at the end, where it says "other

4    entities," we added in "or events."

5            THE COURT:  Okay.  Other entities or events.

6            And what evidence are we going to have about events?

7            MR. EDELSON:  Well, there's already been evidence

8    about events.

9            THE COURT:  What is that?

10           MR. EDELSON:  Ms. Miller testified about a job

11    change, yesterday.

12           THE COURT:  And what is the basis from which one

13    could infer that she was distressed over --

14           MR. EDELSON:  Because she testified that she was.

15           THE COURT:  Okay.  I missed that part.

16           MR. EDELSON:  My -- am I correct?

17           She was --

18           THE COURT:  I just missed that part.  So that's fine.

19    If plaintiff doesn't contest that addition to the paragraph,

20    that's fine.

21           MR. JUSTIN BAXTER:  That's fine.

22           THE COURT:  So that sentence now will read,

23    "Moreover, defendant contends plaintiff has not sustained any

24    damages as a result."

25           Do you want that to be singular too, then, in that

Colloquy

1    reference?

2              MR. EDELSON:  Yes.

3              THE COURT:  Defendant contends plaintiff has not

4    sustained any damages as a result of its conduct.  And to the

5    extent it is determined plaintiff has sustained damage, such

6    damage was not caused by defendant but by other entities or

7    events.

8              Okay?  That's good?

9              MR. EDELSON:  Yes.  Thank you.

10             THE COURT:  Anything else on 10?

11             All right.  What's the next area of concern?

12             MR. EDELSON:  There's -- this is -- this is a

13   recurring one.  So it -- we'll start with the first claim.

14             Both counsel thought that there was an unintentional

15   redundancy here.

16             THE COURT:  Okay.

17             MR. EDELSON:  And our suggested change is sort of --

18   we kind of have to invert that first paragraph of each of these

19   claim descriptions.

20             THE COURT:  Okay.

21             MR. EDELSON:  So let me see if I can walk you through

22   how we -- we suggest that.

23             THE COURT:  Okay.

24             MR. EDELSON:  We would start, say, with that second

25   sentence that begins "in her first claim."

Colloquy

1          THE COURT:  All right.

2          MR. EDELSON:  Plaintiff alleges defendant violated

3    Section 1681e(b) of the Fair Credit Reporting Act, period.

4          Then we would come in and say 1681e(b), states

5    that -- and that's new language.

6          THE COURT:  That?

7          MR. EDELSON:  And then we go right back to the top.

8          THE COURT:  To the "whenever" language?

9          MR. EDELSON:  "Whenever," and take that through its

10   period.

11         And then the rest that we -- that I didn't read would

12   be deleted.

13         THE COURT:  Yes, but it doesn't tell the jury how

14   plaintiff contends defendant violated the act.

15         You're simply saying they -- they say they violated

16   the act and here's what the act provides.  But it never

17   explicitly says to the jury how plaintiff contends --

18         MR. EDELSON:  Well, the -- but if we read --

19         THE COURT:  It's too inferential.  It's not adequate.

20   I'm not going to do that.

21         MR. EDELSON:  All right.

22         THE COURT:  I'm going to have to first tell the jury,

23   first, what is the law and how plaintiff contains -- contends

24   the law was violated.  And I'm certainly happy to go along the

25   lines you indicate, but it's not enough to say you violated

Colloquy

1   statute A, statute A provides X.

2           It -- you have to be specific.

3           MR. EDELSON:  Well, in this paragraph -- in this

4   claim, it stands alone as being probably the most redundant

5   sounding because it just parrots what it said in the statute.

6   And maybe there's a better way to put it.

7           THE COURT:  Okay.  How about -- let's focus for a

8   minute on the elements, there, of -- of the first paragraph.

9   Maybe my concern is just subsumed in the fact that the elements

10  are there.

11          Let me ask, do you agree that the elements are

12  correctly stated under the first claim?

13          MR. EDELSON:  Yes.

14          THE COURT:  Do you, Mr. Baxter?

15          MR. JUSTIN BAXTER:  Yes.

16          THE COURT:  Okay.  Let me -- let me just think about

17  this for a moment, please.

18          (Pause, referring.)

19          MR. EDELSON:  We do have changes to No. 4, your

20  Honor, that the parties have agreed to.

21          THE COURT:  Okay.  Tell me about those, first.

22          MR. EDELSON:  Well, I'll just walk through the other

23  changes here, then.  I don't want to leave anything else out.

24          There's just a typo that begins, "In order to prevail

25  on her first claim."  Section 1681 needs an "e," and paren --

Colloquy

201

1     parentheses around the (b).

2              THE COURT:  Thank you.  Good catch.

3              MR. EDELSON:  And then -- Mr. Perling.

4              And then, No. 3, just -- this is just a preference on

5     language that we've agreed to.

6              "In so doing," we prefer to write, "defendant

7     negligently failed" --

8              THE COURT:  Okay.

9              MR. EDELSON:  -- "to follow."

10             THE COURT:  Okay.

11             MR. EDELSON:  Similarly, No. 4, we would all agree to

12    just put a period after the word "damage."  "Defendants allege

13    negligence caused plaintiff to sustain actual damage."

14             THE COURT:  That's fine.  We're going to --

15             MR. EDELSON:  I think that was consistent with our

16    earlier discussion, anyway.

17             THE COURT:  So let me just go back to the

18    introductory paragraph in my mind, first.

19             (Pause.)

20             THE COURT:  How about this.

21             "In her first claim, plaintiff alleges defendant

22    violated" -- it should be a capital S on section -- "Section

23    1681e(b) of the Fair Credit Reporting Act," period.  "That

24    section states that whenever a consumer" -- and then the rest

25    of that sentence, period.

Colloquy

1      Then going down to, "In order to prevail on her first

2  claim for violation of Section 1681e(b), plaintiff must prove

3  all of those elements," with the changes you walked me through.

4      Does that work for the defense?

5      MR. EDELSON:  Yes.

6      THE COURT:  And does that work for you, Mr. Baxter?

7      MR. JUSTIN BAXTER:  Yes, Judge.

8      THE COURT:  All right.  So we need to make comparable

9  structural changes for the others -- other claims.  Right?

10     MR. EDELSON:  That's exactly what we've proposed,

11 your Honor, jointly.

12     THE COURT:  So let me just take a look at the second

13 claim.

14     (Pause, referring.)

15     THE COURT:  So that first paragraph would read, then:

16     In her second claim, plaintiff alleges defendant

17     violated Section 1681i(a) of the Fair Credit

18     Reporting Act, period.

19     That section states when -- that section states that

20 when a consumer disputes.  Is that right?

21     MR. EDELSON:  Yes.

22     THE COURT:  Mr. Baxter?

23     MR. JUSTIN BAXTER:  Yes, Judge.

24     THE COURT:  Okay.  And then with respect to the

25 elements on 2 -- in Element 3, we have defendant negligently

Colloquy

203

```
 1   failed.  And Element 4, you would want, The alleged negligence
 2   caused plaintiff to sustain -- here it came up as actual
 3   damage.  Previously it was actual damage.  So I assume you want
 4   a period there after actual damage.
 5              MR. EDELSON:  Correct.
 6              THE COURT:  With those, are there more changes?
 7              MR. EDELSON:  Yeah, we've also agreed to strike the
 8   last paragraph.
 9              THE COURT:  All right.  Please note -- Okay.  Okay.
10   So the second claim language will read:
11              In her second claim, plaintiff alleges defendant
12              violated Section 1681i(a) of the Fair Credit
13              Reporting Act.  That section states that when a
14              consumer disputes the completeness or accuracy of
15              any item, the consumer reporting agency must
16              conduct a reasonable reinvestigation of the
17              information contained in that consumer's credit
18              file to determine whether the disputed information
19              is inaccurate in order to prevail.
20              And then the changes to the text are only in the
21   fourth element, with a period after damage.  The rest is
22   stricken all the way down to the next caption, "Third Claim."
23              Is that right?
24              MR. EDELSON:  Correct.
25              THE COURT:  Okay.  All right, then.
```

Colloquy

1              In her third claim, plaintiff alleges defendant

2              violated Section 1681g of the Fair Credit

3              Reporting Act, period.  That section states

4              that -- comma -- upon a request by a consumer.

5              So that will -- the rest of that sentence will read

6    as it did.

7              Element 3 would be modified similarly, with a

8    paragraph after -- I'm sorry.  With a period after "actual

9    damage" and the rest of the sentence deleted.  Does that

10   otherwise address the third claim satisfactorily for the

11   plaintiff and defense?

12             MR. EDELSON:  For defendant, yes.

13             MR. JUSTIN BAXTER:  That's fine, Judge.

14             THE COURT:  And so on the fourth claim, we'll follow

15   the same pattern.

16             In her fourth claim, plaintiff alleges defendant

17             violated Section 1681b of the Fair Credit

18             Reporting Act.  That section states that a

19             consumer reporting agency may --

20             And we'll go to the end of that original sentence.

21             In order to prevail, Item 2, defendant negligent --

22   how do you -- how do you rephrase Item 2?

23             MR. JUSTIN BAXTER:  Judge, before we move to 2, on

24   item 1 --

25             THE COURT:  Yes.

Colloquy

1          MR. JUSTIN BAXTER:  -- we discussed with defendant

2     dropping the list of the specific businesses, only because

3     Ms. Miller testified to several others.  So there may be --

4          THE COURT:  All right.  So you would rather have it

5     read, then, to one or more of --

6          MR. JUSTIN BAXTER:  One or more third parties.

7          THE COURT:  How about to a third party?

8          MR. JUSTIN BAXTER:  Okay.

9          THE COURT:  Two?  Or one or more?

10          Let's see here.

11          (Pause, referring.)  To one or more third parties,

12     semicolon.

13          MR. JUSTIN BAXTER:  Okay.

14          THE COURT:  In so doing, defendant --

15          What are you thinking here, Mr. Edelson?

16          MR. EDELSON:  Well, we -- I couldn't figure out a way

17     to make that consistent with the others.  I think we'll have

18     to --

19          THE COURT:  Then I think it's correct the way it is.

20          MR. EDELSON:  Leave that as is.

21          THE COURT:  Because it really is a failure to act

22     reasonably.  So -- okay.  We'll leave it this way, then.

23          Element 3, defendant's alleged damage caused -- I'm

24     sorry.  Alleged negligence caused plaintiff to sustain actual

25     damage, period.  And the rest gone.

Colloquy

1          Okay.  Now, we're on page 15.  And I have formulated

2     this as a definitional section, just so that the jury can track

3     why it is or it isn't.  I think sometimes they have trouble

4     understanding why an instruction appears in a certain place and

5     where it really applies.  So I've been doing this more

6     recently, just as an aid to them.

7          So any content issues, beginning on page 15, then?

8          MR. EDELSON:  Unless counsel has something new, we

9     were good up until page 17.

10          THE COURT:  Okay.

11          MR. EDELSON:  And that's the definition of "cause."

12     And counsel and I do not agree on this.

13          THE COURT:  Okay.  So what do you propose -- well,

14     let me ask you, Mr. Baxter.  Do you agree with this definition

15     of cause?

16          MR. JUSTIN BAXTER:  Yes.

17          THE COURT:  And no more?

18          MR. JUSTIN BAXTER:  Correct.

19          THE COURT:  You don't think any more is necessary?

20          MR. JUSTIN BAXTER:  That's right.

21          THE COURT:  So what am I missing, Mr. Edelson?

22          MR. EDELSON:  Okay.  The statute -- the damage

23     statute gives us the -- I think all of the guidance we need,

24     which says that damages -- you get damages that are the result

25     of the conduct.  And we think that's the language that ought to

Colloquy                                                  207

1    be in the instruction.

2              And there's not a lot of guidance we have on this

3    issue.  There's a case out of the Ninth Circuit, **Vickie Millan**

4    (phonetic) **versus TransUnion** case, that basically parrots that

5    language.  But it's not a holding that really helps us

6    directly.  But that's really the -- the most that we could find

7    on the topic.

8              I think if we start getting into substantial factor

9    tests, I think we run into trouble.  And we don't think that's

10   the right standard.  And I think that could -- that certainly

11   creates something.  You know, we want to look for ways to avoid

12   appealable issues, and I'm all for that.  I think this creates

13   a possible risk on that because I think it's the wrong

14   standard.

15             So our proposed language is, "Defendant's conduct is

16   a cause of damage to plaintiff if such damage was the result of

17   that conduct," period.

18             THE COURT:  Well, the problem with the result is that

19   that's a single cause -- causal connection, meaning it

20   precludes, in theory, any multiple causes.

21             Substantial factor is an analysis that permits a

22   finding of causation, even if there may be other causes, as

23   long as the one at issue was substantial in causing the result.

24   It doesn't require ruling out any other theoretical or minor

25   factor that also helped to cause the result.

208

Colloquy

```
 1          So if "the" was "a," as opposed to the article
 2   "the" -- you use the article "a," you might get to the same
 3   legal construct.
 4          MR. EDELSON:  In fact I misspoke, because my notes
 5   say "a."
 6          THE COURT:  Okay.  "A cause of damage to plaintiff,
 7   if it was a" -- if it was -- wait a minute.  "If it was a
 8   result."
 9          MR. EDELSON:  Correct.
10          THE COURT:  Say it again.
11          MR. EDELSON:  Let me read it from the beginning:
12              Defendant's conduct is a cause of damage to
13              plaintiff, if such damage was a result of that
14              conduct, period.
15          And that comes right out of the statute.
16          THE COURT:  Mr. Baxter, honestly to me that seems a
17   little bit easier for plaintiff than substantial factor.
18          MR. JUSTIN BAXTER:  I'm not sure.  I never know what
19   juries are going to do with --
20          THE COURT:  Well, if all we're saying to the jury is
21   that you have to prove that the harm she's described was a
22   result, not the result, not the only cause, but a result,
23   what -- what's --
24          MR. JUSTIN BAXTER:  I think --
25          THE COURT:  -- worrisome for plaintiff in that
```

209

Colloquy

1    construct?

2           MR. JUSTIN BAXTER:  I can see a juror going through

3    the same analysis you went through before with the word "the."

4    And I think substantial factor is the -- the standard in the

5    Ninth Circuit and --

6           THE COURT:  Well, how about we do both?  How about we

7    say the -- the defendant's conduct is a cause of damage to the

8    plaintiff if it was the result -- if such damage was a result

9    of that conduct.  In other words, it must be a substantial

10   factor or an important or material factor in causing the

11   result.

12          MR. JUSTIN BAXTER:  That would be fine.

13          MR. EDELSON:  I think we run into the same problem.

14          I think if we try defining that the statute is to

15   that kind of a fine point, I think we run a --

16          THE COURT:  What's the difference, principally,

17   Mr. Edelson?

18          If we're saying a result, it's -- it's -- frankly,

19   substantial factor, to me, seems more onerous to plaintiff than

20   what you're telling me.

21          MR. EDELSON:  I don't see it the same way.

22          THE COURT:  I do.

23          MR. EDELSON:  And I don't know if I can articulate

24   why.

25          THE COURT:  Here's why.  If something is merely a

Colloquy

210

1    result, it can be even an insignificant result.  Whereas,

2    substantial factor has to be more than an insignificant cause

3    by its definition.

4            So if I give what you want, the jury can find in

5    plaintiff's favor if there is any causal connection, however

6    slight, between the defendant's misconduct and the harm she

7    describes.  Whereas if I give what plaintiff wants, they can

8    only find in plaintiff's favor if they find your client's

9    conduct was a -- an important, material factor in causing the

10   stress.

11           I think the Baxters are about to retreat from their

12   position.  I think your causation definition is less onerous

13   for plaintiff.

14           I'm just making that observation, so I'll let you

15   choose what position you want to take right now, once and for

16   all, for the record.  And then I'll let plaintiff take the

17   position they want to take, once and for all, for the record.

18   And then I'm going to make a ruling, because we need to get

19   moving.

20           Mr. Edelson, what position are you going to take?

21           MS. SUMNER:  Can we have a moment, your Honor?  Would

22   you mind just a very brief moment?

23           THE COURT:  Are you about to concede their position?

24           MR. JUSTIN BAXTER:  While they're conferring, the

25   Baxters retreat from their position.

Colloquy

1          THE COURT:  See what I told you?

2          MR. EDELSON:  You're good.

3          THE COURT:  No.  I just know "a" is different than

4    material.  Any factor is less than a material or important

5    factor.

6          We need to expedite here, because I don't want to

7    keep the jury waiting, and I know I want to get the rest of

8    your input here.

9          MR. EDELSON:  We have very little left.

10          (Pause, conferring.)

11          MR. EDELSON:  Your Honor, we would stand by our

12    request that it be defendant's conduct -- conduct is a cause of

13    damage to plaintiff, if such damage was a result of that

14    conduct, period.

15          And plaintiff agrees with that?

16          MR. JUSTIN BAXTER:  That's fine.

17          THE COURT:  That's what we'll do, then, since it's

18    agreed to.

19          What else do I need to consider here?

20          We should read through carefully, now, the damages

21    language, to be sure we're consistent with the original -- the

22    change made earlier on.

23          So question 2 is captioned "actual damages."  I don't

24    think the plural is a problem there.

25          I tried, in that first paragraph under that caption,

212

Colloquy

1   to be sure the jury understood the -- the specific unanimity

2   issue, meaning all eight have to agree on the same violation.

3   And I think that -- it's awkwardly phrased, but that was the

4   best way I could do it, considering we have four different

5   claims.  So it didn't look like you were challenging any of

6   that.

7          Where -- so you must determine the amount of any

8   actual damages with which plaintiff proves she sustained -- so

9   that's consistent.

10         All right.  The last paragraph on page 18 starts:

11             In the context of this case, actual damages are

12             any subjective nonmonetary losses the plaintiff

13             sustained as a result of the defendant's wrongful

14             conduct.  Although the law does not furnish you

15             with any fixed standard by which to measure the

16             exact amount of actual damages, the law does

17             require that all damages you award be reasonable.

18             Thus, you must apply your own considered judgment

19             to the evidence in the case in order to determine

20             the amount of any actual damages to award.  In

21             determining the amount of such damages, consider

22             any emotional distress, including the stress

23             caused by --

24         Now, do we want to track back and just pick up the

25   phraseology of the way plaintiff phrased this earlier, in the

213

Colloquy

1   summary of the case?

2           Is that the way you would like it, Mr. Baxter?

3           MR. JUSTIN BAXTER:  Yes.

4           THE COURT:  I'm going to do that, and then you can

5   have another look at the language before we -- we get -- get

6   you locked in.

7           So I'll do that.  I'll make a modification there.

8           And then I'm saying you can't award damages for any

9   harm to the plaintiff that was caused by others.  And you may

10  nod award plaintiff damages to account for her attorney fees

11  and costs in prosecuting this case, as I will decide the amount

12  of reasonable attorney fees and costs award, if any, depending

13  upon your verdict.

14          So that language is there, you were concerned with,

15  Ms. Sumner.

16          MS. SUMNER:  Yes.  Thank you, your Honor.

17          THE COURT:  Now, with respect to punitive damages --

18  is there anything before we get to punitive damages?  No?

19          MR. JUSTIN BAXTER:  No, Judge.

20          THE COURT:  So my worry about the punitive damages

21  language is that we all had various cut and paste from the

22  model instruction, which really covers a variety of categories

23  of bad conduct which punitive damages can be awarded.  And I

24  was worried that the cut and paste might not actually track

25  here, because certain -- certain conduct that arises under the

214

Colloquy

1   model instruction is conduct for -- like personal harm to

2   someone, hurting someone, something that harms the -- the --

3   the public welfare.  And that's usually been understood to

4   mean -- for example, in the tobacco cases, the public health

5   and welfare component.

6         So I just want to be sure that whatever I tell the

7   jury is something you all have thought through and agreed to

8   and is correct.  And I'm not sure the cut and paste I have here

9   is the way it ought to be.

10        So let me read it out loud to you, and see what it

11  sounds to you as we go.

12              The purposes of punitive damages are to punish a

13              defendant and to deter a defendant and others

14              similarly situated from committing similar acts in

15              the future.  You may award punitive damages only

16              if you find that defendant's conduct that harmed

17              plaintiff was malicious, oppressive, or in

18              reckless disregard of the plaintiff's rights.

19        Now, really, I'm understanding plaintiff's claims to

20  be a reckless disregard claim.  And if that's true, we don't

21  need to worry about talking about malice, or oppression, or

22  defining it.

23        What, Mr. Baxter, is your view, since it's your claim

24  first.

25              MR. JUSTIN BAXTER:  That's correct.  We would --

215

Colloquy

1          THE COURT:  You would propose to take out the

2     "malicious, oppressive" language, and simply focus on reckless

3     disregard?

4          MR. JUSTIN BAXTER:  Yes.

5          THE COURT:  That would narrow the focus for the

6     defendant.  I assume that will be acceptable.

7          MR. EDELSON:  No, to the contrary.  We think it

8     dilutes the significance of punitive damages, and the kinds of

9     things that rise to that level.

10          You know, we can't have a situation where they're

11     giving out punitive damages like candy here.  This is -- it's a

12     very serious thing.  It should only be awarded in the most

13     egregious situations.  And so there might be other language

14     that we can use that captures that, but --

15          THE COURT:  Here's what I think should happen.  I

16     think the word "oppressive" should come out.  Because the

17     oppressive category has to do with the civil rights kinds of

18     violations and the harm to the personal rights of people, as

19     opposed to a consumer economic right.  And the definition of

20     "oppression" is actually one, I think, I already deleted.  But

21     I don't have a problem using the word "malicious," because it

22     does encompass the notion of ill will.

23          So let's try on this idea.

24          You may award punitive damages only if you find

25          that defendant's conduct that harmed plaintiff was

Colloquy

1              malicious or in reckless disregard of the

2              plaintiff's rights, but you may not award punitive

3              damages if you find that the defendant's conduct

4              was merely negligent.

5                    Conduct is malicious if it is accompanied by

6              ill will or spite or if it is for the purpose of

7              injuring the plaintiff.

8              Honestly, I'm not sure there's any evidence in the

9      case from which that finding could be found.  And if I was the

10     defendant, I would be moving against that language because

11     it -- it actually invites the jury to consider something for

12     which I don't think there's evidence.  So I'm going to want to

13     think about that more.

14             But we'll go on to "the conduct is in reckless

15     disregard" phrase.

16             It is that:  "If under the circumstances,

17             defendant acts in the face of a perceived risk

18             that its actions will violate the plaintiff's

19             rights under the Fair Credit Reporting Act" -- and

20             then the omission language would be out.

21             Is that a correct definition of "reckless disregard,"

22     Mr. Baxter?

23             MR. JUSTIN BAXTER:  Yes, Judge.

24             THE COURT:  Is it your position I should only be

25     talking about reckless disregard?

Colloquy

1          MR. JUSTIN BAXTER:  Yes.

2          THE COURT:  I'm actually going to take out the

3     language right now about malice because of my supposition that

4     the rest of the case is going to be consistent with the

5     following.  There won't be evidence there was actual ill will

6     directed to the plaintiff, or spite, or something that was

7     directed to her to purposefully injure her, consistent with

8     Ms. Sumner's opening statement.

9          This was a set of transactions by a company that has

10    responsibility for multi-million transactions.  It wasn't

11    personal.  It wasn't about the plaintiff personally.  It was

12    about a process.

13         And so I don't see that there's any factual

14    foundation, unless plaintiff's going to change the record for a

15    finding of ill will.  And a punitive damage award that entered

16    here, with that direction, could be set aside for lack of

17    evidence after the fact.  And I -- I'm just not going to be

18    party to that.

19         So you need to give me some basis from which a jury

20    could find there was actual malice directed toward the

21    plaintiff.

22         Or give me some other language you want me to

23    consider later, but not now.

24         I'm just -- I'm working on this.

25         MR. EDELSON:  All right.  We'll -- we'll provide some

218

Colloquy

1    language for you.

2          THE COURT:  Is there anything else we need to fuss

3    with at the moment?

4          MR. JUSTIN BAXTER:  Just one last citing, Judge.  On

5    the punitives instruction, we would ask for a sentence that the

6    jury may consider the net worth of Equifax.

7          THE COURT:  Okay.  Any objection to that?

8          MR. EDELSON:  No.

9          THE COURT:  Okay.  We'll put that in.

10          We'll generate a third draft.  We'll work from that,

11   just so that we continue to make progress.  Okay?

12          MR. EDELSON:  Thank you, your Honor.

13          THE COURT:  So would you do that?

14          (Pause, Court and law clerk conferring.)

15          (Recess taken.)

16          (Jurors enter.)

17          THE COURT:  All right.  Thank you, everyone.  Please

18   be seated, except for you, Mr. Miller.

19          I need you to stand, please.  Face the jury, raise

20   your right hand to be sworn.

21          (Witness sworn.)

22          THE WITNESS:  I do.

23          THE CLERK:  Please take a seat.

24          THE COURT:  And, jurors, before Mr. Miller identifies

25   himself, let me say good morning to you.  Thank you for

Rick Miller – D

1    returning.  We appreciate that.

2            I want to apologize that we didn't start with you

3    at -- at nine o'clock.  I had some work I had to do with

4    counsel outside your presence.  We try hard to be prepared

5    ahead of time and keep that to a minimum, but we just needed to

6    do that.

7            So we are ready now to continue with the plaintiff's

8    next witness.

9            Sir, would you come close to the microphone there.

10   Tell us your full name, and spell it all, please.

11           THE WITNESS:  It's Rick Steven Miller.  It's R I C K,

12   S T E V E N, M I L L E R.

13           THE COURT:  Thank you.

14           Counsel.

15           MR. MICHAEL BAXTER:  Thank you, your Honor.

16                       DIRECT EXAMINATION

17   BY MR. MICHAEL BAXTER:

18   Q.   Mr. Miller, what is your relationship to Mrs. Miller?

19   A.   Her spouse.

20   Q.   And how long have you been married?

21   A.   Be 32 years this November.

22   Q.   And what do you do for a living?

23   A.   I'm a customer service manager for Hard Time Glass

24   Company.

25   Q.   Can you tell me briefly about your wife?

220

Rick Miller – D

1   A.   Well, been my best friend for 34 years.  She's probably

2   the -- the best multi-tasker that I've ever met.  She can have

3   several different things going on at the same time and manage

4   them well.  Been a great mother of two grown men.  And that's

5   pretty much it.

6   Q.   Okay.  And what does good credit mean to you, and your

7   family?

8   A.   Well, Julie's family and -- her parents and both of my

9   parents were Depression children and grew up during the

10  Depression, and kind of instilled into both of us the fact that

11  savings is everything, you know.  And don't dip into your

12  savings, because you never know what's going to come around the

13  next corner.  So having good credit and the ability to use that

14  at any given time is very important to both of us.

15  Q.   And were you involved in assisting her in trying to

16  correct her Equifax report?

17  A.   Julie and I discussed it.  I didn't really -- I didn't

18  really do anything directly, write anything.  That was her

19  obligation to do so.

20          I was there for her when she had questions, and to

21  comfort her.  Because she was pretty -- she was pretty

22  distressed that this was coming back at us.

23  Q.   And were you there when she would get the responses from

24  Equifax to her disputes?

25  A.   Yes, I was.

221

Rick Miller - D

1  Q.   When she received her original January 18, 2010, credit

2  report, do you remember the conversation?

3  A.   I remember Julie saying that she couldn't believe that

4  this came, and the extent of it.  My gosh, it was like five

5  pages long of disputes that none of them belonged to us.

6          I remember her also saying that -- but based on the

7  information at the top of the report -- that it should be a

8  pretty easy, quick fix.  Because the date of birth, Social

9  Security wasn't even close to being a match.  So we figured,

10  hey -- you know, she figured she would put the document

11  together, dispute it, and it would go away.

12  Q.   When -- as she received these responses of Equifax, did

13  her personality change, as -- as she received more responses?

14  A.   As -- (laughing.)  As we got further into it and started

15  getting the same thing over and over again, yeah.  She --

16  she -- like I said before, she multi-tasked very well and

17  handles that type of thing very well.  She gets very disturbed

18  and distressed when she has something that she has no control

19  over.  And, unfortunately, this was something that we had no

20  control over.  We could dispute it.  But they -- I mean, we

21  didn't hire these people.  We couldn't fire these people.  They

22  were putting our information out to other industries that --

23  that didn't belong to us, and it was very, very disturbing.

24  Q.   Did her demeanor change over that period of time?

25  A.   It did somewhat.  She -- little things that -- that you

Rick Miller - D

222

```
 1   call irritants in life, usually you just blow off, became

 2   bigger; bigger issues.  Arguments that normally would be passed

 3   over took place.  And you could just tell -- you know, when

 4   you've been married to somebody for 32 years, you can kind of

 5   tell it just by their actions and their day-to-day facial

 6   expressions.

 7         She doesn't wear her emotions much on her sleeve,

 8   where you can't just walk up.  But if you've been around her as

 9   long as I have, you can tell she was really being -- a lot of

10   irritation, frustration over this whole matter.

11   Q.  Did you notice any significant change in 2011 from the

12   responses Equifax was giving her?

13   A.  She was at the point -- she was kind of at the point where

14   she was -- felt that she was backed into a corner.  There

15   was -- you know, she had done everything that -- oh, I am

16   totally sorry about that.  (Pause, phone ringing.)

17         THE COURT:  Good reminder to everyone who has a

18   device in the room, please check to turn them off.

19         Ask the question again, please.

20         THE WITNESS:  I apologize, your Honor, for that.

21         THE COURT:  Sure.

22         THE WITNESS:  Sorry.

23         MR. MICHAEL BAXTER:  Do you want me to go ahead?

24         THE COURT:  Ask the question again, please.

25   BY MR. MICHAEL BAXTER:
```

223

Rick Miller – D

1  Q.   Yes.   Do you remember if there was any changes in 2011,

2  when she received the Equifax response?

3  A.   Yes.   This was when she -- I mean, she was really, really

4  frustrated, felt like she had been boxed into a corner, no way

5  to get out.   She felt trapped.   I mean, totally trapped.   Had

6  done everything that had been asked of her, and still receiving

7  the same reports over and over again.

8        I don't know if anybody's ever seen the movie with

9  Bill Murray in it, where he keeps coming back the same day.

10  That's how she felt.   Doing the same thing over and over, and

11  getting the same result back.   Just really infuriated her.

12  Q.   Did you speak with your wife about her credit reporting

13  disputes in 2011, when she was attempting to fix her credit

14  report?

15  A.   Yes.

16  Q.   And tell us about those conversations.

17        MR. PERLING:   Objection, your Honor, hearsay.

18        THE COURT:   Be specific as to a form of the question,

19  please, so that it calls for only Ms. Miller's then-existing

20  state of mind, as opposed to relating a conversation which does

21  go beyond the admissibility rules.

22        Having a conversation is not what the witness is

23  permitted to do here.   He can reflect upon her then-existing

24  state of mind, and you can ask questions around that.

25  BY MR. MICHAEL BAXTER:

224

Rick Miller – D

1   Q.   What was her state of mind during that -- that particular

2   period when she's receiving these responses from Equifax in

3   2011?

4   A.   Well, again frustration, lost, misdirected.

5         I've never seen her like that before.  I mean, she is

6   a very strong-willed person.  Again, multi-tasks well.

7         She was just -- she didn't have any answer.  She

8   couldn't get the thing fixed, and she just felt trapped.

9   Q.   Did you observe any physical changes in her?

10  A.   She had gone through a period where -- the biggest thing I

11  remember is that she was having acne issues, which I've never

12  seen her have before.  And she -- her hair was thinning --

13  falling -- her hair was actually falling out through a period.

14        I could just tell she was under a great deal of -- of

15  distress and emotional pressure.  Never seen her like that

16  before.  Never.

17  Q.   Now, were you and your wife intending to use credit in

18  2011 and 2012?

19  A.   Yes.

20  Q.   And what were you intending to do?

21  A.   Julie's dad -- well, just a little history on that.

22  Julie's dad had a nice shop down at his house.  One of the

23  things, when I first met Julie, she said, Someday I want to be

24  able to build you something like that.  It's kind of a sense of

25  community for family and friends, to be able to kind of come to

225

Rick Miller - D

1   the shop and build things and do projects, and just sit around

2   and do nothing.  She wanted to do that for me.

3          And because of the -- of the credit issues, we were

4   afraid -- or she was afraid that if we applied, that we would

5   be rejected.

6          We had been -- she had been rejected before on a

7   couple of issues that I had ended up going in and signing for

8   some things.  But -- so we put it off.

9   Q.   Did you eventually begin the building of this shop?

10  A.   Not as a present -- presently, we are getting bids on the

11  project, and hope to start breaking ground sometime late fall

12  this year.

13  Q.   Do you remember -- did -- observing her when these plans

14  had to be postponed?

15  A.   She was -- she was upset, as I was, as well.  We were

16  going to take advantage of -- of -- both labor and building

17  materials at that time were at an all-time low.  So we thought

18  we were going to be able to build a really nice shop for a lot

19  less money.  Of course, the bids are coming in now, and labor

20  is up and materials are up, so we lost that opportunity.

21  Q.   And is there any other things that you and your wife put

22  off?

23  A.   I mean, there's -- none that really comes to mind.  I

24  mean, there's always your day-to-day things that you want to

25  do, and --

Rick Miller – D

226

Q.    Did you want to refinance your home?

A.    Yes, we did do that.  That was -- again, that was put off

for a couple of years by doing that.  We have recently done

that.  However, again, with the credit reports that were coming

through, we just felt that we just couldn't go to our bank

and -- and go through the -- the embarrassment of being turned

down.

     We come from a very small community, and everybody

kind of knows everybody.  And the people that you deal with

in -- business-wise, on a day-to-day basis are people you see

all the time.  And it's embarrassing and humiliating when you

get turned down on something when you know that it's not even

your fault that it's happening.

Q.    Do you recall observing her when she received her denials

of credit from KeyBank?

A.    Yeah, she was very upset.  You know, very upset.

Q.    Would you explain that to the jury?

A.    She prides herself on -- on keeping good credit and just

being a good overall person.  And the embarrassment of having

people that we see and know and do business with having to find

out that -- that we have bad credit, she's worried about people

thinking that in a small community, you know, people don't pay

their bills, they're deadbeats.  But, you know, being prominent

people in the community and as active as she is, that's a

really -- that's a real concern.  She was really concerned

Rick Miller – D                      227

1    about that.

2    Q.   And where did she -- what branch did she apply --

3    A.   It was the Hubbard branch, which is just the adjoining

4    little town next to Aurora.

5    Q.   Is that the branch that you bank at?

6    A.   Yes, it is.

7    Q.   When your wife would see -- received the numerous response

8    letters from Equifax, did you observe her reaction, and can you

9    tell that reaction to the jury?

10   A.   She was infuriated.  I mean, something as simple as we

11   thought that it was, or as she thought that it was, just being

12   mixed with a different Social and a different date of birth,

13   that it should have been an easy fix for anybody.  She couldn't

14   understand why people couldn't just put one here and one here

15   and see, obviously, that they're different, and fix it.

16        And the constant denials and the constant re-asking

17   for, you know, the same information, over and over again, was

18   just -- really infuriating to her.  She was really mad.

19   Q.   Did your wife ever discuss a fear of her identity being

20   stolen during this time?

21   A.   Constantly.

22        If you look at the bottom of Equifax's letters asking

23   for more information, they actually reinforce that -- that --

24   that thought, at the bottom of their page.

25        So, yeah, it was always a concern.

Rick Miller - X

228

1          MR. MICHAEL BAXTER:  That's all the questions I have

2     for Mr. Miller.

3          THE COURT:  Thank you.  Cross.

4                     CROSS-EXAMINATION

5     BY MR. PERLING:

6     Q.   Mr. Miller, you're aware that your wife sued TransUnion?

7     A.   Pardon me?

8     Q.   You're aware that your wife sued TransUnion?

9     A.   Yes.

10    Q.   And you're aware that your wife sued Experian?

11    A.   Correct.

12    Q.   She was having problems with those companies mixing her

13    with another consumer.  Right?

14    A.   I believe so.

15    Q.   And they caused her stress?

16    A.   I don't know if they did or not, to be honest with you.  I

17    mean, it wasn't nearly at the -- that -- at the level that

18    we're dealing with right now.

19    Q.   Well, if she admitted that -- yesterday, that they caused

20    her stress, you wouldn't have any reason to disagree with her,

21    would you?

22    A.   Well, I wasn't privy to that testimony.  So --

23         THE COURT:  Excuse me.  Counsel, don't ask a witness

24    to comment on another witness's testimony.

25         MR. PERLING:  Yes, your Honor.

Rick Miller – ReD                    229

1          THE COURT:  All right.  Go ahead.

2    BY MR. PERLING:

3    Q.   TransUnion and Experian caused her frustration as well,

4    didn't they?

5    A.   I would believe that -- somewhat, yes.

6    Q.   Plaintiff settled those lawsuits, your wife?

7    A.   My understanding is correct, yes.

8    Q.   She didn't tell anyone that she had been denied credit at

9    KeyBank; any of her friends, did she?

10   A.   I wouldn't know that.

11          MR. PERLING:  Those are my questions, thank you.

12          THE COURT:  Redirect.

13          MR. MICHAEL BAXTER:  Yes.

14          THE COURT:  Go ahead.

15                     REDIRECT EXAMINATION

16   BY MR. MICHAEL BAXTER:

17   Q.   By the time the episode -- or the issues with Equifax

18   arose, was the TransUnion and Experian issue basically

19   resolved?

20   A.   To my knowledge, that's correct.

21          MR. MICHAEL BAXTER:  No other questions.

22          THE COURT:  All right, sir.  Thank you.  You may step

23   down.

24          Next witness.

25          And is there any objection to Mr. Miller staying in

230

Bauer – D

1    the courtroom now?  Mr. Perling?

2              MR. MICHAEL BAXTER:  Not for me.

3              THE COURT:  Mr. Perling, is there any objection to

4    Mr. Miller remaining in the courtroom, if he chooses?

5              MR. PERLING:  No, your Honor.

6              THE COURT:  All right.  Sir, you can stay in the

7    room, if you would like.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  Would you come forward here,

10   please, to the witness chair.  Please walk all the way up to

11   the chair.  Remain standing.

12             Face the jury there.  Raise your right hand to be

13   sworn.

14             (Witness sworn.)

15             THE WITNESS:  Yes, I do.

16             THE CLERK:  Please take a seat.

17             THE COURT:  And when you're situated there, bring

18   yourself close in to the microphone there, as close as you can.

19             Tell us your full name, and please spell all of it.

20             THE WITNESS:  Sheryl Anne Bauer.

21             That's S H E R Y L, A N N E, B A U E R.

22             THE COURT:  Thank you.

23             Counsel.

24             MR. MICHAEL BAXTER:  Thank you, your Honor.

25                      DIRECT EXAMINATION

231

Bauer – D

1   BY MR. MICHAEL BAXTER:

2   Q.   Ms. Bauer, where do you live?

3   A.   I live in Keizer, Oregon.

4   Q.   What do you do for a living?

5   A.   I am the director of facility services for a company that

6   builds, owns, and operates retirement communities.

7   Q.   And what is your relationship to Mrs. Miller?

8   A.   A good friend.

9   Q.   Can you tell me briefly about Ms. Miller?

10  A.   Well, Julie, Ms. Miller and I grew up together.  We became

11  friends when we were freshman in high school, back in 1970.

12  And we have been friends ever since.  And we've raised our

13  families together.  We've gone on vacation together.  We've

14  just remained really good friends since 1970.

15  Q.   And how often do you see her?

16  A.   About every two to three months, in person, yeah.

17  Q.   And what's the basis for your getting together?

18  A.   We get together and we have dinner and we do girl talk.

19  Q.   Now, during the times that you were seeing her in the last

20  few years, tell us your observations of when she spoke about

21  her problems with the credit report.

22  A.   Well, when she first brought it up, she was telling us the

23  problems -- and this has been -- and it's our other friend --

24  there's three of us that go to dinner every two to three

25  months, and we're all high school friends and have remained

232

Bauer – D

1    friends.

2            And the first time she brought it up, it was

3    probably -- I would say four -- four years ago, she brought it

4    up at dinner, and said, you know, I need to tell you what's

5    going on in my life.

6            And so she started telling us about -- that she had

7    another person, named Julie Miller, that had gotten -- that was

8    very bad and had done a lot of very bad things with regard to

9    her credit, and how all of these -- what this other person had

10   done had gotten onto her credit report.

11           MR. EDELSON:  Your Honor, I'm going to object on

12   hearsay grounds.

13           THE COURT:  So the same issue here, Mr. Baxter.  The

14   witness needs to be directed to speak in terms of her

15   observations of the then-existing mental --

16           THE WITNESS:  Oh.

17           THE COURT:  -- mental impressions of the witness.

18           It's not your fault.  It's a natural tendency.

19           THE WITNESS:  Oh, sorry.

20           THE COURT:  So just listen to Mr. Baxter's question.

21   Just please listen to his question and answer what he's asking,

22   and he'll focus.

23           THE WITNESS:  I'm sorry.

24   BY MR. MICHAEL BAXTER:

25   Q.   Yes.  Can you tell us your impression -- the existing

233

Bauer - D

1  impressions of her when -- as she's relating these problems to

2  you?

3  A.    Okay.  Yes, she was very upset.  She was trying to figure

4  out what to do.  She was distraught.  She was concerned.  She

5  was somewhat embarrassed.  You know, wringing her hands.  You

6  know, just saying, I am not sure what to do.  I'm not sure

7  what -- where to go.  I'm starting to work on this.  I've

8  been --

9              MR. EDELSON:  Your Honor, hearsay.

10             THE WITNESS:  Okay.  Sorry.

11             THE COURT:  Overruled.

12             This is a fair version of a lay opinion about how the

13  witness presented her mental state.

14             What she can't do is just relate a back-and-forth

15  conversation.  That is hearsay.

16             MR. EDELSON:  Thank you.

17             THE COURT:  Go ahead, Counsel.

18  BY MR. MICHAEL BAXTER:

19  Q.    Do you remember if she ever discussed specific lending

20  institutions?

21  A.    I don't remember her saying any specific lending

22  institution, no.  She just said it was a credit -- credit

23  issues, a credit company.

24  Q.    And what's the time frame that you were observing her in

25  these conversations?

234

Bauer – D

1    A.    Well, the time frame would have been over dinner, each

2    time we met.  And we usually talk a lot, and it's probably a

3    three -- two- to three-hour time frame.

4    Q.    And what dates?  I'm looking for --

5    A.    Oh, I haven't kept specific dates.  You know, it's every

6    two to three -- every two to three months, for the last --

7    well, if we're talking in the time frame of talking about this

8    incident, in particular, it's been over the last four years,

9    every two to three months when we get together for our dinners.

10   Q.    Was this a routine point of conversation that she would

11   bring up?

12   A.    It would come up on many occasions.  Many occasions.  I

13   don't think it came up every single dinner, because there were

14   times, I think, that it was probably not at the forefront right

15   at that moment in time.  But it came up numerous times.

16   Q.    Do you remember any other observations of her when she was

17   telling about credit reporting problems?

18   A.    Bags under her eyes, losing sleep over it, hair -- she was

19   talking about having problems with her hair falling out.  Those

20   were the main things.  Observations of -- of her.

21   Q.    Did she ever discuss an issue with confidential

22   information?

23   A.    Yeah, she mentioned an issue -- it was -- something with a

24   hospital.  I think it was a hospital that this other Julie

25   Miller had been at.  And the hospital apparently sent some

235

Bauer – D

1   confidential information on the other Julie Miller to this

2   Julie Miller.

3            And she said that she called the hospital -- I think

4   she called the hospital and said, you know, This is HIPAA.  I

5   mean, this is HIPAA violations.  I guess -- okay.  I can --

6            MR. EDELSON:  (Standing.)

7            THE COURT:  It's not -- hold on a minute.  Counsel is

8   on his feet.

9            Let me just try to -- and your implied objection is

10  sustained.

11           We need the witness asked questions about her

12  observations of the plaintiff's mental state or the reaction

13  she was having to this ongoing problem.

14           It's okay, Ms. Bauer, for you to quote Ms. Miller to

15  illustrate a point.  But what we can't do is simply have you

16  relate a back-and-forth conversation.

17           THE WITNESS:  Okay.  Sorry.

18           THE COURT:  So go ahead, Mr. Baxter, if there's more

19  around that.

20           MR. MICHAEL BAXTER:  Sure.  No.

21  BY MR. MICHAEL BAXTER:

22  Q.   Were there conversations between you and -- about how to

23  correctly make her dispute to Equifax?

24  A.   Yes.

25  Q.   Can you tell what her -- her mental state and reaction was

236

Bauer – X

1  when you were talking about that issue?

2  A.   Well, she was very attentive, and -- and wanted to make

3  sure that she was doing the right thing and -- she was

4  attentive, and listening, and wanting -- you know, wanting to

5  make sure that -- you know, we were trying to give her good

6  advice, to begin with, so that she could get her problem

7  resolved.  So she was very attentive, diligent in wanting to

8  make sure she was doing the right thing.

9          MR. MICHAEL BAXTER:  That's all the questions I have.

10          THE COURT:  Thank you.  Cross.

11          MR. EDELSON:  Thank you, your Honor.

12                    CROSS-EXAMINATION

13  BY MR. EDELSON:

14  Q.   Good morning, Ms. Bauer.  I'm Jeff Edelson, and I

15  represent Equifax here.  And I just have a few follow-up

16  questions for you.

17          Now, I assume that you have been prepared to testify

18  today.  That Ms. -- one of the Baxters spoke to you about your

19  expected testimony?

20  A.   That's correct.

21  Q.   And you have spoken to Ms. Miller, and others, between the

22  time of the conversations that you related today and -- and

23  today.  So you have had additional conversations in addition to

24  what Mr. Baxter was asking you about?

25  A.   Not since -- we have not spoken about this in particular

Bauer – X                                        237

1    since I spoke with Mr. Baxter.

2    Q.    Okay.  Great.

3            So what I want to make sure we do is I -- I don't

4    want you to be testifying about what you've learned since those

5    events you discussed, but just what happened at those events.

6    Okay?

7    A.    Um-hmm.

8    Q.    All right.  Thank you.

9            Did you know, back during those conversations, that

10   there were three major credit reporting agencies in the

11   country?

12   A.    No.

13   Q.    Did you know that there was TransUnion and Experian and

14   Equifax?

15   A.    No.

16   Q.    Did you know, during those conversations, whether

17   Ms. Miller's issues were with TransUnion or Equifax or

18   Experian, or all of them?

19   A.    No, I -- I didn't know.

20   Q.    And did you know -- for example, did she tell you that she

21   sued Experian?

22   A.    No, she did not.

23   Q.    Did she tell you that she sued TransUnion?

24   A.    No.

25   Q.    Now, she has testified about her fear of her reputation

238

Bauer - X

1    being harmed.  And I'll just tell you that because it's -- it's

2    in a context.

3            Did you and your friends and Ms. Miller's friends

4    ever think less of her as a result of this information that she

5    was sharing with you?

6    A.   I have been a good friend of hers since 1970, and I know

7    her inside and out, and I know her character.  And, no, not

8    personally myself.

9    Q.   Of course, not.  And, in fact, I would assume, then, that

10   your admiration actually probably grew because of her

11   willingness to fight on this issue?

12   A.   I -- I -- I -- yeah.  I -- very proud of her for -- for

13   doing the right thing, absolutely, and sticking up for herself.

14   Absolutely.

15   Q.   You're a good friend?

16   A.   I am a good friend.

17   Q.   And you don't know anyone who ever thought less of

18   Ms. Miller because of this mixed-up credit report, do you?

19   A.   I don't personally know of anybody, no.

20   Q.   And when she described her upset, you and her other

21   friends were comforting to her.  Right?  Supportive?

22   A.   Supportive, absolutely.

23   Q.   And during this time period, you didn't observe that

24   Ms. Miller neglected her family?

25   A.   Personally observing her neglecting her family, no.  I

239

Bauer - X

1    can't say I personally observed her neglecting her family.

2    Q.   But you don't have any reason to think that she -- she --

3    because of the issues she was dealing with, that somehow she

4    became a less-attentive wife or a less-attentive mother?

5    A.   I have no idea.  I -- I can speculate that there were a

6    few things falling through the cracks on many levels for her.

7    Q.   But that would be speculation?

8    A.   That would be speculation on my part.

9    Q.   She remained active in the community?

10   A.   Yes.

11   Q.   You testified about issues of her hair or sleep.

12           That's -- those are -- that's information that

13   Ms. Miller gave you.  Correct?  You didn't observe that

14   personally?

15   A.   Oh, I absolutely -- well, I observed her hair falling out,

16   and I observed bags under her eyes; which would connotate a

17   lack of sleep.

18   Q.   But the diagnosis that one -- that the problem she was

19   having with her credit report had anything to do with the

20   other, you're not qualified to tell us that?

21   A.   I'm not qualified.  I'm not a doctor.

22   Q.   Right.  And so your testimony about that was simply what

23   Ms. Miller was telling you?

24   A.   And -- and what I was observing.

25           MR. EDELSON:  All right.  I have nothing else.

240

Bauer – ReD

1          Thank you.

2          THE COURT:  Redirect, if any.

3                        REDIRECT EXAMINATION

4    BY MR. MICHAEL BAXTER:

5    Q.    Sure.  Did you observe any escalation in her stress from

6    2010 to 2011?

7    A.    Absolutely.  Absolutely.

8          You know, she just would be talking quite a bit, you

9    know, when we would have our dinners, and there would be stress

10   in her voice.  And the observation, again, of the bags under

11   her eyes and -- and the hair thinning.  And that's -- that's

12   what I observed.

13         MR. MICHAEL BAXTER:  Thank you.  That's all the

14   questions that I have.

15         THE COURT:  All right.  Thank you.

16         THE WITNESS:  Thank you.

17         THE COURT:  You're free to go, Ms. Bauer.

18         Next witness, please.

19         Would you please come forward here to the witness

20   chair.  Please come all the way up the stairs.

21         Good morning.

22         THE WITNESS:  Good morning.

23         THE COURT:  Please remain standing.  Face the jury

24   and the deputy there.  Raise your right hand to be sworn.

25              (Witness sworn.)

Fox - D

```
 1              THE WITNESS:  I do.

 2              THE CLERK:  Please take a seat.

 3              THE COURT:  Please bring yourself close into the

 4   microphone there, when you're settled.

 5              Tell us your full name, and spell all of it, please.

 6              THE WITNESS:  My name is Karen Fox.  K A R E N,

 7   F O X.

 8              THE COURT:  Thank you.

 9              Counsel.

10              MR. MICHAEL BAXTER:  Thank you, your Honor.

11                       DIRECT EXAMINATION

12   BY MR. MICHAEL BAXTER:

13   Q.   Ms. Fox, where do you live?

14   A.   I live in Lake Oswego.

15   Q.   And what do you do for a living?

16   A.   I'm a nurse.  I'm a registered nurse, and I own a company

17   called Medical Resource Network, where I'm the president.

18   Q.   And do you know Ms. Miller, the plaintiff in this case?

19   A.   I do.

20   Q.   And what is your relationship with Ms. Miller?

21   A.   We went to high school together, and we've been friends

22   ever since.

23   Q.   And how often do you see Ms. -- see her?

24   A.   Probably every several months.  Julie is a dermatology

25   nurse, and so I see her as a nurse, as well as a friend.
```

242

Fox - D

1    Q.   And what's the circumstances that cause you to get

2    together?

3    A.   Oh, girl talk.  We get together and have a cocktail, and

4    visit about our kids.  And -- and then I do see her in the

5    office, from time to time.  As I said, she is a derm -- derm

6    nurse, too.

7    Q.   Could you briefly describe the type of person Ms. Miller

8    is.

9    A.   Julie is a very solid citizen.  She's a volunteer

10   extraordinaire.  She has served on so many committees and

11   nursing associations, and I think currently she's the chair of

12   her local school board.

13   Q.   And from your observations of her, have you come to find

14   that she values good credit?

15   A.   Absolutely.

16   Q.   Do you remember any specific instances when the credit

17   issue came up in the last few years?

18   A.   I can remember Julie expressing frustration about the

19   credit companies, and not being able to do what she had wanted

20   to do.  I know that she tried to -- wanted to sign an apartment

21   leasing -- or loan and wasn't able to for her son.  And she

22   just expressed a lot of frustration.  And, you know, she was,

23   like, you know, what am I going to do?  And there was

24   embarrassment on her part because of that.

25   Q.   Did you ever observe her when she was discussing the

243

Fox - X

1   specific types of problems that she was having with her credit

2   report?

3   A.   Yes.  From time to time she would express a lot of

4   frustration and, you know, some anger and embarrassment.

5               Just like, can you -- you know, can you believe this

6   is still happening?  And that was observed over a period of

7   time.

8   Q.   Do you recall any observations of her when she was talking

9   about her son in relation to this credit issue?

10  A.   Yes.  I believe she expressed, you know, quite a bit of --

11  just sorrow and embarrassment that she wasn't able to do what

12  she wanted to do for her son with regards to his living

13  situation for college.

14              MR. MICHAEL BAXTER:  Okay.  That's all the questions

15  I have.

16              THE COURT:  Thank you.

17              Cross.

18              MR. EDELSON:  Thank you, your Honor.

19                         CROSS-EXAMINATION

20  BY MR. MICHAEL BAXTER:

21  Q.   Hi, Ms. Fox.  I'm Jeff Edelson, and I represent Equifax.

22  And I just have a few follow-up questions for you.

23              What type of nurse did you say you were?  What's your

24  specialty?

25  A.   I'm a legal nurse consultant.

244

Fox - X

1   Q.   What does that -- what does a legal nurse consultant do?

2   A.   We review documents and do preparation -- litigation

3   preparation.

4   Q.   For malpractice lawsuits against doctors?

5   A.   Um-hmm.  (Nods head.)

6   Q.   And did you make any observations about Ms. Miller that --

7   during the time that you had these discussions about credit

8   companies?  Was she drinking more?

9   A.   No, Julie doesn't drink very much.

10  Q.   You didn't see a change in that, did you?

11  A.   Not that I recall.

12  Q.   Did you see a change in her interest and enthusiasm and

13  availability to volunteer and continue to be a solid citizen,

14  as she was?

15  A.   I didn't observe a change.

16  Q.   Did your opinion of her change in any respect?  Did you

17  think less of her as a result of these credit problems she was

18  having with the credit companies?

19  A.   No, I did not think less of her.  I thought less of the

20  credit companies, though.

21  Q.   So did you know, back then, who the credit companies were?

22  A.   No.

23  Q.   Did you know there were three major credit companies?

24  A.   I knew that in -- as far as my general knowledge that

25  there are three companies.

245

Fox – Offer of Proof

1   Q.    And you knew she was having problems with all three?

2   A.    I didn't know the specifics.

3   Q.    Do you know Ms. -- I'm going to get into some bit of

4   delicate questions.  I apologize.  But there's been some

5   testimony that I want to make sure we address.

6           MR. EDELSON:  Your Honor, I wonder if we could have a

7   moment on this issue.  I -- something we didn't anticipate.

8   But there is something we can discuss before I go into an area

9   with this witness.

10          THE COURT:  Jurors, would you mind stepping out,

11  please, while I take up this matter outside your presence.

12          Why don't you take this as a quick opportunity for an

13  early break, but we'll have you right back.

14          Thank you, everyone, for standing for the jurors.

15          (Jurors exit.)

16          THE COURT:  Yes, Mr. Edelson.

17          MR. EDELSON:  If I may request, I would like the

18  witness excused while we discuss this issue, as well.

19          THE COURT:  Why don't you just make an offer of

20  proof.  Ask the questions that you propose to ask, then I'll

21  know what the answers are going to be, and then we can discuss

22  it.

23          Go ahead.

24                      OFFER OF PROOF

25  BY MR. EDELSON:

246

Fox – Offer of Proof

1   Q.   Ms. Fox, how old is Ms. Miller?

2   A.   57.

3   Q.   And are you familiar with -- let me ask you this.

4        Do you know any of the symptoms of menopause that

5   a -- someone in Ms. Miller's age group may be experiencing?

6   A.   Do I know from general knowledge symptoms of menopause?

7   Q.   Either from your professional or personal knowledge.

8   A.   Yes.

9   Q.   Do you know that menopause can cause, for example, hair

10  loss?

11  A.   That wouldn't be the -- be one I would -- that I would

12  bring to mind, personally.

13  Q.   All right.  And how about -- about acne?

14  A.   I guess the things that come to mind -- do you want things

15  that come to my mind?

16  Q.   Yes, please.

17  A.   The things that come to my mind would be hot flashes,

18  memory loss.  Those would be things that come to my mind first.

19       MR. EDELSON:  Okay.  I'll -- I'll pass on that, your

20  Honor.  That --

21       THE COURT:  Sounds like a good idea.

22       MR. EDELSON:  And I apologize for taking your time.

23  We weren't expecting --

24       THE COURT:  No, I appreciate your need, and that you

25  took it up outside the presence of the jury.

247

Fox - D

1          Let's see if we can get the jurors back.  They may

2     not all be right, at this moment, ready to come in.  So just

3     stand by.

4          MR. JUSTIN BAXTER:  Judge, I see the witness looking

5     quizzically.

6          To be clear, we're not going to ask those questions

7     when the jury comes in.

8          THE WITNESS:  Do you want me to stand up for the

9     jury?

10          THE COURT:  You're fine where you are.

11          THE WITNESS:  Okay.  Thank you.

12          THE COURT:  And let me be clear, you're not going to

13     be asked any of the questions you were just asked, in the

14     presence of the jury.

15          THE WITNESS:  Thank you.

16          (Jurors enter.)

17          THE COURT:  All right.  Thank you, everyone.  Please

18     be seated.

19          Thank you, jurors.

20          Mr. Edelson.

21          MR. EDELSON:  Thank you, your Honor.  I have no

22     further questions for this witness.

23          THE COURT:  All right.  Redirect?

24          MR. MICHAEL BAXTER:  And I have no further redirect.

25          THE COURT:  Thank you.  You're free to go, Ms. Fox.

Evanson - D

248

1           Next witness, please.

2           Would you come forward here, please, to the witness

3    chair.  Please come all the way up to the chair.

4           Please remain standing.  Face the jury and the

5    deputy.  Raise your right hand to be sworn.

6           (Witness sworn.)

7           THE WITNESS:  Yes.

8           THE CLERK:  Please take a seat.

9           THE COURT:  Bring yourself close in to the microphone

10   there.  Scoot yourself in.  And when you're situated, please

11   tell us your full name and spell all of it.

12          THE WITNESS:  Monica Evanson.  M O N I C A.

13   E V A N S O N.

14          THE COURT:  Thank you.

15          Counsel.

16                     DIRECT EXAMINATION

17   BY MR. MICHAEL BAXTER:

18   Q.   Ms. Evanson, where do you live?

19   A.   Aurora.  Right across the street from Julie.

20   Q.   And what do you do for a living?

21   A.   I'm a hairdresser.

22   Q.   And how long have you been a hairdresser?

23   A.   35 years.

24   Q.   Now, how do you know Ms. Miller, the plaintiff in this

25   case?

249

Evanson – D

1    A.    She's my neighbor, my best friend.  I'm her hairdresser.

2    She does things with me.  We vacation together, serve on

3    committees.

4    Q.    How long have you known her?

5    A.    22 years.

6    Q.    And how often do you see her?

7    A.    I would say at least weekly.

8    Q.    And what are the circumstances when you would see her?

9    A.    She comes over to the house.  We -- gosh, we vacation

10   together.  I do her hair.  We have served on committees

11   together.

12   Q.    Can you tell me just briefly your observations about her?

13   A.    Julie is the best person you ever want to know.  She is a

14   friend to everyone.  She is active in the community.  Serves on

15   all committees.  Member of the school board.  Even beyond when

16   her kids are there.  She has exchange students in her home,

17   even when her kids were grown and gone.  I could go on and on.

18   Q.    Has she ever spoken about credit reporting problems around

19   you?

20   A.    Yeah, she has.

21   Q.    Can you outline for the jury when this issue would come

22   up?

23   A.    It -- it came up on and off over the last several years,

24   and escalated at certain points.  But a -- I can give specifics

25   of being at her house and having papers spread out on her table

250

Evanson - D

1   and wanting to know what that was all about, and she explained

2   that it was the nightmare that just would not end.  And --

3        Go ahead.

4   Q.   I'm sorry.

5        I didn't mean to interrupt you.  But you said it --

6   it had escalated.  When did it escalate?

7   A.   I would -- for me, it happened -- because I'm her

8   hairdresser, and I -- that's the worst of it, is when her hair

9   was falling out a couple of summers ago.

10       And I asked, just through doing her hair, and, you

11  know, again and again, it's all the stress she's under due to

12  this?

13  Q.   And what did she say?

14  A.   Yes.  She doesn't know how to get this to stop, how to get

15  it to end.  It's -- it just unfolds.  Just about the time she

16  thinks it's stopped, it rears its ugly head again.

17  Q.   Did she ever tell you the specifics about what her problem

18  was with the credit reporting agencies?

19  A.   Yes, she did.  Another person's name and information was

20  on her credit report, and she was fearful where her information

21  was.  But also just how humiliating and damaging it is to

22  have -- and frustrating to have bad credit information on hers,

23  when that's not the way she does business.

24       MR. MICHAEL BAXTER:  That's all the questions I have

25  of this witness.

251

Evanson - X

1          THE COURT:  All right.  Cross.

2          MR. EDELSON:  Thank you, your Honor.

3                    CROSS-EXAMINATION

4    BY MR. EDELSON:

5    Q.   Good morning, Ms. Evanson.  I'm Jeff Edelson, and I

6    represent Equifax.  I just have a few follow-up questions for

7    you.

8    A.   Okay.

9    Q.   During that time period, did you have an understanding

10   that there were three major credit reporting agencies in the

11   country?

12   A.   I -- I am aware that there are three, yes.

13   Q.   Did you -- did you know that Ms. Miller had sued -- at

14   this point, sued all three of them?

15   A.   No.

16   Q.   That she was having issues with Experian and TransUnion

17   and with Equifax?

18   A.   I am not familiar with -- at -- you know, what time --

19   any --

20   Q.   You didn't get into any details about which credit

21   reporting agency she was responding to at which time, and so

22   forth.  Correct?

23   A.   If she did, I wasn't -- I didn't remember the specifics or

24   which one.  I just --

25   Q.   Are you aware that menopause causes hair thinning, as a

252

Evanson - X

1   hairdresser?

2   A.   Lots of things cause hair thinning, and probably the

3   number one is stress.

4   Q.   But my question is, are you aware that menopause causes

5   hair thinning?

6   A.   It can, if you're low on estrogen.  But as far as I know,

7   Julie takes -- takes hormones.  So I know it doesn't -- it

8   doesn't have to, if you compensate for it.

9   Q.   But it can?

10   A.   It can, if you don't take hormones, um-hmm.

11   Q.   And you don't have any information about what her medical

12   history was, do you?

13   A.   As far as I know, I -- I mean, I don't know if I'm

14   qualified to give out Julie's medical history.

15          I know that she takes estrogen.

16          THE COURT:  Excuse me.  I think the form of the

17   question is really a problem, given the nature of its breadth.

18   So --

19          MR. EDELSON:  I'm just going to withdraw the

20   question, your Honor.  Thank you.

21          THE COURT:  Thank you.

22   BY MR. EDELSON:

23   Q.   Was there anything about the experience with Ms. Miller

24   and her issues with the -- her credit reports that caused you

25   to change your opinion about her?

253

Evanson - X

1  A.   Not me, because I'm her best friend.  But I felt badly for

2  her when she would have situations.  Where she went to the bank

3  and was denied credit.  And it's not -- if you know Julie,

4  she's all about helping others, and she's -- she's self-less.

5  And her reputation is everything to her.

6  Q.   That's really my question.  You know, we're trying to

7  understand, here, in this court any damage that may have

8  happened to her reputation.

9        And the question is, for me, are you aware of anyone

10  who thought less of Ms. Miller as a result of anything going on

11  with her credit?

12  A.   I don't know all of Julie's friends, or I don't know all

13  of the circumstances.  I just know Julie, and I know how

14  devastated she's been over certain incidents that have gone on.

15  Q.   And we understand that she was upset, but my question goes

16  to the reputation.

17        Are you aware -- and if you're not aware, then I

18  think the answer is no.  But are you aware of anybody who

19  thought less of Ms. Miller, who no longer liked Ms. Miller,

20  or -- or changed their view of Ms. Miller as a result of any of

21  this?

22  A.   I would have to say I don't know of anyone personally, but

23  then I wasn't behind her in Mervyns when they pulled her card.

24  You know.  I mean, it's -- so I don't know of people

25  specifically, but I know that it had to be -- I don't know.  I

Evanson - X

254

```
 1    just feel like it had to have been damaging to her.
 2    Q.   What -- you mentioned Mervyns?
 3    A.   Or not Mervyns.  I think it was Meier & Frank.  I can't
 4    remember the exact department store it was.  I feel like it
 5    was --
 6    Q.   And you learned this from who?
 7    A.   Julie.
 8              MR. EDELSON:  Okay.  I have nothing else.  Thank you.
 9              THE COURT:  Redirect?
10              MR. MICHAEL BAXTER:  No questions, your Honor.
11              THE COURT:  All right.  Thank you, Ms. Evanson.
12    You're free to go.
13              Next witness, please.
14              MR. JUSTIN BAXTER:  Your Honor, plaintiff calls
15    Margaret Leslie.
16              THE COURT:  All right.  Ms. Leslie, would you come to
17    the witness chair, please.
18              Please face the jury and deputy.  Thank you.
19              (Witness sworn.)
20              THE WITNESS:  I do.
21              THE CLERK:  Please take a seat.
22              THE WITNESS:  Thank you.
23              THE COURT:  Bring yourself close around to the
24    microphone, there.
25              Tell us your full name, and please spell all of it.
```

Leslie – D                                                   255

```
 1          THE WITNESS:  My full name is Mary Margaret Fortson

 2   Leslie.  M A R Y.  M A R G A R E T.  Fortson, F O R T S O N.

 3   And Leslie is L E S L I E.

 4          THE COURT:  Thank you.

 5          Counsel.

 6          MR. JUSTIN BAXTER:  Thank you, Judge.

 7                      DIRECT EXAMINATION

 8   BY MR. JUSTIN BAXTER:

 9   Q.   Good morning, Ms. Leslie.

10   A.   Good morning.

11   Q.   We've been introduced before.  I'm Justin Baxter.  I'm one

12   of the attorneys for Ms. Miller.

13   A.   Yes.

14   Q.   Today you're appearing as the corporate representative for

15   Equifax?

16   A.   Yes, I am.

17   Q.   All right.

18          THE COURT:  Mr. Baxter, we're having a little -- at

19   least I'm having a little trouble hearing you.

20          Thank you.  Go ahead.

21          MR. JUSTIN BAXTER:  Thank you, Judge.

22   BY MR. JUSTIN BAXTER:

23   Q.   In front of you, do you see a black notebook that says

24   "exhibits"?

25          Would you turn to the tab that says one, one, two;
```

Leslie – D                          256

1   112.

2   A.   (Pause, referring.)  It's a different color.  Is that --

3   okay.  I think I've got it.

4   Q.   Okay.  You've seen this document before.  Correct?

5   A.   Yes.

6   Q.   This is a credit report that Equifax prepared for

7   Ms. Miller in January of 2012?

8   A.   January 5th, 2012, is on the letter and on the disclosure

9   form, we call it; the credit report.

10  Q.   And you've had a chance to review the document before.

11  Correct?

12  A.   I have reviewed the credit reports for Ms. Miller, yes.

13  And I don't recall specifically this one, but it's familiar to

14  me.

15  Q.   Does this credit report reflect the maximum possible

16  accuracy?

17  A.   I believe, based on the rules that we have in our systems

18  and our policies and procedures, that we had done the best with

19  the information we were given on Ms. Miller.

20        I am aware that later she identified to Equifax that

21  some of this information does not belong to her.  But I do

22  believe, that given our policies and procedures, that we did

23  the best we could with the information we were provided.

24  Q.   Does this credit report reflect the maximum possible

25  accuracy?

257

Leslie - D

A.   Based on the information we were given, I think it's the
best we could have done.  So, yes, as far as the best we could
have done.

Now, if you define "maximum possible accuracy"
outside the realm of the data we were given, then I think it's
a difficult question to answer.  Because if you apply
information that the systems -- the policies and procedures
are -- have in front of them to that definition, then the
system's not aware of it.  Given the system information it had,
I think it was the maximum we could do with it, yes.  Given
what the system knew.

Q.   So my question was, does this document reflect the maximum
possible accuracy?  Is your answer yes?

MS. SUMNER:  Objection, your Honor.  I think --

THE COURT:  Overruled.  He's trying to clarify the
witness's answer.

The -- the question called for a yes or no, and she
hasn't provided one yet.  So the -- the objection is overruled.

Go ahead with your question.

THE WITNESS:  I need some clarification then, please.

If -- if I'm answering it based on the data that was
given to Equifax, then I believe it is the maximum we could do
given our policies, procedures, and rules.

If you're saying that there's extra information
outside of that, things I'm aware of now, clearly not.  It's

Leslie – D

258

```
 1  not when we would -- it was not an accurate representation of
 2  Ms. Miller's credit report.
 3          But given the information at the time it was
 4  produced, and given our policies and procedures and the -- the
 5  data that was available to us, it was the maximum we could do
 6  at that time.
 7          So I'm not sure at what time you're asking.  I'm not
 8  sure relative to the data and information that's in the systems
 9  and with -- against our policies and procedures, I don't know
10  where you're asking the maximum accuracy at a point of time.
11  But that's -- that's the best I can do.
12  BY MR. JUSTIN BAXTER:
13  Q.   All right.  So your testimony is that Exhibit 112 reflects
14  the maximum possible accuracy?
15  A.   At that point in time, given our policies procedures and
16  the information available to Equifax and our ability to use
17  that information in the context of this -- this information, I
18  believe that we had done the best we could.
19  Q.   Okay.  Thank you.
20          Would you turn to page 3 of Exhibit 112.
21          This is -- if you look in the center of the far right
22  hand, you can see the document is situated landscape --
23  A.   I'm sorry.  I'm not -- I'm confused.  Am I still in
24  section 112?
25  Q.   Yes.  This is 112.  This is page 3 of 10.
```

259

Leslie – D

1    A.    Okay.

2    Q.    Okay.  This is the actual credit file that was prepared on

3    January 5th, 2012.  Correct?

4    A.    Yes.

5    Q.    Okay.  This credit report has Ms. Miller's correct Social

6    Security number.  Correct?

7    A.    I believe her correct Social Security number is the one

8    that ends in 9788.  So, yes, that would be her Social Security

9    number.

10   Q.    It also contains Ms. Miller's correct date of birth.

11   Correct?

12   A.    I believe that that one is her date of birth, yes.

13   Q.    And her correct address?

14   A.    The Maple Leaf address, I am aware, is her address.

15   Q.    And this credit report contains no collections.  Correct?

16   A.    (Pause, referring.)  I do not see collections on this

17   credit report.

18   Q.    Okay.  So this credit report is accurate?

19   A.    I believe it's accurate, based on the data that was

20   provided to Equifax at the time it was produced.

21         Again, you have to look at accuracy in a context of

22   what we have available to us to use.

23         If you -- if we're given information that matches to

24   Ms. Miller's information and the policies and procedures and

25   the systems match that information, we -- the -- the system

Leslie – D

260

1    doesn't have beliefs.  But the system will say this does match,

2    it belongs together, and will put the information together.

3    And we consider that to be accurate.

4            Now, if you come around later and we are informed and

5    there is evidence that the information actually didn't belong

6    there, we have policies and procedures to remove the

7    information.

8            But, again, I have to look at accuracy in terms of

9    what's available at the time; our policies and procedures at

10   that time.

11           So, yes, I believe that this was accurate.  I stand

12   by the information in the credit report, given that snapshot

13   and moment in time, and what was available to us.

14   Q.   All right.  In September of 2009 -- excuse me.  In

15   September of 2009, Equifax received an electronic form called

16   an automated universal data form or an AUD from a collection

17   agency called Bay Area Credit.  Correct?

18   A.   That is correct.

19   Q.   Can you turn to the tab marked Exhibit 109.

20   A.   Yes.

21   Q.   And this document is a printout of computer records

22   maintained by Equifax.  Correct?

23   A.   That is correct.  These are printouts, I believe, in this

24   document, for AUDs or universal -- automated universal data

25   forms.

Leslie - D

261

Q.    Would you turn to page 7 of the AUD, Exhibit 109.

A.    Is that one EIS No. 330?  Or do you want me on 329?

Q.    For your benefit and for the jury's, there are letters and
numbers at the bottom of the page, in the lower right-hand
corner.

A.    Okay.

Q.    I'm directing you to EIS-JMiller-000329.

A.    Okay.  Yes.

Q.    All right.  Did Equifax receive an AUD from Bay Area
Credit on September 18th, 2009?

A.    Yes.  This is -- this is an AUD that was received
September 18th, 2009, at 17 -- let's see.  5:27.

Q.    After receiving this AUD, did Equifax combine Ms. Miller's
credit file with that of another person with a different Social
Security number, date of birth, and address?

A.    The system, given this information reported to us -- what
happens in the system is that it will pull the information of
Julie M. Miller's that matched to this particular AUD.  And at
the time -- at this time, this AUD matched to two Julie
Millers.

      One is your client, and another is a Julie Miller --
or a file on a Julie Miller that was at a different address,
and they have nearly the same Social Security number.

      And at the time, it's my belief that this particular
AUD did -- did produce the combination of the two files into

262

Leslie – D

1    one file.  Yes.  This is information that was provided to us,

2    that caused the combination of the two files.

3    Q.   All right.  Let me restate my question.

4         After receiving the AUD, did Equifax combine

5    Ms. Miller's credit file with that of another person who had a

6    different Social Security number, date of birth, and address?

7    A.   Equifax combined two files with the name Julie Miller and

8    with a similar Social Security number.  And they did put the

9    two files together.

10        There's more involved in that, but I won't go into

11   that right now.

12        I'm aware that one credit report does belong to your

13   client.  I don't know if that's another person.  I'm assuming

14   it is another person, with the Julie M. Miller, with a very

15   close Social Security number.

16        So the -- so, yes, the combination of the two files

17   occurred.

18   Q.   Okay.  And you said their Social Security numbers were

19   similar, but you agree they were different?

20   A.   Yes.  They are different.  They're what we call a

21   seven-for-nine Social Security number.

22        And a seven-for-nine is that -- seven of the nine

23   digits match exactly, or are in -- and are in the same place in

24   the -- in the Social Security number.  What is different is in

25   two places in the Social Security number, there are different

Leslie - D

1    numbers.  They differ.

2            So we call it a seven-for-nine Social Security number

3    match.

4    Q.   Okay.  And my question was, the Social Security numbers

5    were different.  And your answer is yes?

6    A.   They differ by two digits.

7    Q.   And the date of birth.  Ms. Miller's date of birth is

8    different from the other person's.  Correct?

9    A.   The date of births are within two years of each other.

10   That's -- but they are not the same date of birth, that's true.

11   But they are very close, and they are very close in age.

12           And there are reasons why we allow some flexibility

13   in differing date of births, if they are within two years of

14   each other.

15           So -- but, yes, they are different date of births,

16   but within -- I think one of them is a September 22nd, 1957,

17   and hers is the April 16th, 1956.  And that looks like a --

18   what?  13, 14-month difference, something like that.

19           THE COURT:  Excuse me.

20           Ms. Leslie, you need to answer the question asked.

21   And if there's a need to expound on the answer, you'll be

22   asked.  So in the interests of time, could you please take care

23   to listen to the question asked, and answer only that question.

24           Counsel.

25           MR. JUSTIN BAXTER:  Thank you, Judge.

Leslie – D

264

BY MR. JUSTIN BAXTER:

Q.   Finally, the address that Bay Area Credit provided to
Equifax was different from Ms. Miller's actual address.
Correct?

A.   That's correct.

Q.   After September of 2009, Equifax maintained a single mixed
file that included accounts and information for both Ms. Miller
and the other person.  Correct?

A.   At the time, we maintained a file with information that
was later identified to be mixed.

Q.   Okay.  And I just want to get an answer to my question,
which is after September of 2009, Equifax maintained a single
file that contained accounts and information that belonged to
Ms. Miller and to the other person.  Is that correct?

A.   That is correct.  Yes.

Q.   Thank you.

     If a creditor requested Ms. Miller's credit file,
using her Social Security number, it would receive a consumer
report with both Ms. Miller's information and the other
person's information.  Correct?

A.   No.  We don't just return a credit report based on a
Social Security number.  There has to be a lot of information
provided to produce a -- a credit report.

     There have -- we have to have other matching
information.  So with just a credit -- just her Social, no, we

Leslie – D

265

1    wouldn't return that.

2    Q.   Okay.  If a creditor requested Ms. Miller's credit file

3    and provided the necessary information, the single mixed credit

4    file would include account information for Ms. Miller and for

5    the other person.  Is that correct?

6    A.   I think I know what you're asking.  If an inquiry matches

7    to this particular file, then, yes, the information that's

8    contained in the file would be returned, and some of it was

9    later identified as not belonging to her.

10        So I believe -- yes.

11    Q.   Thank you.

12    A.   I think I understand your question.

13    Q.   And if a creditor requested the other person's credit file

14    using their information, that creditor would receive a consumer

15    report with that other person's information, as well as

16    Ms. Miller's information.  Correct?

17    A.   I'm more comfortable saying that if an inquiry matches to

18    this file and the -- if it matches, then it will be returned

19    with the information for Ms. Miller, your client, and for the

20    other Ms. Miller; if -- if that's what you're asking.

21    Q.   That answers my question.

22    A.   Okay.

23        MR. JUSTIN BAXTER:  Judge, those are the questions I

24    have for this witness.

25        THE COURT:  Thank you.  Cross.

Leslie - D                    266

1          MS. SUMNER:  Your Honor, we would like to reserve our

2     examination of Ms. Leslie when we present our evidence.

3          THE COURT:  Very fine.

4          You may step down, Ms. Leslie.  Thank you.

5          THE WITNESS:  Thank you.

6          THE COURT:  Next witness.

7          MR. JUSTIN BAXTER:  Your Honor, we're going to turn

8     to a deposition designation.

9          THE COURT:  All right.  And that takes a short amount

10    of time?  Roughly 15 minutes?  No more than that?

11         MR. JUSTIN BAXTER:  It does.

12         I might suggest this might --

13         THE COURT:  I was just going to say we do that first,

14    then we take a break, and then you have one more witness.

15    Isn't that right?

16         MR. JUSTIN BAXTER:  That's correct.  We have -- the

17    parties just have a brief matter for the Court, and perhaps we

18    could --

19         THE COURT:  Around the deposition?

20         MR. JUSTIN BAXTER:  Around the deposition, yes.

21         THE COURT:  All right.  So, jurors, I tried, but

22    we're going to take the break anyway.

23         15 minutes, please.  This will be your morning

24    recess.

25         Remember not to talk about the case or anything it

Leslie - D

267

 1    involves.  Don't let anything concerning it cross your path.

 2              We'll take 15 minutes and have you back, and we'll

 3    continue.  You should know, actually, I think, they are ahead

 4    of schedule.  So don't be concerned about the time.

 5              All right.  Please follow Ms. Boyer.  Leave your

 6    notes here.  Thank you.

 7              (Jurors exit.)

 8              THE COURT:  All right.  Thank you.

 9              What's the issue?

10              MR. JUSTIN BAXTER:  I don't think there's any

11    intention here, but the depositions refer to the Bates numbers

12    in the documents.  And I've spoken to counsel, and we would

13    like to supplant the actual exhibit numbers when we -- when we

14    read that, to avoid --

15              THE COURT:  That's perfect.  That way the jury can

16    track to what they actually have.

17              MR. JUSTIN BAXTER:  Yeah.  And then there's one other

18    item, which I haven't discussed with counsel, but I think would

19    be fine.

20              There's repeated reference to an acronym, ACDV, which

21    the jury hasn't heard yet.  I guess I would like to tell the

22    jury, as a preface, that it's the automated consumer dispute

23    verification form.

24              THE COURT:  So is there any objection to simply

25    instructing the jury ahead of the reading that the parties

Leslie - D                          268

1   agree that the reference to ACDV is as counsel indicates?

2              MR. PERLING:  Is that what you're going to say,

3   Counsel?

4              MR. JUSTIN BAXTER:  Yes.

5              THE COURT:  It just means -- those letters mean

6   this --

7              MR. PERLING:  No objection, your Honor.

8              THE COURT:  Okay.  You can state that ahead of time.

9   All right?

10             So let's take 15 minutes.

11             Do you have anything else, Mr. Perling?

12             MR. PERLING:  No, your Honor.

13             THE COURT:  All right.  15 minutes.

14             (Recess taken.)

15             THE COURT:  Who's going to be the reader of the

16  testimony?  The answers, that is?

17             MR. JUSTIN BAXTER:  Your Honor, I'll be asking the

18  questions, and my father will be reading the answers.

19             THE COURT:  If you would come to the witness stand,

20  so it will help the jurors orient.

21             We're ready for the jury.

22             (Jurors enter.)

23             THE COURT:  Thank you, everyone.  Please be seated.

24             Now, jurors, you may wonder why Mr. Baxter is in the

25  witness chair.  He's not a witness, as I told you before.  But

269

Leslie – D

1    he's going to be reading answers to questions posed to a

2    witness before this trial started.  Deposition testimony.

3           You'll recall that I told you earlier that sometimes

4    witnesses aren't here in person but their prior testimony is

5    recorded.  And so Mr. Baxter -- this Mr. Baxter, Michael

6    Baxter, will be reading the answers.  Justin Baxter will be

7    reading the questions.  Justin Baxter is going to explain to

8    you the name of the witness, who the person is, when the

9    testimony was taken.

10          And he's going to explain one abbreviation used in

11   the testimony, so that you know what it stands for.

12          So you should consider the answers that Mr. Michael

13   Baxter reads as the testimony of that witness.  And you'll

14   evaluate it the same, as you're evaluating the testimony all --

15   all the live witnesses who testify.

16          Okay.  Mr. Baxter.

17          MR. JUSTIN BAXTER:  Thank you, Judge.

18          Ladies and gentlemen of the jury, the witness in the

19   deposition was LaDeamya Mixon.

20          She was designated as Equifax's corporate

21   representative for certain topics, and she gave her deposition

22   on July 24th, 2012.

23          Oh, I'm sorry.  And then the -- the acronym is ACDV.

24   It's an acronym for automated consumer dispute verification.

25          It's an Equifax record that they'll explain in their

Mixon – Deposition Testimony

270

1   case.

2             THE COURT:  Thank you, Counsel.

3             Go ahead.

4             (Deposition testimony of Ms. Mixon read as follows:)

5                      DIRECT EXAMINATION

6   BY MR. JUSTIN BAXTER:

7   Q.   Page 8.

8             Do you understand that you've been designated today

9   by Equifax as its corporate representative on certain subject

10  matters?

11  A.   I do.

12  Q.   Yeah.  Can you tell me your understanding of those subject

13  matters you've been designated to testify on today?

14  A.   Equifax's policies and procedures that relate to the

15  reverification or reinvestigation of disputed information.

16  Q.   Are you also -- also authorized and designated to testify

17  today regarding consumer disclosures to Ms. Miller?

18  A.   Yes.

19  Q.   Page 22.

20            Did Equifax ever notify Columbia Collection Service

21  that Ms. Miller was disputing information that it was reporting

22  to her credit file?

23  A.   Since there's not an ACDV, I would say, no.

24  Q.   Did Equifax ever notify a professional credit service that

25  Ms. Miller was disputing information that it was reporting to

Mixon – Deposition Testimony

271

1  Ms. Miller's credit file?

2  A.   Since there's no ACDV, I would say no.

3  Q.   Did Equifax ever notify Portfolio Recovery Associates,

4  that Ms. Miller was disputing information that it was reporting

5  to Ms. Miller's credit file?

6  A.   Since there is not an ACDV, I would say no.

7  Q.   Page 43.

8       All right.  In response to Ms. Miller's January 2010

9  dispute, Equifax sent zero ACDVs to furnishers.  Correct?

10 A.   That's correct.

11 Q.   And Equifax notified zero furnishers of Ms. Miller's

12 dispute.  Correct?

13 A.   Correct.

14 Q.   Equifax sent Ms. Miller the February 5th, 2010, letter

15 requesting additional information.  Correct?

16 A.   That's correct.

17 Q.   And why did Equifax send Ms. Miller that letter?

18 A.   Because there was a discrepancy in identification

19 information.

20 Q.   Page 56.

21      Yes.  Would you agree that Equifax acted consistent

22 with its policies and procedures when it handled Ms. Miller's

23 February and January 2010 dispute?

24 A.   Yes.

25 Q.   Page 67.

272

1         And the ACIS case that was created in February of

2  2010, was that handled by Equifax or a third-party vendor?

3  A.   It was handled by a third-party vendor, acting on behalf

4  of Equifax.

5  Q.   And -- and which vendor was it?

6  A.   The vendor was called DDC.

7  Q.   And are the dispute agents employed by DDC trained in

8  Equifax's policies and procedures?

9  A.   Yes.

10  Q.   Are they trained to comply with the federal Fair Credit

11  Reporting Act?

12  A.   Yes.

13  Q.   Does Equifax perform any performance reviews of the

14  dispute agent?

15  A.   There are quality reviews, if that's what you mean by

16  performance reviews.  There are quality reviews that are

17  performed by Equifax of the dispute agents.

18  Q.   Okay.  That's what I mean.

19         And what do you mean by "quality reviews"?

20  A.   Equifax will review a sample of work that is processed by

21  the vendor agents to ensure that the agents are following the

22  policies and procedures that are trained to the agent.

23  Q.   Does Equifax record or keep track of the number of

24  disputes a vendor agent handles?

25  A.   I believe, yes, there is some tracking.  I'm not sure how

Mixon – Deposition Testimony

273

1   long it's kept, but there is tracking of disputes processed by

2   vendor agents, yes.

3   Q.    And is the number of disputes handled by a vendor agent a

4   consideration in the quality review?

5   A.    No.

6   Q.    Okay.  If a vendor agent only handled one dispute in one

7   day, would that be of concern to Equifax?

8   A.    That would be a production concern, I would say, for the

9   vendor, being that -- that that employee, that agent is

10  employed by that vendor.

11  Q.    Page 79.

12        Okay.  When Ms. Miller applies for credit and her

13  creditor requests a copy of her credit report, does Equifax

14  transmit a credit file to that creditor?

15  A.    I honestly can't answer what would be provided to the

16  creditor based upon what they entered to access the consumer's

17  credit file.  Being that the information did not match, I can't

18  say for certain if a creditor would have received a file for

19  Ms. Miller.

20  Q.    Well, let's look at some documents.

21        Why don't you look at Exhibit 1.

22  A.    Okay.

23  Q.    Do you see that this is an adverse action letter from

24  KeyBank?

25  A.    Yes.

Mixon – Deposition Testimony

274

1    Q.    And it says that KeyBank is denying Ms. Miller credit

2    based upon delinquencies listed in her Equifax credit report.

3    A.    I see that.

4    Q.    And the date of the letter is December 2009.

5    A.    Yes.

6    Q.    Look at Exhibit 5, page 9.

7    A.    Okay.

8    Q.    Do you see in the inquiry section, KeyBank requested a

9    copy of this credit file in December of 2009?

10   A.    I see, yes.

11   Q.    Page 81.

12          Would you agree that Equifax sent a copy of this

13   credit file to KeyBank in December of 2009?

14   A.    Yes.

15   Q.    Okay.  And this credit file actually belongs to the other

16   consumer.  Correct?

17   A.    It has a different consumer's identification information

18   on it.

19   Q.    This is not Ms. Miller's credit file.  Correct?

20   A.    No.

21   Q.    And Equifax sent this credit file to KeyBank in response

22   to a request for Ms. Miller's credit file.  Correct?

23   A.    Yes.

24   Q.    Did Ms. Miller contact Equifax by telephone on June 28th,

25   2011?

Mixon - Deposition Testimony

275

1   A.   Yes.

2   Q.   Let's read through the -- going to page 83, line 5.

3        Let's read through the comment screen in Exhibit 17.

4   A.   Okay.

5   Q.   Line 19.

6        When a consumer contacts Equifax by telephone, is

7   there a record created separate from this consumer contact

8   history?

9   A.   If there is an actual dispute of items on the credit file,

10  there would be an ACIS case, in the system, just as if they had

11  written in their dispute.

12  Q.   Is there an ACIS case in the records relating to the June

13  28th, 2011 contact?

14  A.   I don't see an ACIS case.

15  Q.   And if there was a dispute taken, that would be reflected

16  in an ACIS case.  Correct?

17  A.   Correct.

18  Q.   Okay.  And then what department would have received this

19  telephone call?

20  A.   The phone call could have been received by the dispute

21  department.  The Equifax dispute department would receive phone

22  calls from consumers.

23  Q.   Okay.  And is that the same department that receives phone

24  requests for consumer disclosures?

25  A.   Yes.

Mixon – Deposition Testimony

276

1    Q.    And is that department located in Georgia?

2    A.    There is a department located in Georgia, yes.

3    Q.    Are you able to tell me where this phone call was

4    received?

5    A.    Yes.

6    Q.    And where was it received?

7    A.    In Georgia.

8    Q.    And so this was received by the telephone dispute

9    department in Equifax, in Georgia?

10   A.    Correct.

11   Q.    Okay.  And so tell me what the procedure is for receiving

12   this kind of phone dispute.

13   A.    Again, it depends upon the nature of the phone call from

14   the consumer.  A consumer can contact Equifax and reach the

15   dispute department, or a live telephone agent, with general

16   questions about their credit file.  Or they can lodge a dispute

17   of information on the credit file.

18          So the way that the telephone call is handled, again,

19   would depend upon the conversation with the consumer.

20   Q.    Okay.  So let's go back to the text in the comment box.

21          It says the agent advised that the consumer needs to

22   contact credit grantors to up -- update SSN.

23          Do you see that?

24   A.    I do.

25   Q.    Is that consistent with Equifax's policies and procedures?

Mixon – Deposition Testimony

277

1    A.   That may be something that an agent would advise a

2    consumer.

3    Q.   Okay.  Under what circumstances?

4    A.   If a consumer is disputing the Social Security number is

5    reporting incorrectly on their credit file and if the agent

6    does not have documents in hand to prove the Social Security

7    number, an agent may advise a consumer of how a Social Security

8    number is actually reported to the credit file; being by one of

9    the -- their current or one of the creditors that's reporting

10   on the credit file.  Therefore, an agent may advise a consumer

11   that there's a process they could take to ensure their

12   creditors have their Social Security numbers accurately.

13        They may advise the consumer to contact the creditors

14   to ensure that their Social Security number is recording

15   accurately in their system.  So, in return, they can report the

16   information correctly when they report their account

17   information to Equifax.

18   Q.   Okay.  If a consumer disputes specific accounts that

19   appear on their credit report, would Equifax advise them to

20   contact the credit grantors?

21   A.   If a consumer disputed specific accounts on the credit

22   file, Equifax -- the policy is that Equifax would start a

23   reinvestigation to verify those disputed items with the credit

24   grantors.

25   Q.   Page 91.

Mixon – Deposition Testimony                    278

1          Okay.  Let's turn back to Exhibit 19, page 9.

2     A.   Okay.

3     Q.   And would you agree that Ms. Miller sent these documents

4     to Equifax?

5     A.   Yes.

6     Q.   Okay.  Take a look at -- I believe that's Exhibit 19, as

7     well.

8     A.   Okay.

9     Q.   Okay.  Do you see that it's a dispute letter dated July

10    18th, 2011?

11    A.   Yes.

12    Q.   Page 95.

13         Okay.  Then if you'll turn to Exhibit 19, page 11.

14    A.   Okay.

15    Q.   Do you recognize this document?

16    A.   Yes.

17    Q.   And what is it?

18    A.   It's called a research request form.

19         That's included with the disclosure or copy of the

20    credit file that a consumer receives.

21    Q.   Okay.  And this is a form that Equifax provides to

22    consumers for the purpose of disputing specific accounts and

23    trade lines.  Correct?

24    A.   Correct.

25    Q.   And in this research request form, Ms. Miller disputes a

Mixon – Deposition Testimony

279

1    series of accounts.  Correct?

2    A.   Yes.

3    Q.   These include, she writes, all Columbia Collection

4    accounts.

5    A.   It's not very clear.  I can't really see this.

6          I think I see that.  Yes.

7    Q.   Okay.  She disputes the Professional Credit Services

8    accounts?

9    A.   Yes.

10   Q.   She disputes Aaron Rents?

11   A.   I see that, yes.

12   Q.   And American Express?

13   A.   Yes.

14   Q.   And Portfolio Recovery?

15   A.   Yes.

16   Q.   And Visa?

17   A.   Yes.

18   Q.   And for the last four trade lines on that page, she

19   lists -- she lists the specific account numbers.  Correct?

20   A.   Yes.

21   Q.   Okay.  Does Equifax understand that Ms. Miller is

22   disputing all of the Columbia Collection accounts?

23   A.   It's stated here, yes.

24   Q.   And she's disputing all of the professional credit

25   services accounts?

Mixon – Deposition Testimony

1   A.   Yes.

2   Q.   And for the other four accounts that she's listed by

3   number, does Equifax understand that she's disputing those

4   accounts?

5   A.   Yes.

6   Q.   Did Equifax notify any of these furnishers of Ms. Miller's

7   disputes?

8   A.   I don't see a dispute, no.

9   Q.   When Equifax receives a dispute from a consumer, it's

10   required to notify the furnisher of a dispute.  Correct?

11   A.   That is the requirement and policy, yes.

12   Q.   And Equifax did not notify these furnishers of

13   Ms. Miller's dispute.  Correct?

14   A.   Correct.

15   Q.   Is that consistent with Equifax's policies and procedures?

16   A.   No.

17   Q.   Let's turn to the next page.  It's Exhibit 19, page 12.

18   And this is another copy of the research request form.

19   Correct?

20   A.   Correct.

21   Q.   And here Ms. Miller lists a Bay Area Credit account.

22   A.   Yes.

23   Q.   And she also has highlighted the Social Security number

24   and date of birth?

25   A.   Yes.

Mixon – Deposition Testimony                    281

1   Q.    Did Equifax understand that Ms. Miller was disputing the

2   Bay Area Credit account?

3   A.    Yes.

4   Q.    Did Equifax notify Bay Area Credit that Ms. Miller had

5   disputed that information?

6   A.    No.

7   Q.    Is that consistent with Equifax's policies and procedures?

8   A.    No.

9   Q.    Why did Equifax not communicate Ms. Miller's disputes to

10  those furnishers?

11  A.    I don't see a reason why, other than unless it was because

12  of the discrepancy in the ID information.

13  Q.    Well, explain that to me.

14          Under what circumstance would Equifax not notify the

15  furnisher of Ms. Miller's dispute?

16  A.    If there is a discrepancy in the ID information on the

17  credit file with the ID information that the consumer has

18  provided and Equifax needs verification that the credit file we

19  have in fact belongs to the consumer.

20  Q.    Okay.  So we saw earlier that the Social Security number

21  and the birth date on this credit file are different from

22  Ms. Miller's information.  Correct?

23  A.    Correct.

24  Q.    So under that circumstance, would Equifax notify the

25  furnishers of the dispute?

Mixon – Deposition Testimony

282

1   A.    No.

2   Q.    Okay.  And why not?

3   A.    Equifax would need proof that the ID information and

4   credit file belongs to the consumer before sending a

5   verification to the credit grantor.

6   Q.    Page 100.

7          In response to Ms. Miller's July 2011 dispute, did

8   Equifax mail Ms. Miller a request for additional information?

9   A.    Yes.

10  Q.    Why did Equifax send that letter to Ms. Miller?

11  A.    The assumption is because of the discrepancy in the Social

12  Security number.

13  Q.    Let's focus on Exhibit 22, page 3, because I think we can

14  both read that one.

15  A.    Okay.

16  Q.    This one is a W-2 form for Ms. Miller.  Correct?

17  A.    That's correct.

18  Q.    And this is sufficient to establish Ms. Miller's Social

19  Security number?

20  A.    That's correct.

21  Q.    And it's sufficient to establish Ms. Miller's mailing

22  address?

23  A.    Yes, it is.

24  Q.    Okay.  Then in addition, Ms. Miller also sent a copy of

25  her insurance bill at Exhibit 22, page 2.  Correct?

Mixon – Deposition Testimony

283

1  A.    Yes.

2  Q.    Okay.  Thank you.

3        And that was sufficient to establish Ms. Miller's

4  mailing address.  Correct?

5  A.    I said, yes.  Yes.

6  Q.    And Ms. Miller received -- strike that.

7        Equifax received these documents from Ms. Miller in

8  response to the July 28th, 2011, request for additional

9  information.  Correct?

10 A.    Yes.

11 Q.    Did Equifax take any action in response to receiving those

12 documents?

13 A.    Let's see.

14        The next correspondence I see is a copy of the credit

15 file that was sent to Ms. Miller.  So it looks like a credit

16 file was sent to Ms. Miller after that correspondence was

17 received.

18 Q.    So the credit file that you are speaking of is dated

19 August 8th, 2011?

20 A.    Yes.

21 Q.    And that credit file continues to include a Social

22 Security number that does not belong to Ms. Miller.  Correct?

23 A.    Correct.

24 Q.    And a birth date that does not belong to Ms. Miller.

25 Correct?

Mixon – Deposition Testimony

284

1    A.    Correct.

2    Q.    And the disputed addresses that do not belong to

3    Ms. Miller?

4    A.    Correct.

5    Q.    And the disputed Columbia Collection Services accounts,

6    that did not belong to Ms. Miller?

7    A.    Correct.

8    Q.    Did Equifax take any action to delete the disputed

9    accounts or information?

10   A.    No.

11   Q.    Did Equifax take any action to investigate the disputed

12   accounts or investigation -- or information?

13   A.    No.

14   Q.    Was that consistent with Equifax's policies and

15   procedures?

16   A.    No.

17   Q.    And why didn't Equifax reinvestigate the disputed

18   accounts?

19   A.    Being that it's outside a policy, I have no idea why not.

20   Q.    Why didn't Equifax notify the furnishers of Ms. Miller's

21   dispute?

22   A.    Same response.  It's outside of policy, so I have no idea

23   why not.

24   Q.    Do you agree that the furnishers should have been notified

25   of Ms. Miller's disputes.  Correct?

Mixon – Deposition Testimony

285

1   A.   That's correct.

2   Q.   Let's turn to Exhibit 25.

3   A.   Okay.

4   Q.   This is another request for additional information, dated

5   September 1st, 2011.  Correct?

6   A.   Correct.

7   Q.   And if you read the first sentence of the letter, it

8   refers to a request concerning Ms. Miller's Equifax credit

9   file.  Correct?

10  A.   Correct.

11  Q.   And that sentence -- why don't you read the first sentence

12  into the record.

13  A.   We have received your request concerning your Equifax

14  credit file and have addressed your concerns.

15  Q.   Did Equifax address Ms. Miller's concerns?

16  A.   No.

17  Q.   So the letter is not correct?

18  A.   It is not.

19  Q.   Under what circumstances would the agent choose to send

20  this letter?

21  A.   The agent would send this letter if a reinvestigation had

22  been started for the consumer.

23       However, Equifax needed proof of a consumer's current

24  address in order to release the results of the investigation.

25  Q.   And in the prior contact, Ms. Miller had provided proof of

Mixon – Deposition Testimony                    286

1   her current address.  Correct?

2   A.   That is correct.

3   Q.   That was the W-2 and the insurance bill?

4   A.   That is correct.

5   Q.   So -- okay.  So the dispute agent, in this instance,

6   should not have sent the September 1st, 2011 letter.  Correct?

7   A.   That's correct.

8   Q.   That was inconsistent with Equifax's policies and

9   procedures?

10  A.   It is inconsistent.  That is correct.

11  Q.   Let's turn to Exhibit 26.

12  A.   Okay.

13  Q.   This is a dispute package sent from Ms. Miller to Equifax,

14  dated August 25th, 2011.  Correct?

15  A.   Correct.

16  Q.   And did Equifax receive this correspondence on or about

17  August 28th, 2011?

18  A.   Yes.

19  Q.   Page 112.

20          And then let's turn to Exhibit 26, page 2.

21  A.   Okay.

22  Q.   You see this is, again, Equifax's research request form?

23  A.   It is.

24  Q.   And Ms. Miller disputes a series of Columbia Collection

25  Services accounts?

Mixon – Deposition Testimony

287

1    A.    Correct.

2    Q.    And she lists the individual account numbers?

3    A.    Correct.

4    Q.    And she lists them as "not mine"?

5    A.    Correct.

6    Q.    When a dispute agent receives a dispute of a series of

7    accounts from the same furnisher, is the normal procedure to

8    prepare an ACDV for each account?

9    A.    Yes.

10   Q.    Okay.  So even if they're all the same furnisher, a

11   dispute of 20 separate accounts would require a dispute agent

12   to process 20 separate ACDVs?

13   A.    That is correct.  If all 20 of those accounts are on the

14   credit file or credit report, yes.

15   Q.    Okay.  And in Ms. Miller's package, she again –– I'm

16   sorry.  In Ms. Miller's package, she also encloses her

17   identification documents again.  Correct?

18   A.    Correct.

19   Q.    Those are sufficient to establish Ms. Miller's identity to

20   Equifax.  Correct?

21   A.    That's correct.

22   Q.    And based upon these documents, would you agree that

23   Equifax was required to notify the furnishers that Ms. Miller

24   was disputing the information they reported?

25   A.    Yes.

Mixon – Deposition Testimony

288

1  Q.    And did Equifax -- and Equifax did not notify those

2  furnishers.   Correct?

3  A.    Correct.

4  Q.    And that was not consistent with Equifax's policies and

5  procedures?

6  A.    It was not.

7  Q.    Each and every time that Ms. Miller disputed information

8  in her credit file, did Equifax conduct a reinvestigation of

9  her dispute?

10  A.    No.

11  Q.    Each and every time Ms. Miller notified Equifax of

12  disputed information in her credit file, did Equifax notify the

13  furnisher of Ms. Miller's dispute?

14  A.    No.

15  Q.    Each and every time Ms. Miller disputed information in her

16  credit file, did Equifax respond to Ms. Miller with a statement

17  of what it had done to review her dispute?

18  A.    No.   There was no dispute, so there was no response to a

19  dispute.

20        MR. JUSTIN BAXTER:   That completes the deposition of

21  Ms. Mixon.

22        THE COURT:   All right.   Thank you.

23        Your next witness.

24        MR. JUSTIN BAXTER:   The plaintiff calls Evan

25  Hendricks.

289

Hendricks – D

```
 1              THE COURT:  All right.

 2              Mr. Hendricks, would you come all the way to the

 3  witness chair, please.  Thank you.

 4              Please face the jury.  Raise your right hand to be

 5  sworn.

 6              (Witness sworn.)

 7              THE WITNESS:  I do.

 8              THE CLERK:  Please take a seat.

 9              THE WITNESS:  Thank you.

10              THE COURT:  When you're situated there, bring

11  yourself close in to the microphone; as close as you can.

12              Tell us your full name, and please spell all of it.

13              THE WITNESS:  My full name is Evan Daniel Hendricks.

14  It's E V A N, D A N I E L.  Last name is H E N D R I C K S.

15              THE COURT:  Thank you.

16              Counsel.

17              MR. JUSTIN BAXTER:  Thank you, Judge.

18                      DIRECT EXAMINATION

19  BY MR. JUSTIN BAXTER:

20  Q.   Good morning, Mr. Hendricks.

21  A.   Good morning.

22  Q.   We've met before, of course.  I'm Justin Baxter.  I'm one

23  of the attorneys for Ms. Miller.

24              Can you tell the jury what you do for a living?

25  A.   I'm in my 33rd year of publishing a specialty newsletter
```

Hendricks – D

290

1    called *Privacy Times*.

2         *Privacy Times* is sold to mostly institutional

3    subscribers, government agencies, law firms, universities and

4    corporations that have people that follow information privacy

5    laws like the Freedom of Information Act, Privacy Act, and the

6    Fair Credit Reporting Act.

7         I also do expert witness work and do consulting for

8    government agencies and private companies on issues of privacy

9    and personal information.

10   Q.   Please tell the jury a little bit about your background.

11   A.   I'm born and raised in Portland, Oregon.  I went to West

12   Sylvan Grade School, Lincoln High, and went to the University

13   of Oregon for two years before transferring to Columbia, in New

14   York City, where I graduated with a Bachelor of Arts in

15   political science.

16   Q.   Has Equifax recognized you as an expert in the field of

17   information privacy?

18   A.   Yes.  In 1990, Equifax released a survey called Equifax's

19   survey about privacy in the information age.  And the

20   acknowledgment section thanked me for my contributions to

21   Columbia Professor Alan Westin in helping formulate some of the

22   questions for the survey.

23   Q.   Have any other credit reporting agencies recognized you as

24   an expert in the field of credit reporting?

25   A.   Yes.  Another one of the credit reporting agencies is

291

Hendricks - D

1    Experian.  And I have -- Experian advised me and I agreed to

2    serve on their supervisory council from 2002 to 2004.

3    Q.    Have you earned any certifications from the credit

4    reporting agency?

5    A.    Yes.  I have an FCRA certification from a trade

6    association called the National Credit Reporting Association.

7    Q.    Has the Government recognized you as an expert in your

8    field?

9    A.    Yes.  The -- I was served -- the U.S. Social Security

10   Administration had many privacy issues to deal with, so they

11   formed a panel of privacy experts; a three-member panel.

12             I was one of the members, and I served under contract

13   with them from the late '90s to 2006.

14             I also did contract work for the postal -- U.S.

15   Postal Service in translating their Privacy Act notices.

16   Q.    Have you been admitted previously in court to testify

17   about credit reporting?

18   A.    Yes, on at least about 20 cases.

19   Q.    Would you describe your testimony before Congress as it

20   relates to the Fair Credit Reporting Act?

21   A.    I've testified before Congress roughly ten times, always

22   by invitation, about issues of accuracy and inaccuracy; issues

23   about responsiveness by credit reporting agencies to consumer

24   disputes; and -- and issues about how the credit scores work;

25   and different policy issues of people getting access to their

292

Hendricks – D

1    credit reports, so they can read what's in them; and then find

2    the errors and dispute them; and -- and also impermissible

3    access to credit reports.  Pretty broad range of issues within

4    the credit reporting field.

5    Q.    Please describe your published works relating to credit

6    reporting.

7    A.    Well, in addition to being the 33rd year of publishing

8    *Privacy Times*, which is kind of a Kiplinger-style newsletter.

9    It comes out every two weeks, 23 issues per year.  So, you

10   know, it gives you about 200 pages per year.

11          I've also authored a book called *Your Right To*

12   *Privacy*, which is a handbook and a guide to people's legal

13   rights, which was back in 1990.

14          And my most recent book is called *Credit Scores &*

15   *Credit Reports*, *How The System Really Works, What You Can Do*.

16   And that was first published in 2004.

17          And then it's -- it's in its third edition.  Its

18   third edition was published in 2007.

19   Q.    Through your work, have you had access to information

20   about the credit reporting industry that the average person

21   would not have?

22   A.    Yes.  Because, as you might have noticed in a case like

23   this, there's a lot of depositions and you get to see the

24   internal documents of an entity like the defendant Equifax.

25   And Equifax and the other consumer reporting agencies don't

293

Hendricks - D

1  publish what their practices and procedures are.  So the only

2  way you get access to them is by virtue of being an expert

3  witness.  And part of that is you have to agree to a protective

4  order and only use the information for purposes of the case.

5       But that, over -- since I've been doing expert

6  witness work for well over ten years, I've been able to review

7  not only the manuals of credit reporting agencies and the

8  creditors that furnish them, in other types of cases, but also

9  get to hear their most knowledgeable people describe how

10  those -- those policies or practices applied or did not apply,

11  how they broke down, what went wrong.

12  Q.  Would you explain to the jury what a credit report is.

13  A.  A credit report is a compilation of sense -- very

14  sensitive personal information.  It has your credit history --

15  there's basically three sections, unless you're unlucky enough

16  to have the fourth section.  The first section is your credit

17  history; shows what credit cards, mortgages, auto loans you

18  have.  The -- another section has all of your identification

19  information:  Name, address, Social Security number, date of

20  birth.  A third section has the inquiries, which shows who has

21  pulled your credit report and for what purpose.  Is it for a

22  promotion, so you could get preapproved credit card offer?  Or

23  is it because you applied for credit?  Those are the hard

24  inquiries that could have a minor effect on your credit score.

25       And the fourth section you don't want to have is

294

Hendricks - D

1   called the public records section.  These are tax liens,

2   judgments, and sometimes collections will go into that fourth

3   section.

4           That's a section you don't want to have, because that

5   is almost always damaging to your creditworthiness.

6   Q.   You described what's in the credit report.

7           What are credit reports used for?

8   A.   They're used for a broad range of purposes.

9           First, for evaluating whether to grant somebody

10  credit.

11          They're also used for insurance, auto and homeowner's

12  insurance.  They're used as -- some employers will use a credit

13  report for job screening.

14  Q.   And how many Americans have a credit file today?

15  A.   I think the best estimate is around 220 million.

16  Q.   Can you explain to the jury what a credit score is?

17  A.   A credit score is a three-digit number that reflects your

18  creditworthiness at that particular moment in time.

19          The most widely used credit score by lenders is

20  called a FICO score, and it's -- a FICO score is calculated and

21  based entirely on information in the credit report.

22          So that's why my book is called Credit Scores.  The

23  first part of the book explores how the credit score works.  It

24  tells people, these are the factors that make it go up and

25  down.  And then goes on to describe the credit reporting

295

Hendricks – D

1    system, since that credit score is based entirely on that

2    information in the credit report.

3    Q.    Can you explain to the jury what risk-based pricing is?

4    A.    Yeah, risk-based pricing is sort of our modern credit

5    world.

6            Back in the old days, when I started, you know,

7    working in this field in the late 1970s, it was pretty much

8    either you got rejected for credit or you got accepted for

9    credit.   Thumbs up, thumbs down.

10           Now, because of the credit scoring system and because

11   of automation, they can peg what interest rate they're going to

12   charge you based on how high your credit score is.   So the

13   higher the score, the lower the rates you pay, and vice versa.

14           So the risk -- you know, your credit score reflects

15   how risky you are, and the computer will calculate, okay, that

16   means we have to charge this rate because you have this score.

17   Q.    Would you explain to the jury what a mixed file is.

18   A.    A mixed file is a term that came out of consent agreements

19   in the early 1990s.

20           It was first defined -- and I think we'll talk a

21   little bit about that.   But it states when information on a

22   consumer -- other than the consumer, who is the subject of the

23   file -- the information of the other consumer gets mixed into

24   that consumer's file.   In other words, we're talking about

25   consumer A.   But information on consumer B is mixed into that

Hendricks – D

296

1    person's file.

2    Q.    Have there been any studies or reports on the prevalence

3    of mixed files?

4    A.    Yes.  Back in the early 1990s, one of the first ones was

5    done by a group.  And they did a Freedom of Information Act

6    request regarding complaints to the Federal Trade Commission.

7           And they found that the leading cause of complaints

8    was -- to the Federal Trade Commission was about problems with

9    credit reporting agencies, inaccuracy, and nonresponsiveness.

10          And within that study, they found that almost half of

11   the complaints regarded mixed files.  That they -- people were

12   getting mixed with fathers and sons, or people with similar

13   identifiers.

14          And then you fast-forward to last year.  A newspaper,

15   *The Columbus, Ohio Dispatch*, did a similar exercise, getting

16   complaints from both the state attorney generals and the

17   Federal Trade Commission, and found significant rates of mixed

18   files there, as did another study by the National Consumer Law

19   Center.

20   Q.    Has Equifax specifically been placed on notice of the

21   prevalence of mixed files?

22   A.    Yes.  Because of all of the interest in -- like the early

23   1990s, when this has become more and more publicly known

24   through studies like the one I just cited and stories in the

25   newspaper, both the state -- the attorney generals in 18 or 20

297

Hendricks – D

1  states started their own investigations of Equifax, as did the

2  Federal Trade Commission.

3          And in 1992, the state attorney generals came to an

4  agreement with Equifax, to end this investigation.  Equifax was

5  going to pledge to do a better job of -- of avoiding mixed

6  files, and also to have specific procedures in place to

7  reinvestigate disputes involving mixed files.

8          And another thing in --

9          MR. PERLING:  Objection, your Honor.  We're outside

10 the scope.

11         THE COURT:  The scope of what?

12         MR. PERLING:  Prior order of the Court regarding the

13 scope of this testimony.

14         THE COURT:  Well, you'll need to be more specific,

15 because I don't -- I'm not tracking with you.

16         What issue, specifically?

17         MR. PERLING:  With regard to the specifics involving

18 the 1992 and 1994 --

19         THE COURT:  Fair enough.

20         Narrow the witness's focus -- jurors, disregard the

21 last answer, so we can get a clean start on it.

22         And, Mr. Baxter, rephrase the question, please.

23         Thank you.

24         MR. JUSTIN BAXTER:  Thank you, Judge.

25 BY MR. JUSTIN BAXTER:

Hendricks - D

298

1   Q.   Mr. Hendricks, I'm going to focus you on notice to Equifax

2   of the prevalence of mixed files.

3   A.   Okay.  Those -- those studies, those enforcement actions,

4   the media coverage throughout that period and up to the last

5   many, many years.  And also during that time period, Congress

6   started -- the Fair Credit Reporting Act was enacted in 1970.

7   It's very old law.  The first information privacy law.

8            And in the early 1990s, with all of that interest in

9   the problems that were arising, Congress started holding

10  hearings.  And it took them -- after four years of hearings,

11  they amended the law in 1996, to strengthen it.  And a lot of

12  the process in the hearings, leading up to that, focused on

13  problems of mixed files and inadequate reinvestigations by

14  consumer reporting agencies like Equifax.

15  Q.   Have you -- have you reviewed materials from Ms. Miller's

16  case?

17  A.   Yes.

18  Q.   And what have you looked at?

19  A.   Well, I've looked at her credit reports, her Equifax

20  reports, her dispute correspondence.  I've looked at the

21  deposition testimony of Ms. -- Ms. Miller and the -- the

22  corporate representatives for Equifax like Ms. Margaret Leslie

23  and Ms. Mixon.  And I've also looked at their internal

24  documents.

25            They become very important in a case like this,

Hendricks – D

299

1    because Equifax has internal documents called frozen scans,

2    which are snapshots of what's in their database every month,

3    going back in the past.  And they also have a report called

4    online combined report.

5          Those two types of reports are extremely important,

6    in getting to what went wrong in this case.

7    Q.   Does Ms. Miller's case involve a mixed file?

8    A.   Yes.

9    Q.   Can you explain how that happened?

10   A.   It happened because -- and I believe it was 2009, there

11   was a collection company in the San Francisco Bay Area that

12   sent in corrections in the form of an AUD.  It's called

13   automated universal data form.

14         And this automated universal data form, this --

15   company called Bay Area Collections was sending in these

16   corrections.  And the corrections all involved a Julie Miller

17   that had a different Social Security number and a different

18   date of birth.

19         But what was very strange about this is they sent in

20   four.  And each of the four had different addresses.  And one

21   of those four addresses had some data in common with

22   Ms. Miller's address.  It had the Maple Leaf Street address,

23   and I think it had the same house number.  And it had the zip

24   code, but it even had a different state.  It had California,

25   instead of Oregon.  And so because of that one similarity in --

Hendricks – D

300

1    in that AUD, all of the derogatory and harmful collections for

2    the other Julie Miller got dumped onto Ms. Miller's credit

3    report.

4    Q.   Why did Equifax merge Ms. Miller with the other person

5    when their identifying information did not match?

6    A.   Because Equifax, to this day, despite those consent

7    agreements where they emphasize the important of full

8    identifying information --

9              MR. PERLING:  Objection, your Honor, based on the

10   same order.

11             THE COURT:  Overruled.

12             Go ahead.

13             THE WITNESS:  Thank you.

14             They -- they continued to tolerate what's called

15   partial matches in Social Security number.

16             So Equifax says, oh, there's -- this is a seven out

17   of nine match.  They call it a maybe match or a sometimes

18   match.  And they will allow that to let them consider that this

19   Mrs. Miller, here, is the same as the other one with 20

20   collections.

21             And they also -- they disregard the date of birth.

22   The date of birth was completely different, but it was within

23   one year.  So they -- they -- Equifax thinks, well, it's within

24   year.  Then we can just disregard that as well.

25             So it's because of their willingness to tolerate

301

Hendricks - D

1   discrepancies in very important identifiers -- you know,

2   because each of us only have one Social Security number.  That

3   they will do this in an automated, combined way, without any --

4   without any other procedures to go in for a closer look.

5   BY MR. JUSTIN BAXTER:

6   Q.   Would you explain to the jury what a do-not-combine flag

7   is.

8   A.   A do-not-combine flag is -- is so if there are two files

9   on consumers with similar identifiers, a do-not-combine flag is

10  supposed to prevent those two files from merging together.

11  Q.   Did Equifax insert a do-not-combine flag onto Ms. Miller's

12  file?

13  A.   At some point along the way, they did.  They -- it -- it

14  indicates there was a recognition of a danger of a mixed file.

15  But I think it was too little, too late.

16  Q.   Was that do-not-combine flag before or after the merge?

17  A.   It was after the merge, to my recollection.

18  Q.   In this case, did you see evidence that Equifax

19  contractors failed to follow Equifax's written procedures?

20  A.   Yes.

21       They -- at the point where Mrs. Miller had put in a

22  dispute letter, which -- including the credit report which had

23  all of the inaccurate information, they still failed to do a

24  reinvestigation in those cases.

25  Q.   In this case, were Equifax's procedures reasonable?

Hendricks - D

302

A.   No.   They were not reasonable.   The -- first of all, it's

not reasonable to disregard a consumer's Social Security

number.   And -- and the -- the partial matching and the merging

of this information set off this horrible chain reaction.

Because they had the -- with the Social Security

number, they had the same Social Security number in

Ms. Miller's file since 1985, and they had the same date of

birth.   Yet in 2009, because one small collection company in

San Francisco sent in an address which was similar to hers,

they merged a file.   And also -- and since 1995, Ms. Miller did

not have one collection account on her -- in her file.

And so -- because of this one similar address, they

merged dozens and dozens of collections, and they let the

Social Security number of the other person basically devour and

overtake her Social Security number.

And so there's -- there was -- there's no sort of

pattern recognition.   Like if our credit card company sees our

credit card's being used in two or three different places at

the same time, we're going to get a call from our credit card

company.   But they have nothing in place.   What Equifax does

have is they actually have this online combine function that

flags when this merger took place.

So Equifax's system told Equifax that this merger

took place, but they don't use this information to go in for a

closer look.   And despite the fact that they have all of this

Hendricks – D                    303

1    notice from the early 1990s that this was the leading cause of

2    problems.

3           So -- so -- and so what would be much more reasonable

4    and prudent is if you had -- if you had an online combine that

5    flags that this happened, you go in -- you have maybe an

6    automated program or a human being look to see, wait a sec,

7    this woman's file was clean since 1985.  And all of a sudden

8    it's -- you know, the Social Security number is changed, the

9    date of birth has changed, and she's got 20-something

10   collections on her account.

11          Because for a thing -- like for an account to become

12   a collection, it's got to migrate to 30 days late, 60 days

13   late, 120 days late, until its charge-off and collection.  And

14   Equifax's system has all of that, too, in their files.

15          The other problem is that when they created the --

16   Equifax created this discrepancy.  Ms. Miller had the same

17   Social Security number forever.  She only had one, like the

18   rest of us.

19          But then the merging creates the discrepancy.  And

20   then when Ms. Miller contacts them, Equifax doesn't recognize

21   who she is.

22          And then when they don't recognize who she is,

23   instead of reinvestigating her dispute, there could be several

24   steps in doing a reinvestigation.  But one of the first ones is

25   to send a notice to the collection company that's furnishing

Hendricks - D

304

1  the information.

2          They don't do that.  They send her form letters

3  saying, you know, we don't have -- your Social Security number

4  you were providing us doesn't match our files because our files

5  are already messed up.

6          Equifax doesn't recognize that.  And so then, because

7  they don't send a notice of reinvestigation notice to the

8  collector, they don't start what's called an ACIS case.  And if

9  you don't start an ACIS case, then you can't refer back to her

10 previous dispute letters.

11         So when she follows up with other disputes, where she

12 already provided them with the credit report saying --

13         MR. PERLING:  Objection, your Honor.  We're far

14 afield from the question here.

15         THE COURT:  I think that we need a new question.

16         Please -- and I'm not trying to be critical here.

17 But, sir, you need to listen to the question and only answer

18 that.

19         THE WITNESS:  Okay.

20         MR. JUSTIN BAXTER:  I'll move forward, Judge.

21 BY MR. JUSTIN BAXTER:

22 Q.   Mr. Hendricks, to a reasonable degree of certainty, do you

23 believe that what happened to Ms. Miller was foreseeable to

24 Equifax?

25 A.   Yes.

Hendricks - D

1  Q.   In your research and reporting, have you identified

2  categories of damages typically experienced by consumers,

3  caused by inaccurate credit reports?

4  A.   Yes.

5  Q.   Can you list those seven categories?

6  A.   Yeah, I first developed -- I realized that sometimes

7  people had trouble understanding what -- what are the harms in

8  this.

9          And so in 2003, in my testimony -- testimony

10  before --

11          THE COURT:  Excuse me, Mr. Hendricks.  Please just

12  answer the question asked.  The seven categories.

13          THE WITNESS:  Okay.  The seven categories are to be

14  inaccurately described by your credit report information:

15          To be improperly denied credit because of the false

16  information on your credit report.

17          That those errors force you to expend time and energy

18  to try and fix a mistake that was not of your making.  To --

19  and also when that happens, you lose the opportunity to do what

20  you want to do; either work, or spend time with your family,

21  or -- or -- or enjoy yourself.

22          And then there's -- you're chilled from applying for

23  credit.  Because once you realize you have this bad credit, you

24  have 20 collections on your credit report, applying for credit

25  is like banging your head against the wall.  So that's another

Hendricks - D

306

1    harm that comes from this.

2           Most people who are victims of crime can -- actually

3    complain about some sort of physical symptoms or sleeplessness.

4           Another category is the sense of helplessness and

5    loss of control over the personal information, which is a

6    central goal of the Fair Credit Reporting Act, and a lot of

7    other information privacy laws.

8           And the final category is the -- the victims complain

9    about the -- the mental anguish and the emotional distress and

10   the frustration that's associated with all of those other

11   categories.

12   BY MR. JUSTIN BAXTER:

13   Q.   Did you have an opportunity to speak with Ms. Miller about

14   how she was harmed by Equifax?

15   A.   Yes.

16   Q.   And to a reasonable degree of expert certainty, in your

17   opinion, was it foreseeable to Equifax that Ms. Miller would

18   experience these types of damages?

19   A.   Yes.  As I said, I published these back in 2004, 2003.

20   And I presented them to Equifax over and over again.

21   Q.   Before the events in this case, did juries return verdicts

22   for other consumers who repeatedly disputed inaccurate

23   information in their credit file and whose information was not

24   corrected by Equifax?

25   A.   Yes.  And I was the expert in those cases.

Hendricks - D

307

```
 1   Q.    When and where were those verdicts returned?

 2   A.    2005, there was one in Oregon, in this very building.

 3   2007, there was another one in this very building, just here in

 4   Oregon.  And then in 2010, two summers ago, in the federal

 5   court in San Francisco.

 6   Q.    As a result of those verdicts, was Equifax on notice that

 7   inaccurate information in a consumer's credit file, which a

 8   consumer disputes but which Equifax does not correct, can

 9   result in a lawsuit and verdict against Equifax similar to this

10   case?

11   A.    Yes.

12   Q.    To a reasonable degree of certainty, do you have a

13   conclusion on whether Equifax issued a consumer report to a

14   third party without a reasonable belief that it would be used

15   in a credit transaction with Ms. Miller?

16         MR. PERLING:  Objection, your Honor.  Lacks

17   foundation and knowledge for this witness.

18         THE COURT:  Overruled.  Go ahead.

19         THE WITNESS:  Yes, they -- they sold information

20   about Ms. Miller to other creditors, that Ms. Miller had never

21   applied for credit with.  There was a complete invasion of

22   privacy.

23   BY MR. JUSTIN BAXTER:

24   Q.    To a reasonable degree of certainty, do you have an

25   opinion on whether Equifax followed reasonable procedures to
```

Hendricks – D

1   ensure maximum possible accuracy of the information in

2   Ms. Miller's consumer reports?

3   A.   Yes.  As I discussed earlier, they -- not only did they

4   not follow reasonable procedures, they disregarded all of the

5   notice and all of the data in Ms. Miller's file.  And -- and

6   given the notice, that disregard was reckless.

7   Q.   To a reasonable degree of certainty, do you have an

8   opinion on whether Equifax clearly and accurately disclosed to

9   Ms. Miller the contents of her credit file upon request?

10  A.   Equifax did not disclose the information in her file,

11  despite the requirement that they're supposed to disclose all

12  of the information in her file when she requests it.

13  Q.   To a reasonable degree of certainty, do you have an

14  opinion on whether Equifax conducted a reasonable

15  reinvestigation of each of Ms. Miller's disputes?

16  A.   Equifax did not conduct a -- any type of investigation of

17  her disputes because of the discussion we had earlier, about

18  them not recognizing Ms. Miller because of the mistakes that

19  Equifax had made.

20       And another part of this is that the dispute

21  department in Equifax doesn't know how all of this partial

22  matching works.  So when they don't know about online combine

23  reports and they don't know about --

24       MR. PERLING:  Objection, your Honor.  We're far

25  afield again, and this lacks foundation.  It also lacks

Hendricks – X

309

 1   knowledge.

 2              THE COURT:  All right.  We are going to do this one

 3   over.  Disregard the last answer.

 4              Ask the question again.

 5              Answer only the question asked.  If your counsel

 6   needs more from you, he will ask.

 7              No narratives.

 8              Go ahead.

 9              MR. JUSTIN BAXTER:  Yes, Judge.

10   BY MR. JUSTIN BAXTER:

11   Q.   To a reasonable degree of certainty, do you have an

12   opinion on whether Equifax conducted a reasonable

13   reinvestigation of each of -- of each of Ms. Miller's disputes?

14   A.   Yes, my opinion is they did not.

15   Q.   To a reasonable degree of certainty, do you have an

16   opinion on whether Equifax conducted itself as a reasonably

17   careful consumer reporting agency?

18   A.   No, they did not.  They were reckless.

19              MR. JUSTIN BAXTER:  Those are my questions, Judge.

20              THE COURT:  Okay.  Cross.

21              MR. PERLING:  Yes, your Honor.

22                        CROSS-EXAMINATION

23   BY MR. PERLING:

24   Q.   Good morning, Mr. Hendricks.

25   A.   Good morning, Mr. Perling.

310

Hendricks - X

1    Q.    You've never worked for Equifax, have you?

2    A.    No.

3    Q.    And, in fact, you've never worked for any consumer

4    reporting agency?

5    A.    That's correct.

6    Q.    You've never been trained by a consumer reporting agency

7    as to how their system works?

8    A.    That's correct.

9    Q.    You've never been trained by a consumer reporting agency

10   on how to write policies for that agency, have you?

11   A.    That's correct.

12   Q.    You've never been retained by a consumer reporting agency

13   to write procedures, have you?

14   A.    Correct.

15   Q.    You've never been retained by a consumer reporting agency

16   to do a survey of their policies or procedures for handling

17   reinvestigations?

18   A.    That's right.

19   Q.    You've never devised a set of procedures that you believed

20   would be appropriate reasonable procedures for a consumer

21   reporting agency to follow as a whole in handling disputes,

22   have you?

23   A.    Correct.

24   Q.    And you've never devised a set of procedures that you

25   believe would be appropriate reasonable procedures for a

Hendricks – X

1  consumer reporting agency to follow as it relates to issuing

2  disclosures to consumers either?

3  A.    Right.  On all of these things, I've only included some

4  standards in my expert reports about how it would have been

5  done better.

6  Q.    You haven't done any type of analysis or study on any of

7  these proposed items that you said you've included in your

8  reports, have you?

9  A.    What do you mean, analysis, study?

10  Q.    You've never done any type of statistical analysis.

11  Right?  To see if the proposals that you had for other

12  procedures or -- were feasible?

13  A.    Right.  I don't have access to the information.  Only

14  Equifax has -- is holding that information.  And I don't think

15  they'll give me access to it.

16  Q.    All right.  And you've never written a policy and

17  procedure manual for a consumer reporting agency?

18  A.    Correct.

19  Q.    And you've never written a matching program for a consumer

20  reporting agency?

21  A.    That's correct.

22  Q.    You've never worked at a bank?

23  A.    That's right.

24  Q.    You've never been employed in the financial services

25  industry?

Hendricks - X

1  A.   That's right.

2  Q.   You've never been employed by the FTC?

3  A.   No, I only was retained by them as an expert.

4  Q.   Never as a direct employee though.  Correct?

5  A.   Correct.

6  Q.   Never been employed as a computer programmer, anywhere?

7  A.   That's right.

8  Q.   You're not a lawyer?

9  A.   Correct.

10  Q.   You don't have any legal training?

11  A.   No formal legal training, no.  I teach a continuing legal

12  education with the American Bar Association, and other groups.

13  Q.   And that's part of a consumer advocacy program?

14  A.   I mean, it's part of the continuing legal education that

15  some of the attorneys have to take to -- it's a requirement of

16  being an attorney for their bars, I think.  Or state bar.

17  Q.   You're not a doctor, are you?

18  A.   No.

19  Q.   You're not a psychologist?

20  A.   No.

21  Q.   You don't have any medical training?

22  A.   Correct.

23  Q.   You don't have any mental health training?

24  A.   No, except being a parent.  That gets you some on-the-job

25  training.

313

Hendricks - X

1   Q.    You don't have any specialized training in assessing

2   damages, do you?

3   A.    In credit reporting I do, yes.

4   Q.    Training for assessing damages, like --

5   A.    Yes.

6   Q.    -- accounting-type training?

7   A.    On-the-job training and through my experience.

8   Q.    Self-training then?

9   A.    Yes.

10  Q.    So it's your statement that you've self-trained yourself

11  in assessing damages?

12  A.    Yeah.  There's no one else to do it.

13  Q.    Well, you're not an economist.  Right?

14  A.    No.

15  Q.    You don't have an accounting degree?

16  A.    Correct.

17  Q.    Now, it -- it's fair to sum up and say that you're a

18  journalist.  Right?

19  A.    That's -- yeah.  That is one of the hats I wear is an

20  editor of a specially newsletter, including an investigative

21  journalist, which gives you standards of how to investigate

22  something when you need to find out what is not true and what

23  is true.

24  Q.    And the other hat you wear is that of a proposed expert

25  witness.  Right?

Hendricks – X

314

1   A.    Well, I'm an accomplished expert witness, and I've been

2   recognized several times, including cases with Equifax.

3   Q.    Those are two hats, though:  One journalist and one as an

4   expert witness.  Right?

5   A.    Well, then I've also been a consultant to the U.S. Social

6   Security Administration and a consultant to private companies.

7   So that's another hat.

8   Q.    Well, currently, more than half of your employment is as

9   an expert.  Right?

10  A.    That's correct, yes.

11  Q.    The other half of your income comes from your newsletter.

12  Correct?

13  A.    Yeah.  It's even more than half now from expert witness

14  work, because print journalism is not as profitable as it used

15  to be.

16  Q.    In fact you have, fair to say, less than 200 subscribers

17  to your newsletter?

18  A.    That's correct.

19  Q.    Now, this newsletter that you publish, that's the *Privacy*

20  *Times*?

21  A.    Yes.

22  Q.    You self-publish that.  Right?

23  A.    Yes.

24  Q.    You're the only contributor?

25  A.    Pretty much, yes.

Hendricks - X

1   Q.   There's no editorial board to that letter, is there?

2   A.   That's correct.

3   Q.   And there's no peer review?

4   A.   Well, there's certainly peer review from the -- the

5   readers are my peers.  And if they see something that's

6   incorrect, they -- those peers let me know right away.

7   Q.   That's after you publish it though.  Right?

8   A.   Yes, that's right.  There's nothing before publishing

9   that's peer reviewed.

10  Q.   You've published a book, too.  Right?

11  A.   Yes, sir.

12  Q.   And you self-published that as well?

13  A.   Yes.

14  Q.   And the acknowledgments that you -- that you have in your

15  book are from attorneys who represent plaintiffs against

16  consumer reporting agencies like Equifax and against creditors.

17  Right?

18  A.   Right.  Because of those attorneys, they fleshed out

19  information on the internal workings of credit reporting

20  agencies and big credit card companies.

21  Q.   Those are the same attorneys who have a financial interest

22  in suing consumer reporting agencies?

23  A.   I think that's fair, yes.

24  Q.   Now, your only degree is in political science.  Right?

25  A.   Yes.

Hendricks – X

316

1  Q.   You don't have any other formal education, do you?

2  A.   No.

3  Q.   You don't have any education in computer programming?

4  A.   We covered that.

5  Q.   You don't have any education in matching logic?

6  A.   That's right.

7  Q.   You don't have a mathematics degree?

8  A.   Correct.

9  Q.   You've never taken a computer-related college course, have

10 you?

11 A.   Yeah, they didn't have computer-related college courses

12 back in the '70s.

13 Q.   I understand.  But you haven't taken any since then?

14 A.   No.

15 Q.   You don't have any training in statistics?

16 A.   Correct.

17 Q.   You don't have any post-graduate work?  You don't have any

18 graduate college -- after-college degree?  You don't have any

19 graduate work?

20 A.   That's correct.

21 Q.   It's fair to say you consider yourself a consumer

22 advocate.  Right?

23 A.   I -- I have played that role, yes.

24 Q.   And you're a member of a group called NACA, N A C A?

25 A.   Yes.

317

Hendricks – X

1    Q.    That's the National Association of Consumer Advocates.

2    Right?

3    A.    Correct.

4    Q.    That's a group that's made up mostly of plaintiffs

5    lawyers.  Right?

6    A.    Right.  That do consumer law work.

7    Q.    And that includes the lawyers who represent the plaintiff

8    here.  Right?  They're members of that group?

9    A.    Yes.

10   Q.    In fact, if you're a lawyer and you don't represent

11   plaintiffs, you're not allowed into the group.  Right?

12   A.    Right.  They have a screening function.

13   Q.    In fact, they wouldn't let me in if I wanted to join,

14   would they?

15   A.    No.

16   Q.    You're being paid to be here, aren't you?

17   A.    Yes.

18          MR. PERLING:  Those are my questions.  Thank you.

19          THE COURT:  Redirect.

20          MR. JUSTIN BAXTER:  No questions, Judge.

21          THE COURT:  All right.  Thank you, Mr. Hendricks.

22   You're free to go.

23          MR. JUSTIN BAXTER:  Plaintiff rests.

24          THE COURT:  All right.

25          All right.  Do you have a matter we need to address

Colloquy

1   before we continue?

2           MR. PERLING:  Yes, your Honor, we do.

3           THE COURT:  So, jurors, would you step out to the

4   jury room, please, for just a few minutes.

5           THE WITNESS:  I'm not sure if I'm excused.

6           THE COURT:  You're free to go.  Yes.

7           And, jurors, step out to the jury room for just a few

8   minutes, please, and I'll give you a cue about what our

9   schedule will be, going forward, in just a moment.

10          (Jurors exit.)

11          THE COURT:  So Mr. Hendricks, you're free to actually

12  leave or you can stay, since your testimony is concluded.

13  That's up to you.

14          All right.  Everyone can be seated.

15          And for the defense?

16          MS. SUMNER:  Your Honor, we would like to present to

17  you a Motion for Judgment as a Matter of Law.  But we would

18  request a very brief recess, so that we can consider the

19  testimony from this morning to --

20          THE COURT:  Counsel, you've been doing this a long

21  time.  Make your motion now, and let's go.

22          We don't need to overcomplicate this.  You all know

23  what the issues are.  We've worked through the jury

24  instructions on many occasions.

25          So please just make the motion you think I should

Colloquy

319

1    consider, and I will rule.

2            Let's go.

3            MR. PERLING:  Thank you, Judge.  I will make that

4    motion on behalf of Equifax.

5            As you anticipate, Equifax moves under Rule 50, at

6    this point, for judgment as a matter of law.

7            There are, as we've seen in the proposed charges,

8    several sections that the plaintiff is suing under.

9            First, I would like to address Section 1681b, your

10   Honor.

11           The section -- the law states that any consumer

12   reporting agency may furnish a consumer report under the

13   following circumstances:  To a person which it has reason to

14   believe intends to use the information in connection with a

15   credit transaction involving the consumer.

16           Here, Judge, we don't believe -- it's our position

17   that the evidence doesn't support the findings of the elements

18   here.

19           Plaintiff testified that she does not do business

20   with certain entities, which she identified on consumer

21   disclosures.  But she doesn't have evidence outside of the fact

22   that there is just an inquiry on the credit file.  And she says

23   that, essentially, she doesn't do business with that company.

24   Does the third party actually receive the consumer reports?  I

25   think there's a gap here in the factual presentation.

Colloquy

1          In other words, your Honor, it's plaintiff's burden

2    to go get those credit reports.  Those should be before the

3    jury in order to charge the jury on Section b.  The jury needs

4    to be able to see that Equifax in fact produced a credit report

5    to that company.

6          And there's no evidence that the reports -- further,

7    if they were received -- contained information regarding

8    plaintiff, as opposed to the other Julie Miller.

9          I think that one important statement that came out in

10   the deposition of DeeDe Mixon, that was read today, was the

11   following, that I'll read just briefly, your Honor.

12          When Ms. Miller applies for credit and her

13          creditor requests a copy of her credit report,

14          does Equifax transmit a credit file to that

15          creditor?

16          She responded:  I honestly can't answer what would

17          be provided to the creditor based upon what they

18          entered to access the consumer's credit report.

19          Being that the information did not match, I cannot

20          say for certain if a creditor would have received

21          a file for Ms. Miller.

22          Now, based on that, I -- I think it's clear that the

23   plaintiff had a burden to go one step further.  And that's

24   where the gap comes in.  And that is to present the credit file

25   that that third party received, and show that it wasn't her

Colloquy

1    information.

2          There's a second element, of course, to this part,

3    your Honor, about the reason-to-believe factor.

4          The factor is Equifax would have to have reason to

5    believe that the consumer report would not be used by a third

6    party in a credit transaction involving plaintiff or the other

7    Julie Miller.  There's no evidence of supporting that finding.

8    There is no reason to support that Equifax didn't believe that

9    the credit report inquiry -- the credit report that went out on

10   inquiry belonged to the Miller -- Julie Miller, the plaintiff,

11   at the time of the disclosure or that the transaction did

12   involve Ms. Miller.

13         There's, again, a gap here.  That the plaintiff has

14   to show that Equifax did not have reason to believe that that

15   inquiry related to the person, the plaintiff here, at the time

16   it was made.

17         Further, there's no evidence that plaintiff has --

18   she hasn't provided any support that this particular claim

19   caused her damage.

20         THE COURT:  All right.  Let's take up argument on a

21   claim-by-claim basis.

22         MR. PERLING:  Yes, your Honor.

23         THE COURT:  So this actually translates to the fourth

24   claim for relief in the context of the analysis set out in the

25   jury instructions.

Colloquy

322

1          Go ahead, Mr. Baxter.

2          MR. JUSTIN BAXTER:  Judge, I asked Ms. Leslie this

3    morning if a creditor requested a credit file from Ms. Miller,

4    would they get the merged file?  The answer was yes.

5          I asked if a creditor for the other person requested

6    a merge -- requested a credit file for that person, would they

7    get a merged file?  The answer was yes.

8          There are inquiries on the credit reports in the time

9    frame that Ms. Miller has identified as not her creditors.  So

10   those would be credit transactions involving the other person.

11         As to whether Equifax had a reasonable belief it

12   would be used for that purpose, after January of 2010,

13   Ms. Miller had put Equifax on notice that her file was a mixed

14   file, and so the jury could find that it was not reasonable

15   to -- to continue transmitting that merged file.

16         And then as to damages, I think Ms. Miller testified

17   to her damage.

18         THE COURT:  The Court has to apply, at this stage, a

19   standard that views the evidence only in the light most

20   favorable to the plaintiff, that considers both direct and

21   circumstantial evidence that's in the case, and all of the

22   reasonable inferences that can be drawn from that evidence only

23   in plaintiff's favor.

24         For the reasons Mr. Baxter just enumerated, any

25   rational juror could connect the dots without speculation,

Colloquy

1    here.  And so the defendant's Motion for Judgment as a Matter

2    of Law against the fourth claim for relief for insufficiency of

3    evidence on the three bases asserted is denied.

4            Next motion.

5            MR. PERLING:  Thank you, your Honor.

6            The other specific section that we'll be moving under

7    is the Section e(b) claim.

8            While we generally would make the motion that the

9    Section g and i(a) claims are not supported, I will argue for

10    the Court the Section e(b) claims specifically, which is --

11    Section e(b) states that whenever a consumer reporting agency

12    prepares a consumer report, it shall follow reasonable

13    procedures to ensure maximum possible accuracy of the

14    information concerning the individual about whom the report

15    relates.

16            It's a similar argument, your Honor, here, because

17    there has not been presented to the jury an actual credit

18    report upon which they can base a determination that that

19    credit report went to a third party, and it contained

20    inaccurate information.

21            Again, the gap, as we would put it, your Honor, is

22    that the plaintiff needs to come forward with evidence --

23    actual evidence -- for instance, if she wanted to support that

24    KeyBank is the basis for their Section e(b) claim, they needed

25    to go one step further with KeyBank and get the actual credit

324

Colloquy

1   report that KeyBank received, show it to the jury, so that they

2   can make a factual finding that that report to KeyBank, being

3   about the plaintiff, contained inaccurate information about

4   her.  And that is the basis for our motion on Section e(b).

5          We also submit to your Honor that plaintiff has not

6   submitted any proof of the actual procedures that Equifax had

7   in place from -- from compiling the consumer reports.  And that

8   we have submitted evidence that -- or the evidence shows that

9   the merging of the files was not an unreasonable procedure.

10         THE COURT:  Mr. Baxter.

11         MR. JUSTIN BAXTER:  Judge, on the e(b) claim, the

12   standard under **Diamond**, is that the plaintiff makes her prima

13   facie case by showing that there's false information on the

14   credit report.

15         In Ms. Mixon's deposition testimony, she testified

16   that KeyBank requested a consumer report and Equifax returned a

17   consumer report.  And we have the adverse action letter from

18   KeyBank that says that she was denied based on delinquencies

19   and derogatory information in her Equifax credit report;

20   circumstantial evidence of the false information in the -- in

21   the consumer report.

22         Ms. Leslie also testified, again, that there was a

23   request by Ms. Miller's creditors for a credit file.  That

24   Equifax would return the merged file.  And there are numerous

25   inquiries on Ms. Miller's credit reports.

Colloquy

 1          THE COURT:  For the reasons similarly stated with

 2   respect to the defendant's motion against the fourth claim, I'm

 3   denying the motion against the first claim.

 4          This is the sole so-called e(b) claim under Section

 5   1681e(b).  The links to which the defendant is pointing to

 6   assert a failure of proof are links that are filled with

 7   reasonable inferences, and inferences that are required to be

 8   drawn in the plaintiff's favor, based on the evidence already

 9   adduced and highlighted in part just now by Mr. Baxter.

10          It would not be hard for a rational trier of fact to

11   conclude, under the circumstances, and particularly after the

12   plaintiff put Equifax on actual notice of the errors, that

13   there were -- there was a failure to use reasonable procedures

14   to provide maximum possible accuracy of the information in her

15   report.  That likelihood is only increased over the sequential

16   and numerous repetitions by the plaintiff to address the issue.

17          So I don't know how one could argue that seven

18   inquiries, by a person in Ms. Miller's shoes, that went

19   essentially unnoticed and unresponded to by a consumer

20   reporting agency, is the equivalent of concluding there exists

21   reasonable procedures.

22          The mere repetition of this process is sufficient,

23   from which rational triers of fact could conclude that the

24   procedures were not reasonable.  And we have the testimony of

25   Mr. Hendricks.  And we have the testimony in the plaintiff's

Colloquy

1    case of the defendant's own agents that the processes did not

2    respond appropriately.

3                 So this motion is denied.

4                 Are there other grounds we have to address before I

5    bring the jury back?

6                 MR. PERLING:  Yes, your Honor.

7                 I would like to step through the Section 1681g claim.

8                 THE COURT:  Okay.  And that would be the third claim

9    for relief.

10                MR. PERLING:  That would be the third claim.

11                Section g states every consumer reporting agency

12   shall, upon request and subject to Section h(a)(1) of this

13   title, clearly and accurately disclose to the consumer all

14   information in the consumer's file at the time of the request.

15                And, of course, Section g refers to h(a)(1), which

16   reads:

17                A consumer reporting agency shall require, as a

18                condition of making the disclosure required under

19                Section g of the title, that the consumer furnish

20                proper identification.

21                The elements that plaintiff requested a consumer

22   disclosure may be present, your Honor, but the proper

23   identification identifiers, in some instances, were not

24   provided.

25                I think plaintiff admitted, in some certain

Colloquy

327

1    instances, that she only provided partial -- part of her Social

2    Security number.

3         Also, she -- the next element is that Equifax failed

4    to provide a disclosure.  There is actually evidence that

5    Equifax provided some disclosures.

6         And plaintiff has to prove that Equifax caused her

7    damages as a result, and it's Equifax's argument that these

8    elements have not been met.

9         THE COURT:  I don't need to hear from you,

10   Mr. Baxter.

11        In the light most favorable to the plaintiff, a

12   rational juror could find evidence to support each of the

13   elements of this claim, as I've discussed them with counsel and

14   laid out in the proposed jury instructions.  That Ms. Miller

15   may not, each and every time that she responded to Equifax,

16   have not provided all of the information requested repetitively

17   and, frankly, not responsive to the plaintiff, that Equifax was

18   demanding, isn't the question.

19        The question is whether, viewing the totality of the

20   evidence and viewing it in the light most favorable to a

21   plaintiff, whether a jury could find that there was at least

22   one occasion when the -- this section of the act was not met by

23   the defendant, and that it was unreasonable to do so.

24        So all of the damages arguments are, again, the same.

25   Ms. Miller has testified specifically about the distress, the

Colloquy

1    frustration, and the repetitious nature of that which caused

2    escalation of those damages for each and every encounter with

3    the credit reporting agency; here, Equifax.

4            And so this claim can go to the jury on all of its

5    elements.

6            Go ahead.

7            MR. PERLING:  Lastly, your Honor, we would like to

8    address the willfulness claim.

9            THE COURT:  I'm sorry?

10           MR. PERLING:  We would like to address the

11   willfulness claim, your Honor.

12           THE COURT:  Okay.

13           MR. PERLING:  Under Section 1681n(a)(2), any person

14   who willfully fails to comply with any requirement imposed

15   under the subchapter with respect to any consumer may be liable

16   to that consumer in an amount equal to the sum of any actual

17   damages and any amount of punitive damages as the Court may

18   allow.

19           The **Safeco** case is the case that has defined the

20   willfulness conduct under this section.  The U.S. Supreme Court

21   case.

22           THE COURT:  It started here, by the way, in this

23   room, with this judicial officer.  Okay.

24           MR. PERLING:  Yes, your Honor.

25           THE COURT:  Go ahead.

Colloquy

329

1          MR. PERLING:  And, of course, the **Safeco** case says

2     that for willfulness claims, the defendant must have engaged in

3     much more than just unreasonable conduct.  It must have run a

4     risk of violating the law substantially greater -- being the

5     words of the -- of the court there -- than the risk associated

6     with mere carelessness.

7          In this case, your Honor, the only evidence is that

8     Equifax combined the files, made some -- some human errors

9     and -- in responding to that.  And the focus should be on

10    Equifax as a whole, not the actions of its -- of the individual

11    agents in isolation, in -- in making some errors and responding

12    to them.

13         There's no evidence of any ill will towards the

14    plaintiff.  Equifax did not run the risk of violating the law

15    substantially greater than the risk associated with mere

16    carelessness.  And this goes to the line of cases that talks

17    about human errors.

18         Plaintiff has no evidence regarding Equifax's

19    procedures in place, yet.  There's no evidence that Equifax

20    generally fails to follow its procedures, only some anecdotal

21    evidence of failure to file that.

22         There's no evidence that Equifax improperly trains

23    its agents, and no statistical evidence regarding an error

24    rate.  Those are the types of things that might support a

25    finding of running a risk substantially greater than the risk

Colloquy

1  of just mere carelessness, your Honor.

2          THE COURT:   In this case, viewing the evidence in the

3  light most favorable to the plaintiff, Equifax was on notice of

4  its duties for years, before Mrs. Miller encountered her

5  difficulties with Equifax.

6          Equifax was on notice of the risk of merged files, or

7  mixed files, and the particular problems they create for the

8  consumers involved.

9          Equifax's own system, as it was explained by

10 Mr. Hendricks, had a linear automated responsive track that

11 never appreciated that a human being -- that never had in fact

12 a human being involved in this automated repetitious response

13 to the plaintiff.

14         So having a system of that nature, given the course

15 of conduct here and given the notice that Equifax had of the

16 significant risk that mixed files present, would lead any

17 rational trier of fact -- without resort to studying

18 statistics -- to a conclusion that there was a very high risk

19 that if the response to this kind of problem was the type

20 Equifax automatically gave in this case, it would not address

21 the risk, and therefore, there would be an unacceptable and,

22 indeed, a substantially high risk that each one of the

23 violations plaintiff asserts here would occur.

24         This is an analysis that is separate and apart --

25 apart from a failure to use due care or reasonable care.  And,

Colloquy

1    as you already know in the ongoing jury instruction discussions

2    we've been having, there isn't -- there has been planned -- and

3    I will make clear to the jury -- the difference between conduct

4    that is merely negligent and conduct that is sufficient to

5    trigger a finding of willfulness.  That conduct, here, is in

6    the nature of (pause, referring) reckless disregard of an

7    unjustifiably high risk of the very harm that the plaintiff

8    sustained; and a harm that is -- is sustained if one views the

9    evidence in the light most favorable to the plaintiff, and of a

10   harm that is exactly the type explicitly addressed in each of

11   the four sections here.

12          So there is a jury question on willfulness.  There's

13   more to the case, I'm sure, to be developed.  But on this

14   record, it would be error for me not to submit each of the

15   claims and the willfulness issue to the jury.  So that motion

16   is denied.

17          Anything else before we continue?

18          MR. PERLING:  Nothing further from Equifax.

19          THE COURT:  All right.  I didn't anticipate it would

20   take this long, so I have got the jury sitting, and I want to

21   deal with that first.

22          Let me just get a brief preview from you, Counsel,

23   about who's coming first for the defense, the timing of your

24   particular witnesses; so that I can get a schedule set, please.

25          MS. SUMNER:  So, your Honor, we will first call Anne

332

Colloquy

1   Fortney.  Followed by Anne Fortney, we will call Ms. DeeDe

2   Mixon.  And following Ms. Mixon -- Mixon, we will call Margaret

3   Leslie back to the stand.

4            THE COURT:  So how long were you expecting for

5   Ms. Fortney?

6            MS. SUMNER:  I suspect that I will probably take an

7   hour to an hour and a half.

8            THE COURT:  And Ms. Mixon?

9            MR. PERLING:  Same.

10           MS. SUMNER:  Probably about the same.

11           And I suspect that Ms. Leslie will probably be about

12   as long, as well.

13           THE COURT:  Okay.  Ms. Boyer, would you excuse the

14   jury, please, for lunch.  Remind them of the standard

15   instruction, and ask them to be back and ready to go at 1:15.

16           All right.  Counsel, I'm going to ask my law clerk to

17   pass out to you an updated version of the jury instructions,

18   which is a third draft.  That takes into account what we talked

19   about earlier, not necessarily literally incorporating what we

20   discussed.

21           So I want you to go back through -- not right this

22   second.  But I want you, over the noon break, to go back

23   through.  And then we'll resume at 1:15.

24           So I -- I want you to know, with respect to punitive

25   damages, I went back to the Ninth Circuit model instruction, to

333

Colloquy

1   satisfy myself at least that what is there tracks with the

2   model instruction on the recklessness standard only.  I did not

3   include in this text malice or oppression.  And so I want you

4   to look back at the law, and the standards that would trigger

5   those, and tell me if we -- I need to work that back in, from

6   your perspective.

7           But we'll take that up at 1:15.

8           So you have a clean set from which to work.

9           Any other issues for the record right now?

10          MS. SUMNER:  No, your Honor.  Thank you.

11          MR. JUSTIN BAXTER:  No.

12          THE COURT:  See you at 1:15.

13          Thank you.

14          MR. EDELSON:  Thank you.

15          (Recess taken.)

16          THE COURT:  All right.  Let us turn to the third

17  draft of jury instructions.

18          Mr. Baxter, take me to your first concern, if any.

19          MR. JUSTIN BAXTER:  Everything is fine, with one

20  exception.  We would request the sentence on -- oh, it's there.

21  I'm sorry.  I missed it.  Net worth is there.  We're good to

22  go.

23          THE COURT:  You don't have any proposed changes,

24  then, to the third?

25          MR. JUSTIN BAXTER:  No.

Colloquy

334

```
 1          THE COURT:  All right.  Okay.  Mr. Edelson.

 2          MR. EDELSON:  Thank you, your Honor.

 3          I'm not going to rehash the one we already talked

 4    about and reserved this morning.  But I will --

 5          THE COURT:  And that one is the emotional distress

 6    listing or --

 7          MR. EDELSON:  That's correct.  That's correct.

 8          THE COURT:  All right.

 9          MR. EDELSON:  So I want to focus on the punitive

10    damage one.

11          THE COURT:  Okay.

12          MR. EDELSON:  Let me try to explain the concern that

13    we have on this side of the court.

14          You know, punitive damages -- the thing that comes

15    from that model instruction is it emphasizes the seriousness of

16    a punitive damage award.

17          And I made that point earlier this morning, and I

18    don't want to be repetitive.  But that when you pull out

19    malicious -- and I'm going to remind you that plaintiff has

20    argued that Equifax has lied, in their opening.  They said

21    Equifax's behavior has been reprehensible.  I thought

22    Mr. Hendricks' testimony went -- he was emphatic about the

23    recklessness of it.  I think they have put out there arguments

24    that this is something really horrible.

25          And even in the opening remarks by Ms. Sumner, we
```

335

Colloquy

1    understood we were up against this broader kind of punitive

2    damage claim.  And although it may seem peculiar for us to ask

3    for a broader instruction, the fact that that instruction --

4    the standard instruction uses words like "malicious" and

5    "oppressive" --

6             THE COURT:  Let me -- let me give you a little bit of

7    background, first, on the instruction -- the model instruction,

8    which I happen to know about, because I was chair of the

9    committee that prepared it.

10            It was written in order to provide lawyers and trial

11   judges with what would be necessary in order to submit such a

12   claim to the jury.  And it was written expansively, with an

13   idea that when evidence supports all of those things, you

14   include them all.  And if evidence does not support alternative

15   and disjunctive classifications of criterion that would justify

16   the award, you wouldn't have it.

17            So the model says you may award such damages only if

18   you find the conduct was malicious, oppressive, or in reckless

19   disregard.

20            There has never been a suggestion, that I am aware

21   of, that a plaintiff would have to show that conduct was

22   malicious, oppressive, and in reckless disregard.  And to

23   introduce to the jury a standard around which there is not

24   evidence is irresponsible by the Court.

25            So I understand the point.  What I'm wanting -- and

Colloquy

336

1    the reason I interrupted is I want you to tell me what evidence

2    there is in the case that would support an instruction on

3    malicious conduct or on oppressive conduct, based on the

4    definitions of those conduct -- of -- of those terms; and if it

5    is this model instruction that you're working from, which I

6    think it is.

7             MR. EDELSON:  Well, I'm certainly not going to argue

8    that there's evidence of malicious conduct.

9             THE COURT:  Then I can't instruct on it.

10            MR. EDELSON:  And with respect to oppressive, we

11   don't -- we're not insisting or even requesting that oppressive

12   be --

13            THE COURT:  So tell me what you think you want.

14            MR. EDELSON:  What we would like is that it not be so

15   diluted that the heavy weight of this kind of award is -- is

16   lost.

17            THE COURT:  So tell me language that you would

18   propose adding.

19            MR. EDELSON:  Well, I've written some language that

20   goes like this:

21            Punitive damages should only be awarded in the

22            most egregious of circumstances.

23            THE COURT:  That's a comment on the evidence, and I'm

24   not going to say that to the jury.

25            MR. EDELSON:  Well, again, I know it wasn't perfect,

337

Colloquy

1    and I'm just looking for a way to carry -- just so it's not so

2    diluted.

3            THE COURT:  Let's do this, Mr. Edelson, until I

4    instruct the jury, you're free to ask for changes.  You

5    don't -- obviously have something you're suggesting, now, is a

6    correct statement of the law.

7            All you're doing to me is expressing concern that by

8    instructing the jury only on a reckless state of mind, somehow

9    this instruction doesn't put before the jury the serious issue

10   that is different from -- I think it does.  I think it's a fair

11   statement of the law.

12           Find me something or write something that you can

13   point to that has support from a court that has given it.

14   Maybe look at other credit cases.

15           I've instructed on punitive damages before.  I didn't

16   go back to see what I did in the **Ashby** case, but I might look

17   that up, and I'll see what I can do.  But right now the law --

18   you're not conceding there's evidence that supports malice, and

19   you're not conceding there's evidence that supports oppression.

20   In fact, your colleague said there wasn't even evidence to

21   support recklessness, so I'm not going to instruct on a

22   standard for which there's no evidence.  That's the rule.

23           Now --

24           MR. EDELSON:  I have another suggestion.

25           THE COURT:  Okay.

Colloquy

1          MR. EDELSON:  As sort of partway there.

2          THE COURT:  Yes.

3          MR. EDELSON:  And I will take you up on your offer to

4   think about better language than I did a moment ago.

5          THE COURT:  Yes.

6          MR. EDELSON:  If you look at the sentence that's on

7   page 21, it's the end of the first sentence of the -- of the

8   new paragraph.

9          THE COURT:  "Conduct is in reckless disregard."  That

10   sentence?

11          MR. EDELSON:  "If you find the plaintiff's conduct."

12          THE COURT:  "You may award punitive damages only if

13   you find that defendant's conduct that harmed plaintiff was in

14   reckless disregard of the plaintiff's rights.  But you may not

15   award punitive damages if you find that defendant's conduct was

16   merely negligent."

17          MR. EDELSON:  And I would add at the end, "or

18   careless."

19          THE COURT:  That's fine.  That's a correct statement

20   of the law.

21          MR. EDELSON:  So -- well, we'll see if we can come up

22   with other language on the other issue.

23          THE COURT:  You don't object to the addition of

24   "careless," do you, Mr. Baxter?  That comes out of the **Safeco**

25   case.

Colloquy

1       MR. JUSTIN BAXTER:  That's fine.

2       THE COURT:  I'll add "or careless," and if you have

3   other language you want me to consider, I'll consider it.

4       MR. EDELSON:  I would like to mention one other item.

5       THE COURT:  Yes, sir.

6       MR. EDELSON:  That would be a new instruction.

7       And it's a -- I suppose you call it a limiting

8   instruction.

9       We have -- Ms. Miller testified -- and Ms. LeGore has

10  that section, if your Honor would like to hear it -- that she

11  did not suffer any physical harm as a result of Equifax's

12  conduct.

13      And then we had witnesses come up and speculate about

14  acne and hair loss, when their only basis of information was --

15  was what they learned from Ms. Miller.

16      Physical injury has not been part of this case.

17      THE COURT:  I think the first thing you ought to be

18  doing, then, is moving to strike that evidence or at least

19  telling me to instruct the jury, now, that those issues are not

20  before me.

21      MR. EDELSON:  That's precisely what I'm asking for.

22      THE COURT:  So on what basis should the jury be

23  concerned with acne and hair loss, if any?

24      MR. EDELSON:  And sleeplessness --

25      THE COURT:  Or do you agree that that's an issue that

340

Colloquy

1    should be -- the jury should be directed away from?

2         Because we don't have any evidence in the record from

3    which rational jurors could find that hair loss was actually

4    attributed to the stress.  And we do have other concerns.

5         That -- there are a lot of reasons as Ms. Miller's

6    witness/neighbor, who's the hairdresser, explained for which

7    hair loss can occur.  The jury would have to speculate that the

8    hair loss issue was related to her anxiety about this problem.

9         And Mr. Miller's reference to acne reoccurring seems

10   sort of in a way nonresponsive to the question that was being

11   asked of -- by Mr. Baxter, but it wasn't addressed at the time.

12        To -- to me, those are two issues that were really

13   outside the scope of what the case looked like when we started

14   it.  And, to me, the fair thing to do is just simply tell the

15   jury that those are not claims in the case.

16        (Pause, Mr. Justin Baxter and Mr. Michael Baxter

17        conferring.)

18        MR. JUSTIN BAXTER:  That's fine, Judge.

19        THE COURT:  I'll do that without a heavy hand.  I'll

20   simply tell them there were references to Ms. Miller

21   experiencing hair loss and acne.  Those are not actual claims

22   in the case, and the jury is to disregard those when they

23   evaluate the evidence.

24        MR. EDELSON:  I left out sleeplessness, which

25   Ms. Miller did not testify to but one of her friends did.  But

341

Colloquy

1    on cross, admitted that she didn't actually observe any

2    sleeplessness.

3            THE COURT:  Then I'm not going to address

4    sleeplessness.

5            I think to do that puts undue emphasis on it.  We

6    have a lot of emphasis on hair and acne.

7            And you can argue about the sleeplessness issue if

8    they bring it up.  But I don't think it's an issue around which

9    there could be any potential error.

10           Sleeplessness, by the way, I think is something that

11   rational jurors could themselves connect.  Hair loss and acne

12   are -- are different.  I think we all experience sleeplessness

13   or know of people who experience that when they're unhappy,

14   distressed, frustrated to the point or the degree that was

15   described.

16           So other than one more round around punitive damages,

17   is there any other concern, Mr. Edelson, you want me to keep in

18   mind around these jury instructions?

19           MR. EDELSON:  No.  Thank you, your Honor.

20           THE COURT:  We'll add the word "careless" in that

21   sentence that ended with "negligent."  And I'll wait to see if

22   you have something.  I, in the meantime, will see if I can find

23   the **Ashby** jury instructions and see how it looked there.  If I

24   can find it, I'll share that with you.

25           MS. SUMNER:  Your Honor, just one issue for

Colloquy

342

1    clarification.

2         Anne Fortney will be testifying next, who is, of

3    course, our expert.  And I know that you had --

4         THE COURT:  Yes.

5         MS. SUMNER:  -- previously instructed not to refer to

6    prior witness testimony.  But because she is our rebuttal

7    expert, may I be permitted to refer to Mr. Hendricks'

8    testimony?

9         THE COURT:  What I was directing counsel away from

10   was what sounded like one witness being invited to comment on

11   the credibility of another trial witness, and that's not to

12   happen.

13        You certainly are entitled to lay a foundation for

14   rebutting opinions.

15        MS. SUMNER:  Thank you.

16        THE COURT:  Okay.

17        MR. JUSTIN BAXTER:  One more item, your Honor.

18        THE COURT:  Yes.

19        MR. JUSTIN BAXTER:  Now that we've passed the

20   directed verdict, we have a stipulation with the defense on net

21   worth, and I just want to make sure that we find time --

22        THE COURT:  What is it?

23        MR. JUSTIN BAXTER:  The -- Equifax and plaintiff

24   agree that the net operating revenue of Equifax Information

25   Services is 900 million dollars, which is a representation of

343

Colloquy

1    the net worth of Equifax.

2              THE COURT:  All right.  When is it you're proposing

3    that information be provided to the jury?

4              MS. SUMNER:  Well, I thought we had agreed that it

5    would be at the close of evidence, that we would do --

6              THE COURT:  All of the evidence?

7              MR. JUSTIN BAXTER:  That's fine as well.  I just want

8    to make sure it gets read.

9              MS. SUMNER:  And just -- I hate to parse words, but

10   to be precise --

11             THE COURT:  Why don't you write it out then.

12             MS. SUMNER:  Thank you.  We'll do that.

13             THE COURT:  And is this something you want me to read

14   to the jury, or do one of you want to read it to the jury at

15   the appropriate time?

16             MS. SUMNER:  Your Honor, I would be happy to do that

17   on behalf of Equifax, since we're talking about an Equifax

18   number.

19             THE COURT:  All right.  Then we all have to remember

20   to refer to it.

21             So when the jury comes back, I'm going to remind them

22   that the plaintiff has rested, which means plaintiff's offered

23   all of the evidence she's going to offer in her case-in-chief,

24   and now we're going to turn to the defendant's testimony.

25             Ms. Miller, would you like to come back to the table?

Colloquy

1    Maybe that's not the way the question should be framed.  I

2    don't think anybody likes being here.

3              Is Ms. Fortney here?  Fortney?

4              MS. SUMNER:  Yes, she is.

5              Oh, there she is, yes.  Would you like her to take

6    the stand?

7              THE COURT:  Yes.  Yes.

8              All kinds of familiar things going on around here.

9              MR. EDELSON:  Do you want her to take the stand?

10             THE COURT:  Like they say, deja vu all over again.

11             Why don't you come up here, and then when the jurors

12   are in, we'll have you sworn.

13             (Pause, Court and witness conferring.)

14             THE COURT:  Would you all please rise for the jury.

15             (Jurors enter.)

16             THE COURT:  Thank you, everyone.  Please be seated.

17             So, jurors, good afternoon.

18             Just before I sent you out for the noon recess, you

19   may recall Mr. Baxter announced that plaintiff rests.  That

20   means, Ms. Miller's counsel have now presented all the evidence

21   that there is going to be presented in her case-in-chief.

22             So now we're turning to Equifax, to see if it has any

23   evidence to offer.  And, indeed, it does have three witnesses

24   to offer to you.  One of them is before you now.

25             Would you stand, please.  Face the jury.  Raise your

Fortney - D

345

 1    right hand to be sworn.

 2              (Witness sworn.)

 3              THE WITNESS:  I do.

 4              THE CLERK:  Please take a seat.

 5              THE COURT:  And when you're situated there, bring

 6    yourself as close as you can to the microphone.

 7              Please tell us your full name, and spell all of it.

 8              THE WITNESS:  My full name is Anne Price Fortney.

 9    Anne is spelled with an E, A N N E.  Price, P R I C E.

10    Fortney, F O R T N E Y.

11              THE COURT:  Thank you.

12              Counsel.

13                        DIRECT EXAMINATION

14    BY MS. SUMNER:

15    Q.   Good afternoon, Ms. Fortney.

16    A.   Good afternoon.

17    Q.   If you could just start off, please, and tell the jurors

18    what your current position is and responsibilities.

19    A.   Yes.  I'm a lawyer, and I'm a partner with a law firm

20    called Hudson Cook.

21              My law firm and I specialize in compliance in the

22    field of consumer financial services.  We help companies comply

23    with the Fair Credit Reporting Act and similar laws.

24    Q.   And how many years have you been involved in practicing in

25    federal and state consumer protection laws?

Fortney - D

346

A.   Well, I got my start with J.C. Penney back in 1976.  Oh, what?  That's about 37 years.  And at that time, I was in the Washington office with the Penney Company.  And Penney was one of the largest credit card issuers in America.  It was difficult for consumers to get bank cards at that point.

Q.   All right.  Let's back up just a little bit.  And if you wouldn't mind, walk the jury through your educational background.

A.   Sure.

     I went to Mary Washington College, which was then a women's college, University of Virginia.  I went to Georgetown University Law Center.  And -- and I've been practicing law since 1969.

Q.   And have you also participated in other programs, in terms of training at other universities?

A.   I was -- went one year to college at -- in Aix-en-Provence, and I also did some post-graduate work at Harvard University, when I was with the Federal Trade Commission.

Q.   Okay.  Let's actually move to some of your other experiences.  Because in your 37 years, I am sure you have not spent the entire time at the -- this law firm.

     Could you just walk us through some of your -- and you don't need to spend a lot of time on this.  But I think it would be helpful for you to walk through the various

347

Fortney - D

1  positions -- professional positions that you've held.

2  A.    Yeah.  As I said, I began -- oh, I'd been practicing law

3  for a few years before I joined the Penney Company.  But I had

4  been more involved with just general consumer protection

5  issues.  But I really began to get into this industry at the

6  Penney Company.  And I was with them until 1982.

7          And then I went to work for the Federal Trade

8  Commission.  And at the Federal Trade Commission, I was the

9  director of a division that enforces the Fair Credit Reporting

10  Act and the other privacy laws on behalf of consumers.  So I

11  was basically representing -- I was a federal representative of

12  consumers at the Federal Trade Commission.

13          I left the Federal Trade Commission in the late '80s

14  because I got married and my husband was in the Navy, and we

15  had to move to Hawaii.  Tough duty.  Somebody had to do it.

16  And I have been in private practice ever since.  I've been with

17  a couple of law firms.  But about ten years ago I joined Hudson

18  Cook, because I wanted to be able to concentrate my practice in

19  the area of compliance in this field.

20          THE COURT:  Could you slow down a bit, Ms. Fortney,

21  when you are responding.

22          Go ahead, Counsel.

23          THE WITNESS:  Sure.

24  BY MS. SUMNER:

25  Q.    So as part of the compliance work that your firm does, has

Fortney - D

348

1    it done work for any of the three credit reporting agencies?

2    A.    Yes.  Our firm has about 2,000 clients, because we

3    represent just about everyone in the consumer financial

4    services industry.  And the way we get to 2,000 clients is we

5    also represent a lot of auto dealers who are creditors, under

6    the law.

7            And -- and I -- because I specialize primarily in the

8    area of the Fair Credit Reporting Act and privacy, I do work

9    for the major consumer reporting agencies:  Experian,

10   TransUnion, and Equifax, to a certain extent.  I have not done

11   much work for Equifax ever, and I have done no work for Equifax

12   in the last year or so.

13           But I do respond to questions from primarily banks

14   and finance companies as they try to comply with the Fair

15   Credit Reporting Act.  But I also do represent some reporting

16   agencies.

17           THE COURT:  Can you slow down a bit.

18           THE WITNESS:  I'm sorry.  I do talk too fast.  I

19   apologize.

20           THE COURT:  It's really important that the jurors --

21           THE WITNESS:  I know.  I know.

22           THE COURT:  -- are able to understand, and that we

23   have a good record, without interruption.

24           Go ahead, Counsel.

25   BY MS. SUMNER:

Fortney – D

349

1    Q.    Thank you.

2          Ms. Fortney, if you can talk a little bit about some

3    of the publications that you have in this area, and whether you

4    have published any materials specifically on the Fair Credit

5    Reporting Act?

6    A.    Yes, I have.  I have written articles for professional

7    journals on the Fair Credit Reporting Act.  I've also written a

8    how-to-comply manual for the consumer reporting industry.  How

9    to comply with the Fair Credit Reporting Act.

10         I haven't written much recently, because I devote

11   most of my time, other than the practice of law, to giving

12   presentations, at various professional associations, American

13   Bar Association, the -- and others.  And -- because it's

14   difficult for even lawyers to keep up with all of the changes

15   in the law in this area.

16   Q.    And the materials that you -- or that were published, were

17   those self-published or published by some other publication?

18   A.    They were all published by some other publication.

19   Q.    And could you name some of the publications that have

20   published your work?

21   A.    *The Quarterly Report of the Conference on Consumer Finance*

22   *Law.*  The -- I think that's the one that I published in most

23   often, most recently.

24         *Credit World* was another one.  And I'm sure there's

25   some others.  I just don't recall offhand.

Fortney - D

350

1   Q.    Okay.  And have you also acted as an expert on FCRA

2   issues?

3   A.    I do, from time to time; it's not a major part of my work.

4   Again, I spend most of my time dealing with these compliance

5   issues.

6           I would say probably about -- maybe 10 percent, maybe

7   15 percent of my time, on average, is involved in writing

8   expert reports or otherwise serving as an expert witness.

9   Q.    Could you tell the jury a little bit about the purposes of

10  the Fair Credit Reporting Act.

11  A.    The Fair Credit Reporting Act is designed to balance the

12  need of the credit reporting industry for complete and accurate

13  information on consumers.  Balance those needs with the rights

14  of consumers to the privacy and confidentiality and fair

15  treatment of that highly sensitive information.

16  Q.    And does the FCRA require perfect consumer reports?

17  A.    No.  And, in fact, Congress has repeatedly said, and the

18  federal regulatory agencies have said, perfection is impossible

19  given the volume of -- of consumer reports, given the number of

20  files that are out there, given the speed at which this

21  information is disseminated, and also because it's an automated

22  system.  It's also a system that runs pretty much on a

23  voluntary basis.

24          No law requires a bank or other furnisher to give

25  information to a consumer reporting agency, and no law requires

Fortney - D

351

1  a consumer reporting agency to provide a consumer report to a

2  bank.

3           And so it's basically a voluntary system.  It is a

4  system that has evolved; evolved over the last hundred years or

5  so.  And most significantly in the last 20 or 30 years.

6  Q.   So how would you characterize the basic standard that

7  relates to the Fair Credit Reporting Act?

8  A.   Well, as I said, it's a balancing of -- of competing

9  interests, competing needs.

10          And the standard generally is one of reasonableness.

11 What is reasonable under the circumstances?  And that term

12 "reasonable" appears repeatedly throughout the Fair Credit

13 Reporting Act.

14          Consumer reporting agencies are required to have

15 reasonable procedures to ensure the accuracy of information in

16 consumer reports.  They have reasonable procedures to address

17 disputes.  Everything in the act is based on a standard of

18 reasonableness.

19 Q.   Now, if you can address a little bit the role of credit

20 reports in our U.S. economy and the -- how that information is

21 shared between different groups.

22 A.   Okay.  Again, I'm relying here primarily on -- not just my

23 expertise but also the findings of Congress in this area and

24 also the Federal Trade Commission; and a new agency, the

25 Consumer Financial Protection Bureau, which was created a

Fortney – D

352

1    couple of years ago to assure the -- the protective rights of

2    consumers in the field of consumer financial services.

3            And what they all have said, including fairly recent

4    testimony by the director of the Consumer Financial Protection

5    Bureau, is -- is that our economy really rests on -- in large

6    part, on the consumer reporting industry.

7            This is the industry that enables creditors to make

8    informed decisions about consumers, gives consumers access to

9    mortgage loans, credit cards, and even auto loans.  Now, the

10   fact that someone can go into an auto dealership and drive away

11   with a car within minutes or hours, after you finish

12   negotiating with the dealer, that does not exist in most

13   countries.

14           The fact that you can get an instant credit card

15   in -- in a retail department store, that is because of the

16   consumer reporting system.

17           And there have also been studies showing that on

18   average, Americas pay two percent less for our mortgage -- our

19   mortgages than in any other country because of our consumer

20   reporting industry.  It is a -- it is the foundation, as I

21   said, of the U.S. consumer economy.

22   Q.   And is there a certain expectation of the speed of

23   processing the information at this point in our economy?

24   A.   Yes, there is.  That's why I mentioned the fact that you

25   can go into -- actually, you've all been in a department store,

353

Fortney – D

1    they're offering you 10 percent off, or some other incentive,

2    if you get their credit card.  And you can get it right then

3    and there.  The reason you can get it right then and there is

4    because there is an instantaneous report from a –– a CRA, a

5    consumer reporting agency, to the store.  So this –– this all

6    happens with great speed and with remarkable accuracy.

7    Q.    Now, you mentioned a few moments ago Congressional

8    findings.  You mentioned the FTC and the CFPB.  A mouthful.

9          Are those –– first, if you can explain the role of

10   the regulators, and then also –– well, I won't pose two

11   questions.  Just start off with explaining the role of the FTC

12   and CFPB.

13   A.    For many years the Federal Trade Commission was the

14   primary agency regulating the consumer reporting industry.

15         And then when Congress created the Consumer Financial

16   Protection Bureau, it consolidated a number of the functions of

17   other regulatory agencies into this new agency.  So although

18   the Federal Trade Commission still has some responsibilities in

19   this area –– and we'll talk about studies and things like that

20   the FTC has done –– the principal agency now is the Consumer

21   Financial Protection Bureau, and they exercise oversight in

22   this industry.  And they also, along with the Federal Trade

23   Commission, enforce the laws when any of these companies may

24   violate the law.

25   Q.    Through your years in this area of expertise, have you

Fortney - D

354

1   followed Congressional findings, FTC enforcements, and the more

2   recent CFPB actions with respect to credit reporting agencies?

3   A.   Yes, I have.  I've been following them ever since 1976,

4   and when I was with the Federal Trade Commission, and then even

5   more recently in private practice -- practice, I've testified

6   before Congress on issues involving credit reporting.

7   Q.   Now, and as part of your following the guidance from these

8   regulators and from Congress, has there been discussion about

9   whether or not errors are inevitable in this process?

10  A.   Yes.  As I think -- I think I mentioned that -- there's

11  actually direct Congressional language saying that -- that

12  errors are inevitable.

13  Q.   Now, you did mention a little bit about the furnishers

14  of -- of information to the credit reporting agencies.

15         Is there any requirement that they use any specific

16  form of identification of a consumer when they are reporting

17  that information?

18  A.   No, there is not.  And, in fact, that's one of the reason

19  why furnishers will provide different information and sometimes

20  incomplete information with respect to the consumers on whom

21  they are furnishing the information.

22  Q.   Does this -- well, what issues does that create for a

23  credit reporting agency that is receiving information from

24  furnishers that may not include the same identification items?

25  A.   Yeah.  I think, first of all, you have to understand the

Fortney - D

355

1   volume.  We have -- I think it's 1.3 billion updates of

2   information from the furnishers to the consumer reporting

3   agencies each month.  Each month.  Billions of items of

4   information are going into the consumer reporting agencies.

5   And all of this information has been identified by the

6   furnisher with a consumer in some way.

7           Well, the first issue is consumers often have similar

8   names, last names.  Also, furnishers don't have any standard

9   way of reporting a first name.  Names can be abbreviated, they

10  can be misspelled.  Addresses, consumers move around a lot.

11  And -- and the agencies, the consumer reporting agencies

12  actually rely on updates from the furnishers, quite often,

13  because consumers don't notify -- and they are really required

14  to notify these consumer reporting agencies of changes in their

15  address.  So they rely on information from the furnishers about

16  changes in address.  The other issue that comes in is people

17  don't always give or provide accurate information about their

18  date of birth.

19          The final issue involves a Social Security number.

20  There's a move on -- I think, on the part of some governments

21  and some creditors, to truncate Social Security numbers.

22          There's also the error -- in other words, you just

23  provide the last four -- or last six digits a Social Security

24  number.  There are also errors in the input of Social Security

25  numbers.

Fortney - D

356

```
 1          So that creates an issue for the -- the CRAs, the
 2   credit reporting agencies, in trying to match the data that's
 3   coming in, these billions of items of information that are
 4   coming in, trying to match it to the correct consumer.
 5   Q.   So in addition to the variety of information that credit
 6   reporting agencies receive from furnishers, do the furnishers
 7   also rely on receiving information from consumers?
 8   A.   Yes, because it's the consumers, of course, who provide
 9   the information to the furnishers.  It's consumers who complete
10   the -- the applications for credit and who will often notify
11   their creditors when they are changing their address.
12   Q.   And in your opinion, do consumers sometimes provide
13   information that is inaccurate to the furnishers?
14   A.   Consumers could provide inaccurate information or, as
15   indicated, the furnisher could take it down wrong.  You have
16   telephone applications.  That information might be incorrectly
17   recorded.
18   Q.   So have you been involved in reviewing some of the mixed
19   file procedures that Equifax has employed to address issues
20   where information comes in that potentially relates to more
21   than one consumer?
22   A.   Yes, I have.
23   Q.   And has this been an issue that has been -- that Equifax
24   has -- has reviewed over time?
25   A.   Yes.  In fact, when you look at the procedures -- and
```

357

Fortney - D

1   you'll get to them in a minute -- what you see is the -- these

2   procedures are constantly being reviewed, updated.  Every time

3   there's a modification to procedure, there's a notation of when

4   it was made and who made it.  So I think Equifax is, like the

5   other CRAs that I know, updating these procedures, trying to

6   improve the process.

7   Q.   Okay.  Let me back up for just a minute and ask you a

8   little bit about the credit reporting industry.  Is it your

9   understanding that these regulators from the FTC, and now from

10  the CFPB, do they work directly with the credit reporting

11  agencies?

12  A.   Well, they certainly -- I think that they work with the

13  credit reporting agencies with a lot of interaction.  There's

14  always, in my experience, been interaction with the Federal

15  Trade Commission.  And now there's a lot of interaction with

16  the representatives of the consumer reporting agency and the

17  Consumer Financial Protection Bureau.  Yes.

18  Q.   Let me ask you if you are familiar with some agreement of

19  assurances and consent de -- decrees involving the FTC in the

20  early 1990s.  Are you familiar with that?

21  A.   I am very familiar.

22  Q.   Okay.

23  A.   And here's why.

24       When I was at the Federal Trade Commission, we had

25  complaints about accuracy of information at consumer reporting

Fortney – D

358

1    agencies.

2            We investigated the consumer reporting agencies.  We

3    actually sued TransUnion; entered into an agreement with them.

4    And we thought that we had addressed the problem.

5            What happened, though, was that problems were not

6    really addressed, because we were focusing on the information,

7    once it was in –– within the consumer reporting agency.

8            So these investigations by the Federal Trade

9    Commission and the states' Attorney General really focused on

10   the procedures that the agencies had –– or, I'm sorry, with

11   these companies, these consumer reporting agencies had to

12   comply with the Fair Credit Reporting Act, including the input

13   of the data and also resolving consumer disputes.

14           And what the –– the Government found is that there

15   were in fact deficiencies.  And that's why they entered into

16   settlements with all of the consumer reporting agencies.  This

17   was an industry-wide problem.  But this was a problem in the

18   1990s.

19           And in the early 1990s, credit reporting was the

20   number one source of complaints at the Federal Trade

21   Commission.  Today, it isn't even on the top ten list.

22           By the way, identity theft is on the top –– is the

23   number one complaint, not credit reporting.

24           So what happened?  Well, two things happened.  First

25   of all, the industry got a wake-up call.  They realized there's

359

Fortney - D

1    a problem here.  They -- they developed some automated systems,

2    automated systems for the input of information from -- from

3    furnishers.  This is the Metro 2 (phonetic) format, trying to

4    create a standardized format in which information could be

5    automatically provided; these billions of updates each month to

6    the bureaus.

7            Also they developed the EOSCAR system --

8            THE COURT REPORTER:  I'm sorry.  I need you to speak

9    slower, please.

10           THE WITNESS:  They also developed the EOSCAR system.

11   BY MS. SUMNER:

12   Q.   If you could spell that out for the court reporter.

13   A.   EOSCAR is an acronym.  It's E-O-S-C-A-R.  And it stands

14   for the electronic online -- I forget.  I forget the acronym.

15           But, anyway, it's designed to -- it's -- what it is,

16   it is the web-based computer software that enables the CRAs to

17   communicate with furnishers about consumers' disputes, and also

18   enables the furnishers to relay the results of their

19   investigations of these disputes back to CRAs.

20           This is a system that was developed because there was

21   revision in an amendment to the Fair Credit Reporting Act that

22   essentially required the consumer reporting agencies to have an

23   automated system.  They developed this system.  And, again,

24   when the Federal Trade Commission and the Consumer Financial

25   Protection Bureau have -- have looked at this system, they

Fortney - D

360

1    recognized that it does in fact provide for the resolution

2    of -- of consumer complaints.

3             So we had a change in the industry in the early '90s.

4    We also had some major improvements to the federal -- to the

5    Fair -- Fair Credit Reporting Act.  And those improvements

6    really put more of an obligation on the furnishers to provide

7    accurate information to the bureau -- to the consumer reporting

8    agencies, and also to investigate the disputes.

9             So we had a major change in the law.  We had changes

10   in technology.  And so I think that's the reason, today, that

11   we don't have the percentage of complaints involving --

12   involving credit reporting involving consumer reporting

13   agencies.

14   Q.   And if I could just pause you there for a moment.  And I

15   would like for you to actually address this issue of consumer

16   satisfaction and the changes that have occurred over time,

17   since the '90s.

18   A.   Um-hmm.

19   Q.   You mentioned a number of system changes.  But if you can

20   focus on the changes in the consumer satisfaction as well.

21   A.   Right.  Yes.  And because this is an area where the

22   industry is constantly trying to improve, there are studies

23   now -- studied by the Federal Trade Commission and a -- a study

24   by a report by the Consumer Financial Protection Bureau.

25            The Federal Trade Commission reported in, I think it

Fortney - D

1   was, 2008 that 90 percent of consumers resolved their

2   complaints regarding, you know, primarily accuracy and

3   disputes.  But involved -- resolved their complaints with the

4   consumer reporting agencies before these were referred by the

5   Federal Trade Commission to -- to the consumer reporting

6   agencies for their resolution.

7            So -- in other words, the FTC found a 90 percent

8   resolution basis before anybody else had to get involved.

9            What the Consumer Financial Protection Bureau

10  reported in December of last year was that 95 percent of

11  consumers were satisfied with the results of the

12  reinvestigations.

13  Q.   Okay.  Let's focus for a minute on issues with respect to

14  mixed files.

15           Has the FTC provided guidance with respect to that

16  and the -- sort of the evolution of that issue?

17  A.   Yes.  Congress directed the Federal Trade Commission to

18  study this issue.  And, in 2004, the FTC published a report of

19  its investigation of the study.

20           And the first thing that the FTC did was discuss some

21  of the issues that I've just mentioned before about the

22  difficulty that consumer reporting agencies have in matching

23  the data that comes in to them with the correct consumer.

24           And the FTC noted that one of the procedures, which

25  was engaged in by all three of the CRAs -- they focused on the

Fortney - D

1    three nationwide CRAs.  But they said that the procedure

2    engaged in by all three of the CRAs with respect to the Social

3    Security number was that if seven or eight of the nine digits

4    matched, that was -- even though it was considered a partial

5    match, that was considered a sufficient match to identify the

6    consumer to the -- to the correct file.  They recognized that

7    was the procedure that was being used.

8            They also, of course, recognized that the -- the CRAs

9    were -- were attempting to match name, address -- you know --

10   date of birth, as well as Social Security number.

11           So the issue was -- that -- that -- that the FTC

12   thought about the issue, was should we require an exact match?

13   Should we require a nine-for-nine match with -- with the Social

14   Security number?  Should we require more identification with

15   respect to matching?  And the FTC concluded no, we should not

16   require this.

17           Well, why?  The reason is that if you require a more

18   exact match, you're going to have a lot of file fragments

19   sitting out there that don't belong to anybody, because you

20   can't exactly match them to somebody.  What that means -- what

21   the FTC actually said is that would harm consumers.

22           You might have an increase in accuracy, but you have

23   a decrease in completeness, which would mean you would have

24   more incomplete files.  And the more incomplete files would

25   mean that fewer consumers would get credit, because creditors

Fortney - D

363

 1   would not be able to evaluate all of their information, or they

 2   would get credit on high returns -- higher rates.

 3          What the FTC also observed was that 85 percent of the

 4   credit accounts contained positive information.

 5          So they -- they -- they looked at this.  They did a

 6   thorough study.  And they concluded it's not perfect, but we

 7   think, at this point, we are not going to recommend any changes

 8   to this procedure, the procedure that all three of the

 9   nationwide consumer reporting agencies follow.

10   Q.   Let me ask you a question about error rates.

11          Did the FTC consider error rates when it was

12   reviewing the process and particularly with respect to mixed

13   files?

14   A.   They recognized that mixed times are a source of errors.

15   The FTC also did a study at the direction of Congress.  It was

16   a study that took them about ten years to complete because they

17   had to develop the methodology.  They published the results in

18   February of this year.  The study dealt with the accuracy of

19   information in consumer reports.

20          And what they found was that 98 percent of consumer

21   reports contain no errors that would result in a material

22   change in the consumer's ability to get credit or the rate that

23   they would pay.  So you have a two percent error rate.

24          Now, that's not great, but it's a whole lot better

25   than it was in the early '90s, and it's getting better all the

Fortney – D

364

1    time.

2              There was also a study done by the Political and

3    Economic Research Council that was published about a year

4    before, and it found a 1 percent error rate.  And these are --

5    these are not the types of errors that somebody has an old

6    address, or something like that.  These are the errors that

7    could result in somebody either not getting credit or getting

8    credit on higher terms.  We are talking about a 1 to 2 percent

9    error rate.

10             So that means that 98 to 99 percent of consumers are

11   able to get -- or -- 98 to 99 percent of consumer reports

12   are -- can be relied on and are relied on because they

13   completely accurate with respect to the consumers.

14   Q.   Ms. Fortney, Mr. Hendricks testified earlier today and

15   referenced a -- a PIRG study, which I understand that to mean

16   the Public Interest Research Group.  And I believe that the

17   study that he referenced was in the 1990s.

18             Are you familiar with that study?

19   A.   I'm familiar with that study.  I'm familiar with even a

20   later study done in 2004.  I'm also aware that the Consumer

21   Financial Protection Bureau looked at that study and said that

22   the results were not reliable.

23             Why?  Because, first of all, the sample size was 154.

24   That's much too small to -- to form any conclusions.  And,

25   secondly, the people who participated in -- in the study were

Fortney - D

1   employees of PIRG; their family and their friends.  So the --

2   even the Consumer Financial Protection Bureau said there is

3   likely bias here.

4           And there's -- there's an agency called the GAO,

5   which is the Government Accounting Office.  And what they --

6   what they do is investigate -- or sort of -- investigate

7   information, provide information to Congress about various laws

8   that Congress is interested in.

9           And the GAO looked at these same PIRG studies and

10  came to the same conclusion as the Consumer Financial

11  Protection Bureau, which is that these -- that this study -- or

12  these studies by PIRG -- are not reliable.

13  Q.   Mr. Hendricks also referenced generally to media coverage

14  concerning credit reporting issues and mixed files.

15          Do you also follow media coverage with respect to

16  this industry?

17  A.   I do follow media coverage, and I find a lot of it to be

18  very inaccurate, to be sensationalist.  And here's my own take

19  on it, which is the idea that, you know, 99, 98 percent of the

20  time reports are being provided in a way that enables consumers

21  to get credit.  That's not a headline.  The headline is this

22  one person or that one person had difficulty getting inaccurate

23  information removed from their file.

24          So I think the problem is -- is media stories.  And,

25  again, I don't know exactly which ones to which Mr. Hendricks

Fortney - D

366

1   has referred.  But the ones that I have seen, that I question,

2   are the ones that attempt to sensationalize the -- the problems

3   that individuals may have, without necessarily having all of

4   the background, having all of the facts, and also, of course,

5   not looking at this in terms of how the system works for the

6   vast, vast majority of consumers.

7   Q.   Now, based on your experience as having been in a position

8   of the Bureau of Consumer Protection at the FTC, is it your

9   understanding that the FTC would seek enforcement of prior

10  agreements of assurance or consent decrees if they believed

11  that the credit reporting agencies were in violation of those?

12  A.   Yes.  The Federal Trade Commission regularly enforces its

13  consent decrees, the orders it has against companies.  It also

14  reviews compliance by companies with those orders.

15          And if it had found any problems with these or other

16  orders, it would have brought enforcement actions.

17  Q.   Let me switch gears for a moment.  And if I can ask you to

18  tell us -- or tell the jury what you reviewed in preparation

19  for your testimony with respect to Ms. Miller's particular

20  situation.

21  A.   Well, I reviewed her complaint.  I reviewed her deposition

22  testimony.  I reviewed the deposition testimony of -- of two of

23  the witnesses for -- for Equifax who were involved in the

24  process.  And I also reviewed the deposition testimony of

25  Mr. Hendricks.  I've reviewed the initial reports that he

Fortney - D

1    prepared in this case.  And I reviewed the policies and

2    procedures and training manuals of Equifax.

3    Q.   Let's talk a little bit about those policies and procedure

4    manuals.

5         And if I can ask you to just direct your attention

6    to -- do you have a notebook of exhibits?

7    A.   Yes, I do.

8    Q.   Okay.  And if I can just ask you to take a moment, and

9    look at the exhibits that are marked 116 through 134.

10        And just flip the -- through those for a moment,

11   please.  And that way the jurors can do so as well.

12        And after you've had a chance to look at those, let

13   me know if those policies and procedures were some of those

14   that you reviewed in preparation for this case.

15   A.   (Pause, referring.)

16   Q.   Done?

17   A.   Done.  I looked at them before, so I had an advantage over

18   the jury.

19   Q.   Does this represent all of the policies and procedures and

20   manuals that Equifax has concerning consumer disputes and mixed

21   files?

22   A.   I don't believe these are all of the manuals.

23        These are some of the ones that I reviewed.  I did

24   review others.  And these are included in ones that I reviewed.

25   Q.   Are those excerpts from some of the -- and when I say

Fortney - D

1    "excerpts," just -- are partial pieces of the manuals, as

2    opposed to complete manuals, in some circumstances?

3    A.    Yes.

4    Q.    And are the manuals themselves much more voluminous?

5    A.    Yes, they are.

6    Q.    And then, as part of your review, did you go through the

7    policies and procedures manuals and the training manuals?

8    A.    Yes, I did.

9    Q.    And did you review those manuals with respect to consumer

10   disputes?

11   A.    Yes, I did.

12   Q.    Is there a -- a requirement concerning the verification of

13   a consumer identity?

14   A.    Yes.  They're very specific provisions of what is

15   necessary to identify a consumer who is making a dispute.

16   Q.    Why is that important?

17   A.    Because, as I mentioned before, identity theft is a

18   problem.  And consumer -- the consumer reporting agencies are

19   concerned about the wrong person inserting information into a

20   consumer's file.  A -- a common tactic of someone who wants to

21   commit identity theft is to change the address, because now all

22   of the mail is going to them.  They've set up new accounts.

23   That's all going to them.

24           So it's really important for the CRA that it properly

25   identify the consumer before beginning a dispute or making any

Fortney - D

369

1    changes to the information in the file.

2    Q.   And do some of those policies and procedures also

3    specifically address mixed file procedures?

4    A.   Yes, they do.

5    Q.   And do they address the training of agents to prepare them

6    for various mixed file scenarios?

7    A.   Yes, they do.

8    Q.   And have you reviewed the specific scenario, with respect

9    to Ms. Miller?

10   A.   Yes, I have.

11   Q.   And how would you characterize that, based on your

12   experience, in terms of what you've seen in the way of mixed

13   files?

14   A.   Well -- I'm sorry.  Could you --

15   Q.   Sure.  That was not a very clear question.  I apologize.

16        When you -- how would you describe Ms. Miller's

17   situation, in terms of what happened in that particular

18   instance in the mixing of files?

19   A.   Well, I think it's undisputed that her file was merged

20   with that of another consumer, and the evidence also indicates

21   that Equifax provided her file disclosure, even though she did

22   not give Equifax the necessary verification of her Social

23   Security number.

24        And that was in contravention of the -- the policy

25   that -- policies that Equifax had and that I believe every

Fortney - D

1    consumer reporting agency has.  That they must identify the --

2    verify the identity of the consumer before they provide the --

3    the report to the consumer.

4    Q.   And as a result of that, did that trigger next steps with

5    respect to her file that was unusual under the circumstances?

6    A.   Well, I think the first thing is, this was a very, very

7    unusual situation, to have this close a match.  I had never

8    seen it before.

9         You know, we have such a close -- we have the same

10   name, including the same middle initial.  And then, of course,

11   a Social Security number, that was so close.

12        So after she had received her file and saw the

13   information she identified as not being hers, she then disputed

14   this to -- to Equifax.

15        The problem was that they didn't know that she had

16   been able to receive her file with incomplete verification of

17   her Social Security number.

18        So I think that was one of the problems in the

19   process as Equifax was attempting to resolve her dispute.

20   Q.   And does that circumstance create a confusing scenario for

21   purposes of -- of communication from the consumer to the

22   agents?

23   A.   Again I'm not quite sure I understand that.

24   Q.   I'll withdraw it.  Let me try a different approach here.

25        Based on your review and analysis of Equifax's

Fortney – D

371

1   policies and procedures and the circumstances of this case,

2   could you give us your expert opinion as to whether, those

3   procedures were reasonable?

4   A.   Well, I think the jury, when they have a chance to review

5   these policies and procedures, will -- will see how -- how

6   thorough they are.

7        The thing that struck me also about these policies

8   and procedures was how they are periodically updated.  That is

9   one of the elements, in my experience, of reasonable

10  procedures.

11       That the company is not just satisfied with the way

12  things were, you know, 20 years ago, but they are continuing to

13  look at these policies and procedures as -- as new developments

14  occur.

15       So in my experience, and based on my expertise, I

16  would say these policies and procedures that Equifax has for

17  dealing with consumer disputes, including those that involve

18  mixed files, are reasonable, are consistent with the industry

19  standards.

20  Q.   And do you have an opinion as to whether Equifax, over the

21  years -- since the early 1990s, when those agreement of

22  assurances and any consent orders were entered -- as to whether

23  Equifax has changed and updated its policies and procedures

24  over that time?

25  A.   Yes.  And, again, I think the -- the dates on the policies

372

Fortney - D

1    and procedures reflect that.

2    Q.    And with respect to the Social Security number match of

3    seven to nine, do you think by applying that, Equifax

4    disregarded Mrs. Miller's Social Security number?

5    A.    No.    I think Equifax followed the procedure that is the

6    standard in the consumer reporting agency and the procedure

7    that the Federal Trade Commission studied and concluded does

8    not have to be changed.

9    Q.    You talked a little bit about some of the statistics

10   involved in this industry, which range in the millions and

11   millions.

12            Could you also help the jury understand how many

13   times a name can arise in -- like a last name, like a common

14   name.  You know, such as Johnson, or a name like that.  How

15   many times that --

16   A.    The Consumer Financial Protection Bureau, in the study I

17   mentioned before, dating from December of last year, noted that

18   in -- in America, there are 1.8 million consumers with the last

19   name Johnson.  And another million consumers with the last name

20   Davis.  And there are many other common last names.  And,

21   again, that is one of the problems that consumer reporting

22   agencies have to face when they are trying to match the data to

23   the correct consumer.

24   Q.    Earlier, Mr. Hendricks also testified about how closed

25   this industry is, and that consumers don't have access to this

Fortney - D

373

1   type of information.

2           Could you explain to jury what your understanding is,

3   in terms of -- of the status of this industry today?

4   A.   I think this is a very transparent industry, and that's

5   not just my conclusion.

6           The Consumer Financial Protection Bureau, in their

7   study, found that 44 million consumers get their free credit

8   report each year.  44 million.

9           And I also know that each time a consumer gets their

10  free credit report, or any consumer report from a credit

11  bureau, they get a statement of their rights under the Fair

12  Credit Reporting Act.  So they are informed as to how they can

13  protect themselves, protect their rights, exercise their rights

14  with respect to their own credit information.

15          In addition, each time a consumer applies for credit

16  these days, many creditors, in order to comply with what's

17  called the Dodd-Frank credit score structure, and was to comply

18  with a new law -- each time a consumer applies for credit, the

19  creditor gives them a -- a copy of their credit score and an

20  explanation of how credit score -- scoring works and what goes

21  into their particular credit score.  What are the four major

22  factors that influence their credit score.

23          So as a result, as consumers today apply for credit

24  cards or auto loans or mortgage loans, they are getting their

25  free credit score disclosure.  So, as a result, I believe

Fortney – D

374

1    millions of consumers are getting their credit scores on a

2    regular basis.

3            And I think what's also significant is the Consumer

4    Federation of America.  Now, that's an organization that

5    represents consumers.  It does not represent anybody in the

6    industry.

7            The Consumer Federation of America published a study

8    last year, and found that the vast majority of Americans today

9    have a very good understanding of their credit reports and

10   their credit scores, and particularly their credit scores.

11           They found that depending on the question they asked,

12   80 to 90 percent of consumers understood how credit scores are

13   used, who provides them, what goes into a credit score, how

14   consumers behave in paying their bills affects your credit

15   scores.  And they also -- a very high percentage -- understood

16   the importance of seeing their credit report each yeah and

17   checking for the accuracy of that information.  This is a very

18   transparent industry.

19           And I have to say 20 years ago, or in the early '90s,

20   it was not.  Consumers could not get their credit score at all.

21   They couldn't buy it.  They couldn't get it.  And they were not

22   entitled to a free credit report unless they were declined for

23   credit.  So the world has changed dramatically in the last 20

24   years, and for the better.

25   Q.   And as the world has changed dramatically in the last 20

Fortney - D

375

1    years, has Equifax changed its policies and procedures to

2    address that?

3    A.    Absolutely.  Absolutely.

4    Q.    Let's go back to the specific situation that occurred

5    here, from your review.  Is it your -- your review of the

6    materials relating to Ms. Miller.

7              Is it your understanding that a -- a single Equifax

8    agent handled her disputes, or whether there were multiple

9    agents involved?

10   A.    It appeared to me that there were multiple agents

11   involved.

12   Q.    And based upon your review of the information that they

13   were receiving at the time of her disputes, what -- what --

14   what information did the Equifax employees have concerning

15   that -- that credit report that would have indicated to them

16   whether or not they were dealing with the right consumer?

17   A.    Well, again, from the -- when -- when you are looking at

18   the reasonableness of a CRA's procedures and the following of

19   those procedures, you have to put yourself in the place of what

20   did these people know at this time.  Not what did they know

21   today or what do we know today.  This is actually the standard.

22   The test is, what did they know?  What did they reasonably know

23   at the time?

24             And it appears to me that they reasonably knew or

25   believed that they did not have the proper identification from

Fortney - D

376

1   Ms. Miller when she continued to dispute the information.  And

2   that was because she had gotten the report initially from --

3   her free credit report without identifying her Social Security

4   number.

5          But see, the agents looking at that -- you know,

6   after she got that report, they didn't know that.  What they

7   knew was they had one file on Ms. Julie Miller, with certain

8   identifying information.  And what she was providing wasn't

9   matching.

10  Q.   So could you distinguish for a moment the difference

11  between a mixed file and a merged file.

12  A.   Well, a merged file is a type of mixed file.

13         In this -- a mixed file can occur when just some

14  information that, for instance, should go to -- let's assume

15  that a father and son have the same name, senior and junior.

16  But creditors don't always put in, you know, senior and junior.

17  So you could have a mixed file.  Then you have a file for the

18  senior and a file for the junior.  Some goes to the senior

19  file, some to the junior file.

20         That is probably the most common type of mixed file.

21  And mixed files, by the way, are not that common.  They're

22  about 1 to 2 percent of the number of files at consumer

23  reporting agencies.  And that goes back to the FTC study that I

24  mentioned before about mixed files.  So you have a very small

25  percentage of files that are mixed files.

377

Fortney - D

1    In this case, you didn't have a mixed file.  We had

2  some information for one Julie Miller and one information for

3  another Julie Miller.  You had this information merged

4  together.  That makes it extremely difficult to determine what

5  information really should pertain to this Julie Miller.

6  Q.   Now, in this case, if -- would it have been more work for

7  the agents to have reinvestigated and sent out requests for

8  information to the furnisher, as opposed to what they were

9  doing in response to her communication?

10  A.   Well, the procedures are that no investigation should

11  begin until Equifax has the proper identification from the

12  consumer.  So until they receive that identification, they

13  should not have begun any -- any investigation.  This goes back

14  to the concern about fraud, identity theft, corruption of data

15  in -- in the files.

16         So what they did was keep asking her for verification

17  of her identifying information.  That required the agent to go

18  and determine which letter to send.  And that's a hard decision

19  sometimes when you have a situation like this, which is very

20  unusual.

21         So they had to go out and figure out which letter to

22  send.  They had to generate that letter.  That letter then had

23  to be mailed out.  The agents are sitting there were their

24  computer terminals, they have access to the EOSCAR system.  All

25  they have to do is enter into the EOSCAR system, the consumer's

378

Fortney – D

1    dispute, and it goes automatically to the furnisher.  That

2    would have been a much more simple procedure.

3    Q.    Let's talk a minute about information that's coming in

4    from a consumer.

5           Do you agree that Equifax should always just believe

6    the consumer when they contact Equifax and dispute information?

7    A.    I think that would be a disaster to the consumer reporting

8    industry, and let me explain why.

9           Not just the fact that we have the problem of

10   identity theft -- and, again, that is a big problem -- but also

11   we have the problem of credit repair organizations.

12          Now, I don't know if you're familiar with credit

13   repair companies.  These are the ones who promise, falsely and

14   illegally, that they can remove accurate but negative

15   information from consumers' reports and their files.

16          The way they do this is they abuse the process, which

17   is very important for consumers when used properly.  They abuse

18   the process to dispute the information.  They -- they -- they

19   file the same disputes over and over and over again, hoping

20   that at some point either the CRA will get tired of hearing

21   from them.  Or, alternatively, that the furnisher will get

22   tired of verifying the information, or will not verify the

23   information within the appropriate time.

24          Well, the system works in favor of the industry.  It

25   doesn't work in favor of the consumer.  These consumers pay a

379

Fortney - D

1   lot of money to these companies that make these illegal

2   promises.  They violate the law.  But here's the problem.  They

3   are -- these companies, these credit repair organizations are

4   preying on consumers who are desperate.  They want to get this

5   bad information out of their file.  So they are successful in

6   getting consumers to sign up.

7          As a result, 30 percent of all disputes received by

8   Equifax and the other CRAs come from customers of credit repair

9   clinics.  That's a very large percent.  It ties up a lot of

10  resources.  They have to investigate every single dispute.

11         So if you -- if they just took the word of a

12  consumer, Not mine, or This isn't my information, or I want you

13  to change this information, you would have -- it would be an

14  invitation to identity theft and other fraud, and also would

15  enable credit repair organizations to basically corrupt the

16  information on which everyone relies in providing credit to

17  consumers.

18  Q.   Now, earlier, in Mr. Hendricks' testimony, he proffered an

19  alternative procedure to address the mixed file situation.  And

20  I believe -- if I'm quoting this correctly -- he referred to an

21  automated program that he would suggest to review and detect

22  mixed files.

23         Are you familiar with what he is talking about?

24  A.   I've never heard of such a thing, and I am involved in a

25  lot of issues in this area.  And I've never heard of such a

Fortney - D

1    thing.  I don't know what he has in mind.

2            What I do know is that the Federal Trade Commission

3    and Consumer Financial Protection Bureau would not require such

4    a thing unless it were fully developed, vetted, and determined

5    to meet the cost-benefit analysis that would be required before

6    a CRA should implement such a program.

7            So without any more information, I really can't

8    comment on it, other than to say I've never heard of it.  And I

9    can't imagine why the FTC or the CFPB would think it's a good

10   idea.

11   Q.   You mentioned a cost-benefit analysis.  Is that a term

12   that the regulators use in analyzing potential programs or --

13   or procedures for the credit reporting agencies?

14   A.   Yes, it is.

15           And that is the analysis that the Federal Trade

16   Commission applied when studying the problem of mixed files,

17   and determining whether it was appropriate to require more

18   precise matching.

19           They said that they -- based on their study, they did

20   not believe that they could conclude that the cost -- in other

21   words, the harm to consumers of having incomplete files --

22   would offset the -- or be offset by the benefits to consumers

23   of having completely accurate information.

24           They did a cost-benefit analysis and said, Based on

25   that analysis, we do not believe that we should recommend

Fortney - D

381

1   changes to the current system.

2   Q.   Based on your experience and expertise in this industry

3   and your review of this case, do you believe what happened to

4   Ms. Miller was foreseeable to Equifax?

5   A.   Well, even though mixed files occur only about one to two

6   percent of the time, it was foreseeable that there would be a

7   mixed file.  That's why Equifax has these procedures.  This is

8   a foreseeable event.

9        What was not foreseeable was that -- an Equifax agent

10   would provide a consumer report to a consumer who had a

11   different Social Security number than what was on file, without

12   requiring a -- a verification of that Social Security number.

13   That's what was not foreseeable.  And I think that was the --

14   the thing that Equifax, despite all of these good procedures,

15   could not have foreseen.

16   Q.   And in your expert opinion, with respect to the

17   information that you've reviewed in this case, were Equifax's

18   actions that of a reasonably prudent credit reporting agency?

19   A.   Yes, they were.

20   Q.   And in your expert opinion and in your review of this

21   case, did Equifax act with reckless disregard as to Ms. Miller?

22   A.   Not at all.

23        MS. SUMNER:  May I have a moment, your Honor?

24        THE COURT:  Yes, of course.

25        MS. SUMNER:  Thank you, your Honor.

Fortney – X

382

| 1 | THE COURT:  No further questions? |
| 2 | MS. SUMNER:  No further questions. |
| 3 | THE COURT:  Cross. |
| 4 | MR. JUSTIN BAXTER:  Thank you, Judge. |
| 5 | CROSS-EXAMINATION |
| 6 | BY MR. JUSTIN BAXTER: |
| 7 | Q.   Good afternoon, Ms. Fortney? |
| 8 | A.   Good afternoon. |
| 9 | Q.   My name is Justin Baxter.  We've never been introduced. |
| 10 | I'm one of the attorneys who represents Ms. Miller. |
| 11 | A.   Um-hmm. |
| 12 | Q.   Earlier in your testimony, you said that consumer |
| 13 | reporting agencies are required to have reasonable procedures |
| 14 | to ensure maximum possible accuracy.  Is that correct? |
| 15 | A.   That's correct. |
| 16 | Q.   But that's not the legal standard under the Fair Credit |
| 17 | Reporting Act.  Correct? |
| 18 | A.   Yes, it is. |
| 19 | Q.   Well, let me read to you Section e of the statute. |
| 20 | A.   Yeah. |
| 21 | Q.   Whenever a consumer reporting agency prepares a |
| 22 | consumer -- |
| 23 | MS. SUMNER:  Your Honor, I would ask counsel to |
| 24 | provide Ms. Fortney with a copy of the -- |
| 25 | THE COURT:  Well, if she needs it, she'll ask for it. |

Fortney - X

383

1    But given what she's described, she can probably read it to

2    counsel.

3           So let's everybody get on the same page.  And if you

4    need the help, go ahead and ask for it.

5           Go ahead.

6    BY MR. JUSTIN BAXTER:

7    Q.    Whenever a consumer reporting agency prepares a

8          consumer report, it shall follow reasonable

9          procedures to assure maximum possible accuracy of

10         the information concerning the individual about

11         whom the report relates.

12   A.    Yeah.  That's a -- I shortened that.  That is the

13   standard.  The standard is to have reasonable procedures to

14   assure maximum possible accuracy.  Where the Fair Credit

15   Reporting Act actually imposes that obligation is when that

16   report is actually provided by the CRA.  That's why you have

17   that language.

18   Q.    And you would agree that the Fair Credit Reporting Act

19   requires consumer reporting agency not just to have procedures

20   but to follow procedures?

21   A.    Yes.

22   Q.    Okay.  And so that's the correct standard?

23   A.    Yes.

24   Q.    All right.  You mentioned that there's an approximate 1 to

25   2 percent error rate for mixed files.  Is that correct?

Fortney - X

1    A.    That's correct.

2    Q.    So --

3    A.    That's what the Federal Trade Commission reported.

4    Q.    And so for 200 million adults in America with credit

5    files, approximately 2 to 4 million Americans with mixed files?

6    A.    That's correct.

7    Q.    All right.  As we discussed a moment ago, the standard

8    under the Fair Credit Reporting Act is that the agency must

9    follow reasonable procedures to assure maximum possible

10   accuracy.  Correct?

11   A.    Correct.

12   Q.    Now, in this case, Equifax merged Ms. Miller's credit file

13   with a different person, with a different Social Security

14   number, with a different date of birth, and a different

15   address.  Correct?

16   A.    Correct.

17   Q.    And that's not reasonable, is it?

18   A.    That's not the standard.

19         The standard is they follow reasonable procedures to

20   assure the accuracy, not that the report be accurate.  That

21   would be strict liability.  They follow the reasonable

22   procedures to assure the accuracy of the information.  The

23   focus is on the reasonableness of the procedures.

24   Q.    Okay.  But my question is, was it reasonable to mix

25   Ms. Miller's credit file with a different person, with a

385

Fortney - X

1   different social, a different date of birth, and a different

2   address?

3   A.   What I'm saying is given the report that the Federal Trade

4   Commission did on this -- on this issue of mixed files, that

5   Equifax followed the industry standards, which the FTC declined

6   to change.

7   Q.   All right.  I guess we're talking past each other.

8           I'm just asking --

9   A.   No, I'm trying to answer your question.  I'm just --

10  Q.   All right.  I'm just looking for a yes-or-no answer.

11          Was it reasonable to mix Ms. Miller's file with a

12  different person, with a different social, a different date of

13  birth, and a different address?

14  A.   Under the circumstances, yes.

15  Q.   All right.  Now, each and every time a consumer disputes

16  information in their credit report, the agency is required to

17  conduct a reasonable reinvestigation within 30 days.  Correct?

18  A.   Once the agency -- consumer reporting agency identifies

19  the consumer, yes.

20  Q.   Okay.  And it's not just that they have to do a

21  reinvestigation.  The -- the statute actually defines what they

22  have to do.  Correct?

23  A.   It's set forth -- sets forth the parameters, yes.

24  Q.   Okay.  And that includes the agency has to review and

25  consider all of the relevant information provided by the

Fortney - X

1   consumer?

2   A.   That's once the agency -- once the consumer reporting

3   agency begins the investigation, yes.

4   Q.   Okay.  The agency must also notify the furnisher of the

5   disputed information?

6   A.   Once it begins the investigation, yes.

7   Q.   Okay.  The agency also has to provide all relevant

8   information that it receives from the consumer to the

9   furnisher?

10  A.   Yes.  Yes.

11  Q.   The agency also has to delete any information that it

12  finds to be inaccurate or incomplete or cannot verify?

13  A.   That's correct.

14  Q.   Okay.  And the agency also has to provide written notice

15  to the consumer of the results of their reinvestigation?

16  A.   Yes.  Once they complete the reinvestigation, yes.

17  Q.   Okay.  And all of that has to take place within 30 days?

18  A.   That is correct.

19  Q.   And if the agency doesn't take each of those steps, that's

20  a failure to comply with the Fair Credit Reporting Act?

21  A.   No, it is not.  Because the first step, which I mentioned,

22  is that the agency must obtain the proper identification of the

23  consumer before beginning the investigation.

24  Q.   Okay.  So in this case, Ms. Miller disputed the

25  completeness and accuracy of information in her credit file.

Fortney – X

1    Correct?

2    A.   That's correct.

3    Q.   And Equifax received that dispute.  Correct?

4    A.   They received a dispute.  They did not know from whom that

5    dispute came, because they did not have the information they

6    needed to verify the identity of Ms. Miller.

7    Q.   Okay.  Would you take a look at your book.  Okay?

8    A.   Um-hmm.

9    Q.   If you'll turn to Exhibit (pause) 25.

10   A.   Okay.

11   Q.   I'm sorry.  Exhibit 26, please.

12   A.   Okay.

13   Q.   This has been identified as a dispute package that

14   Ms. Miller sent to Equifax.

15        Okay.  If you'll take a look at the first page.  It's

16   marked Exhibit 26, page 1 of 8.

17   A.   (Pause, referring.)  Yes.

18   Q.   Okay.  Do you see the final sentence in the first

19   full-body paragraph is:

20             I've exposed my identity by mailing requested

21             information several times.

22             And she writes:  And twice now, I've received

23             someone else's credit report, with the wrong

24             Social Security number and birth date.

25   A.   That's what it says.

Fortney - X

388

1    Q.   Okay.  That would adequately advise Equifax of -- of an

2    issue with the credit file.  Correct?

3    A.   It -- well, the letter speaks for itself.  It basically

4    tells what her concern is here.

5    Q.   Okay.  If you'll turn to the second page.

6    A.   Um-hmm.

7    Q.   This is Equifax's research request form.  Correct?

8    A.   Right.

9    Q.   And this is a document that comes with a credit file.

10   Correct?

11   A.   Correct.

12   Q.   And Ms. Miller could only obtain this if she had provided

13   enough information and documentation to obtain a credit file.

14   Is that correct?

15   A.   I don't know what Equifax agents look at when they

16   provided the information of the credit file to her.

17           What I do know, because it's in the record, is that

18   she did not provide the verification of the Social Security

19   number when she initially received her report.

20   Q.   Okay.  Well, let's keep looking at this letter, because I

21   think we'll get there.

22   A.   Okay.

23   Q.   So also on page 2, you see, she circles the Social

24   Security number and date of birth.

25   A.   Correct.

Fortney - X

389

1   Q.   And she writes "incorrect."

2   A.   Correct.

3   Q.   So --

4   A.   She writes "incorrect."

5   Q.   Right.  That would put Equifax on notice that there's an

6   issue with this credit file with the Social Security number and

7   the date of birth?

8   A.   Yes.

9   Q.   Okay.  Now, if you will flip with me a couple of pages --

10  A.   Um-hmm.

11  Q.   -- to page 6.

12  A.   Okay.

13  Q.   Exhibit 26, page 6.

14  A.   Um-hmm.

15  Q.   This is a copy of Ms. Miller's complete W-2 form.

16  Correct?

17  A.   Um-hmm.  Correct.

18  Q.   And it has her full, unredacted Social Security number?

19  A.   Um-hmm.

20  Q.   And it has her address?

21  A.   Yes.

22  Q.   Okay.  Would you turn to the next page.

23  A.   Um-hmm.

24  Q.   It's Exhibit 26, page 7?

25  A.   Um-hmm.

Fortney - X

1   Q.   This is an insurance bill.

2   A.   Um-hmm.

3   Q.   And it shows Ms. Miller's complete, correct address?

4   A.   Right.

5   Q.   Okay.  This is enough information for Equifax to verify

6   Ms. Miller's identity?  Do you agree?

7   A.   I really don't know, because, again, I would have to know

8   everything else that was there at the time.  I really don't

9   know.

10  Q.   Okay.  During your testimony, you said that the standard

11  is what's reasonable based on what they knew at the time.

12  A.   Right.  Um-hmm.

13  Q.   Correct?

14          Here we have a complete document the -- the --

15  Ms. Miller sent to Equifax and they received.

16  A.   Right.

17  Q.   And she says, I'm receiving the credit file for another

18  person.

19  A.   Um-hmm.

20  Q.   And then she provides the confirmation number that

21  corresponds to that person.  And then she provides her W-2 and

22  her insurance bill.

23          What more could she provide?

24  A.   Well, again, I don't -- I would have to look at everything

25  that was available.  That's outside the scope of what I've

Fortney - X

 1   testified to.

 2          What I'm saying is we're looking at this from her

 3   perspective, and that's a very important perspective.  This is

 4   what she provided.

 5          The other thing -- and I think there are some

 6   unknowns here -- is what did the agents have in front of them?

 7   What did they know?  What did they look at?  We have some

 8   information.  But, again, this is not something I spent a lot

 9   of time on because I'm only talking about the -- the issues as

10   an expert here.

11          I bet the jury could certainly look at the evidence.

12   But what I think we have to do is say that this was an unusual

13   situation from the perspective of the agents.  That's not

14   Ms. Miller's' perspective.  And I appreciate her perspective.

15   But there are two perspectives here, and I don't know what

16   other information the agents had, and why they did not respond

17   in the way Ms. Miller wanted.

18   Q.   Okay.  But this is the document.  We actually have a real

19   document --

20   A.   Yes.

21   Q.   -- that she sent.

22   A.   But -- but we also need to know that, you know, what they

23   had on file, was -- was other information.  We know that.

24   Q.   Okay.  What I'm asking is based upon this documentation

25   that we have before us --

Fortney - X

1    A.    Right.

2    Q.    -- was this enough to initiate a reinvestigation?

3    A.    I -- I think that what we have here is her identifying

4    information, the nature of her dispute.

5          So I think if we're just looking at this and not

6    anything else, I would say yes.  But I don't know what else was

7    going on.

8    Q.    Okay.  So your answer to my question is yes?

9    A.    That's correct.

10   Q.    They should have started a reinvestigation?

11   A.    Yes.

12   Q.    And if they didn't, that would be a failure to comply with

13   the Fair Credit Reporting Act?

14   A.    I wouldn't go that far.  Again, it could be, and -- it

15   could be a failure.  It could also be that they misunderstood

16   what was there.  We don't know that.

17         What we do know is Ms. Miller submitted this dispute,

18   and it was not resolved to her satisfaction.  That's what we

19   know.

20   Q.    Okay.  Earlier in your testimony you said that the agency

21   must follow reasonable procedures.  Correct?

22   A.    Um-hmm.  Correct.

23   Q.    In your review of this case file, did you see evidence

24   that Equifax failed to follow its own procedures?

25   A.    What I saw, yes, was that Equifax did not always follow

Fortney - X

1   its own procedures; including when it initially provided that

2   first consumer report to Ms. Miller.

3   Q.   In fact Equifax sent four different credit reports to

4   Ms. Miller.  Correct?

5   A.   Correct.

6   Q.   And each of those credit reports had the full Social

7   Security number of the other person.  Correct?

8   A.   That's what -- because that's what Equifax had on file.

9   Q.   And the date of birth?

10   A.   That's what they had on file.

11   Q.   And that other person's accounts?

12   A.   That's what -- that's what they had on file.  They thought

13   they were providing the complete file to Ms. Miller.

14   Q.   Okay.  But it was also your testimony that under their

15   procedures they weren't supposed to send any of those credit

16   files to Ms. Miller.  Correct?

17   A.   That's correct.

18   Q.   Okay.  So those four times, Equifax ignored its own

19   procedures?

20   A.   I didn't say they ignored their own procedures.  I don't

21   know why they provided a report to Ms. Miller when she did not

22   provide, from the perspective of the agent, the necessary

23   identifying information and verification of that identifying

24   information.

25   Q.   Okay.  Okay.

394

Fortney - X

1   A.   Are we saying the same thing?

2   Q.   Did you happen to review -- you said you read some

3   deposition testimony in this case.  Correct?

4   A.   Correct.

5   Q.   You read the deposition of Ms. Mixon.

6   A.   I think so, yes.

7   Q.   And she talked about some of the reinvestigations, or --

8   or some of the disputes.  Correct?

9   A.   Correct.

10  Q.   And in fact she said that on some occasions, Equifax was

11  supposed to process reinvestigations, but the agents didn't do

12  that?

13  A.   That's what I think her testimony is, yes.

14  Q.   And she said that when they didn't do that, that was also

15  outside of procedure.  Correct?

16  A.   I don't recall exactly what she said.  What I do recall is

17  that she said -- and I don't think there's an issue here --

18  that Equifax agents did not always follow the procedures.

19  Q.   Okay.  So -- so there were instances with regard to

20  investigations where Equifax didn't follow its procedures.

21  Correct?

22  A.   The -- the -- the record reflects the fact that Equifax

23  did not respond to Ms. Miller's disputes and did not always

24  follow its procedures.

25          This -- you know, you really don't need an expert to

```
 1   tell you that.

 2            MR. JUSTIN BAXTER:  Judge, those are the questions I

 3   have of this witness.

 4            THE COURT:  Thank you.

 5            Redirect.

 6            MS. SUMNER:  Your Honor, we have no redirect.

 7            Thank you.

 8            THE COURT:  All right.  Thank you.  You are free to

 9   go, Ms. Fortney.

10            THE WITNESS:  Thank you.

11            THE COURT:  Next witness, please.

12            This will be Ms. Mixon, yes?

13            MR. PERLING:  Yes, your Honor.

14            MS. SUMNER:  Your Honor, just for scheduling purposes

15   may I ask when you plan to do an afternoon break?

16            THE COURT:  In about a half hour, 3:00, 3:15.

17            Do you need a break now?

18            Jurors, would you like a break now?

19            Okay.  We'll have a break.

20            How about 15 minutes, and then we'll take Ms. Mixon

21   up after the 15-minute recess.

22            So same instruction as before.  Don't talk about the

23   case.  Not yet.  Talk about anything else you want.

24            And, in fact, I bet Ms. Boyer would be willing to

25   take you up to the 16th floor balcony for a little fresh air
```

Fortney - X

396

1    on --

2                THE JUROR:  A field trip, right?

3                THE COURT:  A field trip up the elevators.  Okay.  15

4    minutes, though.  Not a long trip.  Come back.

5                THE JURORS:  It's her fault if we're not.

6                THE COURT:  Please follow Ms. Boyer.

7                All right.

8                (Jurors exit.)

9                THE COURT:  Okay.  We'll take a 15-minute recess, but

10   before we do, let me just update.

11               I went back to the **Ashby** case and was reminded that

12   was not a punitive damage case, though.  But that was a case

13   where we were looking for whether the plaintiff had a basis to

14   establish actual damage -- or statutory damages of 100 per

15   person in a class.

16               The issue there, however, did involve willfulness and

17   the definition of willfulness.  And the instructions we're

18   working with here are exactly consistent with the definition of

19   reckless disregard.  There wasn't any commentary on punitive

20   damages.

21               I went to Judge Mosman's instruction in **Kirkpatrick**.

22   He deleted -- of the three categories malicious, oppressive, or

23   reckless disregard, he deleted oppressive.

24               You may remember this or not.  Didn't you try the

25   **Kirkpatrick** case?

Fortney - X

1                    MR. MICHAEL BAXTER:  Yes.  Yes, we did.

2                    THE COURT:  So oppressive was not in the list but

3      malicious was.  So I'm just letting you know that's there.  I

4      haven't found any other guidance on the question.

5                    So I told you I would look, and I did.

6                    MR. EDELSON:  Thank you for looking.

7                    THE COURT:  15 minutes, please.

8                    MS. SUMNER:  Thank you for breaking, your Honor.

9      Appreciate that.

10                   THE COURT:  Okay.  Good.

11                   (Recess taken.)

12                   MR. EDELSON:  Your Honor, this is Ms. Mixon.

13                   THE COURT:  Good afternoon.

14                   THE WITNESS:  Good afternoon.

15                   THE COURT:  Okay.  Are the jurors ready?

16                   Bring them in, please.

17                   (Jurors enter.)

18                   THE COURT:  Thank you, everyone.  Please be seated.

19                   Except you, Ms. Mixon.  Would you remain standing.

20                   Face the jury there and deputy, and raise your right

21     hand to be sworn.

22                   (Witness sworn.)

23                   THE WITNESS:  I do.

24                   THE CLERK:  Please take a seat.

25                   THE COURT:  Bring yourself as close in as you can to

398

Mixon - D

1    the microphone there.

2             Tell us your full name, and spell all of it, please.

3             THE WITNESS:  My name is LaDeamya Ellis Mixon.

4    That's L A capital D E A M Y A.  E L L I S, hyphen, M I X O,

5    like X-ray, O N, like Nancy.

6             THE COURT:  Thank you.

7             Counsel.

8             MR. PERLING:  Thank you, your Honor.

9                         DIRECT EXAMINATION

10   BY MR. PERLING:

11   Q.    Good afternoon, Ms. Mixon.

12   A.    Good afternoon.

13   Q.    You also go by DeeDe.  Is that correct?

14   A.    That's correct.

15   Q.    Is this the first time you've testified in court,

16   Ms. Mixon?

17   A.    Yes.

18   Q.    Would you please tell the jury where you live.

19   A.    I live in Lake Columbia, Georgia.

20   Q.    And where do you work?

21   A.    I work for Equifax.

22   Q.    How long have you worked for Equifax?

23   A.    A little over 20 years.

24   Q.    Can you tell the jury a little bit about your background,

25   before you went to work for Equifax?

Mixon - D

1  A.   Prior to working for Equifax, actually I had just

2  completed my student teaching internship.  I graduated from

3  college, and then I did student teaching intern.  And then I

4  started working for Equifax as a temporary employee, part time,

5  while I was completing the -- my student teaching internship.

6  And then I started with Equifax full time.

7  Q.   And where did you get your education?

8  A.   Spelman College in Atlanta, Georgia.

9  Q.   And did you graduate from Spelman?  Excuse me.

10  A.   I did.  I graduated in 1991.

11  Q.   And so you've worked at Equifax ever since?

12  A.   Ever since, yes.

13  Q.   What's your current position at Equifax?

14  A.   I'm a customer service manager.

15  Q.   And you didn't start as a customer service manager, I take

16  it?

17  A.   No, I didn't.

18  Q.   Would you take us back to your very first position, and

19  tell the jury what your very first job at Equifax was.

20  A.   My first job at Equifax was a disclosure agent.

21  Q.   Would you explain to the jury what a disclosure agent

22  does?

23  A.   A disclosure agent is responsible for actually sending out

24  a copy of the credit file.  We refer to that as a disclosure

25  copy.

Mixon – D

400

1          So when a consumer contacts Equifax to ask for a copy

2   of their credit file, the disclosure agents will send that copy

3   to the consumer.

4   Q.   And what was your next job at Equifax?

5   A.   After that, I became a verification agent.

6   Q.   And what does a verification agent do?

7   A.   A verification agent is responsible for inputting a

8   response that's received from a data furnisher or credit

9   grantor, which is a company that's recording information on a

10  consumer's credit file.  So if a consumer disputes information

11  and then we get verification from the data furnishers or the

12  credit grantors, the verification agents will input that

13  response into the system that we use to track consumer

14  disputes, and just consumer correspondence.

15  Q.   Now, the jury might have already heard this term before,

16  but what do you call that system, where you track those things?

17  A.   It's called ACIS.

18  Q.   And what does ACIS stand for?

19  A.   It stands for Automated Consumer Interview System.

20  Q.   Now, after verification agent, what was your next job at

21  Equifax?

22  A.   My next job was actually a dispute agent with Equifax.

23  Q.   And what does a dispute agent do?

24  A.   As a dispute agent, I just -- a dispute agent, I was

25  responsible for actually taking disputes from a consumer.

Mixon - D

401

1          So when a consumer contacts Equifax to request an

2    update on their credit file or to state that some information

3    is not reporting correctly on the credit file, a dispute agent

4    would handle that type of situation from a consumer.

5    Q.   Do you sometimes refer to that as a front line agent?

6    A.   That would be considered a front line indicator or dispute

7    agent, yes.

8    Q.   What was your next job at Equifax?

9    A.   After dispute agent, I became a maintenance reviewer.

10   Q.   And what --

11   A.   A maintenance reviewer, that is an agent that is

12   responsible for reviewing the -- the dispute process.  So it's

13   like the end of the process.

14          After the verification is received, the maintenance

15   reviewer, maintenance agent will review to make sure that the

16   update that was requested by the data furnisher has been made

17   on the consumer's credit file, and the maintenance reviewer

18   will then send out a revised copy or the revised results to the

19   consumer, the results of the -- of the reinvestigation.

20   Q.   And what was your next job at Equifax?

21   A.   Let's see.  After maintenance, I became a quality agent

22   for Equifax.

23   Q.   And what is a quality agent?

24   A.   And as a quality agent, I was responsible for actually

25   quality checks, where we -- we called it service observing,

Mixon - D

1  where we basically -- we monitor and we check a sample of the

2  work that the agents perform.

3        So for all of the different functions, the disclosure

4  agents, dispute agents, verification, maintenance agents, the

5  quality agents -- as a quality agent, I was responsible for

6  checking their work to make sure that they were meeting service

7  levels, and they were following the policies and procedures as

8  they should have.

9  Q.   And then your next job?

10 A.   And then after quality, I became a trainer, and that's

11 where I trained new-hire agents.  And as -- as well as train

12 existing agents on refresher training and any up-training,

13 which is if they were trained to perform an additional

14 function, I was responsible for that as a trainer.

15 Q.   Okay.  After you were a trainer, what would you do?

16 A.   After trainer, I became a supervisor in the customer

17 service department.

18 Q.   And what did you do in that job?

19 A.   I supervised a team of dispute agents.

20 Q.   And then after you were a supervisor in the dispute

21 department?

22 A.   After that, I was a -- what's called a vendor manager.  I

23 became a manager, and I was a vendor manager.

24 Q.   And what did you do as a vendor manager?

25 A.   As the vendor manager, I was responsible for overseeing

Mixon – D

403

1    the vendors that processed the work on behalf of Equifax, to

2    make sure they were processing correctly.

3    Q.    Okay.  So were each of those prior positions that you just

4    described related to customer care regarding consumer contacts?

5    A.    Yes.  All of those were in the consumer -- what we call

6    consumer services division.  So they deal with consumer

7    contacts.  Yes.

8    Q.    And was each one a promotion?

9    A.    Yes.

10   Q.    All right.  Those are your past jobs.

11          Would you tell the jury what you do in your current

12   job as a customer service manager.

13   A.    Okay.  As a customer service manager, I am now responsible

14   for the training department.  I manage the quality department,

15   as well.

16          I also manage a department that handles consumer

17   disputes that we receive from state and local governmental

18   agencies, as well as the BBB, which is the Better Business

19   Bureau.

20          I also have a team of agents that will handle

21   disputes or complaints that we receive from the CFPB, which is

22   the Consumer Financial Protection Bureau.  And they are

23   basically formerly known as the FTC.  So it's a new agency.

24   Q.    Did you mention quality?  I might have missed that.  You

25   also mentioned the quality/training department?

Mixon - D

404

1   A.   Quality/training, um-hmm.  Yes.

2   Q.   Now, plaintiff's counsel read to the jury much of your

3   deposition today.  Do you recall giving that deposition?

4   A.   I do.  Yes.

5   Q.   Have you reviewed it since then?

6   A.   I have, yes.

7   Q.   And you agree in the deposition that Equifax included some

8   information on plaintiff's credit file that did not belong to

9   her.  After reviewing that deposition, is that still true?

10  A.   That's true, yes.

11  Q.   And plaintiff's counsel read to the jury the portions

12  where he went through each of the contacts that plaintiff had

13  with Equifax, and you admitted that Equifax made some mistakes

14  in handling those contacts.

15       Have you determined where Equifax made those

16  mistakes?

17  A.   Well, yes, I did.

18       As you stated, I reviewed the previous contacts that

19  we received from the plaintiff.  And in reviewing those, a part

20  of what, you know, my responsibility was, was to try and

21  determine where we made those errors, and I did see where those

22  errors were unfortunately made, yes.

23  Q.   Okay.  We'll come back to that.  Before we talk about

24  that, let's back up and talk about Equifax a little bit

25  generally.

Mixon - D

405

```
 1              What is Equifax?

 2   A.   Equifax is a -- is one of the three major credit reporting

 3   agencies.

 4              Equifax, a credit reporting agency, is considered a

 5   repository of information; meaning that we store credit history

 6   on consumers.

 7   Q.   Okay.  And this is pretty obvious.  But what does Equifax

 8   do with those credit histories?

 9   A.   Basically the information is stored.  And when a consumer

10   applies for credit or a benefit or employment, the companies in

11   which the consumer is applying for that credit or benefit would

12   have you -- will come to Equifax and review the consumer's

13   credit history in order to make the business decision of

14   whether or not to grant the credit or the benefit that they're

15   applying for.

16   Q.   Okay.  And we've been talking about this a lot during the

17   trial.  That's obviously called a credit report?

18   A.   A credit report, yes.

19   Q.   Okay.  So what is the information contained in the

20   credit -- what are the four areas contained in the credit

21   report?

22   A.   A credit report contains basically, as you stated, four

23   areas.

24              The first section of the credit file or the credit

25   report is the identification section, which includes name,
```

Mixon - D

406

1    address, Social Security number, date of birth.

2          The next part of the credit report is the inquiry

3    section of the credit file, and the inquiry section is a record

4    or a list of any companies that may have requested or accessed

5    the consumer's credit file for review.

6          The next section of the credit file would be the --

7    the public record or -- what we call public record, or other

8    information.  Meaning public records such as a bankruptcy, a

9    lien, and the collection agency section of the credit file.

10         And the last part would be the trade history section.

11   And that would be the area of the credit file that shows the

12   consumer's credit history with any companies that they

13   currently have a business relationship with.

14   Q.   All right.  The first section you mentioned was the -- the

15   ID section, is that often referred to as the header

16   information?

17   A.   That is the header, yes.

18   Q.   Okay.  How does Equifax obtain the header information?

19   A.   Identification information is reported to Equifax in a

20   number of ways.

21         The consumer may provide us with ID information

22   and -- and information is on the credit file or updated on the

23   credit file based upon that.

24         And also the companies that report the information to

25   the credit file, they report ID information to the credit file.

Mixon – D

407

1  So that's another way that identification is reported to the

2  credit file.  And probably the most common way that it's

3  reported to the credit file.

4  Q.    You mentioned a –– a trade line section.  What's contained

5  in the trade line section?

6  A.    In the trade line section, that would be any companies

7  that the consumer has any credit with or has had credit with in

8  the past, such as department stores or loans or mortgage

9  information.  And it's the credit history.  And it shows

10  information such as a balance or payment history on that

11  consumer.

12  Q.    Okay.  And where does that information come from, or how

13  does Equifax obtain that information?

14  A.    It comes directly from the source, which would be the

15  company that's reporting it.  The company that owns that

16  information.

17  Q.    Okay.  And does Equifax pay those sources for the trade

18  lines?

19  A.    No.

20  Q.    And then, finally, you mentioned the inquiry section.  Are

21  all inquiries on a credit file equal to a credit report being

22  issued?

23  A.    No, not necessarily.

24  Q.    Okay.  Would you explain to the jury what you mean by

25  that?

Mixon - D

408

1  A.   So an inquiry on a consumer's credit file, it could mean

2  that the -- that the company actually viewed the consumer's

3  credit file in order to make a business decision.

4           But there may also be inquiries on a consumer's

5  credit file that are, like, promotional inquiries.  And that is

6  where the only information that was provided would be the

7  consumer's name and address, and it would be because that

8  consumer's credit history or that consumer may meet certain

9  criteria that a specific company may be looking for in order to

10  offer credit to that consumer.

11           So, in that sense, they -- the company didn't

12  actually get a copy of the consumer's credit file, but that

13  inquiry will show to the consumer.

14  Q.   Why do banks and other customers of Equifax need

15  information regarding consumers' credit?

16  A.   Well, banks and other companies and entities, they use

17  credit information in order to -- to make their business

18  decisions.

19           So that they can determine who, you know, they want

20  to do business with based upon creditworthiness.

21  Q.   Does Equifax make more money on selling a bad credit

22  report than a good one?

23  A.   No.

24  Q.   Do you understand what I mean by bad?

25           If there's negative information on there, does

Mixon - D

409

1    that -- does Equifax charge more to its customers if there's

2    negative information on a credit file?

3    A.    No, that doesn't have any bearing upon the credit file.

4    On -- I mean, as far as what's on the credit file, Equifax

5    doesn't sell a credit file based upon what's on it, no.

6    Q.    Does Equifax want the credit reports that it sells to be

7    accurate?

8    A.    Definitely.  That's a part of what we do.  We strive to

9    make sure that the credit files that are stored in our database

10   are accurate.  That's one of the stipulations of the -- the

11   Federal Trade Commission, that Equifax should provide accurate

12   information on the credit file.  So that's definitely something

13   that we strive to do.

14   Q.    What would happen if Equifax got the reputation in the

15   marketplace of selling inaccurate credit reports?

16   A.    I would think that if that happened, then other companies

17   wouldn't want to do business with Equifax.

18         You know, that wouldn't be a good look for Equifax to

19   have that type of reputation.

20   Q.    Does Equifax try to follow procedures that are designed to

21   ensure that the credit reports it sells are accurate?

22   A.    I'm sorry.  Can you repeat?  I'm sorry.

23   Q.    Yes.

24         Does Equifax try to follow procedures that are

25   designed to ensure that the credit reports that it sells are

Mixon - D

410

1    accurate?

2    A.    Oh, definitely.  Yes.

3            We have procedures in place to try and make sure

4    those credit files are accurate.

5    Q.    So could you give the jury some examples?  Like,

6    initially, when information comes in, of what Equifax does to

7    make sure that the information is accurate on those credit

8    files?

9    A.    Well, there are different quality controls that are in

10   place, so that when information is reported to a consumer's

11   credit file, there's a quality process that's there to try and

12   ensure that the information is accurate.

13           There is also like a -- a different quality process

14   or a monitoring process, where there is a department that will

15   monitor a company's pattern and how they report information.

16           And if there is anything that -- that doesn't look

17   right or seem right or any red flags, based upon a company

18   that's reporting information, then there is a process that's in

19   place where Equifax will -- or may make the decision to no

20   longer do business with that company because they're not --

21   their reporting practices are not up to standard.

22   Q.    And does Equifax have policies and procedures in place to

23   assure that it conducts prompt investigations and adequate

24   investigations of disputes made by consumers?

25   A.    Yes, we have written policies and procedures in place to

Mixon - D

411

1    make sure that happens.

2    Q.   And you use those policies and -- do -- do you use those

3    policies and procedures to train your agents who communicate

4    with consumers?

5    A.   Yes.

6    Q.   So let me ask you to take a look at Exhibit 116 through

7    134 in front of you, which are kind of a balance, in the

8    notebook there, from 116 to the end.

9         Are those excerpts from those training manuals

10   that -- that you just described?

11   A.   Yes.  These are excerpts from the policy and procedure

12   manuals.  Yes.

13   Q.   All right.  So the actual full manual would obviously be

14   several more pages -- hundreds of more pages?  Would that be

15   fair to say?

16   A.   That's definitely fair to say.  There is more to it than

17   this.

18   Q.   All right.  Who -- who wrote these manuals?

19   A.   Actually, some of these policy and procedure manuals were

20   actually written -- or co-written by me.  And there are other

21   trainers who may assist with writing the policy and procedure

22   manuals under my direction.  So most of them were written by

23   me.

24   Q.   Do you update these?

25   A.   Yes.  Policy and procedure manuals are updated.  Yes.

Mixon – D

412

1    Q.    So how often do you issue the manuals?

2    A.    The full manuals are reissued to all employees, or all

3    agents that process on consumer credit files on an annual

4    basis.

5    Q.    And so the exhibits that we have here, 116 to 134, those

6    aren't the 2013 manuals.  These are historic manuals.  Is that

7    fair to say?

8    A.    Yes.  Based upon the date here, these are not the 2013

9    manuals.

10   Q.    Okay.  And so the current manuals might have more

11   information about -- I'll withdraw that.

12         What does Equifax consider to be a dispute?

13   A.    A dispute is when a consumer contacts Equifax to request

14   information to be updated on their credit file or to state that

15   there is information on the credit file that they don't agree

16   with, that they think it's not correct.

17   Q.    Okay.  And could you give the jury some examples of a

18   typical dispute that Equifax might see?

19   A.    We may receive -- or we do receive disputes from consumers

20   where they may be requesting identification information to be

21   updated.  For example, there may be someone who's changed their

22   name, and they want their ID updated.

23         Or we receive disputes from consumers who may be

24   disputing an account, or something on the credit file, and

25   they're saying it doesn't belong to them.

Mixon - D

413

1          Or another example would be a balance.  A consumer

2   may dispute a balance on a -- on -- on an account, saying the

3   balance is not correct, or the balance should be paid in full.

4   So those are some examples of disputes.

5   Q.   Are you familiar with how Equifax handles disputes?

6   A.   Yes, I am.

7   Q.   How did you gain that familiarity?

8   A.   Well, I was a dispute agent myself, yeah.

9   Q.   All right.  And you've also supervised that department.

10  Right?

11  A.   That's correct.

12  Q.   And you've also trained agents that do that?

13  A.   Trained the agents on it, supervised it.  I still process

14  disputes, even today.  So --

15  Q.   So you still personally handle contacts from consumers?

16  A.   I do, yes.

17  Q.   What are the different ways the consumers can contact

18  Equifax to dispute something on their credit file?

19  A.   Consumers can contact us by phone, by mail, by fax.

20          They can also go online to start a dispute.

21  Q.   Can they even come to Equifax and make a dispute?

22  A.   There is a -- a walk-in center that's located in Atlanta,

23  and consumers can come to that center, yes.

24  Q.   How many steps are there in -- in the dispute process, in

25  general?

Mixon – D

414

1  A.    It's a three-step process.

2  Q.    And what are those three steps?

3  A.    The first step would be indication or indicating, as we

4  call it.

5         The next step would be verification and then

6  maintenance (indicating).

7  Q.    And are these three steps contained in the Equifax

8  training manuals?

9  A.    Yes.  There is a training manual that covers the policies

10  and procedures for each of those individual steps.

11  Q.    So, for example -- if you would turn to Exhibit No. 117

12  for me, please.  And if you would take a look at the first five

13  pages.

14         And, generally, do these describe, in your training

15  of the indicating staff, the entire dispute process, in

16  general?

17  A.    Yes.  This is just -- this is in general a dispute

18  process, and how the dispute process works overall.

19  Q.    Obviously it's not just these five pages that you train

20  your agents on.  It's -- it's more than that.  Right?

21  A.    Well, no, they're trained on the complete manual.

22  Q.    Now, before the three-step process can start, does Equifax

23  first need to locate a credit file for the consumer that's

24  contacted it?

25  A.    Yes.

Mixon - D

415

1  Q.    And what information does Equifax require that the

2  consumer provide in order to locate the credit file?

3  A.    Equifax requests the consumer to provide identification

4  information, which would be the name, address -- current

5  address, Social Security number, and date of birth.

6  Q.    There are different ways -- well, what happens if -- if

7  the consumer doesn't provide all of the information that

8  Equifax requests?

9  A.    If we don't receive all of the information or complete

10  information from the consumer, there is a chance that we may

11  not be able to locate a credit file for the consumer.

12  Q.    Okay.  And so depending on -- I think you said that the

13  piece of ID and information you asked for were name, address,

14  Social Security number, and date of birth.

15        Depending on what's missing, is there a different

16  process for each?  Do you understand my question?

17  A.    Can you repeat it?

18  Q.    Let me -- I think this will help.

19        MR. PERLING:  Let me -- if I might publish to the

20  jury, your Honor, a demonstrative.

21        THE COURT:  Have you shown it to counsel, just to be

22  sure we're good with that?  Yes?

23        MR. PERLING:  Yes, we have.  Thank you, your Honor.

24        THE COURT:  Go ahead.

25  BY MR. PERLING:

Mixon – D

416

1   Q.    So on your screen there in front of you, Ms. Mixon -- is

2   it there?

3   A.    Yes.

4   Q.    Does this demonstrative show what happens in the different

5   scenarios when different piece of ID is missing, when the

6   consumer first contacts Equifax?

7   A.    These are the different scenarios, yes, when a consumer

8   contacts us for -- with a dispute, yes.

9   Q.    Okay.  So if a consumer contacts Equifax to make a dispute

10  and their name is similar but it's not 100 percent -- it's not

11  exactly the same -- for instance, the last name differs, but

12  the first name matches -- what does Equifax do in that

13  scenario?

14  A.    If we're able to locate a credit file for the consumer, if

15  it's -- if the address and Social Security number matches the

16  consumer's credit file but the name varies slightly, then we

17  will go ahead and start the reinvestigation process for the

18  consumer.

19          And the consumer will be sent a standard response or

20  form letter requesting proof of their ID, so that we can make

21  whatever update needs to be made to the credit file, to make

22  sure that ID is correct.

23  Q.    Okay.  And on this demonstrative, we have put that in

24  quotes, the need for proof of ID letter.  Is that the form

25  letter that you're referring to?

Mixon - D

417

1    A.    Yes.

2    Q.    And so that's if the name is -- is slightly different but

3    you've got the -- a Social Security number and date of birth

4    that matches exactly what's on the consumer's credit file.  Is

5    that right?

6    A.    Yes.

7    Q.    What happens if the address is different than -- than what

8    the consumer -- the address on the file is different from what

9    the consumer said, but the name, date of birth, and the Social

10   Security number are exactly the same?

11   A.    If the address is different, then Equifax will move

12   forward and start the reinvestigation process for the consumer.

13   And this would be another scenario where the letter that says

14   we need ID information from you to verify your address would be

15   sent to the consumer, requesting proof of that address, so that

16   we could release the results of the reinvestigation to the

17   consumer.

18   Q.    Okay.  So, again, that would fit in that first category

19   that we have on the top of the slide there.  Right?

20   A.    Yes.

21   Q.    And then, finally, what if the date of birth differs than

22   the one -- on the file than what the consumer says?  So they

23   gave you the exact name, exact Social Security number, and

24   exact address, but it's just the date of birth?

25   A.    A different date of birth would also fall into the same

1  category, where the reinvestigation will be started, and we

2  would request proof of the date of birth, so that it could be

3  updated on the credit file.

4  Q.   Now, what if the Social Security number is different --

5  the Social Security number that the consumer provides when they

6  advise Equifax that they're making a dispute is different than

7  what the agent sees, or the agent tries to pull up in the

8  computer when the disputes are -- what happens in that

9  scenario?

10  A.   With the Social Security number, if that is different,

11  then the dispute process would not be started on that credit

12  file.  And the consumer would be sent a -- another -- a

13  different standard form letter that says that we are unable to

14  locate a credit file for them in our database with the ID

15  information they provided.  That is the file not found form

16  letter.

17  Q.   And then is that the same letter that would go to the

18  consumer if the name is completely different?  In other words,

19  first name and last name are not even similar, but you've got a

20  Social Security number, date of birth, and address that's

21  actually the same on the file?

22  A.   That's correct, yes.

23  Q.   What if multiple pieces of ID differ?

24       So you get contact by a consumer, where the name and

25  address is different, but you have the exact Social on a credit

419

Mixon – D

1    file?

2    A.   When there are multiple pieces of ID that differs, we will

3    send the consumer the file not found letter.  And the

4    reinvestigation would not be started at that point.

5    Q.   Now, how do your agents know what to do in each of these

6    scenarios?

7    A.   The scenarios are listed in the policy and procedure

8    manuals that the agents are trained from.

9    Q.   Okay.  And so, for example, if you would turn to Exhibit

10   117 in your notebook there, it's the same exhibit we were just

11   looking at.

12   A.   All right.

13   Q.   And if you would turn to the page -- there's -- there's a

14   number that says, EIS, dash, JMiller, dash, 000614, on the

15   bottom right-hand corner.  And I'll just refer to those as page

16   614, if -- if that's okay.

17   A.   Okay.

18   Q.   So if you look at page 614, is 614 and 615 -- are those --

19   is that an example of where you say your agents will be trained

20   on these different scenarios?

21   A.   Yes.

22   Q.   And that's just one example.  It's also contained

23   elsewhere in your manuals?

24   A.   Yes.

25   Q.   Okay.  Why, in those situations -- and I'm referring to

Mixon - D

420

1    the slide that we have up on the screen.

2            Why, in those scenarios, on the bottom half, where

3    the -- where the Social Security number differs, the name

4    differs completely -- or I think you also said you get multiple

5    pieces of ID that differs.  Why, in those scenarios, is the

6    process stopped?

7    A.   Well, with those scenarios, basically we stop the

8    process -- or we don't really start the process is because we

9    want to ensure that we are accessing and processing on the

10   correct -- correct consumer's credit file.

11   Q.   All right.  And you corrected me there.  It's not that the

12   process has even stopped.  It's the process hasn't started yet.

13   Right?

14   A.   That's correct.

15   Q.   And in that scenario, in that bottom half scenario of this

16   screen here, you send what's called a file not found letter.

17           What does that say, if you could just summarize that

18   for the jury?

19   A.   The file not found letter basically just tells the

20   consumer that Equifax is not able to locate a credit file in

21   the database with the identification information that they have

22   provided.

23           And it gives the consumer a -- some examples of

24   documents that they can provide to Equifax in order to assist

25   with trying to locate the credit file, and -- and making sure

Mixon – D

421

1   the ID information is correct.

2   Q.   And what happens at Equifax if a consumer responds, and --

3   and I think you said that you asked them to provide some proof

4   of ID.

5   A.   Yes.

6   Q.   So -- so what happens in the process, if Equifax then gets

7   that proof of ID from the consumer?

8   A.   When the ID is received from the consumer, if we have

9   received complete identification from the consumer, then we

10  will attempt to locate the consumer's credit file.

11          So that will be when the process would actually --

12  it's like it starts over again, where we're attempting to

13  locate a credit file for the consumer.

14  Q.   All right.  And at this point, assuming the -- the ID is

15  different than what was on the credit file, will Equifax update

16  that ID to match what the consumer sent in?

17  A.   If we received the documents with the correct ID, yes.

18  The information will be updated on the consumer's credit file.

19  Q.   Okay.  And -- and then the agents are trained to go into

20  the dispute process at that point?

21  A.   That's correct.  Yes.

22  Q.   And so staying with Exhibit No. 117 -- I don't know if

23  you're still looking at Exhibit 117.

24          But if you look at page 630 through 632, does that --

25  is that an example of the -- some of the training that you do

Mixon – D

422

1  for the agents to tell them what to do when that update of ID

2  comes in when the consumer's making that dispute?

3  A.   Yes.

4  Q.   All right.  And there's actually another example here.  If

5  you were to take a look at Exhibit No. 119.

6  A.   I'm sorry.  You said --

7  Q.   Yeah, Exhibit No. 119.  If you take a look at 119.

8  A.   Okay.

9  Q.   And page 937, in the bottom right-hand corner.

10  A.   (Pause, referring.)  Okay.

11  Q.   And is this the policy that -- that goes along with the

12  procedure that you just looked at in the prior --

13  A.   Yes.

14  Q.   And it appears that this -- as you mentioned before, I

15  think you said that -- that these are frequently updated.

16       Does the information up here that says "revised by"

17  mean that that was updated -- that this particular policy had

18  been updated on those occasions?

19  A.   Yes.  It means there were some updates made to the policy.

20  Q.   And you were D. Mixon, as it's listed here, on this?

21  A.   That's me, yes.

22  Q.   So you personally updated this procedure in April 2008,

23  May of 2008, and then in June of 2009?

24  A.   Yes.

25  Q.   Okay.  And then this was -- if you look at the first page,

Mixon - D

423

1    this was the September 2009 dispute manual.  Right?

2    A.    (Pause referring.)

3    Q.    Look at the first page of 119.  I apologize.

4          First page of tab 119.  There you go.

5    A.    Went too far back.  Yes, it is.  September of 2009.

6    Q.    And, again, these manuals are updated every year?

7    A.    They're updated every year, yes.

8    Q.    Would you take a look at Exhibit 118.

9          What is Exhibit 118?

10   A.    This is an addendum to the policy manual regarding

11   multiple ID changes.

12   Q.    Well, would you describe to the jury what -- first of all,

13   what an addendum is.  Why -- and why you would do an addendum.

14   A.    So what happens is throughout the year, Equifax -- we may

15   need to make a change or a revision to a policy, or we may need

16   to implement a new policy.  And as we make those changes

17   throughout the year, we will write an addendum, such as this,

18   so that it can be easily communicated out to all of the agents.

19          And then we take these addendums, and as we're

20   updating the manual for the annual update, we make sure that

21   any addendums that we've made throughout the year are included

22   in the manual at the end of the year, when the updated manual

23   is made -- is completed and sent out to all the agents.

24   Q.    All right.  So mid-year or maybe as-necessary update.  Is

25   that --

Mixon – D

424

1    A.    These are as necessary.

2    Q.    And this one, in particular, related to this topic -- that

3    we've just been talking about -- which is updating multiple

4    pieces of ID.  Right?

5    A.    Yes.

6    Q.    Okay.  So we've talked about the file not found letter.

7    So that's the -- on the slide still.

8          Can you describe what the -- the need proof of ID

9    letter advises the consumer?  What does it say?

10   A.    Excuse me.  I'm sorry.

11         The need proof of ID or need more information letter

12   basically just tells the consumer that we have addressed your

13   concerns.  However, there is ID information that you provided

14   that does not match what's on the credit file.  And in order to

15   update that information, we'll need proof of that ID before we

16   can make the update.

17         If it's an address that we need proof of, then it

18   asks the consumer for proof of their address, and it gives them

19   a short list of some examples of the types of documents that

20   they can send to Equifax in order to make those updates.

21   Q.    Okay.  And so again, on that slide, we're talking about

22   that top half of the ID kind of miss -- not exactly matching

23   the credit file.

24         Why -- why is it that the process was able to start

25   for those consumers, even though they had some different ID,

Mixon - D

425

1    and it wasn't able -- or it was not able to start for the

2    consumers -- I will say -- on the bottom half of the slide?

3    A.   Well, basically, when there's a Social Security number

4    that doesn't match, there is a chance that the credit file that

5    actually -- if we were able to find one in the database, it's a

6    chance that that credit file may not actually belong to that

7    consumer.

8         So we ask for proof of a consumer's Social Security

9    number, to make sure we have the correct credit file in hand,

10   before we start any process or provide that credit file to the

11   consumer.

12   Q.   Do you have security concerns?

13   A.   Oh, definitely.  With identity theft and fraud being

14   prevalent, and we do have security concerns, we want to make

15   sure the credit file that we have is the correct credit file.

16   And we try to make sure that we are sending the credit file to

17   the correct address before we -- we send it out.  So that's why

18   we ask for proof of the address before we mail it.

19   Q.   But in any instance, Equifax would not start -- or would

20   Equifax start the dispute process if the Social Security number

21   differed?

22   A.   No.  That's not -- the policy states that we should not

23   start the dispute process if the Social Security number is

24   different.

25   Q.   All right.  So let me go back to the need proof of ID

Mixon – D

426

1    letter, when the reinvestigation is started.

2            When the consumer responds to the -- to that letter,

3    what's the process of Equifax?

4            So not the -- not the file not found letter but the

5    need proof of ID?

6    A.    Well, when we get the -- the correct proof, then -- as --

7    as I stated, the reinvestigation process should have already

8    started.

9            And when that proof comes in, if it was the address

10   that we needed proof of, then the address would be updated on

11   the consumer's credit file.  And the results of that

12   reinvestigation, if it was already completed, then the results

13   would be sent.  Or if it was still in progress, then when --

14   when it's completed, the results, again, would be sent to the

15   consumer.

16           So when we get that ID from the consumer for the need

17   more information letter, we -- basically we update the file

18   with the ID, and the -- the reinvestigation process continues

19   on to completion.

20   Q.    Okay.  And what happens if the consumer sends in ID -- and

21   I'll just say, I think it might be the same for you, the

22   letter.  And the file is still not found.  Equifax still isn't

23   able to locate the file with a matching Social Security number.

24           Let's talk about Social Security number.

25           So -- so if the consumer sends in proof of ID, and it

Mixon – D

427

1  includes proof of their Social Security number, and that Social

2  Security number still doesn't match exactly a credit file at

3  Equifax, when that updated ID is received, what happens with

4  that?

5  A.    The consumer should be sent another letter saying file not

6  found, because we're still not able to locate a credit file in

7  our database that matches that consumer's ID.  So at that point

8  we consider it a file not found situation, where we didn't find

9  a file.

10  Q.   Can you give us some examples of the documents that a

11  consumer could provide to update their ID?

12         So in either instance, you're asking consumers for --

13  for some different types of documents.  What are the different

14  documents that consumers can send in?

15  A.   Some examples would be a copy of a driver's license.  That

16  would include a -- I mean -- I'm sorry.  That would include

17  a -- an address or date of birth, what we found on the driver's

18  license.  A copy of the consumer's Social Security card or a

19  birth certificate or a W-2 form that would include the Social

20  Security number.

21         If it's a name change, that the consumer has made,

22  then we would accept a copy of a document that shows that

23  consumer's correct name, or the legal document with that name

24  change on it.  So those are some examples.

25  Q.   So if Equifax is having difficulty locating a file based

Mixon – D

428

 1   on the consumer's ID, at some point might it be necessary to

 2   ask the consumer to contact furnishers directly, themselves,

 3   about that?

 4   A.    Can you repeat?  I'm sorry.

 5   Q.    Yeah.  So in a situation like this, like you're talking

 6   about on the slide here, where the -- the -- Equifax is having

 7   difficulty locating a credit file based on an ID that's been

 8   sent in, might it be necessary to ask the consumer to contact a

 9   furnisher of information directly?

10   A.    Well, if -- if we are communicating with the consumer,

11   then, yes, that is something that we do advise the consumers to

12   do.  We advise them to contact their data furnishers.  Because

13   if we're not able to locate a file in the system for the

14   consumer, then we tell the consumer that there's a possibility

15   that the company that they are doing business with -- because

16   normally consumers will say I have credit with somebody or I

17   have credit with these different companies.  So we will advise

18   the consumers to contact their creditors, to make sure they

19   have your ID information correct, and to make sure they are

20   reporting that information, so that it will show up on their

21   credit file.

22   Q.    So if we get past the identification and we're able to

23   locate the -- excuse me, Equifax is able to locate the credit

24   file and start a process -- I believe you said it was a

25   three-step process.

Mixon – D

429

1        MR. PERLING:  I would like to demonstrate the other

2   slide to the jury, your Honor.

3        THE COURT:  All right.  Go ahead.

4   BY MR. PERLING:

5   Q.    Is this -- does this slide, busy as I understand it is,

6   describe or show the dispute -- three-step dispute resolution

7   process at Equifax?

8   A.    Yes.

9   Q.    Okay.  Would you explain for the jury what indication is?

10  A.    Indication -- indication, I'm sorry, or indicating, as we

11  also call it, is the first step of a dispute process, as shown

12  here.  And that's where the contact from the consumer, that we

13  receive from the consumer, is reviewed.  We attempt to locate

14  the consumer's credit file.  The credit file is located.  I

15  review the information that they're disputing.  And that's the

16  first part of the dispute process, where a CDV -- which is also

17  a consumer dispute verification form -- may be sent out to that

18  data furnisher, or the source that's reporting the information

19  on the credit file, to verify the accuracy of the information.

20  Q.    Okay.  And, again, the ACIS case is the way you track a

21  dispute.  Is that correct?

22  A.    That is the way we track disputes, yes.

23  Q.    Okay.  Does Equifax open an ACIS case for every dispute?

24  A.    Yes.

25  Q.    And as part of an ACIS case, does Equifax always contact

Mixon - D

430

1   the source of the information that is disputed?

2   A.    Not always, no.

3   Q.    Okay.  Could you unpack that for us?  What do you mean by

4   "not always"?

5   A.    Well, there may be some situations where a consumer may

6   dispute something on the credit file, and when we review the

7   credit file, the information may be reporting correctly

8   already.

9          So, for example, a consumer may say the balance on my

10  auto loan should be paid in full.  It should be zero.  When we

11  review the file, it may be showing zero.  So in that scenario,

12  we wouldn't need to contact the data furnisher to verify

13  anything.

14         There are also disputes that we receive, such as I

15  mentioned, where consumers may request ID information to be

16  updated on their credit file.  So they may send us a copy of

17  their driver's license or Social Security card, or whatever

18  piece of ID they have, of a name change.  They may send a

19  marriage license, or something of that nature.  And then we're

20  able to update it in that sense.

21         And there also are disputes that we receive where the

22  consumer may be disputing information on their credit file, and

23  they may say, it's not mine.  Or -- any dispute of information.

24  And that item may not even be on the consumer's credit file.

25  Q.    All right.  And so as we're looking at the demonstrative

Mixon – D

431

1    here, is that what we mean, in the red, where no verification

2    is needed?  Are those some examples where no verification is

3    needed?

4    A.    Yes.

5    Q.    So in that instance, is the second step of verification --

6    well, it's skipped.  Is that fair to say?

7    A.    The vare -- if it's not -- right.  If we don't verify

8    anything, then the second step would be skipped, yes.

9    Q.    And then after maintenance, in those instances, would

10   Equifax contact a consumer?

11   A.    After maintenance is completed on the credit file, that is

12   when the consumer will be sent the results of that

13   reinvestigation.

14   Q.    Okay.  Okay.  What is verification?

15   A.    Verification is whether we -- or Equifax contacts the data

16   furnishers, the courthouses, the collection agencies, whoever

17   is reporting the information on the credit file.  That's when

18   we call the source of the information.  It's when they contact

19   the source of the information, to verify the accuracy of

20   whatever's reporting on the file.

21   Q.    And, in general, does Equifax contact -- how does Equifax

22   contact furnishers?

23   A.    The normal process to contact furnishers is -- it's an

24   automated process.  It's call EOSCAR.  So it's an automated

25   dispute verification process.

Mixon – D

432

1          And the consumer's dispute information, it's entered

2    into the ACIS database, and the verification request -- or the

3    verification form, that we talk about, is sent automatically

4    through the system to the -- the data furnisher in order to

5    verify the information.

6    Q.   Okay.  And what does the data furnisher do when they -- or

7    what are they supposed to do when they get that information

8    from Equifax?

9    A.   The data furnishers are supposed to review the consumer's

10   dispute in its entirety and also review the information that

11   they have in their database on that consumer's account and

12   accurately respond back to Equifax.  Either telling us to

13   update the information.  They may tell us the information is

14   verified correct, as reported.  Meaning -- meaning that what

15   they show in their records match what we show on our records.

16   And they also may request that we delete the information from

17   the consumer's credit file.

18   Q.   I believe you said that maintenance was the final step in

19   the process.

20          What -- what is the maintenance part of the dispute

21   process?

22   A.   With maintenance, that's where the maintenance agent will

23   review the responses.  When we get responses from the data

24   furnisher, they will also review.  If we don't verify

25   information, but if there's something that the agent entered

Mixon - D

433

1    into the system saying that it was already correct on the file,

2    they review to make sure that is accurate.  And then they

3    revise the copy or the results would be sent to the consumer.

4    Q.    Okay.  After Equifax has completed that final step, the

5    maintenance step, does Equifax notify the consumer that the

6    reinvestigation is -- or dispute process is done?

7    A.    That's the results notification letter that is sent to

8    the -- the consumer with the results on it.  That does go to

9    the consumer, yes.

10   Q.    So what generally is the purpose of this

11   reinvestigation -- these reinvestigation processes by Equifax?

12   A.    What's the -- I'm sorry.

13   Q.    The purpose -- what's the purpose of this three-step

14   process?

15   A.    Well, basically, the purpose of it is to make sure that we

16   are reporting accurate information on the consumer's credit

17   file.  So that's why we go back to the source of the

18   information, when needed, to verify that information, to get

19   accurate information, so that the credit file will be as

20   accurate as possible for the consumer.

21   Q.    Do you feel those goals are met through Equifax's

22   reinvestigation procedures?

23   A.    I do.  Yes, um-hmm.

24   Q.    And we've already talked some about the training.  But

25   Equifax trained -- does Equifax train its employees to follow

Mixon – D

434

1    these procedures?

2    A.    We do train the –– all employees have to complete the

3    training program.  And they are trained to follow the policies

4    and procedures that are outlined in the policy and procedure

5    manuals.

6    Q.    All right.  Is the training the same for all agents who

7    handle disputes for –– for Equifax?

8    A.    The basic training is the same for everybody.  The manuals

9    are compiled by Equifax.  We review the manuals, we update the

10    manuals.  And all agents receive the same training manual;

11    however, there may be some additional training that may take

12    place with –– with agents for additional processes.  But the

13    training is the same.

14    Q.    All right.  Can you describe generally the –– is it a

15    class that the –– it's like a training class, if you go to a

16    class?

17    A.    It is a training class.  The Equifax training program is a

18    six- to eight-week program, where the –– it's a classroom

19    setting, where the agents are in a classroom.  As I state, it's

20    approximately six to eight weeks.  And they are trained from

21    the policy and procedure manuals.  And the agents are –– they

22    also are trained using test files, in which they have simulated

23    examples of different things that we –– or different types of

24    disputes that we receive.  So the training is classroom-based.

25    Q.    Okay.  And then when they finish the classroom training,

Mixon - D

435

1    are they -- are the agents generally put right out on the front

2    line, or is there any type of -- of monitoring --

3    A.    There is on-the-job training that is completed with every

4    training class.  When the agents are trained, they're actually

5    not only monitored closely right after the training is

6    completed but they're actually -- the monitoring actually

7    starts during the training class itself.  Where training or

8    quality -- I'm sorry.  Quality agents, the trainers, the

9    supervisors -- even I do some of the quality observations for

10   training classes.

11         So we are actually -- as we're -- as we're training

12   them and they're processing and doing the hands-on in the

13   training class, we start the quality process and start

14   monitoring during that phase.  So it's not just when they get

15   to the floor.

16   Q.    Okay.  So you mentioned this is a six- to eight-week

17   course.  Is that the same for the operators -- let me back up.

18         Are the operators that do steps 1, 2, and 3 generally

19   one person trying to do all of that?  Or do you do it

20   differently than that?

21   A.    Well, we do have some agents who are trained to process.

22         We call them multi -- multi-function agents, who are

23   trained to process all of these functions.

24         And then there are other groups of agents who are

25   trained based upon just the -- the -- the basic function, the

Mixon – D

436

1  indicators.  Those agents would only process disputes.

2  Disclosure agents would only process disclosures.  And -- and

3  verification agents and maintenance agents, the same.

4  Q.    And we'll talk about the disclosures in a little bit.  So

5  far we've just been talking about the dispute agents.

6        There other people at Equifax that handle requests

7  for consumer credit files, otherwise called disclosures?

8  A.    Yes.

9  Q.    But back to the training of these people that do these

10  three functions, is it one class of six to eight weeks on all

11  of this, or do they have separate trainings?

12  A.    No, it's separate training classes.

13        The indicating training -- well, disclosure, and

14  indicating training, that is generally one class, because

15  before an agent can process disputes, they have to know how to

16  process disclosures.  So disclosures is like the basic function

17  that a dispute agent must know.  So that would be one class for

18  a dispute agent.

19        But for the verification and the maintenance, those

20  are separate classes that are trained to agents outside of the

21  dispute process.

22  Q.    Who handles the training?

23  A.    Equifax initially handles the training.  And there are

24  also trainers at each location that processes the -- the work,

25  who will train the -- the agents.

Mixon - D

437

1   Q.    You mentioned some -- some quality, where you follow the

2   agents when you first -- when they first complete the classes.

3         Does that quality continue -- the quality assurance

4   continue throughout the employees' tenure while they're working

5   for Equifax?

6   A.    Yes.

7         When the agents first complete their training, they

8   have what we call a 90-day -- it's like a -- an on-the-job

9   training process, where they are -- they do receive quality

10  observations during that time frame.  And then even after that,

11  all agents have quality checks that are completed on -- on an

12  ongoing basis.  Daily, weekly, monthly, there's quality

13  completed on the agents.

14  Q.    Okay.  What happens -- do you -- strike that.

15        If Equifax has this extensive training in quality,

16  that you've just described, why do you have mistakes?

17  A.    Basically, I -- with mistakes, I just have to say, it's

18  human error.  The agent gets confused sometimes.  Agents forget

19  sometimes.  And they don't refer back to their training

20  material.  You know, sometimes they think they know it, so --

21  it's just a human error.  Mistakes happen, unfortunately.

22  Q.    Do you conduct refresher courses?

23  A.    We do.  We conduct refresher courses throughout the year.

24        When we identify mistakes that the agents are -- are

25  making with -- through the quality process, when we identify,

Mixon – D

438

1    definitely, like trends, where we see the agents are making a

2    mistake in a specific area, then we will create or develop

3    training or refresher training, based upon what we have

4    identified.  And that's to remind the agents, you know, what

5    they need to do.

6            In addition to the refresher training that may be

7    created, I'm just -- as we identify areas when we get from

8    other dispute agents, the maintenance agents -- because they're

9    reviewing everything as they see things; that the verification

10   agent or the dispute agent may not have done.  They may bring

11   that to the attention of a supervisor, or a lead, or even their

12   trainer.

13           And on a weekly basis, we have a communication that

14   we'll send out to all agents that process, and it's just a

15   weekly -- a reminder, so we'll just come up with some little

16   tips that we'll put in there, in the communication.  It's like

17   a newsletter that we send to them.

18           And the trainers will review it, or the supervisors

19   or managers will review that every week with all of the agents.

20   And then they are required to respond back to myself and my

21   trainers, stating that they have covered that information with

22   all agents.

23   Q.   You referred to them as your trainers.  You feel

24   personally responsible for the training?

25   A.   Definitely, yes.

Mixon – D

439

1      I'm personally responsible for –– for the training,

2  yes.

3  Q.   Now, are some of your agents trained on specific types of

4  contacts from consumers?

5  A.   Yes.

6  Q.   So would you give the jury some examples of the specific

7  type of contacts that you might up-train, I think might be a

8  term you used, to –– with those agents.

9  A.   Sure.  We up-train agents.  And we call those specialty

10  agents.  So we have agents who may be trained –– or who are

11  trained to process fraud disputes and disputes of mixed files,

12  when a consumer's credit file is mixed.

13      So we have specialty agents that we train to process

14  those types of disputes.

15  Q.   What's a mixed file, that you just –– like you just

16  mentioned?

17  A.   A mixed file is a situation where either two consumers'

18  credit files have become merged together, or there also may

19  be –– it could be not an entire file that's been merged.  It

20  may be one or two items that may have been reported to the –– a

21  different consumer's credit file.

22  Q.   How does Equifax identify a dispute as a mixed file

23  dispute?

24  A.   Well, we can identify mixed files basically upon how the

25  consumer disputes.

Mixon – D

440

1          Normally, when we receive a mixed-file dispute, many

2     of those -- that communication comes to us where the consumers

3     have gotten a copy of their credit file, and they will notice

4     something on their file, and they may say, This doesn't belong

5     to me.  And they will tell us who it belongs to.  And it may be

6     someone who has the same or similar name.

7          So we may get that, such as a junior/senior situation

8     with a father and son.  And the -- one may dispute and say,

9     This is not mine.  This is my father's.  We have the same name.

10    This is my son's.  We have the same name.  So that's one way

11    that we can identify a mixed file.

12    Q.   How does the -- the -- the mixed file dispute get to the

13    specialized agent?  The special mixed-file agent?

14    A.   Well, we have -- when those mixed-file disputes are

15    identified, the agents in the mail room who processes the mail,

16    they are trained on the mixed-file criteria, how to identify a

17    mixed file.  They receive that training.

18         So they are able to send that document directly to

19    the -- we have what we call cues, where the agents will log

20    into a cue in the ACIS database, and the agents will process

21    the disputes from that cue.

22         So when a mixed file is identified on the front end,

23    by the mail room, they're sent directly to that cue for the

24    mixed-file agents to process.

25         If they are not identified in that manner, if a --

Mixon - D

441

1   what we call the front-line agents, the -- maybe the agents who

2   are not trained to process mixed files, they have also received

3   criteria to help them identify what is considered a mixed file.

4           So when they get that, they have a policy that states

5   they're supposed to transfer or redirect that correspondence to

6   that cue, so that it can be processed by a mixed-file trained

7   agent.

8   Q.   And you mentioned redirection.

9           I -- I ask you to look at Exhibit No. 117, and pages

10  694 through 696.  It should be the last few pages.

11          Do those -- does -- is that the training that you do

12  for the redirection for your front-line agents?  Is that an

13  example of the training?

14  A.   This is the procedure that -- that tells the agent how to

15  redirect to a specialty team, such as mixed files, yes.

16  Q.   All right.  And then also, if you would look at Exhibit

17  133, please.

18          Again, is this a whole separate training material

19  on -- on redirecting to the fraud and mixed files?

20  A.   Yes.  This is the training that I mentioned that's trained

21  to the -- the mail room agents, how to identify fraud and

22  mixed.  And also to the front-line agents, to help them

23  identify what may be a fraud or mixed dispute, so that it can

24  be redirected properly.

25  Q.   Okay.  Now, I know there's -- there's several, maybe,

Mixon – D

442

1    hundreds of pages of mixed-file policies that Equifax -- but I

2    would like to see if you can describe for the jury how Equifax

3    addresses mixed files.

4          Say, for instance, a consumer notifies Equifax that

5    they believe they've been mixed, and it gets to the mixed file

6    cue, I think is what you called it.

7          What is Equifax's general procedure for handling a

8    mixed-file dispute?

9    A.   The procedure or policies that -- for a mixed file --

10   handling a mixed file dispute, the agents -- one thing that

11   they will do is they will search the database to see if they

12   can locate another file for another consumer.  They will use

13   information that the consumer may have provided.

14         Sometimes consumers will -- as I stated, they will

15   know exactly who they think it's mixed with, and they will give

16   us that information.

17         So we'll search our database to see if we can locate

18   that credit file, and we'll look to see if that information is

19   also on that consumer's credit file as well.  And that would be

20   indication that it's a mixed file.

21         We will -- the agents are trained to look back at

22   CDVs, to see if there is a CDV -- which is the consumer dispute

23   verification form; which we get back from the data furnishers,

24   when they dispute information.

25         Those data furnishers will provide ID information on

Mixon - D

1    those CDVs.  So we may use that information, as well, to try

2    and locate another file on the consumer, or on a different

3    consumer.

4            When we locate information or we determine that there

5    are multiple files in the database for consumers that have very

6    similar ID information and also when we determine that there

7    are accounts that may -- that have been reported on consumers'

8    credit files inaccurately, what we will do in that sense is we

9    will perform procedures that we call blocking.  So we block the

10   information on our consumer's credit file, so that it will not

11   merge again.  So we have those procedures in place.

12   Q.   All right.  Let me ask you about some of the things you

13   just mentioned.

14           You said your agents look for another file in the

15   system.  Do you mean looking for, like, another file with some

16   similar ID on it?

17   A.   Yes.

18   Q.   Does Equifax use the term "N file"?

19   A.   That's called the N file, where we look for another

20   consumer's credit file.  That would be the N file.

21   Q.   All right.  And so if your agent finds no other file or no

22   N file, do -- are they trained to make a note that none was

23   found?

24   A.   They do.  They note in the -- the ACIS case for the

25   consumer that sent the dispute.  They'll look for the N file.

Mixon - D

444

1    If they don't find it, they will note -- normally, they'll --

2    we'll see a note that says "N file not found."

3            So that will let us know, as the quality team is

4    looking at the -- the case to review it for quality, they'll

5    know that the agent did in fact look for that credit file, to

6    see if there was another file there.

7            If their N file information is found, that

8    information will be noted on the ACIS case, so that when this

9    case gets to the maintenance agent, the maintenance agent will

10   know there is another credit file in the system that has ID

11   information that closely matches our consumer.

12           So that's an indication to them to -- what I just

13   mentioned -- block that information.  We have different codes

14   that we can use to block it.  And block it is just a way of,

15   like, suppressing it, so that it cannot cross over to different

16   files.  So --

17   Q.   Are your mixed-file agents trained to look at previously

18   cases and see what's happened before with the consumer, if

19   there have been any previous contacts?

20   A.   They are, yes.

21   Q.   Will they look and see if there were any online combines?

22   A.   Mixed files agents are trained to look for what's called

23   an online combine.  Yes.

24   Q.   Okay.  And -- and what -- what do they do if they find an

25   online combine?

Mixon - D

445

1  A.   If an online combine is found, that's an indication --

2  what online combine -- that's when the credit files have, for

3  some reason, automatically combined together.  So when they

4  look for the online combine, that's an indication that there is

5  probably a mixed-file situation that's happening.  And the

6  agents will know that they need to take steps to try to make

7  sure that the information that's on our consumer's credit file

8  is in fact the consumer's information.

9        If there's any information that we can identify

10 through the CDV process with looking at the previous cases, if

11 they're able to identify anything, then they will know that

12 because of that online combine, they should take that

13 information and remove it from our consumer's credit file.

14 Q.   All right.  Now, does Equifax -- do the agents, once they

15 determine there's been a mixed file and they've identified

16 that, are there steps that they can take to prevent future

17 mixing?

18 A.   That's where the blocking information comes in.  They can

19 block the information, so that it won't combine again.  And

20 when blocking -- and they can add the code that we call a do

21 not combine.

22        So that is something that is put on a consumer's

23 credit file so that the -- the likelihood -- so that files

24 won't combine anymore.  So another file can't combine with that

25 consumer.

Mixon - D

446

1    Q.    So, as an example, can Equifax's agents note that a Social

2    Security number is blocked, so that if the consumer contacts

3    Equifax with that Social Security number, that file is not

4    found?

5    A.    If a Social Security number is blocked on the consumer's

6    file, if that is the -- if it's a consumer's Social Security

7    number that somehow became blocked, yeah, that file won't come

8    up for the agent.

9    Q.    Do they also have a function called a do-not-combine

10   function?

11   A.    Yes.  That's what I just mentioned, the do not combine,

12   that they will add to the file so they won't combine.  Yes.

13   Q.    Okay.  The -- you said that these -- these -- special

14   agents, do they have additional training separate from the

15   front-line agents?

16   A.    The mixed-files agents?

17   Q.    Yes.

18   A.    They do receive additional training.  They are --

19   mixed-file agents are selected from agents who are already

20   dispute trained, and the agents who have been -- or exhibited

21   higher performance with their quality with the dispute process.

22         So they are identified by the quality team, as well

23   as by their supervisors and leads.  And they are taken back

24   into the classroom, and they receive additional training.

25         There is a separate manual for mixed-files training,

Mixon - D

447

1   and they -- and they receive that training from that policy and

2   procedure manual.

3   Q.   Okay.  And since you mentioned that, let's take just a

4   quick look at Exhibits 127 and 134.

5         Are those excerpts or parts of your mixed-file

6   additional training for that -- those advanced stages?

7   A.   You said 127?

8   Q.   127 through 134.  Are those part of your additional

9   training for mixed files?

10   A.   Yes.

11   Q.   And so are these your cream-of-the-crop agents that you

12   have taken into the mixed-file training, essentially?

13   A.   We do consider the mixed file -- the agents who are chosen

14   to process or be trained on mixed files, we consider them to be

15   at a higher level of agent.  Yes.

16   Q.   Okay.  I think we've covered the dispute process.  Let's

17   talk about the disclosure process a little bit.

18         If a consumer wants to -- contacts Equifax and wants

19   to see their credit file, are they entitled to see it?

20   A.   Yes, they are.

21   Q.   All right.  And is there a -- is that policy in your

22   manuals, that they are entitled to get their credit file?

23   A.   It is in the policy manual, yes.

24   Q.   Okay.  If you would take a look at Exhibit 116, please, at

25   page 534.  It should be the third page of that.  It says "534"

Mixon – D

448

1    in the bottom right-hand corner.

2    A.    Okay.

3    Q.    Is that the written policy describing that Equifax issues

4    disclosures when consumers request?

5    A.    Yes.

6    Q.    How can a consumer get a copy of their credit file?

7    A.    A consumer can request a copy by mail, by phone.  They can

8    go online to get a copy of their disclosure -- or a copy of

9    their credit file.

10   Q.    Okay.  Are -- does Equifax charge consumers to give them

11   copies of their credit files?

12   A.    There are some instances when a consumer may be charged

13   for a copy of their credit file, yes.

14   Q.    All right.  Does every consumer get some free ones,

15   though?

16   A.    Yes.  Every consumer -- I believe it was in 1990, a law

17   was passed that was called the FACT Act.

18              And it entitles every consumer to receive one free

19   copy of their credit file every 365 days.  So those consumers

20   are eligible for that copy of the credit file.

21   Q.    And so does Equifax refer to those as annual-free?

22   A.    That's an annual-free.

23   Q.    Can you describe for the jury how -- how that works?  How

24   you get your annual-free?

25   A.    Yes.  The annual-free -- the request for the annual-free

Mixon – D

449

1   credit file -- as I stated, every consumer is eligible for that

2   free copy every 365 days.

3          So a consumer can go online, and there is a website,

4   annual-free -- annualcreditreport.com.  The consumers can go

5   online to that cite, and they are able to receive a free copy

6   of their credit file from any of the three major credit

7   reporting agencies.

8          So they can choose, at that time, to receive it from

9   one agency, they can get it from two, or they can get it from

10  all three.  So it's their choice.  Sometimes they may want --

11  just want it from one agency at that time.  They may come back

12  later and decide they want it from another agency, and so on

13  and so forth.

14         So they will go to that website and request a copy of

15  their annual-free.

16  Q.   All right.  Now, what information does Equifax need from

17  the consumer to provide the file if they get a request via

18  mail?

19  A.   We -- we ask the consumer to provide name, address, Social

20  Security number, and date of birth.  Again, to -- to assist us

21  with accessing the credit file.

22  Q.   And why does Equifax require all of that information?

23  A.   That -- the more complete ID information we have, we

24  are -- that helps us to actually located the credit file, and

25  make sure we have a correct credit file in hand before we send

Mixon – D

450

1    it out to the consumer.

2    Q.    And if -- if the consumer's speaking with somebody with

3    Equifax on the telephone, what information is required to

4    provide that consumer with a copy of their disclosure?

5    A.    The same information as -- is required or requested when

6    we speak to a consumer on the phone.

7    Q.    Now, if -- if the consumer doesn't provide enough ID or

8    the ID doesn't match -- for instance, Social Security number is

9    not a match to what is in Equifax's system, what happens then?

10   A.    When we receive the consumer's request, if the Social

11   Security number doesn't match, the copy of the credit file will

12   not be sent to the consumer.  We will send the consumer the

13   standard form letter, just as we do with -- stating that we

14   can't find a file in the database with the ID information

15   they've provided.  And it asks them to provide a copy of the

16   document that shows the information, so that we can attempt,

17   again, to locate the credit file.  If it's --

18          I think that's what you asked me.  Right?

19   Q.    Yes.  So is it like that first slide, where you showed

20   us --

21   A.    Right.  It's basically like a reinvestigation process,

22   that first slide that we looked at.  Based upon which pieces of

23   ID that doesn't match, it depends whether we will send out the

24   credit file.

25   Q.    And why would Equifax not want to send a disclosure

Mixon – D

451

1    without getting adequate proof of ID?

2    A.   Because we want to make sure we're sending it to the

3    correct consumer.  Which with the disclosure process, that is a

4    little bit different.  Because with a disclosure process, we

5    need a correct address for the consumer before that credit file

6    can be sent, because we definitely want to make sure -- it's

7    our intent to make sure we're sending that credit file to the

8    right location.

9    Q.   Okay.  And the policies and procedures regarding the

10   disclosures you just described are in manuals, as well?

11   A.   Yes.

12   Q.   For instance, the need to verify ID -- if you take a look

13   at -- at Exhibit 116 again, at page 538.

14        Is that the policy for verifying identifying

15   information?

16   A.   Yes.

17   Q.   Okay.  And, again, you revised that prior to -- to this

18   being published and -- in -- in 2008.  Correct?

19   A.   I did.

20   Q.   Okay.  And -- and the next few pages of this same manual,

21   starting at 539, also relate to getting additional information

22   in order to get the disclosure out to the consumer.  Right?

23   A.   That's correct, yes.

24   Q.   All right.  Let me ask you to take a quick look at Exhibit

25   126.  And these are the -- the procedures at Equifax at page

Mixon - D

452

1    1211 and through 1213, or 1,213, I suppose.

2         Those are the procedures for producing a disclosure

3    to the consumer when the ID doesn't match.  Is that right?

4    A.   This is the disclosure manual, yes.

5    Q.   All right.  Let's -- now, were you personally involved

6    with handling Ms. Miller's disputes or contacts?

7    A.   No.

8    Q.   Have you had a chance to investigate those disputes and

9    contacts?

10   A.   Yes.

11   Q.   And what did you do to educate yourself about Ms. Miller's

12   disputes and contacts?

13   A.   I looked at the correspondence that we received from

14   Mrs. Miller, and I have looked back in our database to see what

15   we did.

16   Q.   And was there -- was there incorrect information on

17   plaintiff's credit file?  Was there incorrect information on

18   plaintiff's credit file?

19   A.   Yes.

20   Q.   How did it get there?

21   A.   The information was reported to the credit file by a data

22   furnisher or a creditor.

23   Q.   Did it come on by way of an online combine?

24   A.   As I recall, the -- the file -- there was an online

25   combine, and the -- the information did combine with -- with

453

Mixon - D

1   her file; another file combined with hers.

2   Q.   All right.  Did -- did that online combine, in this

3   instance, create an unusual situation involving plaintiff's

4   credit file?

5   A.   The online combine -- now, I will say that I'm not really

6   familiar with the whole online combine process.  But I -- in

7   reviewing Ms. Miller's credit file, I do know that, as you

8   state, the online combine happened.  And because of that

9   situation, it did create a situation that was a little bit

10  unusual and -- a little bit unusual for us to handle, yes, it

11  did.

12  Q.   All right.  And did the combine result in a file that had

13  plaintiff's name and address and a slightly different Social

14  Security number?

15  A.   It did -- it had -- yes, the name and address matched and

16  the Social Security number was different, yes.

17  Q.   Did that create a unique challenge for Equifax's agents?

18  A.   Well, as I reviewed the situation and what happened, it

19  did, yes.  Because that credit file -- the combining of the

20  credit files with that different Social Security number did

21  create a unique situation that we don't want to see happening;

22  that I haven't seen happen normally.  So --

23  Q.   All right.  Even though Equifax has the mixed file

24  policies and procedures that you described for the jury, why

25  was this particular situation unique?

Mixon – D

454

1  A.   Well, as I looked through the -- the information and I

2  looked at what happened, it -- I guess it became unique in

3  that, one, the files were combined.  That was the number one

4  thing that happened with the different Social Security numbers.

5  But, also, I think there was a situation where -- I don't

6  think.  There was a situation where the copy of the credit file

7  was actually sent to Mrs. Miller with the incorrect Social

8  Security number on it.

9  Q.   Okay.  And so you got a little ahead of me.

10         Did Equifax receive requests from Ms. Miller for

11  copies of her credit file?

12  A.   Yes.

13  Q.   And did Equifax send plaintiff copies of her credit file?

14  A.   Ms. Miller was sent a copy of a credit file, yes.

15  Q.   All right.  And so did Equifax's agent -- when they first

16  sent a copy of the credit file, to Ms. Miller, after the online

17  combine, did they make a mistake in doing that?

18  A.   Yes.

19  Q.   Okay.  Why is that?

20  A.   Well, again, we have the policies and procedures in place

21  that we train, that we just talked about.  And the policy says

22  that if the Social Security number is different than what the

23  consumer provides, that the credit file should not be sent to

24  the consumer.

25         So that in fact was an error -- unfortunately, an

Mixon - D

455

1   error that was made by our agent -- in that they sent out a

2   copy of the credit file to Ms. Miller with that incorrect

3   Social Security number on it when they shouldn't have.

4   Q.   All right.   And then do you remember seeing the notes

5   about a telephone call that the plaintiff had with Equifax?

6   A.   Yes.

7   Q.   And should the agent, based on that telephone call, have

8   sent the consumer a copy of her disclosure?

9   A.   No.

10  Q.   Why not?

11  A.   Because, again, the Social Security number that was on the

12  credit file, that we had in our database, it still did not

13  match what Mrs. Miller had provided.   So that file should not

14  have been sent to Ms. Miller.

15  Q.   Instead, should Equifax have sent her a letter?

16  A.   Well, in that situation, because the agent was actually

17  speaking to her on the phone, then that could have been verbal

18  communication and/or a letter sent to Ms. Miller, yes.

19  Q.   So there -- there was also a disclosure sent to the

20  plaintiff in August of 2001 -- excuse me, August of 2011, after

21  the plaintiff sent in some proof of ID.   Do you recall seeing

22  that?

23  A.   Yes.

24  Q.   Should -- should that one have been sent?

25  A.   If I -- with that one, that situation, if I recall, we did

Mixon – D

456

1    receive -- or Equifax received a copy of a -- I believe it was

2    a utility or an insurance bill, something that had the

3    complete -- or -- and current address on it.  But the W-2 form

4    that was received did not show the complete Social Security

5    number.

6              So, again, we didn't have the matching Social

7    Security number.  We didn't have enough proof to update the

8    Social Security number or to search for another file, so we

9    should not have sent that credit file to Ms. Miller.

10   Q.   All right.  Ms. Miller later did send in to Equifax

11   sufficient information to update her ID.  Is that -- did that

12   happen?

13   A.   Yes, she did send sufficient ID information.  She did,

14   yes.

15   Q.   Did Equifax update the ID?

16   A.   Unfortunately, that ID information was not updated when

17   that information came in from Mrs. Miller, and it should have

18   been.  Yes.

19   Q.   And did plaintiff also send in adequate ID with a dispute

20   for Equifax to update the ID, and then start the dispute

21   process?

22   A.   Yes.

23   Q.   Did that happen?

24   A.   No.

25   Q.   Why not?

Mixon – D

457

1    A.    Again, I have to say it was agent error.

2              They review the document carefully, or -- I can't say

3    what happened there.  But based upon our policies and

4    procedures, they were trained that information should have been

5    updated on Ms. Miller's file because we did receive the

6    complete ID information, as we requested.  And we should have

7    started the reinvestigation process at that point.  So it

8    should have been done and, unfortunately, it was not done.

9    Q.    All right.  Did Equifax receive some disputes from

10   plaintiff?

11   A.    Yes.

12   Q.    All right.  And did it initiate the three-step process,

13   like we're looking at, still, here on the screen?  Did that get

14   started?

15   A.    No, it did not get started.

16   Q.    Okay.  And why -- why not?  Why didn't that get started?

17   A.    The agents, again, did not start the dispute process.  So

18   that was another error that was -- that was by the agents,

19   unfortunately.

20   Q.    Okay.  Well, plaintiff's Social Security number did not

21   match the Social Security -- or did the plaintiff's Social

22   Security number match the Social Security number on the credit

23   file when she contacted --

24   A.    Well, the Social Security number didn't match what was on

25   the credit file at the time.  It still did not match because it

Mixon - D

458

1   had not been updated on the file, so it didn't match.

2   Q.    And did Equifax send plaintiff letters that contained the

3   language that said that her concerns had been addressed?

4   A.    Yes.

5   Q.    All right.  But they hadn't been addressed, had they?

6   A.    They had not been addressed.

7   Q.    Why -- why did those go out?

8   A.    Well, we have the -- the different standardized form

9   letters that we send to the consumers, based upon whether we

10  see -- we receive correct ID information from the consumer.

11          So with this situation, that form letter was sent to

12  the consumer.  And, again, it was a situation where the agent

13  chose the -- the wrong letter to send to the consumer, as

14  opposed to sending a letter that said, We could not find a file

15  in the database that matches your ID.  That letter was sent,

16  saying we have addressed your concerns, however, we still need

17  proof of your ID.  So it was -- just the wrong letter was sent

18  to the consumer at that time.

19  Q.    And is that language, that -- that your concerns have been

20  addressed, is that in the form letter?

21  A.    That is in the standard form letter, yes.

22  Q.    Okay.  So you didn't have an agent adding that to the --

23  strike that.

24          Did Equifax intend to mislead plaintiff in those

25  letters?

Mixon - D

459

1   A.   No, definitely not.  It's never our intent to -- to

2   mislead a consumer.

3        It's just a situation when you're -- with this

4   unusual situation that happened, the wrong letter was chosen

5   and sent to her.  It was sent to Ms. Miller, so --

6   Q.   I think you might have said earlier that -- does Equifax's

7   system allow its agents to look back to the prior

8   correspondence with consumers?

9   A.   Yes.

10  Q.   All right.  In fact, that process is in your training

11  manual.  And let's just take a quick look at that at page 1 --

12  excuse me.  Exhibit 117, page 556.

13       And it says there, towards the bottom, "Consumer

14  contacts history."  And that goes on to the next page.

15       Is that the process by which an agent can look back

16  to prior correspondence?

17  A.   Yes.  This does explain to an agent how to -- to review

18  back and look at prior contact from the consumer.

19  Q.   Did you see any evidence that Equifax had -- or -- let me

20  back up.

21       Did that happen in any of plaintiff's contacts, where

22  the agent went back and looked at the prior correspondence?

23  A.   I didn't see evidence where that was actually done.

24  Q.   Should -- should it have been done?

25  A.   It should have been done.  It's here, in the manual.  It's

Mixon - D

460

1    trained to the agent.  So it should have been done, yes.

2    Q.   Does Equifax also have some policies in place that its

3    agents should advance some disputes to a different department

4    if they're confused?

5    A.   Yes.  There -- there are policies in place for that.

6           If I recall, at -- on the policy manuals, at the

7    bottom of the pages of the policy manuals, there's a notation

8    that says if there's any question or concern or confusion

9    within -- you know, about the policy that's written, that the

10   agent should seek assistance with that.

11          The policy addendum that we actually referred to a

12   little bit earlier regarding multiple ID changes states to the

13   agents that if a consumer is requesting multiple identification

14   to be changed on the credit file, that it should be referred to

15   what we call the Office of Consumer Affairs.  So that policy is

16   there.

17   Q.   Okay.  And that's actually the department that you

18   physically work at.  Correct?  The Office of Consumer Affairs?

19   A.   I do work with the Office of Consumer Affairs, yes.

20   Q.   Now, what can the Office of Consumer Affairs do

21   differently than, say, your front-line agents?

22   A.   Agents in the Office of Consumer Affairs, they are veteran

23   agents who have been with the company for -- some of them as

24   long as I have, or longer.

25          And what they can do is actually -- if there's

Mixon - D

461

1    contact information provided by the consumer, they can actually

2    call the consumer or e-mail the consumer.

3            We preferably call, if we have a phone number, to --

4    just to get clarification from the consumer as to as to what it

5    is the consumer is requesting or what it is that Equifax needs.

6    Q.    After the lawsuit was filed, did the Office of Consumer

7    Affairs update this consumer's credit file?

8    A.    Yes.  The -- the -- they did.  They updated it.

9    Q.    Could you take a look at Exhibit 112.

10   A.    112.  (Pause, referring.)

11   Q.    Is that a copy of the credit file with the OCA updated

12   after the policy was filed?

13           Did you find it?  I apologize.  Exhibit 112.

14   A.    I have it, yes.

15   Q.    Are any of the items that plaintiff previously disputed

16   reported on that credit file?

17   A.    No.  With this copy, with -- everything had been removed

18   that Ms. Miller had disputed.

19   Q.    Has Equifax taken steps to prevent these accounts from

20   ever coming onto the file again?

21   A.    Yes.

22   Q.    What -- and what steps were those?

23   A.    Well, one thing that we've done is we've actually -- when

24   the items were removed from Mrs. Miller's credit file, we

25   add -- added a code to those items that we call a suppression

Mixon – D

462

 1   code.  So those items cannot re-report on her credit file.

 2        So the cross-blocking that I -- or blocking that I

 3   mentioned earlier, whereas we will -- where we've identified ID

 4   information that was mixed on a consumer's credit file, we

 5   block that information so that it can't come back on the

 6   consumer's credit file.  And we also add the do not combine --

 7   added the do not combine to the credit file, so that the credit

 8   file will not combine with any other credit file in the system.

 9   Q.   What -- what's been done at Equifax to address this

10   situation that -- that plaintiff found herself in here?

11   A.   Well, with this situation, as -- you know, we've stated

12   before, it was unusual.  It's something -- a situation that I

13   can personally say, in my 20 years of processing Equifax, that

14   it's not something that -- that happens on a regular basis at

15   all.

16        So one thing that I've done, being that I am the

17   manager of the training department -- the quality department, I

18   write the policies and procedures, we have one -- we have

19   communicated -- sent communication to the agents to refresh

20   their training, to the agents.

21        Something else that we've actually done is we started

22   about two years ago with mixed files, to make sure that

23   everybody that processes mixed files is -- gets the refresher

24   on mixed files.  What we do is we created an annual mixed files

25   training, a refresher training.  And with that, what we do is

Mixon - D

1    we -- we have taken scenarios, such as what happened with

2    Mrs. Miller, or any other unusual scenarios that we identify

3    through the quality process, that we've identified from other

4    mixed-files agents, that we've identified from consumers.  And

5    we use those as a training tool, as a part of that training.

6    And it's a two-day training -- training process that we

7    facilitate with the agents to -- just to refresh them and to

8    bring them up to speed and give them additional information on

9    mixed files.  So that is definitely something that we've done.

10        Another thing that I have personally done, because of

11    the situation with the letters, that happened with -- with this

12    scenario, being that -- again, I think this -- it's my

13    responsibility to make sure that -- I don't want another

14    consumer to get caught up in a loop like what happened with

15    Mrs. Miller, or where -- where we're asking her to send ID

16    documents and we're sending her the wrong letter.  So we -- I

17    personally have a particular -- my own that I'm doing with the

18    trainers and other leadership team members where we're

19    reviewing all of the letters that go out to the consumers, to

20    make sure those letters are clear and concise.  And that we

21    have letters that fit scenarios.

22        And, of course, we can't have a letter for every

23    scenario that may come up, because there may be another unusual

24    scenario.  But when something like that happens, we do have the

25    policy and the procedure in place to say this type of scenario

Colloquy

1   needs to be redirected to our Office of Consumer Affairs, so

2   that it can be handled differently.  Because it does require a

3   different handling than what is actually noted in the -- in the

4   manuals.

5          So those are just some of the things that -- that I

6   have personally done, you know, in using this -- this scenario.

7   This is definitely the -- a scenario that -- that is written

8   into the training program that we'll have for 2013, for our --

9   the mixed-files agents.

10  Q.   Thank you, Ms. Mixon.

11         MR. PERLING:  Those are our questions on direct, your

12  Honor.

13         THE COURT:  I think it's probably a good time to

14  break for the day, and we'll take the cross-examination

15  tomorrow.

16         But before we adjourn, jurors, I wanted to tell you

17  that I'm thinking we may actually get to closing arguments and

18  getting the case in your hands tomorrow afternoon.  I would

19  like to reserve flexibility on that front.  And by that, I

20  mean, I would like you not to make lunch plans tomorrow that

21  commit you to meet somebody at a particular time, and so forth.

22         In fact, tomorrow, we'll provide you lunch.

23  Ms. Boyer will give you a menu in the morning.  Albeit, you

24  know, a sandwich, or something like that, that can be delivered

25  here.

Colloquy

1           I'm doing that to try to maximize the use of your

2   time, so that if we get to a place where you can -- we can

3   condense the lunch hour a bit and get the case in your hands

4   earlier, that's fine.

5           We won't push it.  We won't make you go too hard.

6   But as I understand it, there's one more witness for the

7   defense after this one is completed?

8           MS. SUMNER:  That's correct, your Honor.

9           THE COURT:  And so it's likely we'll be into giving

10  you instructions and hearing the arguments of counsel at least

11  by early afternoon tomorrow.  So I think that's a better use of

12  your time.

13          So would you please not make lunch plans.  When you

14  come in the morning, Ms. Boyer will have menus for you to fill

15  out, and we'll -- we'll work through that.  All right?

16          Now, it's very important, again, that you not do any

17  research or allow anything about the case to cross your path.

18  Don't talk to people about it.  Don't let people bring the

19  subject up to you.  We'll start again, for your purposes, at

20  nine o'clock tomorrow.  If you come a little before nine,

21  you'll have time to fill out those menus.  Okay?

22          I appreciate very much your attention.  I know the

23  parties do.

24          So please leave all of your papers here.

25          Please rise for the jury.  And, good evening, folks.

Colloquy

1    Have a good evening.

2                (Jurors exit.)

3                THE COURT:  Ms. Mixon, you can step down, if you

4    would like.

5                THE WITNESS:  Thank you.

6                THE COURT:  Other than returning once again to jury

7    instructions, do we have any matters for the plaintiff?

8                MR. JUSTIN BAXTER:  No, Judge.

9                THE COURT:  For the defense?

10               MS. SUMNER:  I don't believe so, your Honor.

11               THE COURT:  Let's do this.  Let's reconvene at 8:30

12   in the morning.  I need your best argument in a concise fashion

13   then.  In other words, if you have specific language you want

14   me to add to what is currently in your third draft, I want to

15   know what it is, and I want the authority for it.  And I'll

16   make a decision, and we'll be finished with it by nine o'clock,

17   so we can get the jury in the box.  And I can get the jury

18   instructions finalized.

19               Except for this punitive damage contention, however,

20   it appears to me every other part of the instructions are

21   settled, so that you should be able to count on them in the

22   language that you have seen, as you prepare for closing

23   arguments.

24               So if you want to reproduce parts of them in an

25   electronic format, or something, as you argue to the jury, I'm

467

Colloquy

 1    happy to do that.

 2            If you want to just point a juror to -- point the

 3    jury to a page or text while you argue, they'll have exactly

 4    the same final set as you will.  And I just want to give you as

 5    much flexibility as possible.

 6            Anything else for tonight, from plaintiff?

 7            MR. JUSTIN BAXTER:  No, Judge.

 8            THE COURT:  You already --

 9            MS. SUMNER:  One request, your Honor.  If we might

10    have an electronic version of the jury instructions, it

11    might --

12            THE COURT:  The third draft?  Yes, we can e-mail that

13    to you.

14            MS. SUMNER:  Thank you.

15            THE COURT:  We'll do that.  Okay.  We'll do it for

16    all of you.

17            All right.  Have a good evening.

18            MS. SUMNER:  Thank you, your Honor.  You, too.

19            THE COURT:  See you tomorrow at 8:30.

20            (Court adjourned.)

21

22                              -0-

23

24

25

Certificate

468

1

2

3                                    --oOo--

4

5    I certify, by signing below, that the foregoing is a correct

6    transcript of the oral proceedings had in the above-entitled

7    matter this 2nd day of August, 2013.  A transcript without an

8    original signature or conformed signature is not certified.  I

9    further certify that the transcript fees and format comply with

10   those prescribed by the Court and the Judicial Conference of

11   the United States.

12

13            /S/ Amanda M. LeGore
          _____

14            AMANDA M. LeGORE, RDR, CRR, FCRR, CE

15

16

17

18

19

20

21

22

23

24

25