**MICHAEL C. BAXTER**
Oregon State Bar ID Number 910203
michael@baxterlaw.com
**JUSTIN M. BAXTER**
Oregon State ID Number 992178
justin@baxterlaw.com
**KACHELLE A. BAXTER**
Oregon State Bar ID Number 120659
kachelle@baxterlaw.com
Baxter & Baxter LLP
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone 503-297-9031
Facsimile 503-291-9172
**MAUREEN LEONARD**
Oregon State Bar ID Number 823165
P.O. Box 42210
Portland, Oregon 97242
Telephone: 503-224-0212
mleonard@pacifier.com

*Attorneys for Plaintiff Miller*

Judge Anna J. Brown

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **JULIE MILLER,** | Case No 3:11-cv-01231-BR |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR REDUCTION OF PUNITIVE DAMAGES** |
| v. | |
| **EQUIFAX INFORMATION SERVICES LLC,** a foreign limited liability company, | |
| Defendant. | |

## INTRODUCTION

Plaintiff sued defendant for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*  The FCRA exists to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.  *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995).  "These consumer oriented objectives support a liberal construction of the FCRA."  *Id.*

The jury found that Equifax had violated the FCRA by failing to ensure the accuracy of Ms. Miller's credit report; failing to reinvestigate the information when she disputed its accuracy; falsely claiming to have reinvestigated when it had not; denying Ms. Miller access to her credit file; and disclosing her erroneous and derogatory credit information to unauthorized third parties.

After a three-day trial, the unanimous jury determined that Equifax had willfully violated the FCRA in these respects.  The jury awarded plaintiff compensatory damages of $180,000, and punitive damages of $18,400,000.

Defendant now seeks to reduce the punitive damages award to $180,000.  Not only does Equifax ignore the evidence of its repeated wrongdoing toward Ms. Miller, it makes very clear that it has no intention of changing its harmful practices.

This is not the first case in which jurors have tried to stop Equifax's abusive business practices regarding mixed files.  Equifax's two-year mistreatment of Ms. Miller is simply the latest installment in the lengthy saga of Equifax's willful intransigence regarding mixed files.  As one example, shortly before Ms. Miller initiated the first of her several fruitless disputes, a jury in Florida awarded nearly $3 million to a plaintiff who had endured the same mistreatment.

PAGE 2 –  PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR
REDUCTION OF PUNITIVE DAMAGES

*Angela Williams v. Equifax* (Case No. 48-2003-CA-9035-0), Orange County Florida Circuit Court, (January 8, 2008), Ex. B (Judgment); Declaration of Steven M. Fahlgren (describing the facts of the case).   The seven-figure award in Florida made no difference to Equifax.  It has decided that it is more profitable to break the law and pay damages, than to bring its practices into compliance with the FCRA.

A robust punitive damage award in this case could change that business decision.  The U.S. Supreme Court has endorsed the "strong medicine" of significant punitive damages against a recidivist "to cure the defendant's disrespect for the law." *BMW of N. Am. Inc. v. Gore,* 517 U.S. 559, 576–577 (1996).  That is, after all, the purpose of punitive damages:  to prevent a wrongdoer from making law violations a part of its everyday business practice. *Schmidt v. Pine Tree Land Dev. Co.,* 291 Or. 462, 466, 631 P.2d 1373 (1981).

The facts and law support the jury's award of $18,400,000.  Plaintiff also offers other calculations consistent with the Supreme Court's due process jurisprudence that support punitive damage awards from $4.8 million to $14.5 million.

**ARGUMENT**

**A.      Facts pertinent to punitive damages**

In this case, Equifax merged Ms. Miller's file with someone else.  Equifax defended its mixed file practice to the jury.  It explained that a seven-out-of-nine-digit correspondence of two Social Security numbers was a "match," that birth dates that differed by date, month and year were a "match," and that addresses in different states were a "match."  Tr 262-264; 585-586 (Leslie).  Equifax explained that its merger of plaintiff's file with another was "a reasonable combination" that occurs with "regularity."  Tr 583 (Leslie).

After Equifax merged Ms. Miller's file with another, Equifax refused to recognize Ms. Miller's Social Security number, refused to investigate its own merger of her file with another person, and refused to reinvestigate the source of the incorrect information. Tr 302-304; 527, 532 (Hendricks; Mixon). Equifax sent a letter stating falsely that it had "contacted each source and our investigation is now completed." Tr 505 (Mixon). It falsely told Ms. Miller that it had reinvestigated incorrect information and had "addressed her concerns." Tr 519-520 (Mixon).

This went on for two years, leaving Ms. Miller with no recourse to protect her identity from Equifax's misuse and correct her credit information except a lawsuit. In fact, the jury heard that the first time Ms. Miller got anybody at Equifax to review her file and start making corrections was after she filed a lawsuit. Equifax testified that it was "normal procedure" to review a consumer's file after they initiate a lawsuit and then "make whatever revisions to fix whatever the issue is." Tr 530 (Mixon).

Equifax defended its responses to Ms. Miller and its mixed file practice generally. It blamed others (reporting sources, Ms. Miller, the FTC), and it claimed that Ms. Miller's erroneous credit file reflected the maximum possible accuracy Equifax could provide. Tr 258-260 (Leslie); Tr 354 (Fortney: "errors are inevitable."); Tr 385 (Fortney: "Equifax followed industry standards, which the FTC declined to change."). It claimed that Equifax's actions regarding Ms. Miller's disputes were those of a reasonably prudent credit reporting agency. Tr 381 (Fortney). Equifax acknowledged that the repeated failures to comply with the law were done by multiple agents and employees at different times, and not by a single rogue actor. Tr 532 (Mixon).

Plaintiff's expert, Evan Hendricks, testified that studies since the 1990's showed significant numbers of consumer complaints regarding mixed file errors. Tr 296-297. He

testified that Ms. Miller's difficulties arose as a result of Equifax's willingness to tolerate discrepancies in individual identifying information, and merge files automatically despite non-matching information.   Tr 300-301.  He also testified about other mixed file cases in which juries had found Equifax to have violated the FCRA.  Tr 306-307.

Equifax's expert, Anne Fortney, disputed the extent of the mixed file problem.  She testified about a study that showed that two percent of consumer files contained inaccurate information.  Tr. 363.  She also testified that one to two percent of the number of files at consumer reporting agencies were mixed files.  Tr 376, 381. Equifax acknowledged that this meant approximately 2 to 4 million Americans had inaccuracies in their credit reports because of mixed files.  Tr. 384.

Federal regulators likewise tried and failed to bring Equifax into compliance with regard to its mixed files practices.  The jury heard about investigations undertaken by state Attorneys General and the Federal Trade Commission in the 1990s concerning complaints of Equifax's mixed files and its failure to remedy them.  Tr 296-298 (Hendricks); Tr. 358 (Fortney).  They heard that despite Equifax's consent agreements, Equifax continued to rely on partial matches of consumer information to merge files.  Tr. 300 (Hendricks).

Equifax's net operating revenue was stipulated to be $916,800,000.  Tr. 592.

## B.      Applicable law

A punitive damages award is subject to review for compliance with the substantive constitutional limitations of the Due Process Clause of the Fifth Amendment.  *Morgan v. Woessner,* 997 F2d 1244, 1255 (9th Cir. 1993) (recognizing that the Fifth not the Fourteenth Amendment applies to a federal claim in federal court; due process principles developed in

Fourteenth Amendment cases apply to punitive damages issues pursued under Fifth Amendment).

The Supreme Court has held that punitive damages can be imposed to further "legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("punitive damages serve a broader function; they are aimed at deterrence and retribution."). The courts' task in reviewing the constitutionality of a punitive damage award is to identify the "outermost limit of the due process guarantee," *State Farm*, 538 U.S. at 425, not to choose a number the court regards as appropriate on the facts of the case. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) ("[t]he judicial function is to police a range, not a point," citing *Gore*, 517 U.S. at 582–83 and *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993)); *See also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433–434 (2001) (noting that within substantive limits on an award, the jury has discretion in establishing the precise number).

### 1.      Guideposts

In assessing the constitutionality of a punitive damage award, the court considers three "guideposts" identified by the Supreme Court: (1) the degree of reprehensibility of the defendant's conduct; (2) any disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive award; and (3) any difference between the award and civil penalties that are authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 418 (2003). Due process requires that a defendant "receive fair notice not only of the conduct that will subject him to punishment, but also of the penalty the State may impose." *Gore,* 517 U.S. at 574 (suggesting that the guideposts are an indication of notice of the magnitude of the sanction that might be imposed).

Equifax was indisputably on notice that significant punitive damages are recoverable for violations of the FRCA. *Williams v. Equifax* (Case No. 48-2003-CA-9035-0) ($219,000 in compensatory damages; $2.7 million in punitive damages) (Ex. B); *Judy Thomas v. Trans Union,* Case No. 00-1150-JE, (D. Or. July 22, 2002) (jury award for plaintiff for mixed file errors and failure to correct; $300,000 in compensatory damages and $5 million in punitive damages, reduced to $1 million on post-verdict review), Ex. A (Judgment); *Cousin v. Trans Union,* 246 F.3d 359 (5th Cir. 2001)(jury awarded $50,000 in compensatory damages and $4.47 million in punitive damages for failure to correct re-reporting of erroneous credit information; verdict reversed on appeal); *see also Eric Drew v. Equifax,* Case No. 07-00726 SI, 2010 WL 5022466 (N. D. Cal. 2010) (jury awarded approximately $320,000 in compensatory damages and $700,000 in punitive damages against Equifax for failing to reinvestigate and correct errors caused by identity theft). And certainly, the FTC's considerable enforcement authority (discussed later in this memorandum) is well known to Equifax.

The guideposts need not be rigidly or exclusively applied and should not be taken as an "analytical straight jacket." *In re Exxon Valdez*, 472 F.3d 600, 612–13 (9th Cir.2006), *vacated and remanded,* 554 U.S. 471 (2008) (quoting *Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70 (1st Cir. 2001). In *Zimmerman,* the court explained, "Other pertinent factors may from time to time enter into the equation. When all is said and done, a punitive damage award will stand unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct." 262 F.3d at 81.

**2.    Applying the guideposts**

**a.    Reprehensibility**

Reprehensibility is "the most important indicium of the reasonableness of a punitive damages award[.]"  *Gore,* 517 U.S. at 575; *State Farm,* 538 U.S. at 419.  The court compiled some of the reprehensibility factors in *Gore,* 517 U.S. at 575-577.  Violence or the threat of violence is more reprehensible than nonviolent crimes; trickery and deceit are more reprehensible than negligence.  517 U.S. at 576.  Personal injury is more reprehensible than economic harm, except that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct * * * or when the target is financially vulnerable, can warrant a substantial penalty."  517 U.S. at 576.  Repeated misconduct is more reprehensible than an individual instance of malfeasance.  517 U.S. at 577.  The Court emphasized this point as follows:

> Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.

517 U.S. at 576-577.

Several reprehensibility factors support the jury's punitive damage award in this case.

### (1) *Trickery and deceit*

Equifax consistently gave Ms. Miller false information in response to her disputes.  Equifax told Ms. Miller that it had contacted each reporting source directly, when it had not contacted any sources.  It told her that it had addressed her concerns, when it had done nothing.  Equifax repeatedly misrepresented that it had completed reinvestigations, when no investigations had even been initiated.

### (2) *Plaintiff's personal injury*

It would be a rare FCRA case that involved the kind of physical injury associated with a tortious assault.  Nonetheless, this does not lessen the propriety of significant punitive damages

for plaintiff's noneconomic harms in this case.  Here, plaintiff's harms were personal injuries in

the form of psychic harm.  Ms. Miller testified that for two years she was frustrated,

overwhelmed, angry, depressed, humiliated, fearful about misuse of her identify and concerned

for her damaged reputation. Tr 126, 128, 133, 135, 144, 147, 150, 152, 154, 156.  In *Goldsmith v.*

*Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008) the court explained that causing

emotional and psychological harms made the defendant's conduct more reprehensible. [1]

### (3)    Plaintiff's financial vulnerability

As Equifax emphasizes, consumer credit is an important part of the U.S. economy.

Equifax's expert testified that the credit reporting industry is "the foundation" "of the U.S.

consumer economy."  Tr 352 (Fortney).  It is easy to understand the financial vulnerability of a

consumer whose credit is destroyed because of a credit report that contains errors of Equifax's

making, and that Equifax refuses to correct.  In *Saunders v. Branch Banking & Tr. Co. of VA*,

526 F.3d 142 (4th Cir. 2008) the court found that a plaintiff was financially vulnerable when

dealing with a bank that reported false debt information.  The court explained, "Saunders has a

modest income and limited resources compared to BB&T [Branch Banking and Trust Company

of Virginia].  Furthermore, BB&T's conduct rendered Saunders significantly more financially

vulnerable."  526 F.3d at 153.  Ms. Miller was in the same position,  She had limited resources

compared to Equifax, and Equifax's errors and intransigence destroyed her access to credit and

rendered her financially vulnerable.

---

[1] Cases agree that even when a violation of the FCRA produces purely economic harm, Congress nonetheless still saw fit to permit punitive damages for such claims, and the absence of physical harm does not weigh strongly against punitive damages in such cases.  *Saunders v. Branch Banking and Trust Co. of VA.*, 526 F.3d 142, 152–153 (4th Cir. 2008) (so stating); *Brim v. Midland Credit Mgmt., Inc.,* 795 F. Supp. 2d 1255, 1263 (N.D. Ala. 2011).

PAGE 9 –  PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR
REDUCTION OF PUNITIVE DAMAGES

### (4)    *The scope of harm Equifax is willing to inflict on consumers*

In *TXO,* the Court explained the two components of potential harm. The first (which we address later in this memorandum) is the "harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." 509 U.S. at 460 (emphasis omitted). The second – which is directly relevant to the defendant's reprehensibility -- is "the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.*

In *Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007) the court returned to this idea:

> At the same time we recognize that **conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility.** *Cf., e.g., Witte v. United States*, 515 U.S. 389, 400, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (recidivism statutes taking into account a criminal defendant's other misconduct do not impose an " 'additional penalty for the earlier crimes,' but instead ... 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.'

549 U.S. at 357 (emphasis added).

Equifax's mixed file errors with Ms. Miller's credit report were not rare or one-time problems. Even under Equifax's best estimate, Equifax's lauded industry "matching" (*i.e.,* non-matching) criteria produced errors in 2 to 4 million consumer files. The jury could properly regard Ms. Miller as an "exemplar" of the harm that Equifax is prepared to inflict on many other consumers. *Philip Morris USA v. Williams,* 549 US at 356 (explaining that the number of people potentially at risk of harm is relevant to defendant's reprehensibility). The jury could increase the punitive damage award on this basis.

### (5)    *Equifax's repeated misconduct*

In *Gore,* the Court highlighted that "persist[ing] in a course of conduct after it had been adjudged unlawful" (517 U.S. at 579), acting in bad faith, and making deliberate false statements

all increase the reprehensibility of defendant's conduct.  517 U.S. at 579.  *Gore* incorporated into

due process review the principles relevant to criminal habitual offender jurisprudence, which

allow the sentencing authority to consider past bad acts that did not result in conviction, as well

as the defendant's "lawful conduct that bears on the defendant's character and prospects for

rehabilitation."  517 U.S. at 573, n. 19.  *See also Ewing v. California,* 538 U.S. 11, 27-30 (2003)

(affirming California's three-strikes life sentence law for repeat, nonviolent offenders, holding

such punishment not "grossly disproportionate" under the Eighth Amendment).

       This jury could properly assess Equifax's "character and prospects for rehabilitation" and

conclude that they were not good.  Equifax was unapologetic about its treatment of Ms. Miller; it

accepted no responsibility for her harms.  Equifax defended its mixed file system and rejected

any suggestion that it needed improvements.  In fact, based on the evidence of past civil actions

and state and federal enforcement efforts, the jury could conclude that Equifax would continue

its law violations until it became financially painful to do so.

       Several of the enhanced reprehensibility factors were amply proved in this case.

Plaintiff's personal injury and financial vulnerability, Equifax's deceit, its repeated misconduct,

and its willingness to expose many others to the harms it inflicted on Ms. Miller, all warrant a

heavy punitive damage award.  The jury's verdict is the appropriately "strong medicine" required

to remedy Equifax's consistent and continual disregard for the law.

       **b.**     **Ratio**

       As the Supreme Court explained in *Gore*, a punitive damages award should bear some

reasonable relationship to the corresponding award of compensatory damages, but such a

relationship is only one factor in an excessiveness analysis.  *Gore,* 517 U.S. at 580.  The

Supreme Court has "consistently rejected the notion that the constitutional line is marked by a

simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582; *see also State Farm*, 538 U.S. at 425 ("We decline again to impose a bright-line ratio which a punitive damages award cannot exceed."); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."); *TXO,* 509 U.S. at 460 ("[T]his Court [has] eschewed an approach that concentrates entirely on the relationship between actual and punitive damages.").

As described above, this case involves several enhanced reprehensibility factors and so supports a higher ratio. The following additional considerations also justify a higher ratio.

### (1) A higher ratio is justified here

In one of the early cases the Supreme Court cites as historic precedent for a substantive due process limit on punitive damages -- a railroad's challenge to a civil penalty for overcharging a passenger for a ticket – the Court rejected the railroad's argument that the penalty must be confined to the passenger's loss. *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919). [2] The court explained that the penalty was a reflection of the "the public wrong rather than the private injury." Moreover, the court stated:

> When the penalty is contrasted with the overcharge possible in any instance it of course seems large, but, as we have said, its validity is not to be tested in that way. When it is considered with due regard for the interests of the public, **the numberless opportunities for committing the offense,** and the **need for securing uniform adherence** to established passenger rates, we think it properly cannot be said to be so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.

251 U.S. at 67 (emphasis added).

---

[2] This case is cited in *Haslip*, 499 U.S. at 12; *TXO,* 509 U.S. at 454; and *Gore,* 517 U.S. at 575.

In *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) (the Exxon Valdez oil spill), the Supreme Court reviewed punitive damage considerations from various states. The court noted such concerns as the profitability of the wrongdoing, the amount required for disgorgement of profit, and whether the action was taken or omitted in order to augment profit. 554 U.S. at 494, 503-505. In particular, as relevant here, the court highlighted two important principles from *Gore:*

> Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (**increasing chances of getting away with it**), see, *e.g., BMW of North America, Inc. v. Gore,* 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("A higher ratio may also be justified in cases in which the injury is hard to detect"), or when the value of injury and the corresponding compensatory award are small (**providing low incentives to sue**)[.]

554 U.S. at 494 (emphasis added).

In *Johansen v. Combustion Engineering, Inc.,* 170 F.3d 1320, 1339 (11th Cir. 1999) the court upheld a 100:1 ratio of punitive damages to compensatory damages for $47,000 in property damage caused by water run-off from former mine site. A remitted punitive damage award of $4.35 million was considered constitutional even though reprehensibility was "not very severe[.]" 170 F3d at 1333. What mattered most to the court was to deter the defendant from "getting away with it," that is, from engaging in what the court described as a "pollute and pay" environmental policy. 170 F.3d at **1339.**

The same concerns apply here. Equifax has "numberless opportunities" to jeopardize a consumer's financial information. When it injures a consumer, in most cases it will simply get away with it.

The first purpose of the FCRA is to give consumers an expeditious means to correct inaccurate credit reports without litigation. Equifax rejected that option, ignoring Ms. Miller

until she filed this lawsuit.  Consumers have the right to enforce the law in court, but this is a difficult, slow, expensive and uncertain path, which few consumers are able to pursue.  Damages for FCRA violations are often hard to monetize or detect.  Noneconomic damages for violations of the FCRA are "unquestionably harmful" but "difficult to translate into monetary terms." *Sloane v. Equifax Information Services, LLC,* 510 F.3d 495, 506 (4th Cir. 2007).  Also, it can be difficult to find a lawyer willing to take on a well-financed opponent where payment is continent on success.  The problem is even more acute here, because the usual pressure on a business to police itself is significantly relaxed.  Equifax owes no customer service obligation to Ms. Miller. Equifax profits by gathering and disseminating Ms. Miller's private financial information and providing it to others, without her permission.  It makes no money fixing mixed files.

These considerations demand a ratio commensurate with the wrong.  The evidence easily justifies the highest single-digit ratio of 9:1, but it also allows the court to impose a higher ratio as well.  Equifax urges the court to reduce the verdict to a token punitive damage award of $180,000, derived from a 1:1 ratio.  Such a reduction virtually guarantees that Equifax will persist in its unlawful business practices.  It condones the "violate and pay" policy that Equifax has pursued over several years.

### (2)  *Plaintiff's actual harm includes her attorney fees and litigation costs*

The FCRA ensures that prevailing plaintiffs are fully compensated by authorizing as part of the plaintiff's recovery "the costs of the action together with reasonable attorney's fees as determined by the court."  15 U.S.C. 1681n (a)(3).  A prevailing plaintiff is entitled to attorney fees and costs for both negligent and willful violations of the FCRA, 15 U.S.C. 1681n & 1681*o*, thus confirming that these recoveries are compensatory, not punitive, in nature.  In *Cairns v. GMAC Mortgage Corp.*, CIV 04-1840 PHXSMM, 2007 WL 735564 (D. Ariz. Mar. 5, 2007) the

PAGE 14 – PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR
REDUCTION OF PUNITIVE DAMAGES

court described attorney fees as part of plaintiff compensation under the FCRA:  "The FCRA provides for **compensation** in the form of actual damages and attorneys' fees if a consumer reporting agency negligently fails to comply with any provision of FCRA."  2007 WL 735564, *7.  (Emphasis added).

The FCRA relies on private civil actions to enforce compliance with the law.  The FTC's Director of Credit Practices emphasized the importance of the civil liability provisions of the FCRA, which include attorney fees and costs entitlement, in testimony before Congress, stating, "because the statute was designed to be largely self-enforcing, the capacity of consumers to bring private actions to enforce their rights under the statute is at least equally important [as the FTC's enforcement authority]."  S. REP. 103-209, 6, December 9, 1993, 1993 WL 516162.  *See also Nitti v. Credit Bureau of Rochester, Inc.*, 84 Misc. 2d 277, 283, 375 N.Y.S.2d 817, 824 (Sup. Ct. 1975) ("This Act [FCRA] * * * was enacted to enable private litigants to assist in the enforcement of the Congressional purposes and, at the same time, recover such damages as may have been inflicted upon them.  The federal purpose is to create a species of private attorney general to participate prominently in enforcement." (internal quotations omitted)).

Several cases include litigation costs and attorney fees as part of plaintiff's compensation for purposes of the punitive damage ratio calculation.  In *Blount v. Stroud,* 395 Ill. App. 3d 8, 27, 915 N.E.2d 925 (2009), *cert den* 131 S Ct 503 (2010), a racial discrimination claim under 42 U.S.C. 1981, the court stated:

> [T]he majority of the courts across the country that have considered this issue have agreed that an award of attorney fees should be taken into account as part of the compensatory damages factor in the *Gore* analysis.

395 Ill. App. 3d at 27.

In *Blount,* as here, the purpose of the federal statute was to ensure plaintiffs access to the judicial process and to support litigation to enforce the statute. 395 Ill. App. 3d at 28.

In *Willow Inn, Inc. v. Pub. Svc. Mut. Ins. Co.,* 399 F.3d 224, 234-37 (3d Cir. 2005), the court incorporated the attorney fee and costs award as part of compensatory damages for purposes of the ratio consideration for two reasons, both relevant here. First, state law awarded attorney fees in order to vindicate the state's policy that wronged insureds can secure counsel. 399 F.3d at 236. Second, the statute was intended to enlist private attorneys to prosecute meritorious cases. 399 F.3d at 236. In that case, with consideration of attorney fees and costs, the ratio was well within constitutional lines. 399 F.3d at 237.

In *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302 (11th Cir. 2007), the court included the attorney fees as part of compensatory damages for the ratio consideration for another reason that applies here: so that insureds were not further injured by the cost of seeking legal redress to enforce their policies. The court upheld a $17.5 million punitive damage award with a compensatory damage award of approximately $3.2 million. 481 F.3d at 1321.

In *In re USA Commercial Mortgage Co.*, 802 F. Supp. 2d 1147, 1188-89 (D. Nev. 2011) $2.5 million in attorney fees and costs awarded pursuant to contract, in addition to the jury's award of $79,000 in compensatory damages, supported a punitive damage award of $5.1 million.

In *Clausen v. Icicle Seafoods, Inc.*, 174 Wash. 2d 70, 87, 272 P.3d 827, *cert. denied,* 133 S. Ct. 199 (2012), the court applied the same rationale in a maritime claim for maintenance and cure. The court stated that the compensatory nature of attorney fees does not change because the attorney fees are awarded post trial rather than with the jury's compensatory damages award.

In *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634 (10th Cir. 1996), the court explained – in terms relevant to this consumer litigation -- why litigation costs are relevant to the constitutional assessment of a punitive damages award:

> A rich defendant may act oppressively and force or prolong litigation simply because it can afford to do so and a plaintiff may not be able to bear the costs and the delay. **We have held that the costs of litigation to vindicate rights is an appropriate element to consider in justifying a punitive damages award.**

101 F.3d at 642 (emphasis added).

Here, plaintiff will submit a petition for attorney fees and costs of approximately $250,000. Declaration of Justin Baxter. This amount, together with plaintiff's noneconomic damages of $180,000, reflect plaintiff's total actual damages of $430,000. This is the actual damages amount that must be considered in measuring the constitutionality of the punitive damages award. This amount at a 9:1 ratio warrants a punitive damages recovery of more than $3.8 million, but a higher ratio of 12:1 yielding a $5 million punitive damage award is more consistent with the evidence in this case and would not be constitutionally excessive.

### (3)     *Plaintiff's potential harm must also be considered*

The jury valued plaintiff's psychic harms at $90,000 per year; it awarded plaintiff $180,000 for two years of frustrating, time-consuming and stressful disputes. If plaintiff had failed to find lawyers willing to take her case to trial, as happens to many consumers, her harms would have gone on much longer. For example, in *Thomas v. Trans Union*, Case No. 00-1150-JE, (D. Or. July 22, 2002), Ex. A, plaintiff disputed Trans Union's mixed file errors for six years. In *Angela Williams v. Equifax* (Case No. 48-2003-CA-9035-0), Orange County Florida Circuit Court, (January 8, 2008), Ex. B (Judgment), plaintiff disputed Equifax's mixed file errors for 13 years. Declaration of Steven M. Fahlgren. In *Michelle Jansen v. Experian Information*

*Solutions, Inc.*, et al., Case No. 05-CV-0385-BR (D. Or. 2010), Ex. C (Stipulated Judgment),
plaintiff disputed Equifax's mixed file errors for 18 years.

This is substantial potential harm that, if applied to Ms. Miller, amounts to $540,000 for
six years and up to $1,620,000 for 18 years, using those cases as examples.  The constitutional
evaluation makes the potential harm relevant to the punitive damages award.  *TXO,* 509 U.S. at
460 ("It is appropriate to consider the magnitude of the potential harm that the defendant's
conduct would have caused to its intended victim if the wrongful plan had succeeded[.]").

Plaintiff's potential harms alone (not including attorney fees) would justify a punitive
damage award (at a 9:1 ratio) of $4.8 million to $14.5 million.

### c.    Comparable civil fines

The FTC is empowered to impose up to $10,000 in fines per violation per day.  15 U.S.C
45(l), (m)(C).   It is also empowered to extract amounts representing disgorgement of profit, and
to impose injunctive relief.  *See, e.g., In the Matter of Equifax Information Services LLC,* 2013
WL 1151916 (Docket No. C-4387), March 5, 2013 (Complaint and Order imposing profit
disgorgement assessment of $392,803 and requiring mandatory disclosure of training materials
and business records demonstrating compliance, for selling consumer lists to unauthorized third
parties).  These significant enforcement powers, although perhaps not directly comparable to
punitive damage awards, nonetheless provide notice to Equifax that FCRA violations can have
serious consequences.

Several cases indicate that this factor is not particularly useful to the due process analysis
in a FCRA case.  *Cortez v. Trans Union*, LLC, 617 F.3d 688, 724 (3rd Cir.2010) (explaining that
"there is no 'truly comparable' civil penalty to a FCRA punitive damages award"); *Saunders,*
526 F.3d at 152 (concluding that Congress specifically chose not to limit punitive damages for a

violation of the FCRA); *Bach v. First Union Nat'l Bank*, 486 F.3d 150, 154 n. 1 (6th Cir.2007) (noting that FCRA does not limit compensatory damage awards in suits brought by private citizens); *Dixon–Rollins v. Experian Information Solutions, Inc*. 2010 WL 3749454, *11 (E.D. Pa. 2010) (because statutory limit does not apply to actions brought by private citizens, the third guidepost is not particularly helpful in assessing the constitutionality of punitive damages awards under the FCRA.).  It is significant, however, that despite the FTC's expansive regulatory powers, Equifax has not addressed its mixed file problems.

### d.    Importance of deterrence

The threat of punitive damages under § 1681n of the FCRA is the primary factor deterring erroneous reporting by the credit reporting industry.  *Brim,* 795 F. Supp. 2d at 1265 (so stating; upholding more than 6:1 ratio; $623,180 in punitive damages and $100,000 in compensatory damages); s*ee also Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967, 972 (4th Cir. 1987) ("The award of punitive damages in the absence of any actual damages, in an appropriate case, comports with the underlying deterrent purpose of the FCRA."); *Dixon-Rollins,* 753 F. Supp. 2d at 465 (using 9:1 ratio to assess punitive damages against Trans Union, a "repeat FCRA offender.").

As *Brim* cautioned, 795 F. Supp. 2d at 1265, any reduction of the jury's punitive damage must remain significant enough to punish and deter the defendant; otherwise the reduction is itself "purely arbitrary."  *Id.*

There are several factors specific to deterrence that warrant a large punitive damage award in this case.

### (1)    *Defendant's wealth*

Defendant's wealth is relevant to the amount of the punitive damages award, because it informs the amount necessary to punish and deter the unlawful misconduct.  *TXO*, 509 U.S. at 462 n. 28 (noting that it is "well-settled" that a defendant's "net worth" is a factor that is "typically considered in assessing punitive damages"); *Haslip,* 499 U.S. at 21-22 (approving, among other factors used to determine a punitive damage award, the "financial position" of the defendant); *Bains LLC v. Arco Products Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005) ("A punitive damages award is supposed to sting so as to deter a defendant's reprehensible conduct, and juries have traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting.").

Equifax is a large and profitable corporation.  It deals in (and profits from) consumers' private financial information.  It has the power to destroy financial reputations, and to disable an individual from functioning in the financial marketplace.

Here, the jury's award of $18 million in punitive damages was a fractional two percent of Equifax's admitted net operating revenue of nearly $1 billion.

### (2)    *Lesser amounts have not deterred Equifax's misconduct*

In *Gore,* the Court stated, "The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal."  *Gore*, 517 U.S. at 584.  Here, we know that cumulative awards of more than $6 million (including compensatory and punitive damages and attorney fee awards) have not been enough to compel Equifax to remedy its mixed file and dispute resolution problems.[3]

---

[3] This is likely an incomplete list of damage awards against Equifax in the last few years.

PAGE 20 – PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR
REDUCTION OF PUNITIVE DAMAGES

• In a 2008 case raising the same violations involving a mixed file and refusal to reinvestigate inaccurate information, the court entered judgment against Equifax on the jury's punitive damage award of $2.7 million and plaintiff's compensatory damage award of $219,000. *Angela Williams v. Equifax* (Case No. 48-2003-CA-9035-0), Orange County Florida Circuit Court, January 8, 2008.  Ex. B (Judgment); Declaration of Steven M. Fahlgren.  Ms. Miller's experience with Equifax in late 2009 through 2011 indicates that nearly $3 million in damages to Ms. Williams was not enough to motivate Equifax to alter its mixed file and reinvestigation procedures.  In other recent cases, awards of compensatory damages also did not spur Equifax to bring its practices into compliance with the law.

• In 2007 a jury awarded compensatory damages of $200,000 against Equifax for mixed file errors. *Rebecca Valentine v. Equifax,* Case No. 05-CV-0801-JO (D. Or. 2008).  The court awarded approximately $120,000 in attorney fees and costs. Ex. D (Amended Judgment).

• In 2005 a jury awarded plaintiff $210,000 in compensatory damages against Equifax for mixed file errors and failure to correct them.  *Matthew Kirkpatrick v. Equifax,* Case No. CV 02-1197-MO Lead (D. Or. 2005).  The court awarded over $209,000 in attorney fees and costs.  Ex. E (Amended Judgment).

• Equifax faced other significant awards in similar but not identical cases involving identity theft and refusal to correct inaccuracies.  In *Drew v. Equifax,* Case No. 07-00726 SI, 2010 WL 5022466 (N. D. Cal. 2010) the jury awarded approximately $320,000 in compensatory damages and $700,000 in punitive damages against Equifax for failing to reinvestigate and correct errors caused by identity theft.  In *Michelle Jansen v. Experian Information Solutions, Inc.*, et al., Case No. 05-CV-0385-BR (D. Or. 2010) plaintiff accepted Equifax's offer of judgment for $275,000 in compensatory damages and additional attorney fees for failing to

correct errors resulting from identity theft.  Ex. C (Stipulated Judgment).  This court awarded

approximately $310,000 in attorney fees and costs.  *Jansen v. Equifax,* 2010 WL 3075324 (D.

Or. 2010) (attorney fee and cost decision).

    • In 2009 a jury awarded plaintiff $200,000 in compensatory damages for Equifax's

mishandling of plaintiff's credit file after identity theft.  *Robinson v. Equifax,* 560 F.3d 235 (4th

Cir. 2009).  The appellate court affirmed the compensatory damage award and remanded the

nearly $269,000 attorney fees award for further evidence of attorney market rates.  In *Sloane v.*

*Equifax,* 510 F.3d 495 (4th Cir. 2007) the appellate court reduced plaintiff's noneconomic

damage of $245,000 to $150,000 and remanded for further consideration of the $181,000 award

of attorney fees.

    This record of recalcitrance justifies a punitive damage award here of a minimum of $6

million, the approximate total of prior awards which were insufficient to change Equifax's

behavior.  Equifax has demonstrated that repeatedly paying six and seven-figure verdicts is more

profitable than changing its conduct.  Equifax asks the court to reduce this verdict to far less.

Rather than punishing Equifax, such an extreme reduction would serve only to reward and

encourage Equifax to continue its unlawful conduct.

    ### *(3)      The need to change behavior*

    In *Schmidt v. Pine Tree Land Dev. Co.,* 291 Or. at 466, the court identified that "punitive

damages serve the function to deter enterprises from accepting the risks of harming other private

or public interests by recklessly substandard methods of operation at the cost of paying economic

compensation to those who come forward to claim it."  When punitive damages are warranted, as

here, because of consciously indifferent corporate practices that defendant has a financial interest

in sustaining, "the plaintiff whose economic loss may be insignificant to the enterprise and

perhaps too small to justify the expenses of pressing a claim represents social interests larger than his own."  291 Or. at 466.

*Schmidt* articulates that punitive damages are meant to prevent a wrongdoer from making law violations a part of its everyday business practice.  Equifax's motion makes clear that even now it does not acknowledge or understand the seriousness of its conduct.  Equifax's own expert testified that the problem of merged files affects 2 to 4 million Americans.  Equifax's own witnesses testified that its employees and agents ignored policies and procedures with respect to Ms. Miller's disputes one hundred percent of the time.  The unassailable fact is that none of the six- and seven-figure verdicts to date have put a stop to Equifax's serial violations of the FCRA.

The U.S. Supreme Court has relied on the due process guidelines, especially the ratio, to make punitive damage awards more predictable.  However, punitive damage awards that are predictably too low to make a chronic law violator change its practices do not fulfill any legal purpose.  In *Exxon Shipping Co. v. Baker*, the court explained:

> [A] penalty should be reasonably predictable in its severity, so that even Justice Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another.  *See The Path of the Law*, 10 Harv. L. Rev. 457, 459 (1897).  And when the bad man's counterparts turn up from time to time, the penalty scheme they face ought to threaten them with a fair probability of suffering in like degree when they wreak like damage.

554 U.S. at 502

Punitive damages are supposed to be "predictable in [their] severity," not predictable in their laxity.  They are supposed to be "threaten[ing]," so that this defendant and others can expect to "suffer[]" similarly in the future if they continue to violate the law.  There should not be the comfortable option Equifax seeks in this case -- a reduction so low that Equifax has no

incentive to correct abuses and every incentive to ignore the other 2 to 4 million consumers like

Ms. Miller with admittedly erroneous credit files.

## CONCLUSION

The evidence and the law support a significant punitive damage award.

Respectfully submitted this 11th day of October 2013.


*/s/ Maureen Leonard*
Maureen Leonard  OSB 823165
Justin M. Baxter    OSB 992178
Michael C. Baxter OSB 910203
Attorneys for Plaintiff Julie Miller

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 6,869 words, including headings, footnotes, and quotations, but excluding the table of contents, table of authorities and any certificates of counsel.

_____/s/ Maureen Leonard_____
Maureen Leonard OSB 823165
Of Attorneys for Plaintiff