1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3    JULIE MILLER,                    )
                                      )   Case No. 3:11-CV-1231-BR
4              Plaintiff,             )
                                      )
5    v.                               )   December 20, 2013
                                      )
6    EQUIFAX INFORMATION SERVICES,    )
     LLC, a foreign limited liability )
7    company,                         )
                                      )
8              Defendant.             )
     _____)   Portland, Oregon
9

10                   TRANSCRIPT OF PROCEEDINGS

11                       (Oral Argument)

12

13      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23   COURT REPORTER:          AMANDA M. LeGORE, RDR, CRR, FCRR, CE
                              U.S. COURTHOUSE
24                            1000 SW Third Avenue, Suite 301
                              Portland, OR  97204
25                            (503)326-8184

2

1    APPEARANCES:

2    FOR THE PLAINTIFF:        JUSTIN BAXTER
                               Baxter & Baxter, LLP
3                              8835 SW Canyon Lane, Suite 130
                               Portland, OR  97225
4                              (503)297-9031
                               michael@baxterlaw.com
5                              justin@baxterlaw.com

6                              MAUREEN LEONARD
                               PO Box 42210
7                              Portland, OR  97242
                               (503)224-0212
8

9    FOR THE DEFENDANT:        JEFFREY EDELSON
                               Markowitz, Herbold, et al.,
10                             1211 SW Fifth Avenue
                               Suite 3000
11                             Portland, OR  97204
                               (503)295-3085
12                             jeffedelson@mhgm.com

13
                               PHYLLIS SUMNER
14                             LEWIS PERLING
                               King & Spalding, LLP
15                             1180 Peachtree Street, NE
                               Suite 1700
16                             Atlanta, GA  30309
                               (404)572-4799
17                             psumner@kslaw.com
                               lperling@kslaw.com
18

19

20

21

22

23

24

25

1          (Friday, December 20, 2013; 9:08 a.m.)

2

3                  P R O C E E D I N G S

4

5          THE COURT:  So, we are back on the record in the

6     matter of Miller versus Equifax to review the defendant's

7     motion, which is Docket No. 91, for reduction of the punitive

8     damage award.

9          I've read all of your papers.  I'm interested in any

10    further guidance you would like to provide.  And, in

11    particular, I think it's fair to assume that I'm going to

12    have to reduce the award.  And so I'm interested in what you

13    view as the absolutes that exist in the case law and the

14    ranges within which I should give serious consideration to

15    reduction.

16         I don't mean to presume anything adverse to the

17    plaintiff, but the breadth of the difference here between

18    compensatory damages and punitive damages is so wide that I

19    don't see any basis on which I can sustain that judgment.

20         Now, issues of ratio come and go.  There's some

21    argument plaintiff's make that the attorney fees they will be

22    awarded once a judgment is entered should be considered in

23    the ratio calculation.  I'm not finding authority to support

24    that proposition, so I'm interested in why that factor should

25    be taken into account.

4

1        It seems to me attorney fees are not a fair measure,

2   in any event, of harm because the plaintiff will be fully

3   compensated for the attorney fees she incurred.

4        It's not -- it's not anything individual to her and

5   to doesn't really measure the kind of harm that the ratio

6   looks at; at least that's my understanding.  But I'm

7   certainly open to being redirected.

8        It's Equifax's motion.  Ms. Sumner, are you arguing

9   it?

10       MS. SUMNER:  I am, your Honor.

11       THE COURT:  All right.  Good afternoon.

12       MS. SUMNER:  Good afternoon.  Would you have prefer me

13   to stand or sit?

14       THE COURT:  You're fine where you are.

15       MS. SUMNER:  Okay.  Thank you, your Honor.

16       THE COURT:  On your feet, that is.

17       MS. SUMNER:  May I go over here, then --

18       THE COURT:  You may if you want.  Sure.

19       MS. SUMNER:  I have to admit my eyes are not quite as

20   good as they used to be, in terms of trying to view it from the

21   lower table.  Thank you, your Honor.

22       THE COURT:  Go ahead.

23       MS. SUMNER:  Your Honor, I don't intend to rehash,

24   obviously everything in the briefs.  Because, like you've said,

25   you've had the opportunity to review it.  So I would just like

1   to hit a few of the highlights, from Equifax's perspective, and

2   why Equifax believes that it is appropriate to be looking at a

3   one-to-one ratio despite the fact that there is a very

4   significant amount at issue, that -- in terms of the jury's

5   award of 18.4 million in punitive damages.

6        To start off with, I do want to make it clear that

7   it is Equifax's position that the maximum constitutional

8   award should be a one-to-one ratio, which would mean a

9   180,000 dollar punitive damages award in addition to the

10  compensatory damages.

11       And I would ask your Honor to consider a couple of

12  things.  And particularly looking at some of the Supreme

13  Court decisions and the -- and the findings of -- of the

14  court in **State Farm** -- excuse me, in **Gore,** and other cases

15  that I would like to mention.

16       One is that -- that in **State Farm** the Supreme Court

17  recognized and expressed distinct concern that juries will

18  use their verdicts to express vices against big businesses,

19  and particularly those without strong local presences.

20       And Equifax would ask your Honor to consider that

21  when taking a look at what the jury returned and what is --

22  is actually appropriate and constitutional.

23       Further, because here we're subjected to civil

24  punitive damages that do not have the protections afforded in

25  criminal proceedings, it's also important to take a look at

1  the boundaries of what would be appropriate because punitive

2  damages pose an acute danger of irrational and arbitrary

3  deprivation of property, which we believe occurred here.

4          When your Honor considers the **Gore** factors, the

5  degree of reprehensibility as the number one factor; the

6  disparity between the actual harm suffered by the plaintiff

7  here, which are the compensatory damages awarded, and the

8  punitive damages; and then the difference between the

9  punitive damages and the civil penalties that would be

10  authorized, it also makes clear that a very low ratio would

11  be appropriate.

12          I do want to point out, too, your Honor, in

13  considering the record, we ask that the Court evaluate what

14  was before the jury and not extra-record evidence that the

15  plaintiff provided.  In particular, I will point to a

16  declaration by another counsel who represented a plaintiff,

17  Williams, in a case.  That case was not before the jury.

18  There were three other cases that were considered.  We

19  believe that the Court should disregard such evidence.  That

20  this is a Rule 50 motion, as a matter of law, and that it

21  would be inappropriate to start bringing in evidence outside

22  of the record.  However, if your Honor were to consider that,

23  then we would like the opportunity to rebut that.

24          The starting point, your Honor, for this is we

25  believe, not at looking at what the actual award was because

1   it is clearly excessive, but looking at the compensatory

2   damages that were actually awarded in this case.

3           And in order to do that, it is clear that the jury

4   did not find even the amount of compensatory damages that

5   plaintiff's counsel requested.

6           You may recall, and the record would reflect, that

7   plaintiff's counsel requested compensatory damages of

8   400,000.  The jury awarded damages of 180,000.

9           And those damages were all for emotional distress.

10  There were no economic damages outside of that.  There was no

11  physical injury or harm.  It was all based on emotional

12  distress when, in and of itself, that has a punitive damages

13  aspect to it.  And courts have recognized that.  So there is

14  some overlap between emotional distress damages and punitive

15  awards.

16          In considering the ratio, your Honor, we would ask

17  that you focus on several cases that we believe are

18  instructive.  The **Bach** cases, **Bach I** and **II**, which are cited.

19  And the **Noyes** case, which is a Ninth Circuit case in 2009,

20  where the court reduced the punitives to a one-to-one ratio,

21  given the modest reprehensibility of the defendant's conduct

22  in that case.

23          **Exxon Shipping** is also instructive, where the Court

24  recognized that where there are few earmarks of exceptional

25  blameworthiness within the punishable spectrum, that the

1   punitive award should be at a lower range; and suggested, on

2   average, less than one-to-one ratio.

3        And this case, as your Honor knows, involves

4   reckless conduct only.  If you look at the **Gore** factors and

5   you focus on, first, the reprehensibility factor, which

6   breaks down to five different potential issues to consider,

7   three I think we can put aside immediately.  One of that

8   would be that this involved malice, trickery, or deceit.

9        If you recall, plaintiff conceded that this was not

10  a case involving malice.  That it was not intentional

11  misconduct.  And, in fact, that part of the punitive damages

12  instruction was not provided to the jury because the focus

13  was on recklessness.  So that **Gore** factor shouldn't be

14  considered here.

15       The other two that should be quickly set aside are

16  the two that deal with harm.  One is physical harm to the

17  plaintiff in the case.  And here we have a concession during

18  trial that there was no physical harm, and your Honor

19  instructed the jury as such.

20       In addition, the -- another factor is the focus on

21  whether the defendant's conduct endangered the health and

22  safety of others.  And, again, there was no evidence of any

23  of that related to this case.

24       So three of the reprehensibility factors, your

25  Honor, I would say should be set aside immediately.  And then

1    there are two that probably bear some reason for discussion.

2         One of those is financial vulnerability.  And, of

3    course, Ms. Miller argues that she is potentially vulnerable,

4    and that that should be considered here.

5         We submit to you that she is not, under the case

6    law.  And if you look at the **Bach** cases, where they did find

7    that the plaintiff was financially vulnerable, that plaintiff

8    was elderly and had suffered a severe stroke.  You know,

9    putting her in a very different position than Ms. Miller, who

10   is employed; who testified that, you know, that this didn't

11   impact her status in the community.  It didn't cause her

12   economic damage.  And, in fact, she was represented by

13   counsel and had filed suit against other companies, the other

14   two CRAs, prior to filing suit against Equifax.

15        If your Honor could take a look at --

16        THE COURT:  Well, how is the plaintiff's ability to

17   vindicate her right relevant at all to vulnerability in the

18   financial realm?  That goes to the risk that the defendant's

19   conduct posed to her before she stood up to say, I'm not going

20   to take it anymore.

21        It's not really probative that she have lawyers

22   helping her vindicate her rights.  To me the vulnerability

23   question with respect to Ms. Miller is the risk of her

24   identity theft and the legitimate concern she had, supported

25   by the evidence, that when her data was mixed with that of

1    the other consumer, there was this ongoing unresolved risk

2    that she might be victimized.

3              That's the kind of vulnerability that I think does

4    exist on this record, regardless of the fact that she was

5    well employed, well spoken, capable of standing up for

6    herself.

7              I agree she's not the elderly plaintiff in **Bach.**

8    But in today's economic world, where everything turns on the

9    electronic transaction, it seems to me fair to infer a form

10   of economic vulnerability when one's financial identity has

11   been jeopardized by a willful violation; hence the jury found

12   here.

13             Am I missing something here?

14             MS. SUMNER:  I would make two points, your Honor.

15             First, I would ask you to take a look at the

16   **Bridgeport Music** case, which is the Sixth Circuit.  I believe

17   it's a 2007 case, where the Sixth Circuit did find that where

18   a plaintiff had previously brought similar lawsuits relating

19   to the same issues and was represented by counsel, that that

20   person would not be considered vulnerable in the context of

21   this type of litigation.  That's not an --

22             THE COURT:  Were the lawsuits that were previous in

23   **Bridgeport** previous in time or did they simply involve separate

24   actions against the different credit reporting agencies for the

25   same kind of violation, as was Ms. Miller's case here?

1          MS. SUMNER:  It was not an FCRA case, your Honor.  So

2     its simply focused on the fact that it was a -- a plaintiff who

3     had a -- I'm sorry.

4          THE COURT:  I didn't find **Bridgeport** to be very

5     helpful here because it seems different.  And I -- to me, the

6     fact that Ms. Miller brought an action against all those she

7     thought were responsible for the same pattern and the same

8     generic kind of harm simply shows she's standing up for her

9     rights.

10          The vulnerability, to me, really ought to focus on

11     what risks did she face as a result of the defendant's

12     willful violation.  And, to me, that risk basically came down

13     to the risk of her identity -- her financial identity being

14     stolen, and the fear; for which the jury compensated her

15     about that.

16          So I'm -- I wouldn't agree that she is not

17     financially vulnerable here in the sense that you're arguing,

18     although it's an issue of degree.  And her vulnerability

19     certainly is less than an elderly person like the plaintiff

20     in **Bach**, who has other limitations.

21          MS. SUMNER:  And, your Honor, if I might, two other

22     points on that issue before we move on, that I do think, again,

23     worth mentioning.

24          I know the plaintiff relies heavily **Saunders** to make

25     their argument that she is financially vulnerable.  And I do

1   want to point out some distinctions.

2          That is an FCRA case.  And in that case, the Fourth

3   Circuit did find that there was financial vulnerability.  But

4   there the consumer produced evidence demonstrating that he

5   had actually suffered a significant drop in his credit

6   report.  He also suffered economic damage as a result of it

7   by not obtaining credit.

8          If you recall, your Honor, this is not a scenario

9   where Ms. Miller produced any evidence whatsoever to show any

10   impact on her credit score, nor did she provide evidence

11   relating to economic damage.

12          So I guess I would ask you to consider that if you

13   were to find her financially vulnerable, you know what that

14   does is put just about any consumer who takes -- you know,

15   files an action against a CRA because they don't believe that

16   the CRA has not complied with -- with the F -- with the Fair

17   Credit Reporting Act, then just about any consumer could be

18   considered financially vulnerable.  And I think --

19          THE COURT:  Well, when one considers the power that

20   the credit reporting agencies have over consumers generally, in

21   a limited number of consumer reporting agencies in whom

22   Congress has permitted the vesting of all of this financial

23   data, I'm not sure that gives me a lot of comfort.

24          Vulnerability -- financial vulnerability is a factor

25   and one of degree.  And I will grant you that Ms. Miller did

1   not prove and did not suffer any out-of-pocket financial

2   losses.  But the jury found persuasive her testimony about

3   her fear of losing her financial identity, her fear of being

4   victimized because she repeatedly was associated with this

5   other person, and Equifax was not responding.

6          And I'm simply saying it seems to me there is a

7   financial vulnerability that arises from the loss of one's

8   control over one's financial data.  We see it in the national

9   news today.  A national fright being reported over this issue

10  with the Target stores, where consumers who used credit card

11  or debit card authorizations to transact business in the last

12  three weeks are all being told that their identify now -- or

13  that -- the identity for that account may be subject to theft

14  or misuse.

15         I just think it's naive to say that when one's

16  financial identity is at issue that there isn't some form of

17  financial vulnerability.

18         I don't see that the cases have elaborated that, but

19  they haven't ruled it out, either.  It's on a continuum; is,

20  I guess, how I would look at it unless there's a case that

21  tells me I can't.

22         Is there?

23         MS. SUMNER:  Well, the cases reflect that -- that

24  financial vulnerability focuses on the weakest of the herd.

25  Here you're focusing on the herd, when you're talking about

1    individuals --

2            THE COURT:  But it's because of the nature of the

3    misconduct by the credit reporting agency.  We have a

4    different-in-kind risk here that arises from the work of a

5    credit reporting agency.  And when it comes down to logarithms

6    and financial -- and -- pardon me -- and computer programs and

7    decisions that are removed from a human decision maker, as

8    opposed to that individual consumer like Ms. Miller, who tried

9    repeatedly to get a problem solved and all the while a

10   vulnerability to financial harm exists, I think that does weigh

11   in -- in favor of a finding of reprehensibility based on a risk

12   of financial harm but to a lesser degree than in other cases.

13   It's simply something that I don't think I should ignore,

14   especially given the nature of the trust placed in a credit

15   reporting agency like Equifax and -- and the risk to the

16   consumer -- any consumer -- when this kind of error goes

17   unaddressed as long as this one did.

18           So I -- I'm not persuaded that financial

19   vulnerability weighs in Equifax's favor here.  It's also not

20   the end all and be all, here.

21           MS. SUMNER:  I understand, your Honor.  And unless you

22   have more questions on that, I'll move on to the last factor.

23           THE COURT:  Reprehensibility, yes.

24           MS. SUMNER:  Reprehensibility analysis.  Which is

25   really the repeated wrongdoing aspect of this.

15

1       And, here, I think the cases make clear that the

2  repeated wrongdoing is not focused on repeated conduct within

3  a -- a series of transactions that occur with the plaintiff,

4  but is focused more on repeated conduct outside of that

5  context.

6       And, of course, Ms. Miller relies heavily on the

7  verdicts that -- that were presented to the jury.  There were

8  three verdicts.  As you know, Equifax objected strenuously to

9  providing that information to the jury.  And I would ask that

10  your Honor consider a couple of things with respect to that.

11       One is the evidence was -- did not support that

12  those three verdicts related to very similar conduct, and in

13  fact they were all identity theft cases.  They were not

14  scenarios which occurred with Ms. Miller's case; which, as

15  you know, is an online combine because of their similar

16  identification information.

17       In addition, three verdicts that had general verdict

18  forms -- and it was even unclear as to what the jury found

19  Equifax had -- had done in violation of the FCRA -- would not

20  support any nationwide pattern or practice, particularly when

21  you look at the volume of credit files that Equifax manages

22  on an annual basis.

23       The numbers as you know, again, from the evidence --

24  are tremendous.  We're talking 250 million.  So three

25  matters, with general verdict forms that do not have the same

1   conduct at issue, should not support this aspect of

2   reprehensibility.

3          So it would be Equifax's position, your Honor,

4   recognizing our agreement on the financial vulnerability

5   question, that there is very little evidence of

6   reprehensibility with respect to the conduct at issue.

7          The second **Gore** factor, your Honor, is the

8   comparison between the compensatory and punitive damages.

9   And I think it is important to note that the Supreme Court,

10  of course, has not created a bright line, which I know makes

11  it difficult for your Honor to come up with the exact figure

12  that may be appropriate.  But it has strongly cautioned

13  against awards that exceed single-digit ratios.  And, in

14  fact, where it has focused is on a one-to-one ratio, which

15  would support compensatory -- I mean, which would support

16  punitive damages of 180,000.

17         And I think the area where the courts have

18  recognized that a higher ratio would be appropriate is when

19  the compensatory damages are very nominal.  And I think one

20  example that a court used was if -- if someone has a rifle

21  and they shoot into the crowd and they don't actually hit

22  anyone but they have some minor property damage, then the --

23  the compensatory damages may be very nominal, but the -- the

24  punitive damages may be a much higher ratio because of the

25  conduct at issue.

1          The -- the cases that support a higher ratio are

2    really intentional conduct with very high levels of -- of

3    blameworthiness.  And I will ask you to take a look at the

4    **Planned Parenthood** case because that is a case in which the

5    Ninth Circuit reduced an award from 206-to-1 to 9-to-1.  But

6    this is a scenario with exceptionally blameworthy conduct,

7    where we have anti-abortion activists putting wanted lists

8    for doctors.  And in fact doctors had been murdered after

9    being placed on similar lists.

10          So the court found, in that context, in light of --

11   of the blameworthiness of that conduct and the egregiousness

12   of it, that a higher ratio was appropriate.

13          Because there, too, the amount of damages that had

14   been awarded to the doctors was only about 50,000 dollars

15   per.  So, again, a relatively low compensatory damage amount,

16   a very high blameworthiness in terms of the conduct, which

17   warranted a higher ratio.

18          We had provided your Honor with a lot of cases which

19   support a one-to-one ratio.  And, in fact, I think it's in

20   the **Exxon** case where they -- where the court recognizes that

21   most of the ratios are below one-to-one.  So I think that it

22   is important for your Honor to take a look at that; not

23   necessarily focusing on what the jury actually awarded but

24   what would be appropriate in the context of the particular

25   circumstances of this case.

1          The other case I know that plaintiff's counsel

2   focused on is the **Johansen** case, which is an Eleventh Circuit

3   case.

4          And there the Eleventh Circuit approved a 100-to-1

5   ratio.  Again, that was a scenario where the compensatory

6   damages were relatively low.  They were 47,000 dollars.  And

7   this was a circumstance of pollute and pay, where a company

8   was profiting from polluting.  And there was a very high

9   state interest here.  And so in that case the court did

10  recognize and uphold on extremely high ratio.  That is not

11  appropriate in the context of this case.

12         There -- most of the cases that would be analogous

13  here have very low ratios.  And that is what the Supreme

14  Court in **State Farm** supported.  That it would be highly

15  unusual to be above a -- a two times, three times, or four

16  times the compensatory damages.

17         THE COURT:  So is the highest -- what is the highest

18  ratio that's been endorsed in a FCRA case?

19         I know of the **Dixon-Rollins versus Experian** case out

20  of the Eastern District of Pennsylvania.  There, the trial

21  court imposed a nine-to-one ratio.

22         Are you aware of any higher ratios in a FCRA case?

23         MS. SUMNER:  I am not, your Honor.  And I would say --

24         THE COURT:  Are you aware of ratios higher than

25  one-to-one in a FCRA case that have been endorsed by an

1    appellate court?

2          MS. SUMNER:  I will say that there are verdicts that

3    are higher than one-to-one.  I don't know --

4          THE COURT:  Verdicts don't help in --

5          MS. SUMNER:  No.

6          THE COURT:  -- the context of reviewing for

7    excessiveness.

8          So I'm looking for the outliers and what other

9    courts have done in the context of a FCRA setting, not other

10   kinds of claims.  Because you, and I know Ms. Leonard, will

11   spend your time pointing out why they're different as opposed

12   to the same.  So I'm interested in the comparison range in

13   FCRA cases, if you can offer any.  Maybe you've been involved

14   in some.

15         MS. SUMNER:  I -- I cannot think of one, your Honor,

16   that has gone to the appeal level, which --

17         THE COURT:  How about in trial court reviews?

18         MS. SUMNER:  I can think of the -- the -- actually the

19   cases that were cited by plaintiff.  And I'm not -- I cannot

20   think of others, other than those.  And that, of course,

21   provides some context for what the juries have awarded and what

22   has been presented to the trial court in terms of the

23   possibility of reducing those amounts.

24         THE COURT:  I haven't gone back to check the record,

25   but correct me if I'm wrong in my memory.

1          I thought when we discussed jury instructions, both

2    sides ruled out my -- or both sides asked that I not instruct

3    the jury on ratios or parameters.  And, of course, I didn't.

4    Does that bear on -- in any way on the analysis I should be

5    following now?

6          A jury made a decision, based on the record, that

7    Ms. Miller sustained 180,000 dollars in compensatory harm.

8    And the jury, without guidance from me -- and I think it was

9    at the request of both sides because each side had a reason

10   not to want a standard put in front of the jury.  Plaintiff

11   didn't want it limited to some single-digit range, and

12   defendant didn't want that suggestion even made to the jury,

13   that punitive damages would be warranted, never mind in a

14   range larger than compensatory damages.

15         But does the fact that the parties have the

16   opportunity and then persuaded me not to give the jury

17   guidance around ratios have anything to do with the analysis

18   I'm required to make now?

19         MS. SUMNER:  Your Honor, I don't think it bears on the

20   constitutional analysis that the Court is required to consider.

21   That is not one of the **Gore** factors, and I don't believe that

22   it plays into that.

23         I think what the Court must consider is what would

24   be the appropriate constitutional limit, not based on what

25   the jury actually returned as a -- a punitive damages award.

1          The cases --

2          THE COURT:  Well, there's some message the jury was

3   sending, and there's a jury for a reason.  They're the triers

4   of fact, not the Court.  They made a deliberate decision that

5   the compensatory damages -- and I -- I wouldn't say this is a

6   nominal award of compensatory damages, given the very factors

7   you've been pointing to.  They made a compensatory award that

8   was significant and then they came at it with great

9   multipliers.  I've forgotten what the number is here, what the

10  ratio is; a thousand or something.

11          Anyway, the point is, don't I have to give some

12  deference to the fact that the jury did what they did?

13          And considering ratios, assuming I'm bound to --

14  say, for example, a single-digit ratio.  Why would I endorse

15  a one-to-one ratio when this jury felt so strongly that

16  punitive -- that -- that the defendant should be punished?

17          MS. SUMNER:  Your Honor, you do not owe deference to

18  the jury's finding.  And that -- and it is clear, from **State**

19  **Farm**, that there is a -- a high risk that jurors will sometimes

20  be prejudiced and biased against out-of-state corporations,

21  especially wealthy corporations.  And --

22          THE COURT:  Or, as is noted in the environmental case,

23  there's also legitimate value to an award that actually stings,

24  one that reaches the pockets of a very wealthy defendant, even

25  if the conduct isn't physically harmful but it's likely to be

1    repeated; it's the kind of conduct that would -- would run a

2    risk of harm to consumers everywhere.

3              So why shouldn't the Court consider the fact that

4    this jury -- the breadth of the disparity here has a message?

5    And if I have discretion in trying to set an appropriate

6    ratio, why shouldn't it be at the very highest end that the

7    Constitution would permit, as opposed to one-to-one or less?

8              MS. SUMNER:  Your Honor, the analysis does not give

9    deference to the jury's verdict.  The analysis does not start

10   at looking at what the jury awarded.  That is not in the

11   analysis at all.

12             And -- and if you look to the Supreme Court's

13   guidance, they warn against doing that.

14             THE COURT:  But in determining an appropriate ratio,

15   clearly there is no bright line rule.

16             And when one is looking at the various factors, why

17   would a court choose the most minimal ratio when a higher

18   ratio might likewise be justified under the law, especially

19   when the jury found in such a significant way that the

20   defendant needed to be punished?

21             There isn't any question but that the Court has to

22   follow the legal standards, but there also is not a bright

23   line rule.  So when one seeks to determine the appropriate

24   ratio, you have to base that on something.

25             And I'm simply saying it seems to me, in the context

1   of guidelines -- much like in the context of sentencing

2   individuals, where we have federal guidelines -- the

3   guidelines are there to provide guidance.  There is an

4   absolute line somewhere, beyond which there's constitutional

5   uniformity.  But if I can identify that line, why shouldn't

6   the punitive damage award be the highest that the

7   Constitution would permit, given the message that this jury

8   sent?

9           You're saying it's -- it's not a factor at all?

10          MS. SUMNER:  That's correct, your Honor.  I don't

11  think that --

12          THE COURT:  All right.  Then why shouldn't it be the

13  highest the Constitution should permit anyway, because the jury

14  clearly was motivated by the fact that the factors on which I

15  did instruct them, without guidance about ratios, produced this

16  particular outcome?

17          MS. SUMNER:  Well, your Honor, as you know, we

18  respectfully disagree about some of the evidence that was

19  presented to the jury about the other verdicts.  And so, of

20  course, it's our position that they were inflamed by that.

21          We -- we don't know exactly why the jury decided

22  to --

23          THE COURT:  Well, if you're arguing inflammation, why

24  isn't it just as appropriate to infer that this jury was

25  concerned, legitimately -- because they're permitted to

1    consider the wealth of the defendant when punishing -- that

2    they needed to determine an award that was enough to make the

3    point?  Enough to sting, as in the environmental case?

4              MS. SUMNER:  The -- the -- at this point, though, your

5    Honor, the constitutional analysis does not include wealth.

6    And so I --

7              THE COURT:  I'm back -- I'm trying to focus, however,

8    on the notion of the ratio.  And if nine-to-one is appropriate

9    in a FCRA case, as was the case in this one out of the Eastern

10   District of Pennsylvania -- is it higher in other FCRA cases?

11             MS. SUMNER:  I'm not aware of any higher ratio, your

12   Honor, and I think it would be inappropriate to apply that

13   ratio because I don't think the -- the issues are the same in

14   this case.  And I'll also point out there was not evidence

15   before the jury to reflect any type of ongoing FCRA errors with

16   respect to its matching process.  In fact, the evidence was

17   just the opposite.

18             They have might have discounted the expert --

19   evidence of our expert, who testified.  But the record

20   reflects that the FTC supported the matching algorithm which

21   combined these two individuals and created this problem.

22             THE COURT:  Well, that might have justified a lower

23   jury outcome in the end, if the defendant had responded to the

24   first complaint of Ms. Miller.

25             But in the light most favorable to Ms. Miller, this

1    was a two-year saga that was met with nothing but being blown

2    off.  It took her suing, to get action.  And that is conduct

3    that I think appropriately a jury could consider, regardless

4    of your views about whether the evidence was properly

5    submitted.  All of that could weigh legitimately in the

6    calculus that led -- that -- that would lead to, ultimately,

7    a constitutionally permissible award.

8          So it seems to me taking advice from other FCRA

9    cases is appropriate for the Court to consider, especially

10   when my duty, in the end, is to ensure that the punitive

11   damage award that makes in the judgment is one that's not

12   constitutionally excessive.  And I guess I come back to the

13   same question.

14         Why shouldn't I strive to find the highest number

15   that would satisfy due process and not be excessive in light

16   of the evidence that the jury heard, in the light most

17   favorable to Ms. Miller, would support a finding of, really,

18   conduct that deserves punishing primarily because of the

19   ongoing nature of her complaints and the ongoing lack of

20   response from Equifax?

21         MS. SUMNER:  But, your Honor, the reprehensibility

22   analysis, when it comes to repeated conduct, does not focus on

23   the conduct with respect to Ms. Miller.

24         THE COURT:  No, but I'm -- you're moving on to ratios.

25   And all of my questions to you just now have been in the

context of evaluating whether the ratio is excessive or not.

And when you -- you pick at a data point and say it wasn't repetitious conduct or it was an algorithmic formula supported by the FTC, well, the FTC representatives weren't the person at the receiving end of two years of being ignored. And so, to me, in the context of comparing a ratio, one has to look at what the actual evidence was.

And here, the evidence in the light most favorable to Ms. Miller was she could have -- she could have gone to the corporate headquarters and put a plane overhead with a banner, and it would have been ignored. I'm simply saying it's a factor that I think one has to look at the evidence in evaluating whether a ratio is too high. And we get -- the Supreme Court says single digits are typically the range. So that says to me, why isn't nine-to-one then appropriate?

MS. SUMNER: And I guess, your Honor, what I'm focused on is if you're looking at appropriate ratios, then you also should be looking at the reprehensibility factors --

THE COURT: Of course.

MS. SUMNER: -- in order to come to what would be appropriate. And my point is that there is very little evidence of reprehensibility. That's our position why we believe that the ratio should be lowered, under these circumstances.

And the concern that we have is once you move

1    outside of the context of what the Supreme Court said you

2    should focus on with respect to reprehensibility, then it is

3    very difficult and you start looking at many factors which

4    should not necessarily weigh into the analysis.

5             THE COURT:  Well, you know, I'm perfectly capable of

6    acknowledging that Ms. Miller was not physically injured.  I do

7    disagree with you that she did not suffer a meaningful harm.

8    She -- she did.  And for two years, she dealt with this -- this

9    stonewall kind of response from Equifax.  And she did worry and

10   she -- I'm saying in the light most favorable to the plaintiff,

11   about what was going to happen.  Because this problem

12   continued, persisted, and was not being resolved.

13            I don't think that means defendant's conduct was not

14   reprehensible.  I think it's a different caliber of

15   reprehensibility.

16            It's not a tobacco company pushing its wares on

17   unsuspecting consumers before public health and other

18   knowledge was at a point in time that they should have known

19   better.

20            It's not physically going to harm Ms. Miller.  She's

21   not going to die of lung cancer because of that kind of

22   reprehensible conduct.

23            But we're talking about a consume -- a consumer

24   reporting agency that exists by operation of law.  It's

25   permitted to collect and rate and control the information of

1    all consumers who have very little control, it turns out,

2    over getting it right, even though that was a big part of

3    Congress's motivation and the legislative history around the

4    mechanisms to correct information.

5            And so when a jury hears that an agency does not

6    respond and the problem continues, that's a form of

7    reprehensibility; different in kind, but still worthy of

8    punishment, it seems to me, if the jury made that first call.

9    And it did here.

10           So what else did you want to add, before I take up

11   all of the time that plaintiff's counsel might want to use

12   today?

13           MS. SUMNER:  Your Honor, I will -- I just wanted to

14   briefly address the third **Gore** guideposts, which was the focus

15   on -- on civil penalties.

16           THE COURT:  Right.

17           MS. SUMNER:  And there, I think I can be brief because

18   it is clear that the FTC has authority to impose 10,000 dollar

19   fines per FCRA violation.

20           And here I know that plaintiff's counsel referenced

21   that there was the ability to -- to find more for a

22   continuing violation.  And there is not evidence in the

23   record to support that there was an ongoing continuing

24   violation of the FCRA.  Here, this case, there was evidence

25   put on about several different potential violations of the

1    FCRA.

2            We don't know how many of those violations the jury

3    found.  We know that they found at least one.  But even if

4    they were to have found 18, they would have to do that in

5    order to get the -- the amount up to even the compensatory

6    damages, which the evidence would never support that number

7    of FCRA violations.

8            So, your Honor, in closing for -- for Equifax's

9    position, you know, we think that if you look at the

10   reprehensibility factors, there is -- in our perspective --

11   at most one that should be considered in the calculations.

12           If you look at the ratio of the compensatory to

13   punitive damages, it's so incredibly excessive and

14   inappropriate, and particularly in light of the fact that the

15   jury did not even find that harm to the plaintiff was as high

16   as argued by plaintiff's counsel.

17           And then finally, if you look to the parameters of

18   civil penalties, they pale in comparison to this jury's

19   verdict.  So we ask that your Honor take all of those into

20   consideration and grant the Motion to Reduce the Punitive

21   Award.  And from Equifax's perspective the appropriate award

22   would be a one-to-one ratio.

23           Your Honor, may I answer any further questions?

24           THE COURT:  Not at the moment, but we'll see what

25   comes up.

1          Thank you very much, Ms. Sumner.

2          Counsel.

3          MS. LEONARD:  Thank you, your Honor.

4          I appreciate your -- some of your comments, and I

5     would like to come back to those.

6          I would like to make a point about why this case is

7     different here.  We have aggravated factors.  The two I would

8     highlight right away is the repeated misconduct, which is an

9     enhanced represent -- reprehensibility factor; and what we

10    describe as an unwillingness to change behavior, which is

11    part -- which is a deterrence consideration and part of the

12    purpose of punitive damages as a whole.

13         And I won't go through the facts because you know

14    them better than I.  You saw the testimony come in.

15         I do want to respond, though, on the -- the jury did

16    hear evidence, for example, of three other Fair Credit

17    Reporting Act cases.  That was the **Kirkpatrick** case, the

18    **Valentine** case, and the **Drew** case, and the testimony of

19    Mr. Hendricks at transcript 306, 307.  And I want to respond

20    to our post-trial submissions, including other cases.

21         These are, for the most part, coming out of the

22    court records.  They're judgments in other cases.  Two

23    against Equifax.  **Angela Williams against Equifax**, out of

24    Florida in 2008.  And the **Jantzen** decision, here in Oregon,

25    in 2010.  Didn't involve punitive damages but did have a

1   compensatory award of 275,000 and a stipulated judgment.

2   Your Honor was involved in the -- that case and also the

3   attorney's fees litigation.

4       We also cited the **Judy Thomas against TransUnion**

5   case, which involved 300,000 in compensatory damages and

6   originally 5.3 million in punitives, which was reduced by the

7   trial court to 1 million.  That's an Oregon district court

8   decision from 2002.

9       The nature of those claims appear in a reported

10  decision at 197 Fed.Supp 2d 1233, out of the District of

11  Oregon, 2002.  And it makes clear that that's -- those claims

12  were about -- just like Ms. Miller's situation -- the failure

13  to reinvestigate and address errors in a credit file.

14      We've also submitted the -- and so all of these are

15  appropriate for you to consider, both in their form as

16  judgments, public records, and because of your particular job

17  as deciding a question of law here.  It's kind of a mixed

18  bag, fact and law.  But your job, now, is to consider due

19  process constitutional limits.

20      We've also submitted the -- and so you should not be

21  limited to simply the evidence before the jury.

22      We have submitted, also, the affidavit of the

23  Florida counsel in the **Angela Williams** case to explain what

24  the claim was about there; the same claims as in -- in issue

25  here:  Mixed files and a failure to reinvestigate that went

1    on way too long.

2          I want to say why it is appropriate for you to

3    consider this evidence, in addition to the idea that you're

4    dealing with a question of constitutional law here, as the

5    jury was not.

6          First, the Federal Rule 50, which is about -- which

7    was about setting aside verdicts, entering judgments

8    notwithstanding verdicts, does deal with sufficiency of the

9    evidence in a sort of traditional sense.  Directed verdict

10   motions, that sort of thing.  But it turns out it's the

11   source of power for this Court to deal with reduction motions

12   under the Constitution.  But that doesn't control the

13   evidence or limit the evidence that you can -- you can

14   consider because your decision is a legal one, not simply an

15   evidentiary one.

16         In **Cooper against Leatherman Tool Group**, the --

17   which was a Ninth Circuit case, went to the U.S. Supreme

18   Court, the Supreme Court tells us that the jury's punitive

19   damage award is not a fact.  You know, in trial court we

20   regard it as a finding of fact.  Here, it's not a fact.  And

21   so when the court reduces or reconsiders a punitive damage

22   award, it's not re-examining a fact, which has Seventh

23   Amendment implications.

24         And in **Leatherman**, the court endorsed **Gore's** -- the

25   **Gore** factors and how it should be used.  And, in particular,

1    used the phrase from the third **Gore** guidepost about

2    considering civil penalties authorized or imposed in

3    comparable cases.

4           So we've offered you evidence of verdicts imposed in

5    comparable cases, and that seems to be entirely consistent

6    with the constitutional job you're here to do.

7           Other things that the U.S. Supreme Court tells us

8    that the Court should consider include things like, as I

9    mentioned, comparable sanctions; what has happened elsewhere

10   in comparable litigation.

11          Third, we do a due process notice inquiry.  And so

12   there, that considers other sources for the defendant's

13   notice of potential sanctions.

14          In **Gore**, the Court had a discussion about prior bad

15   acts that are relevant to sentencing.  Sentencing is a

16   court's job, not the jury's job, in the usual criminal case.

17          And in -- just to give a comparable view, Oregon has

18   a statute which allows new evidence to come in that has not

19   been heard by the jury.  It comes in -- if it comes in at

20   all -- for the first time on post-trial motion to reduce.

21   And that new evidence may include remedial measures the

22   defendant may have undertaken and other punitive damage

23   verdicts against the defendant.  The statute is ORS

24   31.730(3).

25          And perhaps the best example I can offer you of why

1  it's appropriate for you to be able to consider everything

2  before you now is -- comes out of the **Gore** decision itself.

3  At page 565 and 566, there we see a discussion of evidence

4  that came in only on the post-trial briefing in the trial

5  court in that case.  And that evidence was significant all

6  the way up, and significant to the U.S. Supreme Court when it

7  made its constitutional decisions.  And that evidence

8  included things like verdicts in other cases, which **BMW**

9  **against Gore** had submitted in its post-trial briefing.  It

10  considered the evidence that BMW had changed its policy after

11  this -- after the verdict came in.  Changed its nationwide

12  policy.  That was not before the jury.

13       And it considered testimony -- it sounds like it was

14  live testimony, perhaps, before the Court about other

15  lawsuits that had been filed against BMW; filed and settled.

16  And BMW was trying to make the point about whether they

17  involved repainting or not, so all of that new evidence was

18  before the Court for its consideration on its constitutional

19  function.  So I think all of that is properly here.

20       So I would like to address the **Gore** -- **Gore**

21  guideposts.  We believe there are several enhancement

22  reprehensibility factors in play here.  Trickery and deceit

23  is in play.  Yes, malice was taken off the boards because

24  there isn't evidence, everyone agreed, of malicious conduct.

25  And yet there is evidence of trickery and deceit in the form

1    of the letters that Equifax sent to Ms. Miller, which told

2    her they had conducted a reinvestigation, they had gone and

3    contacted sources of information, they had addressed her

4    concerns.  All of this was false.  They never did that.  That

5    was the testimony that came out at trial.

6            There -- I would like to speak, now, about the --

7    her personal injuries.  These are psychic harms.  They're not

8    economic damages.  They're personal injury damages.  We call

9    them noneconomics.  And here's why I think that they're

10   significant as an enhancement factor for reprehensibility.

11   And the courts -- many courts speak about this.

12           These are damages that are -- in many cases, they're

13   very small.  Here they're not particularly small.  But in all

14   cases they're hard to articulate and prove for the plaintiff

15   and they're hard for the jury to quantify.  That means that

16   it's more difficult for plaintiff to have the incentive and

17   the ability to sue and bring -- and -- and right the wrong

18   that's been done to them.  It's difficult for a lawyer to

19   take that case.  It's difficult for a plaintiff to find a

20   lawyer to take the case.  Those kinds of damages make these

21   cases harder to -- to prosecute.  And, as a result, they

22   increase -- that all increases the chances of a defendant

23   getting away with it.

24           That's why this kind of damage is an enhancement

25   factor for reprehensibility.  We see such a discussion, for

example, in the bed bug case, **Mathias**, out of the Seventh

Circuit.   And many other cases talk about it.

You've talked a lot about financial vulnerability.

And of course we agree that, frankly, the reason Ms. Miller

is financially vulnerable here is because Equifax made her

so, and I think that's the crux of your remarks.   And I agree

with them and I don't think I need to elaborate farther on

that.

We cited to you the **Saunders** case.   Even in **Planned**

**Parenthood**, a doctor was considered vulnerable in this sense

because the doctor was threatened to -- threatened such that

he or she would not be willing to go to work and, thus, it

threatened their livelihood.   So that was a vulnerability

factor that the **Planned Parenthood** case remarked upon.

Another factor in play here is the idea of the

evidence that showed harm to many others.   And the **Williams**

**against Philip Morris** case uses the term, the plaintiff is

the "exemplar" for the extent of harm and the kind of harm

that the defendant may be willing to inflict on many others.

And here we have evidence of Equifax's admission at

trial that many others are exposed to the same mixed-file

problem.   One to two percent was the testimony we heard from

the Equifax witness, which translates to 2 to 4 million

consumers.   Now, I appreciate they're maybe not all Equifax

files, but that's a lot of consumers who are exposed here.

1          We have the evidence of the FTC's longstanding

2     concerns and the many complaints to which it was responding

3     in -- in the 1990s.

4          We have evidence about -- also from Mr. Hendricks,

5     about the time of Congressional hearings and their concerns

6     about widespread complaints for exactly this kind of problem,

7     the mixed-file response -- the mixed-file problem without

8     response.

9          Another reprehensibility factor here is the repeated

10    misconduct itself, and the evidence there being the -- the

11    past cases, in addition to consent decree in the past.

12         And here we have Mr. Hendrick's testimony.  And I

13    want to go back to this and tell you the transcript pages are

14    306 and 307.  These are in fact cases that are entirely

15    relevant because it is the same misconduct.

16         The question that plaintiff's counsel asked

17    Mr. Hendricks had to do with other cases in which consumers

18    disputed inaccurate information and it was not corrected.

19    That's the crux of all of these cases.  And we have the three

20    cases, as you know, which Mr. Hendricks talked about.

21         So we think there are several enhancement factors

22    here that make Equifax's conduct particularly reprehensible.

23         With regard to the ratio, you asked the interesting

24    question about what deference, if any, should you give to the

25    jury's -- the jury's verdict.

1           And I would -- I went back to the jury instructions.

2    No, they were not, of course, instructed on a ratio, as you

3    recounted.  But they were instruction -- they were instructed

4    on a reasonable relationship.  And I think this is

5    significant.

6           It -- first it says -- and I'm looking at -- this is

7    page 21, but it's not going to be accurate -- I can find the

8    transcript cite a little later, your Honor.

9           THE COURT:  I have the instructions.  Go ahead.

10          MS. LEONARD:  Okay.  Can't give you the page cite.

11          But, You may consider the relationship of any award

12   of punitive damages to any actual harm inflicted on

13   plaintiff -- inflicted on plaintiff and defendant's net

14   worth.

15          And then the caution:  You may not set the amount to

16   punish for -- defendant for harm to others other than

17   plaintiff in the case.

18          So they had -- they had a directive to consider the

19   relationship, and I think they did do that.  And for that

20   reason I think their -- their view of the relationship is

21   entitled to deference here.

22          Because this is a -- both a fact and a law inquiry

23   and because your job is not to be a 13th juror here but,

24   rather, simply to set the highest number that the

25   Constitution would permit, it is entirely appropriate for you

1    to consider the jury's response here.  The jury's response to

2    the evidence, as reflected in the verdict.

3            I would like to talk about two features of -- that

4    are relevant to the ratio.  Two things to consider with

5    regard to the plaintiff's harm.  The first has to do with the

6    idea of potential harm, which has been endorsed in **TXO** and

7    other cases.  The idea that actual -- the actual number on

8    the verdict -- the actual harm number on the verdict is not

9    the end of the inquiry.

10           It's appropriate to consider plaintiff's potential

11   harm that would have been incurred -- she would have incurred

12   if the misconduct hadn't stopped.

13           And in this respect, the jury -- we have two years

14   of frustration, anxiety, reputational damage, bad credit.

15   And the jury awarded 180,000 dollars.  That looks like 90,000

16   dollars a year.  If we extend that out over a reasonable

17   lifetime for a conflict, it can add up very quickly.

18           We've given you other cases.  The **Williams** case was

19   a dispute process that went on for 13 years.  The **Jantzen**

20   case was a dispute process that went on for 18 years.

21           The **Thomas** case, which was not against Equifax -- it

22   was against TransUnion -- went on for six years.  So we know

23   that the jury has given us a number of actual harm, but we

24   know that we can also consider potential harm for all -- for

25   the -- for the plaintiff if her injuries had not been

1    terminated by this litigation and correcting her file.

2          The other aspect of plaintiff's damages that I

3    wanted to talk about -- and you already signaled your

4    thinking about that -- was the attorney's fees as part of

5    compensation.

6          We've cited some cases which have done exactly that,

7    considered the attorney's fees as part of the compensation.

8    And these cases, for the most part, are cases with statutory

9    attorney's fees built in.  So a civil rights statute, for

10   example, was involved in one case.  Insurance protection

11   statutes feature in several of the cases we found.  There was

12   even a consideration given in a maritime claim out of

13   Washington state.

14         And I -- I think it's entirely appropriate to do

15   that in this case by virtue of the statute itself.  The

16   Federal Credit Reporting Act statute itself, 15 U.S.C.

17   1681(n) and (o), both describe the liabilities of a -- of the

18   violator and the amounts they should pay.  And they list

19   those things that should be paid as a package.  In other

20   words, attorney fees are not set off in some other part of

21   the statute, as some -- some courts have found that.  Right?

22         And here we see in the Federal Credit Reporting Act

23   a person who willfully or even negligently -- same thing --

24   violates the law, is liable to the consumer in an amount

25   equal to the sum of, one, actual damages or statutory

41

1   damages; two, punitive damages, if it's a willful violation;

2   and attorneys fees.  All of this as a package, which looks to

3   me like compensation for the plaintiff.

4           THE COURT:  The Supreme Court's never taken attorney

5   fees into account in looking at a ratio.

6           MS. LEONARD:  **BMW against Gore**.  In that case -- and I

7   would refer you to Justice Breyer's concurring opinion.

8           THE COURT:  Oh, dear.  Concurring opinion.

9           MS. LEONARD:  All right.  Well, hang in with me just

10  for a minute, at pages 591, 592.

11          Justice Breyer liked the idea of including

12  litigation costs and attorney's fees as a part of

13  compensation, as part of the ratio analysis.  Explicitly said

14  that.

15          Because, in Alabama, the costs of litigation is one

16  of their seven or eight factors they use for their own

17  remittitur review.  And that's indeed what the court did --

18  the trial court, and the state reviewing courts in Alabama --

19  in the **Gore** case.  Okay?  So that was already in the case,

20  when it came up to the Supreme Court.

21          And here's what Justice Breyer said about that.  He

22  says, This standard, the idea that you include litigation and

23  attorney fees in there, this standard provides meaningful

24  constraint to the extent that the enhancement is -- it

25  authorizes is linked to a fixed ascertainable amount

42

1    approximating actual costs, even when defined generously to

2    reflect the contingent nature of plaintiff's victories.

3            And so he's endorsing this coupling --

4            THE COURT:  So you've got one.  How about others on

5    the Supreme Court?

6            MS. LEONARD:  The others didn't discuss this --

7            THE COURT:  Right.  That's the problem with the

8    concurring opinion.

9            MS. LEONARD:  They didn't discuss it.  But --

10           THE COURT:  But if you start here, I grant you that --

11           MS. LEONARD:  He likes it precisely because it's

12   quantifiable and potentially, in his view I think, limiting.

13   It gives a number --

14           THE COURT:  He didn't say one-to-one.  You know, you

15   can put formulas out there.  But until you know what all of the

16   variables are, I'm not sure this really provides much help.

17           So the concern I have about attorney fees, in the

18   context of ratios, is that they really have nothing to do

19   with compensating -- quantifying the degree of harm to the

20   plaintiff.

21           The attorney fee --

22           MS. LEONARD:  Well, I have to disagree -- I'm sorry.

23           THE COURT:  Well, the attorney fee measure is, in --

24   in -- is a remedy provided by the Congress, in this context, to

25   ensure that even in that one dollar case the plaintiff doesn't

1    lack the incentive to go forward.

2         Even in those cases of minimal damage, there will be

3    compensation to the attorney, so that the case doesn't die on

4    the shelf.

5         I don't think it has a bearing on ratio because

6    ratio goes to the quality of the defendant's conduct, as

7    compared to the harm the plaintiff sustained.  One is

8    comparing those throughout the **Gore** guideposts.

9         A lawyer may be particularly efficient and have a

10   very low attorney fee charge in a case that's particularly

11   egregious.  On the other hand, a lawyer might be not very

12   efficient.  It might be a case where there are two lawyers

13   doing the work of one.  It could be a variety of factors.

14        Lawyers and attorney fees and load stars, and all of

15   the factors that go into determining what is a reasonable

16   fee, that body of law really does not connect in my view to

17   this.

18        And until we've got some -- somebody who places

19   parameters around the ratio and -- and thereby determines

20   whether this is or isn't something the Court in a reduction

21   motion should consider, I -- I think it simply serves as a

22   putatively objective basis on which to ratchet up the ratio.

23        I say "putatively," because I don't think it has

24   anything to do with the degree of harm.

25        The harm to the plaintiff is really what the ratio

44

1    is about, also the fact of the civil penalties and other

2    fines or punishments.

3            I think factoring an attorney fee award in is

4    exactly the wrong thing to do because it is so much dependent

5    upon the -- the case management skills of the lawyer, the

6    degree to which you're dealing with a -- a court that does or

7    doesn't move the case forward.

8            It really has nothing to do with the underlying

9    harm.  And -- and -- and the plaintiff's already getting the

10   benefit of the attorneys being paid.  So I'm just not there,

11   unless you've got a case that says I have to do this.

12           MS. LEONARD:  No.  I don't have a case that says --

13           THE COURT:  Then we really shouldn't waste time on it.

14   You've made your point, and you can argue it to the Ninth

15   Circuit that I should have considered it.  I just don't think

16   it's helpful here.

17           MS. LEONARD:  One other Supreme Court case that might

18   be of interest is the **TXO** case.  And there -- that was the

19   oil-and-gas deed.  You remember it.  And the only damages that

20   the small company, who was being abused by the large company,

21   had were litigation costs.  It was 19,000 dollars in litigation

22   costs, and those were entirely appropriate damages.

23           THE COURT:  But those weren't attorney fees awarded by

24   statute.

25           MS. LEONARD:  No, they were not.  They were not.

1          THE COURT:  It's a different calculus.

2          MS. LEONARD:  I would like to briefly touch on the

3    comparable civil fines.

4          I believe the FTC has significant enforcement

5    authority, and I think the defendant's point is that -- well,

6    there needs to be violation consent decrees or there needs to

7    be ongoing offenses for the FTC to move in and do something.

8          But in fact if they were to move in and do

9    something, they can disgorge profits, they can enforce

10   injunctions.  These are very powerful remedies that can be

11   quite crippling to a business.  So I don't think we just need

12   to consider the 10,000 dollar fine when we're looking

13   somewhere for a comparable notice component and an

14   appropriate punishment component.  It's out there already

15   with the FTC statutes.

16         And -- and just one thought about how Equifax has

17   been using FTC's inaction here to justify its behavior.

18         The FTC has not forced them to change.  I think

19   Equifax describes that as an endorsement of their practices,

20   and I don't think it is.  And I think it's significant that

21   the FTC has been inactive here.

22         It highlights the need for private attorneys

23   generally.  Like Ms. Miller, as difficult as it is for her to

24   bring this case, she needs to be here.  She's the first and

25   maybe last defense for the enforcement of the law because I

1    think the jury was aware that the FTC had its concerns but

2    hadn't done anything, in this respect, for some years.

3          The final discussion I want to have has to do with

4    deterrence in particular.

5          Two thoughts.  Wealth matters.  And I looked at the

6    **Southern Union Company** case, **against Irvin**, that the

7    defendants, I think, cited.  I don't think we cited it.  That

8    was a punitive damage case that went up and down a couple of

9    times to the Ninth Circuit, ultimately resulting in a

10   three-to-one verdict.  That was the Arizona commissioner who

11   steered a merger decision in the wrong direction for

12   self-dealing, self-gain.

13         The jury awarded 390,000 in compensatory damages, 60

14   million in punitive damages, which was reduced on appeal.  I

15   think the court used a three-to-one ratio.

16         But the interesting part of that case was Judge

17   Reinhardt's concurring opinion to raise the issue, once

18   again, that wealth matters.  What is ruin to one may be a

19   matter of indifference to another was his point.  And that's

20   in play here.

21         The second point I want to make about deterrence is

22   the evidence we have of Equifax's willingness to persist with

23   law violations, even in the face of significant jury awards.

24         I would contrast this evidence with what was going

25   on in the **Gore** case before the U.S. Supreme Court.  The court

1    noted, in particular, the absence of any evidence that BMW

2    had persisted in a course of conduct after it had been judged

3    unlawful, at page 579.  And later on at 584 or 585, there was

4    no history of noncompliance with nonstatutory requirements.

5         And so the putative damage award could be more

6    modest because it wasn't necessary to motivate full

7    compliance with the law.

8         This highlights, for me, that the need to secure law

9    compliance is a very legitimate concern, and I think it's

10   very much in play here.

11        We've described to you the -- the -- the jury

12   verdicts that have already come in over the last few years,

13   and these significant amounts have not deterred Equifax, have

14   not changed behavior.

15        In particular, the **Angela Williams** case, out of

16   Florida, a total of 3 million dollars.  A combination of

17   significant punitive damages and significant compensatory

18   damages.  That was entered just a short time before

19   Ms. Miller started her own dispute process here in 2008.

20        So we can't let -- we can't ignore the jury when it

21   says this shouldn't be a matter of indifference to Equifax.

22   They saw a defendant who was willing to defend and maintain a

23   practice that violated the law.  There was no acknowledgment

24   of wrongdoing.  The business is built with financial

25   incentives to continue law violations, not the reverse.  It

1    doesn't -- Equifax doesn't make money fixing these files.

2            And the people who receive the information, the

3    banks, yes, they probably care about accurate information.

4    But if it's inaccurate and -- and disparity -- disparaging to

5    the consumer, they simply charge higher interest rates.

6    That's all to the good for the bank.

7            It's difficult for consumers to bring claims and

8    litigate.  That's a deterrence consideration.  And we can't

9    allow a system that sustains a defendant's ability to pay

10   verdicts without changing behavior.  That's the **Johansen**

11   case, the pollute-and-pay case.  I don't think due process

12   requires you to condone a violate-and-pay policy here.  In

13   fact, in the **Brim** case, the court said that a reduction that

14   does not adequately punish and deter is itself arbitrary.

15           THE COURT:  What's the highest ratio that you think

16   can be sustained?

17           MS. LEONARD:  It depends on now you view the damages.

18           THE COURT:  Well, let's factor out the attorney fees,

19   point one.

20           MS. LEONARD:  Let's look at -- let's look at -- you

21   asked about cases -- ratios in cases that we know of.

22           We have the **Williams** case, a 12.3-to-1.  That's the

23   **Angela Williams** case out of Florida.  And that was sustained

24   by the trial court.

25           THE COURT:  And what became of that verdict?

1          MS. LEONARD:  I believe the case settled.

2          THE COURT:  Okay.

3          MS. LEONARD:  It did not go up on appeal.

4          And we have the **Dixon-Rollins** case, nine-to-one.

5          I think the reprehensibility factors, though, and

6     the -- warrant a higher -- more than a single-digit ratio.

7     And I also think the damages are bigger than 180,000 for you

8     to consider when -- when you make a ratio determination.

9          THE COURT:  Why do you say that?

10         MS. LEONARD:  Because of the potential harm factor

11    here.  The idea that this law violation could have gone on for

12    a long time.

13         THE COURT:  But it didn't.

14         MS. LEONARD:  It didn't.  But it could have.  And

15    that's part of, I think, what -- in **TXO**, that was a

16    consideration for the Court.  What about the potential loss of

17    royalties if **TXO**'s scheme had succeeded?

18         You know, in the **TXO** case, the little guy had

19    already gotten protection with a declare -- defending a

20    declaratory judgment order before going into court to sue for

21    slander of title, in West Virginia.

22         So there was no damages beyond their -- their

23    litigation defense damages.  Right?

24         But the court was willing to consider the potential

25    harm to this defendant if the scheme had succeeded.  And that

50

1    was a stream of royalties over many years.  It was worth a

2    lot of money.

3            And that was one way the Court analyzed the

4    relationship between the harm and the punitive damage award,

5    which was quite large.  That's at page 462 of the **TXO**

6    decision.

7            THE COURT:  Is there anything else you wanted to add?

8            MS. LEONARD:  Thank you, your Honor.

9            THE COURT:  Thank you.

10           Ms. Sumner, anything else?

11           MS. SUMNER:  Yes, your Honor, if I may.

12           THE COURT:  Sure.  You're here.  I'm all ears.

13           MS. SUMNER:  Thank you.

14           I do -- I would like to respond to several comments.

15   One is the repeated conduct issue.

16           I think plaintiff's counsel is conflating the

17   concept of what should be considered for purposes of repeated

18   conduct as one of the reprehensibility factors and what

19   should be considered when looking at appropriate ratios.  The

20   idea of -- of bringing in additional evidence outside the

21   record in order to determine whether there was

22   reprehensibility and repeated conduct is entirely

23   inappropriate.

24           And if -- if what they would like to do is to hold

25   an evidentiary hearing and open it up for evidence outside

1    the record, we're going way beyond a motion that is a matter

2    of law and way beyond the Supreme Court's analysis of -- in

3    terms of reducing the punitive damages award.

4            THE COURT:  Well, I -- I think I agree with what

5    you're saying, which is that to the extent I'm to consider at

6    all the decisions made in other proceedings for purposes of

7    evaluating the question of ratios, that's appropriate.

8            If that evidence has been submitted and defendant

9    wants an opportunity to respond to it with additional

10   evidence, that -- that can be done.

11           If the point is that it's not appropriate for the

12   Court to consider extra-record evidence in evaluating

13   reprehensibility, I think I agree with that.  We deal with

14   what the evidence was at trial.

15           But when I'm asked to compare, you compare to what's

16   relevant.  And that could be what the FTC has done.  That

17   could be what other courts have done.  That's why I'm still

18   asking, What are you finding in the case law?  So --

19           MS. SUMNER:  And I -- I think I mostly agree with what

20   you're saying, your Honor, until we start moving away from case

21   law.

22           When we get into declarations that don't provide an

23   opportunity to distinguish matters -- like, for example, the

24   **Williams** case -- I do agree --

25           THE COURT:  You're not hearing me.  To the extent you

1    want to supplement the record on behalf of your client with

2    respect to so-called extra-record evidence the plaintiff has

3    provided, knowing that I'm going to consider it in the context

4    of ratios and the third **Gore** guidepost, you may do that.

5          MS. SUMNER:  And -- okay.  And, your Honor, we may

6    like to do that, given --

7          THE COURT:  Well, you're going to make a decision, if

8    you want to do that, today because this case has been pending

9    quite a while and I'm getting close to resolving it.  So if you

10   want a brief opportunity to add your comment to their

11   commentary about ratios and the third guidepost, you can do

12   that.

13         MS. SUMNER:  Then, your Honor, we would like that

14   opportunity.  Thank you.

15         THE COURT:  Fair enough.

16         MS. SUMNER:  The -- several other comments I would

17   like to respond to, and that is the continued accusation that

18   Equifax is unwilling to change its behavior.  That is entirely

19   inconsistent with the record that -- of evidence that was put

20   in at trial.

21         Your Honor heard testimony from Equifax's

22   representatives, as well as the expert, about the many

23   changes that Equifax has implemented over a long period of

24   time and specifically with respect to the issues that ebb --

25   that were in evidence in this case.

1          Equifax did not ignore the problem with respect to

2    Ms. Miller, once it recognized the confusion at the agent

3    level.

4          And, in fact, Ms. Mixon testified here in this

5    courtroom about steps that she took to try to address that

6    confusion because of this particular circumstance.  So it's

7    unfair for them to stand here today and argue that Equifax is

8    unwilling to change.  That is not consistent with the record.

9          THE COURT:  All right.  Is there anything else you

10   wanted to add?

11         MS. SUMNER:  Yes, your Honor.

12         THE COURT:  Go ahead.

13         MS. SUMNER:  I think the -- the citation to Oregon

14   state law concerning adding new evidence is not relevant for

15   this proceeding.

16         THE COURT:  I agree.

17         MS. SUMNER:  And then I -- your Honor, with respect to

18   this issue of trickery and deceit, I -- I think that counsel is

19   talking out of both sides of -- of her mouth here because we

20   had lengthy discussion during the trial about the punitive

21   damages jury instruction.  And it was in fact Equifax's desire

22   to have an instruction that showed that punitives involved a

23   much higher degree of -- of -- of malice and deceit and

24   intentional conduct, although it could also be recklessness.

25         And, for now, for them to argue that there was that

1    type of intent in order to support the reprehensibility

2    guideposts, I think, is entirely inconsistent with what was

3    represented at trial.

4         Your Honor, I -- with respect to injury, I would --

5    I would ask you to take a look at the **Bach** decisions because

6    there the court made clear that FC -- FCRA violations had the

7    potential for economic injury only, which would include

8    emotional distress in the economic realm, not physical harm.

9    So to try to push the emotional distress into a somehow

10   physical injury is inconsistent with the case law.

11        Responding briefly to the comments about Evan

12   Hendricks' testimony in suggesting that because he made a

13   very broad conclusory comment that other consumers disputed

14   inaccurate information that was not corrected, that covers an

15   enormous number of potential policies and procedures and a

16   wide variety of factual circumstances that could be entirely

17   different from what was at issue in this trial.  And so,

18   again, I do not think that would support the **Gore** guideposts.

19        As to the comment that the jury's verdict should be

20   entitled to deference, I think it is clear from the **State**

21   **Farm** decision that an unconstitutional verdict is not

22   entitled to deference.  And that you don't start by look

23   being at the excessive award.  You start by looking at the

24   guideposts.

25        With respect to potential harm, your Honor, counsel

1    particularly asked you to take a look at the **TXO** case and --

2    to support that you should consider potential harm, and which

3    would mean going beyond the actual harm that the -- the

4    compensatory damages that the jury awarded.

5           That case focused on potential harm where there

6    was -- where there was not any real actual harm.

7           So the point there was that the Court found that,

8    for example, if the wrongful plan doesn't actually succeed,

9    then it may be appropriate to look at potential harm.

10          That is not the case here.  There -- there was

11   actual harm.  The plaintiffs spent an enormous amount of time

12   putting evidence up to prove that harm, and the jury awarded

13   compensatory damages.  So that -- that case does not apply to

14   the context here.

15          With respect to attorney's fees, just two comments:

16   One, the **Gore** case, 1996, was before **State Farm**, 2003.  If

17   the Supreme Court had intended to consider attorney fees at

18   that point, it certainly had the opportunity to do that.

19          It didn't when the case was remanded to Utah.  Utah

20   Supreme Court specifically found that the attorney fee

21   measure should not be considered in that **State Farm** would not

22   support that.

23          With respect to the comments about the FTC, this is

24   not about the fact that the FTC simply didn't act.  There was

25   testimony during trial about the fact that the FTC has

1    reported and -- information to support the type of matching

2    process that the CRAs -- CRAs use.

3              In terms of deterrence and this whole concept of

4    wealth matters, juries should not punish defendants for who

5    they are, as opposed to what they did.  And **State Farm** --

6              THE COURT:  Yet we are, as a matter of law, required

7    to instruct the jury to take into account the wealth of the

8    defendant in determining how much is necessary for punishment.

9              MS. SUMNER:  I recognize that.  But the Supreme Court

10   also found in **State Farm** that massive wealth cannot justify an

11   otherwise unconstitutional punitive award, and I feel like that

12   is what plaintiff's --

13             THE COURT:  And it's the "and otherwise

14   unconstitutional" part of the phrase that I guess bears

15   focusing on.

16             Wealth does matter, but it matters in a way that has

17   to balance in the context of the nature of the harm, the

18   nature of the defendant's conduct.  And we come back, I

19   think, in the end to the undisputed rule that

20   reprehensibility is the most important factor in the -- in

21   the balance.

22             MS. SUMNER:  Finally, your Honor, I would just like to

23   also point out -- and this, again, is in the record -- Equifax

24   doesn't profit from inaccuracies.  Equifax's business model

25   depends on providing accurate information.

1          So there is no reason for Equifax to -- to ignore

2    inaccuracies.  In fact, the procedure is to try to address

3    all inaccuracies to the extent possible.

4          Finally, your Honor, I -- I believe that if -- if

5    your Honor were to take the suggestion of plaintiff's counsel

6    and look at a 9-to-1 or a 12-to-1 ratio, we believe under the

7    guidepost analysis that that would be unconstitutional.

8          THE COURT:  You mean in summary, or with respect to

9    any particular factor being weighed too heavily?

10         MS. SUMNER:  Your Honor, in going through the

11   analysis, both with respect to, one, reprehensibility, I think

12   is in line with the majority of the cases, which are within the

13   low single-digit ratios, not consistent with the higher ratios;

14   like, for example, the -- the nine-to-one in **Planned**

15   **Parenthood**, or some of the other cases that -- or the polluted

16   pay cases.  So my -- my point being that if -- our view of

17   going through the constitutional analysis would put the

18   constitutional limit much lower.

19         THE COURT:  All right.

20         MS. SUMNER:  Thank you, your Honor.

21         THE COURT:  Thank you, Ms. Sumner.

22         Anything else?

23         MS. LEONARD:  Nothing, unless you have questions.

24         THE COURT:  I always have questions.  I just don't

25   think either -- either of you, as capable as you are, can

1    answer them.  So it's left to me to sort through this, and I

2    will do that.

3            Now, if you -- if Equifax wants to submit a

4    supplement in -- in further support of its Motion for

5    Reduction, that addresses only the additional factual

6    material that plaintiff provided, knowing that it is for the

7    purpose of the Court considering it in the second and third

8    of the **Gore** guidepost factors, you may to do that.  But you

9    need to do it rather soon because I want to get this motion

10   resolved.

11           I appreciate we're on the eve of the year-end

12   holidays.  So how about January 3rd?

13           MS. SUMNER:  May I beg you for slightly more time?

14           THE COURT:  I was going to say -- well, look, Counsel,

15   this isn't rocket science.

16           January 3rd is generous.  It was going to be Friday.

17           MS. SUMNER:  All right.  Well, given that, your Honor,

18   thank you.

19           THE COURT:  You're welcome.  And I don't think

20   plaintiff needs an opportunity to provide anything else since

21   plaintiff opened this door.

22           MS. LEONARD:  Okay.

23           THE COURT:  You've made your points.  You have all of

24   the data at your fingertips.  I have the benefit of the

25   argument.

1        So I'll take the motion formally under advisement on

2    January 3rd, or sooner if defendant's supplemental material

3    is received then.

4        Thank you, everybody.

5        Happy holidays.

6        MS. SUMNER:  Thank you, your Honor.

7        MR. JUSTIN BAXTER:  Thank you, Judge.

8        MS. SUMNER:  Happy holidays to you, too, your Honor.

9        MS. LEONARD:  Thank you, your Honor.

10       (Conclusion of proceedings.)

11

12

13                              --oOo--

14   I certify, by signing below, that the foregoing is a correct

15   transcript of the oral proceedings had in the above-entitled

16   matter this 26th day of December, 2013.  A transcript without

17   an original signature or conformed signature is not certified.

18   I further certify that the transcript fees and format comply

19   with those prescribed by the Court and the Judicial Conference

20   of the United States.

21       /S/ Amanda M. LeGore

22       _____

23       AMANDA M. LeGORE, RDR, CRR, FCRR, CE

24

25