IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JULIE MILLER,                                    3:11-CV-01231-BR

        Plaintiff,

                                                 OPINION AND ORDER

v.

EQUIFAX INFORMATION SERVICES,
LLC.,

        Defendant.


**MICHAEL C. BAXTER**
**JUSTIN M. BAXTER**
**KACHELLE A. BAXTER**
Baxter & Baxter, LLP
8835 S.W. Canyon Lane
Suite 130
Portland, OR 97242
(503) 297-9031

**MAUREEN LEONARD**
P.O. Box 42210
Portland, OR 97242
(503) 224-0212

        Attorneys for Plaintiffs


1  - OPINION AND ORDER

**IAN E. SMITH**
**LEWIS P. PERLING**
**PHYLLIS B. SUMNER**
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA 30309
(404) 572-4600

**JEFFERY M. EDELSON**
Markowitz Herbold Glade & Mehlhaf, PC
1211 S.W. Fifth Avenue
Suite 3000
Portland, OR 97204
(503) 295-3085

   Attorneys for Defendant

**BROWN, Judge.**

  This matter comes before the Court on Defendant Equifax Information Services, LLC's Motion (#91) for Reduction of Punitive Damages.

  For the reasons that follow, the Court **GRANTS** Equifax's Motion (#91) for Reduction of Punitive Damages as herein specified and **REDUCES** the jury's punitive-damages award from $18,420,000 to **$1,620,000,** which produces a 9-to-1 ratio between the amount of punitive damages the Court finds constitutionally permissible on this record and the $180,000 of compensatory damages the jury awarded.

**BACKGROUND**

  Plaintiff Julie Miller brought this action for actual damages and punitive damages pursuant to the Fair Credit

2  - OPINION AND ORDER

Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq*. Miller alleged
Equifax negligently violated FCRA by (1) failing to follow
reasonable procedures to assure the maximum possible accuracy of
the information contained in her credit report; (2) failing to
conduct a reasonable reinvestigation of disputed information in
Miller's credit file after she notified Equifax of the disputed
information; (3) failing to disclose to Miller the entire
contents of her credit file upon her request; and (4) furnishing
Miller's consumer credit report to persons or businesses who did
not have a permissible purpose to receive her credit report.

In particular, Miller sought "actual damages" damages under
§ 1681n to compensate her for emotional distress, including
humiliation, mental anguish, loss of reputation, invasion of
privacy, and fear of lost credit opportunities that she alleged
she sustained as a result of Equifax's FCRA violations. Miller
also contended Equifax acted willfully in violating her rights
under FCRA, and, accordingly, Miller sought an award of punitive
damages under § 1681n.

During the three-day jury trial beginning July 24, 2013, it
was undisputed that Equifax merged Miller's credit file with the
file of a different person who had the same name and a similar
Social Security number as Miller but who lived in a different
state and who had a negative credit record and a significantly
different credit record than Miller had. According to Margaret

Leslie, Vice President of Equifax's Technology Area, this kind of
file-merger was a "reasonable combination" that occurs with
"regularity."  Trial Transcript (Tr.) 583.

    When Miller learned about the erroneous merger of her file,
she reported the problem to Equifax and began a two-year saga to
resolve it.  Despite Miller's repeated notices to Equifax and
Equifax's numerous reports to Miller that it had investigated her
complaints, Equifax did not correct the problem.  Tr. 152-53.  In
fact, Equifax did not take steps to correct the information in
Miller's file until she filed this action after her two years of
efforts proved fruitless.  Nevertheless, Equifax argued to the
jury that taking corrective steps only after a civil action is
filed complied with its "policy."  Tr. 530.

    During the two years that Miller attempted to get Equifax to
fix her file, she was frustrated, overwhelmed, angry, depressed,
humiliated, fearful about misuse of her identity, and concerned
that her reputation would be damaged as a result of Equifax's
conduct.  Tr. 152-54, 156-58.  Miller did not, however, seek
medical or mental-health services for these issues.

    The jury had the benefit of two expert witnesses to assist
them in assessing Equifax's alleged FCRA violations:  Evan
Hendricks, Miller's expert, testified about other mixed-file
cases in which juries had found Equifax violated FCRA, and Anne
Fortney, Equifax's expert, testified that "only" one-to-two

percent of consumer files contain inaccurate information, which means approximately two-to-four million Americans have inaccurate information in their credit reports because of mixed files. Tr. 306-07, 384.

The jury returned a verdict in favor of Miller and found Equifax had negligently and willfully violated FCRA in one or more of the ways Miller alleged.  The jury awarded Miller $180,000 in compensatory damages and $18,400,000 in punitive damages.

During oral argument on Equifax's Motion for Reduction of Punitive Damages on December 20, 2013, Equifax took issue with the "extra-record" evidence that Miller submitted in support of her Opposition (#93) to the Motion, which included copies of judgments in a number of FCRA cases and a declaration from a plaintiff's attorneys in one of those cases.  To ensure both parties had the same opportunity to complete the record on this Motion, the Court granted Equifax leave to file a Supplemental Brief limited to arguments the Court should consider as to the appropriate punitive-damages ratio and the third *Gore* guidepost. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  Equifax filed its Supplemental Brief (#103) on January 3, 2014, but Miller filed a Motion (#104) to Strike that submission on January 9, 2014, on the grounds that it exceeded the scope of the Court's instructions and prejudiced Miller.

5  - OPINION AND ORDER

In its Supplemental Brief, Equifax cites a number of FCRA cases to support its argument that the Court should adopt a 1:1 ratio of punitive to compensatory damages.  In support of its position that the available civil penalties do not support the jury's punitive-damages award, Equifax also submitted a December 2004 Federal Trade Commission (FTC) report regarding the FTC's approval of Equifax's process for matching consumers to credit reports.

The Court has considered Equifax's supplemental arguments and materials and concludes they do not exceed the scope of the Court's instructions.  In any event, the Court notes Miller has not been prejudiced by Equifax's supplemental filing in light of the Court's conclusion that a ratio significantly greater than 1:1 is warranted and that, as explained below, the Court concludes the third *Gore* guidepost is not helpful in the context of this case.

Accordingly, the Court **DENIES** Plaintiff's Motion (#104) to Strike.

## STANDARDS

A punitive-damages award that is grossly excessive violates "[e]lementary notions of fairness enshrined in our constitutional jurisprudence."  *Gore*, 517 U.S. at 574.  In *Gore* the Supreme Court set forth three "guideposts" for determining excessiveness

of a punitive-damages award:   (1) "the degree of reprehensibility
of the defendant's conduct"; (2) the "ratio to the actual harm
inflicted on the plaintiff"; and (3) the "civil or criminal
penalties that could be imposed for comparable misconduct." *Id.*
at 575-83.  Although these guideposts provide an analytical
framework, they must be viewed in the context of the case and
need not be "rigidly or exclusively applied." *In re Exxon
Valdez*, 472 F.3d 600, 613 (9th Cir. 2006).


## DISCUSSION

In its Motion for Reduction of Punitive Damages, Equifax
moves the Court to reduce the jury's punitive-damages award "to
within constitutional limits as a matter of law."  Thus, the
Court turns first to the *Gore* Guideposts.

## I.   The First *Gore* Guidepost:  Reprehensibility

It is well-established that the most important of the three
*Gore* guideposts is the reprehensibility of the defendant's
conduct.  *Gore*, 517 U.S. at 575 ("Perhaps the most important
indicium of the reasonableness of a punitive damages award is the
degree of reprehensibility of the defendant's conduct.").  When
determining the reprehensibility of a defendant's conduct for
purposes of evaluating the constitutionality of a punitive-
damages award, courts should consider whether

(1)  the harm caused was physical as opposed to

economic;

(2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

(3) the target of the conduct had financial vulnerability;

(4) the conduct involved repeated actions or was an isolated incident; and

(5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

## A.   Physical v. Economic Harm

When the harm to the plaintiff arises from "a transaction in the economic realm" and "not from some physical assault or trauma" and "there are no physical injuries," this subfactor weighs against finding the defendant's conduct was sufficiently reprehensible to warrant significant punitive damages. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). When the plaintiff suffers both economic, emotional, and psychological harm, however, some courts have found this subfactor weighs in favor of finding the defendant's conduct was reprehensible and, therefore, warrants an award of punitive damages. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008)(The plaintiff, who brought an employment-discrimination case, sought counseling as a result of emotional distress, and the court found "[o]ne factor that suggests that the misconduct of [the defendant] was reprehensible is that [the plaintiff] suffered both economic harm and emotional and

8  - OPINION AND ORDER

psychological harm.").

To support its argument that this reprehensibility subfactor weighs in its favor, Equifax relies heavily on *Bach v. First Union National Bank*, 149 F. App'x 354, 362 (6th Cir. 2005)(*Bach I*). In *Bach I* the plaintiff sued the defendant bank for FCRA violations. The trial evidence established the plaintiff lost credit opportunities as a result of the defendant's conduct in the form of a second denial of a mortgage application and a denial of a credit-card application, and she sustained injuries in the form of pain, suffering, and humiliation. When assessing the reprehensibility of the defendant's conduct, the court found emotional distress resulting from the alleged harm was "not the sort of physical injury the *State Farm* case contemplates, and thus, the first [reprehensibility subfactor, was] not present." *Id.* at 364. *See also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003)("Although the plaintiffs in *State Farm* alleged emotional distress, the reprehensibility of the fraudulent business practices at issue . . . is different in kind from the reprehensibility of intentional discrimination on the basis of race or ethnicity.").

Here Equifax emphasizes its conduct did not cause Miller to suffer any physical harm and the emotional distress she described to the jury arose from a purely economic transaction. Thus, Equifax asserts this case is like *Bach I*, and this Court should

follow the Sixth Circuit's analysis in *Bach I* and conclude the
reprehensibility factor does not apply because the jury's verdict
for compensatory damages was for "emotional distress from an
economic harm."

In response Miller relies on the Eleventh Circuit's analysis
in *Goldsmith* in which the court found "emotional and
psychological harm" in an employment discrimination case weighed
in favor of the reprehensibility subfactor.  Miller asserts she
too suffered "personal injuries in the form of psychic harm,"
and, as already noted, the jury heard evidence that "for two
years she was frustrated, overwhelmed, angry, depressed,
humiliated, fearful about misuse of her identify [*sic*], and
concerned for her damaged reputation."  Pl.'s Opp'n Mem. at 9.
Unlike the plaintiff in *Goldsmith* who sought medical attention
for her emotional distress, however, the Court notes there was
not any trial evidence in this case that Miller sought such
treatment for her emotional distress.

In *White v Ford Motor Co.* the Ninth Circuit reviewed the
"hallmarks of particularly reprehensible conduct" from *Gore*:

> Nonviolent offenses are less blameworthy than those that
> involve violence or the threat of violence.  "Similarly,
> 'trickery and deceit' are more reprehensible than
> negligence."  *Conduct that causes economic harm alone is
> less reprehensible than conduct that injures (or risks
> injuring) the health and safety of others. Id.*  "[R]epeated
> misconduct is more reprehensible than an individual instance
> of malfeasance."

312 F.3d 998, 1029 (9th Cir. 2002)(citing *Gore*, 517 U.S. at 576-

10 - OPINION AND ORDER

77)(emphasis added)).  Because the Court has not found any Ninth Circuit case in which the court concludes emotional injuries arising in an "economic realm" are categorically insufficient as a matter of law to preclude a finding of reprehensibility, the Court declines Equifax's invitation to apply the Sixth Circuit's reasoning in *Bach I* to this matter.  Instead the Court expects the Ninth Circuit would recognize emotional injuries are on a continuum of harm affecting at least the "health and safety of others" and that conduct causing such injuries, even in the absence of bodily harm, is, in fact, more reprehensible than conduct that causes "economic harm alone."

Thus, for purposes of this reprehensibility subfactor, the Court concludes Miller's emotional injuries are sufficient to trigger a reprehensibility finding, and, therefore, the Court concludes this reprehensibility subfactor weighs in Miller's favor when considering the record as a whole.

**B.    Indifference to or a Reckless Disregard of the Health or Safety of Others**

Equifax argues this reprehensibility subfactor weighs against Miller because Equifax did not act in reckless disregard for anyone's health or safety because its conduct occurred in the "economic realm."  According to Equifax, any potential harm to be expected from the violations that Miller asserted would have been purely economic, and, as a result, its conduct should not be viewed as reckless.  *See State Farm*, 538 U.S. at 426.  *See also*

11 - OPINION AND ORDER

*Bach I*, 149 F. App'x at 364.  Although the Court agrees FCRA violations are most likely to cause primarily economic harm, the Court has already found Miller's emotional-distress injuries are on the continuum of harm affecting the "health and safety of others," and, therefore, the fact that she sustained "only" emotional and non-economic harm does not rule out a conclusion that Equifax acted in reckless disregard of the "health and safety of others."

When evaluating this subfactor, Miller first asserts the Court should consider "the possible harm to other victims that might have resulted if similar future behavior were not deterred."  *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460-61 (1993)(In a slander-of-title case, the Court found the defendant's "pattern of behavior 'could potentially cause millions of dollars in damages to other victims.'").  *See also Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007) ("[C]onduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few.  And a jury consequently may take this fact into account in determining reprehensibility.").

Miller also argues Equifax's recklessness was proven by trial evidence that showed Equifax's mixed-file errors were not rare or isolated problems, and, in fact, Equifax's industry "matching" criteria produced errors in two-to-four million

12 - OPINION AND ORDER

consumer files.  As noted, Miller's expert testified about cases in which juries returned verdicts against Equifax based on allegations of mixed files, and Equifax's own representative testified it is Equifax's policy to investigate and to correct files only after a lawsuit is filed.  Miller contends the jury could have regarded Miller as an "'exemplar' of the harm that Equifax is prepared to inflict on many other consumers."  Pl.'s Opp'n Mem. at 10.

As noted, the jury found Equifax acted willfully when it violated Miller's FCRA rights.  The Court agrees with Miller that the jury's Verdict supports a conclusion that Equifax's conduct was more than merely indifferent to Miller's rights and, in fact, resembled reckless disregard of those rights in light of the fact that Miller's repeated efforts over two years to get Equifax to correct its errors went completely unheeded.

Accordingly, the Court concludes this subfactor weighs in favor of Miller.

### C.    Financial Vulnerability

Equifax argues Miller was not financially vulnerable because she is not elderly, poor, or enfeebled: "[S]he is a middle-aged woman who is employed, earned a college degree, owns her own home, . . . is active in her community," and "was knowledgeable about her rights, represented by counsel, and exercised those rights - both by complaining to Equifax and also by filing suit

13 - OPINION AND ORDER

against other consumer credit reporting agencies." Def.'s Mem. at 8. Equifax also contends this subfactor does not weigh against it because it did not intentionally target Miller.

When a plaintiff is of "limited means" and is "subject to the recklessness or malice of a large corporate bureaucracy," this subfactor is satisfied. *Arizona v. ASARCO, LLC,* 733 F.3d 882, 887 (9th Cir. 2013). Contrary to Equifax's contention, however, this subfactor does not require the defendant to have targeted the plaintiff. *See Bach I,* 149 F. App'x at 365 ("[This] factor . . . does not require that the defendant target the victim specifically because of her vulnerability, but rather requires only that the target be financially vulnerable."). *See also Dixon-Rollins v. Experian Info. Solutions, Inc.,* 753 F. Supp. 2d 452, 465 (E.D. Pa. 2010). According to Miller, this subfactor has been satisfied because Miller "had limited resources compared to Equifax, and Equifax's errors and intransigence destroyed her access to credit and rendered her financially vulnerable." Pl.'s Mem. at 9. In addition, Miller established at trial that she delayed the refinancing of her home while interest rates were low and did not apply for a loan to help her disabled brother due to the errors in her credit file. Tr. 155-56.

Miller compares her situation to that of the plaintiff in *Saunders v. Branch Banking & Tr. Co. of VA,* 526 F.3d 142 (4th

Cir. 2008).  In *Saunders* the plaintiff prevailed on her claims against the defendant bank for willfully breaching its FCRA obligations.  The Fourth Circuit found the plaintiff was financially vulnerable compared to the bank:  "[The plaintiff] has a modest income and limited resources compared to [the defendant].  Furthermore, [the defendant's] conduct rendered [the plaintiff] significantly more financially vulnerable."  *Id.* at 153.  The court in *Dixon-Rollins* reached a similar conclusion:  "[B]ecause Trans Union was well aware of [the plaintiff's] specific disputes and repeatedly failed to conduct proper reinvestigations with respect to them . . . .  We shall take into account [the plaintiff's] financial vulnerability in our reprehensibility analysis."  753 F. Supp. 2d at 465.

In light of the significant disparity between the parties' financial resources in this case and the fact that Miller was subjected to two years of Equifax's repetitive, wrongful conduct that violated FCRA and affected Miller's credit and her financial condition, the Court concludes this subfactor weighs in favor of Miller.

**D.  Repeated Actions or an Isolated Incident**

In *Gore* the Court noted:  "[P]ersist[ing] in a course of conduct after it had been adjudged unlawful," acting in bad faith, and making deliberate false statements all increase the reprehensibility of defendant's conduct.  517 U.S. at 579.

Equifax argues even if Miller encountered the same conduct repeatedly and even if juries may have returned verdicts against Equifax in other cases involving mixed files as Miller's expert testified, Equifax's conduct in this instance is not considered "repetitive" within the meaning of *State Farm* and *Gore* because it involved only "isolated" violations of FCRA as to Miller personally, and, in any event, there was not any specific evidence offered as to similar conduct by Equifax in relation to other parties.

As noted by the Ninth Circuit in its recent decision in *ASARCO*, however, this subfactor is satisfied when the defendant's wrongful conduct is repetitive and directed solely at the plaintiff, and, therefore, such evidence as to similar conduct in relation to others is not necessary. *ASARCO*, 733 F.3d at 887. Specifically, in *ASARCO* the court found this subfactor was satisfied, and "there was nothing 'isolated' about the [defendant's] conduct" when it "involved repeated harassment" and "cruel treatment [of the plaintiff] . . . over a lengthy period" and the plaintiff's many complaints "went repeatedly unaddressed." *Id.*

Here, as in *ASARCO*, Equifax's conduct was repetitive and Miller's repeated complaints went unaddressed for two years until she filed this lawsuit. Accordingly, the Court concludes this subfactor weighs in favor of Miller.

16 - OPINION AND ORDER

E.    **Intentional Malice, Trickery, or Deceit or Mere Accident**

Equifax also argues its conduct was not the product of "intentional malice, trickery, or deceit."  In particular, Equifax relies on the Court's decision at trial not to instruct the jury on malice because Miller had not introduced evidence of "actual ill will directed to the plaintiff, or spite, or something that was directed to her to purposefully injure her." Tr. 217.  Although Miller does not dispute this jury-instruction analysis, she, nevertheless, argues this subfactor is satisfied because Equifax consistently gave Miller false information in response to her complaints and repeatedly gave her incorrect information about the extent to which Equifax had investigated and resolved her complaints.

In light of the Court's trial rulings that Miller did not establish there was a jury question as to whether Equifax acted with actual ill will towards her, the Court concludes this subfactor weighs in favor of Equifax.

F.    **Summary of Analysis under the First *Gore* Guidepost**

As noted, only one of the first *Gore* guidepost subfactors weighs in favor of Equifax (*i.e.*, the lack of intentional malice, trickery or deceit), and all of the other subfactors weigh in Miller's favor.  In particular, the Court finds Miller's emotional injuries are sufficient to trigger a reprehensibility finding; Equifax's conduct was not isolated in that Equifax

17 - OPINION AND ORDER

repeatedly ignored Miller's complaints over a period of two years; Equifax acted with more than mere indifference to the harm caused by its conduct; and Miller was a financially vulnerable victim.

Accordingly, the Court concludes Equifax's conduct was sufficiently reprehensible to support a substantial award of punitive damages.

## II.  Second *Gore* Guidepost:  Ratio to Actual Harm

As noted by the Ninth Circuit in *ASARCO*:

> The Supreme Court has noted that "[punitive]
> damages must bear a reasonable relationship
> to compensatory damages." *Gore*, 517 U.S. at
> 580 (internal citations and quotation marks
> omitted).  Further, the Court has stated that
> "few awards exceeding a single-digit ratio
> between punitive and compensatory damages
> . . . will satisfy due process." *State Farm*,
> 538 U.S. at 425, 123 S. Ct. 1513.  Nonethe-
> less, the Court has steadfastly refused to
> create a bright-line ratio and has emphasized
> that a higher ratio is justified when "a
> particularly egregious act has resulted in
> only a small amount of economic damages."

733 F.3d at 888.  "Although single digit multipliers are more likely to be constitutional, a greater ratio may be appropriate where an egregious act results in only a small amount of economic damages." *Dixon-Rollins*, 753 F. Supp. 2d at 466 (citing *State Farm*, 538 U.S. at 425).  "Ultimately, the appropriate ratio must be based on the particular facts and circumstances of the defendant's conduct and the plaintiff's injury." *Id.*

In cases involving FCRA violations, courts have determined

18 - OPINION AND ORDER

ratios exceeding 1:1 are constitutional.  For example, in
*Dixon-Rollins* the court characterized as "modest" the jury's
$30,000 compensatory damages award for non physical, emotional-
distress injuries arising from willful FCRA violations, but, in
reducing the punitive-damages award from a 16:1 ratio, the court
chose a 9:1 ratio, primarily because of "recidivist" conduct on
the part of the defendant.  753 F. Supp. 2d 452, 467 (E.D. Pa.
2010).  *See also Cortez v. Trans Union*, LLC, 617 F.3d 688, 723-24
(3d Cir. 2010)("An award that is twice the compensatory damages
award falls well within the Supreme Court's standard for ordinary
cases of a single-digit ratio"); *Mullins v. Equifax Info. Servs.,
LLC*, No. 3:05-cv-888, 2007 WL 2471080, at *7 (E.D. Va. 2007)("[A]
five-to-one punitive damages ratio is well within the
constitutionally permissible ratios.").

Equifax emphasizes there is not a bright-line rule for the
permissible ratio and insists the 102:1 ratio of punitive damages
to compensatory damages in this case is "indefensible."  Equifax
relies on *Bach v. First Union Nat. Bank (Bach II)* in which the
court found "alarming" the punitive-damages award of $2,268,600,
which was 6.6 times the compensatory-damages award of $400,000.
486 F.3d 150, 156 (6th Cir. 2007).  Equifax also relies on *Paul
v. Asbury Automotive Group, LLC*, a workplace harassment case
based on race in which the court reduced the compensatory damages
for each plaintiff to $150,000 and the multi-million dollar

19 - OPINION AND ORDER

punitive-damages award to $150,000 (a 1:1 ratio) on the basis that "$150,000 in compensatory damages [is] substantial, particularly in light of the fact that plaintiffs suffered no long-term effects and the damages are based on emotional harm, something not easily quantified."  No. 3:06-cv-01603-KI, 2009 WL 188592, at *11 (D. Or. Jan. 23, 2009)(case settled at trial level).  Equifax argues a 1:1 ratio is appropriate here because Miller, like the plaintiff in *Paul*, did not suffer long-term effects from her experiences with Equifax and was awarded compensatory damages based entirely on emotional distress and not on out-of-pocket losses.

Miller, on the other hand, argues there are a number of considerations in this case that justify a ratio higher than 1:1, including the fact that Equifax has numerous opportunities as a credit-reporting agency to jeopardize a consumer's credit status. Accordingly, Miller argues the penalty in this case should be a reflection of "the public wrong rather than the private injury." *See St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919).  *See also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 494 (2008)("Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect.")(citing *Gore*, 517 U.S. at 582); *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 506 (4th Cir. 2007)(FCRA violations, "while unquestionably harmful, are difficult to

translate into monetary terms.").

Miller also contends the Court should take into account the potential harm that Miller would have faced if she had not been able to find an attorney to represent her and had not filed this lawsuit after two years of attempting to have Equifax correct the errors in her credit file. Because this point raises speculative issues, however, the Court does not find it helpful.

Finally, for purposes of the ratio analysis of her "actual damages," Miller asks the Court to include the attorneys' fees and litigation costs she incurred, which total approximately $250,000, but the Court notes there is not any clear authority on this point. *Compare Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 237 (3d Cir. 2005)("an award of attorney fees and costs . . . is an apt term in the *Gore/Campbell* ratio analysis") *with Sun Pacific Farming Co-op., Inc. v. Sun World Intern., Inc.*, No. 1:01-cv-61022009, 2009 WL 900751, at *7 (E.D. Cal. 2009)("No consideration may be given to the amount of costs recovered, attorneys fees, which were not recovered, or any sum other than the compensatory damages actually awarded to calculate the *State Farm* ratio."). Here the Court concludes the appropriate denominator on which to determine a constitutionally-permissible punitive-damages ratio is the amount of actual damages the jury awarded Miller to compensate her for the harm she suffered. Accordingly, the Court declines to include the

attorneys' fees and costs incurred by Miller in the ratio analysis.

In any event, there is not any question that the 102:1 ratio of punitive damages to compensatory damages awarded by the jury in this case is constitutionally excessive and inconsistent with due process. Accordingly, the Court must reduce the award of punitive damages to bring it within constitutional limits.

## III. Third *Gore* Guidepost: Penalties that Could Be Imposed

In a FCRA case the third *Gore* guidepost is not particularly helpful to the due-process analysis of a punitive-damages award. "The maximum civil penalty the FTC can pursue for knowing violations of the FCRA is $2,500 per violation. 15 U.S.C. § 1681s(a)(2)(A). However, because this limit does not apply to actions brought by private citizens, the third guidepost is not particularly helpful in assessing the constitutionality of punitive damages awards under the FCRA." *Dixon-Rollins*, 753 F. Supp. 2d at 466 (citing *Cortez*, 617 F.3d at 724). *See also Bach I*, 149 F. App'x at 367.

Accordingly, the Court concludes this guidepost does not provide any assistance in the Court's analysis of the constitutionality of the punitive-damages award in this case.

## IV. Deterrence

When determining the appropriateness of a punitive-damages award in a FCRA case, the Court must consider not only the three

22 - OPINION AND ORDER

*Gore* guideposts, but also the effect the punitive-damages award will have on deterring future misconduct.

## A.    Considerations

"The threat of punitive damages under § 1681n of the FCRA is the primary factor deterring erroneous reporting by the credit reporting industry." *Brim v. Midland Cred. Mgmt.*, 795 F. Supp. 2d 1255, 1265 (N.D. Ala. 2011)(citing *Yohay v. City of Alexandria Employees Cred. Union*, 827 F.2d 967, 972 (4th Cir. 1987)).  In *Brim* the court upheld a punitive-damages award of $623,180.00 even though the plaintiff had been awarded only $100,000 in compensatory damages.  The *Brim* court reasoned:  "Any reduction . . . of an award that was decided by a jury who were fully instructed regarding all relevant aspects and the economic ability (substantial net worth) of the offending defendant to withstand such an award while forcing it to acknowledge the award's legitimate punitive and deterrent purpose, would be purely arbitrary."  *Id.*

In *Bains LLC v. ARCO Products Company* the Ninth Circuit explained the extent to which a defendant's wealth can be considered when determining the amount of punitive damages that will deter future conduct:

> A punitive damages award is supposed to sting so as to deter a defendant's reprehensible conduct, and juries have traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting.  But there are limits.

> "The wealth of a defendant cannot justify an
> otherwise unconstitutional punitive damages
> award," and "cannot make up for the failure
> of other factors, such as 'reprehensibility,'
> to constrain significantly an award that
> purports to punish a defendant's conduct."

405 F.3d 764, 777 (9th Cir. 2005)(quoting *State Farm*, 538 U.S. at
427-28).

### B.    Analysis

Here Equifax's worth is substantial:  It has a net operating
revenue of close to one billion dollars.  A punitive-damages
award that is sufficient to "sting" economically would,
therefore, exceed constitutional limits in this FCRA case.
Nevertheless, the Court must determine a punitive-damages amount
that is high enough to serve as the deterrence intended in FCRA's
punitive-damages provision while, at the same time, ensuring the
award comports with due-process requirements, which, in essence,
means it must fall within a single-digit ratio.

As noted, the Court has concluded under the first *Gore*
guidepost that Equifax's conduct was sufficiently reprehensible
to justify a substantial award of punitive damages.  Certainly
the jury's 102:1 ratio, while constitutionally excessive,
nevertheless, conveys that message.  Moreover, although the Court
agrees with Equifax that the jury's $180,000 compensatory-damages
award is "substantial" in light of the fact that Miller did not
sustain any out-of-pocket losses or "physical injury," there is
not any reason to think that award is not supported by the

24 - OPINION AND ORDER

evidence or is inconsistent with the jury instruction to
compensate Miller "reasonably" for the real, but noneconomic,
harm she sustained as a result of Equifax's wrongful conduct.

The difficulty with Equifax's arguments in favor of a 1:1
ratio is that those arguments do not focus on Equifax's wrongful
behavior or the need to deter Equifax from future misconduct.
Instead, because the jury chose to award compensatory damages in
a "substantial" sum (consistent with the evidence and the law),
Equifax focuses on that amount and the fact this case arises in
an "economic realm" to argue that a 1:1 ratio is enough.  The
Court is not aware of any legal standard, however, that directs
it to reduce the awarded punitive damages to the lowest possible
amount that survives constitutional scrutiny.

On the other hand, the Court has not found any explicit
authority for the proposition that the Court should reduce an
excessive award to the highest amount within constitutional
limits.  Nevertheless, the Court agrees with the trial judge in
*Brim* that it would be arbitrary not to adopt a jury's punitive-
damages award to the extent that it is constitutional.

For purposes of this constitutional analysis and based on
the record as a whole, the Court concludes Equifax engaged in
reprehensible conduct that caused real harm to Miller; Equifax
should be punished financially for that wrongful conduct; and the
amount of the punitive-damages award, although within

25 - OPINION AND ORDER

constitutional limits, nevertheless, should be enough to deter Equifax and others similarly situated from repeating this type of conduct in the future.

For all of these reasons, the Court concludes it should reduce the jury's punitive-damages award to the highest single-digit ratio ordinarily accepted as within constitutional limits; that is, a 9:1 ratio of punitive damages to the compensatory damages that the jury awarded in this case.

Accordingly, the Court reduces the jury's punitive-damages award from $18,420,000 to $1,620,000 in order to reach a 9-to-1 ratio between the amount of punitive damages that the Court finds constitutionally permissible on this record and the $180,000 of compensatory damages the jury awarded.

## CONCLUSION

For these reasons, the Court **GRANTS** Equifax's Motion (#91) for Reduction of Punitive Damages as specified herein, **DENIES** Miller's Motion (#104) to Strike, and **REDUCES** the jury's punitive-damages award from $18,420,000 to **$1,620,000,** which reflects a 9-to-1 ratio between the amount of punitive damages the Court finds constitutionally permissible on this record and the $180,000 of compensatory damages the jury awarded.

The Court directs counsel to confer on an appropriate form of Judgment and to submit **no later than February 7, 2014,** a

26 - OPINION AND ORDER

stipulated form of Judgment for the Court's consideration.

If the parties are unable to agree on the form of Judgment, each party shall separately submit by the same deadline a proposed form of Judgment together with a concise explanation supporting that proposal.

IT IS SO ORDERED.

DATED this 29th day of January, 2014.

Anna J. Brown
ANNA J. BROWN
United States District Judge

27 - OPINION AND ORDER